# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN HISTORICAL ASSOCIATION,
400 A Street SE
Washington, DC 20003,

AMERICAN OVERSIGHT,
1030 15th Street NW, B255
Washington, DC 20005,

      Plaintiffs,

v.

DONALD TRUMP, in his official capacity as
President of the United States and in his personal
capacity,
1600 Pennsylvania Ave NW
Washington, DC 20500,

JAMES DAVID VANCE, in his official capacity as
Vice President of the United States,
1600 Pennsylvania Ave NW
Washington, DC 20500,

THE WHITE HOUSE OFFICE,
1600 Pennsylvania Avenue NW
Washington, DC 20500,

SUSAN WILES, in her official capacity as White
House Chief of Staff,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PHILIP C. DROEGE, in his official capacity as
Director of the Office of Records Management,
1650 17th St NW,
Washington, DC 20006,

NATIONAL SECURITY COUNCIL,
1600 Pennsylvania Ave NW
Washington, DC 20500,

CATHERINE KELLER, in her official capacity as
Executive Secretary of the National Security Council,

Civil Action No.

1600 Pennsylvania Ave NW
Washington, DC 20500.

HOMELAND SECURITY COUNCIL,
1600 Pennsylvania Ave NW
Washington, DC 20500,

STEPHEN MILLER, in his official capacity as
Homeland Security Advisor,
1600 Pennsylvania Ave NW
Washington, DC 20500,

COUNCIL ON ECONOMIC ADVISERS,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PIERRE YARED, in his official capacity as Acting
Chairman of the White House Council of Economic
Advisers,
1650 17th St NW
Washington, DC 20006,

EXECUTIVE RESIDENCE,
1600 Pennsylvania Ave NW
Washington, DC 20500,

ROBERT B. DOWNING, in his official capacity as
White House Chief Usher,
1600 Pennsylvania Ave NW
Washington, DC 20500,

PRESIDENT'S INTELLIGENCE ADVISORY
BOARD,
1600 Pennsylvania Ave NW
Washington, DC 20500,

DEVIN NUNES, in his official capacity as Chairman
of the President's Intelligence Advisory Board,
1600 Pennsylvania Ave NW
Washington, DC 20500,

OFFICE OF ADMINISTRATION,
1650 17th St NW
Washington, DC 20006,

2

JOSHUA FISHER, in his official capacity as
Director of the Office of Administration,
1650 17th St NW
Washington, DC 20006,

OFFICE OF THE VICE PRESIDENT,
1650 17th St NW
Washington, DC 20006,

JACOB RESES, in his official capacity as Chief of
Staff to the Vice President,
1650 17th St NW
Washington, DC 20006,

UNITED STATES DOGE SERVICE,
736 Jackson Pl NW
Washington, DC 20503,

AMY GLEASON, in her official capacity as Acting
Administrator of the United States DOGE Service,
736 Jackson Pl NW
Washington, DC 20503,

UNITED STATES DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave NW
Washington, DC 20530,

PAMELA BONDI, in her official capacity as
Attorney General of the United States
950 Pennsylvania Ave NW
Washington, DC 20530,

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,
8601 Adelphi Road
College Park, MD 20740,

ED FORST, in his official capacity as Acting
Archivist of the United States,
8601 Adelphi Road
College Park, MD 20740,

      Defendants.

3

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      This case is about the preservation of records that document our nation's history, and whether the American people are able to access and learn from that history.

2.      Yet the stakes of this case are even greater. The Executive Branch has declared the power to override the legal determinations of the U.S. Supreme Court, in order to override the laws passed by Congress to preserve and provide public access to official records of the President's activities. The Executive Branch has nullified the determinations of the other two branches of government so that the President may claim these official government records to be his own.

3.      Days ago, the Office of Legal Counsel (OLC) advised the White House that the President may disregard the Presidential Records Act—the longstanding federal law requiring the preservation of records reflecting the official activities of the President, the Vice President, and White House staff. As of this moment, the Administration believes that the President is legally free to destroy records of his official government conduct, or even spirit away the records for his own future personal use. In the Administration's view, the records of the official activities of the President and nearly 1,000 White House employees—generated using taxpayer funds, on government property, regarding official government business—belong to the President personally, and not to the American people. Government for the people, by the people, and of the people this is not.

4.      OLC has declared the Presidential Records Act (PRA) "unconstitutional" by fiat even though the Supreme Court upheld the constitutionality of a materially identical law 50 years ago in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977). The OLC legal opinion declaring the Presidential Records Act unconstitutional makes no serious effort to distinguish the

Presidential Records Act from the prior law that the Supreme Court upheld, the Presidential Recordings and Materials Preservation Act. Nor could it. Instead, OLC simply decided that the Supreme Court got it "wrong." The Administration's actions nullifying a law duly enacted by Congress, based on a legal determination that contravenes a decision of the Supreme Court, violate the separation of powers twice over.

5.      Plaintiffs the American Historical Association and American Oversight file this suit to stop the unconstitutional actions of the government, ensure the President and his administration abide by the recordkeeping obligations required by federal law, and to preserve the historical record that belongs to the American people, before it is forever lost.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law, specifically the constitutional separation of powers and the Presidential Records Act, 44 U.S.C. § 2201, *et seq.*, the Administrative Procedure Act, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Mandamus Act, 28 U.S.C. § 1361.

7.      This Court has jurisdiction to review final agency action pursuant to the APA. 5 U.S.C. § 702 ("A person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

9.      Plaintiff American Historical Association (AHA) is a nonprofit organization founded in 1884 and incorporated by Congress in 1889 "for the promotion of historical studies, the collection and preservation of historical manuscripts and for kindred purposes in the interest

of American history and of history in America." AHA's mission is to enhance the work of historians, including by promoting professional standards and ethics, innovative scholarship and teaching, academic freedom, and international collaboration. AHA is the largest membership association of historians in the world, with over 10,200 members. AHA serves historians in a wide variety of professions, and represents every historical era and geographical area. AHA and many of its members have a unique interest in presidential records and have previously pursued legal action to enforce the PRA. *See, e.g.*, *Am. Hist. Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995); *Am. Hist. Ass'n v. Nat'l Archives & Recs. Admin.*, 516 F. Supp. 2d 90 (D.D.C. 2007). AHA and its members regularly request and make use of presidential and vice-presidential records. AHA is headquartered in Washington, D.C.

10.     Plaintiff American Oversight is a nonpartisan, non-profit corporation organized under section 501(c)(3) of the Internal Revenue Code and incorporated under the laws of the District of Columbia. It is committed to promoting transparency in government, educating the public about government activities, and ensuring the accountability of government officials. Through research and requests made under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, American Oversight uses the information it gathers, and its analysis of that information, to educate the public about the activities and operations of the federal government through reports, published analyses, press releases and other media. American Oversight is headquartered in Washington, D.C. In November 2020, American Oversight launched a document preservation initiative to ensure that presidential records (and federal agency records) from President Trump's

6

first term were properly preserved.[1] American Oversight currently has at least five pending open FOIA requests seeking presidential records from President Trump's first term.

11. Defendant Donald J. Trump is the President of the United States. He is sued in his official and personal capacities.

12. Defendant J.D. Vance is the Vice President of the United States. He is sued in his official capacity.

13. Defendant The White House Office is an entity within the Executive Office of the President (EOP) that is subject to the PRA. Congress has prescribed the number of allowable White House Office employees and their compensation under 3 U.S.C. §§ 105, 107(a), and 109. Congress annually appropriates funding for the White House Office. For Fiscal Year 2026, Congress appropriated $78,904,000 for salaries and expenses of the White House Office. As of October 1, 2025, the White House Office had 373 full-time employees.

14. Defendant Susan Wiles is the White House Chief of Staff and the head of the White House Office. She is sued in her official capacity.

15. Defendant Philip C. Droege is the Director of the White House Office of Records Management. In that role, he is responsible for managing, preserving, and forwarding to the National Archives and Records Administration (NARA) at the appropriate time records reflecting the business of the Presidency and Vice Presidency, in accordance with the Presidential Records Act. He is sued in his official capacity only.

16. Defendant National Security Council is an entity within the EOP that is subject to the PRA. Congress has prescribed the functions, membership, and staff allocations for the

---

[1] American Oversight, *American Oversight Launches Document Preservation Initiative* (Nov. 10, 2020), https://americanoversight.org/american-oversight-launches-document-preservation-initiative/.

7

National Security Council under 50 U.S.C. § 3021. Congress annually appropriates funding for the National Security Council. For Fiscal Year 2026, Congress appropriated $19 million to be shared by the National Security Council and the Homeland Security Council for salaries and expenses. As of October 1, 2025, the National Security Council staff included 31 full-time employees, plus many more detailees from other federal agencies.

17.    Defendant Catherine Keller is the Executive Secretary of the National Security Council, in which role she serves as the head of National Security Council staff, pursuant to 50 U.S.C. § 3021(e)(1). She is sued in her official capacity only.

18.    Defendant Homeland Security Council is an entity within the EOP that is subject to the PRA. Congress established the Homeland Security Council within the EOP in 2002. *See* 6 U.S.C. § 491. Congress annually appropriates funding for the Homeland Security Council. For Fiscal Year 2026, Congress appropriated $19 million to be shared by the National Security Council and the Homeland Security Council for salaries and expenses.

19.    Defendant Stephen Miller serves as the Homeland Security Advisor, in which role he directs the Homeland Security Council. He is sued in his official capacity only.

20.    Defendant Council on Economic Advisors is an entity within the EOP that is subject to the PRA. Congress created the Council on Economic Advisers as an entity within the EOP. *See* 15 U.S.C. § 1023(a)(1). Congress has prescribed by statute the composition, duties, and compensation of members of the Council of Economic Advisors and its staff. *See id.* § 1023. Congress annually appropriates funding for the Council of Economic Advisers. For Fiscal Year 2026, Congress appropriated $4,854,000 for salaries and expenses of the Council of Economic Advisers and its staff. As of October 1, 2025, the Council on Economic Advisors had 25 full-time employees.

8

21.     Defendant Pierre Yared is the Acting Chairman of the Council of Economic Advisers. He is sued in his official capacity only.

22.     Defendant the Executive Residence is an entity within the EOP that is subject to the PRA. Congress annually appropriates funding for the Executive Residence. For Fiscal Year 2026, Congress appropriated $14,453,000 for the operating expenses of the Executive Residence, plus additional amounts for Repair and Restoration expenses. As of October 1, 2025, the Executive Residence had 82 full-time employees.

23.     Defendant Robert B. Downing is the White House Chief Usher. He is sued in his official capacity only.

24.     Defendant President's Intelligence Advisory Board is an entity within the Executive Office of the President that is subject to the PRA.

25.     Defendant Devin Nunes is the Chairman of the President's Intelligence Advisory Board. He is sued in his official capacity only.

26.     Defendant Office of Administration is an entity within the EOP that is subject to the PRA. The Office of Administration performs administrative and operational functions for the components of the EOP, including managing electronic and paper records covered by the Presidential Records Act and providing those records to NARA at the end of any presidential administration. Congress has limited the number of political appointees that may work within the Office of Administration (at 10 political employees), 3 U.S.C. § 107(b), and has prescribed their compensation and the compensation and hiring of career employees within the Office of Administration. Congress annually appropriates funding for the Office of Administration. For Fiscal Year 2026, Congress appropriated $114,308,000 for salaries and expenses of the Office of

9

Administration. As of October 1, 2025, the Office of Administration had 268 full-time employees.

27. Defendant Joshua Fisher is the Director of the Office of Administration. He is sued in his official capacity only.

28. Defendant Office of the Vice President is an entity within the EOP that is subject to the PRA. Congress has prescribed the number of employees of the Office of the Vice President and their compensation under 3 U.S.C. § 106. Congress annually appropriates funding for the Office of the Vice President. For Fiscal Year 2026, Congress appropriated $6,015,000 for salaries and expenses of the Office of the Vice President. As of October 1, 2025, the Office of the Vice President had 18 full-time employees.

29. Defendant Jacob Reses is the Chief of Staff to the Vice President. He is sued in his official capacity only.

30. Defendant United States DOGE Service is a component of the EOP established by Executive Order 14158 on January 20, 2025. It has claimed to be subject to the PRA and that it maintains records in compliance with the PRA.

31. Defendant Amy Gleason is the Acting Administrator of the United States DOGE Service and is DOGE's highest ranking official. She is sued in her official capacity only.

32. Defendant United States Department of Justice is an agency of the United States government. The Office of Legal Counsel is a component of the Department of Justice currently headed by Assistant Attorney General Elliot Gaiser. By delegation from the Attorney General, the Assistant Attorney General in charge of OLC provides legal advice to the President and all executive branch agencies.

10

33.     Defendant Pamela Bondi is the Attorney General of the United States. She is sued in her official capacity only.

34.     Defendant National Archives and Records Administration (NARA) is an agency of the United States government. After each Presidential administration, NARA implements the Presidential Records Act, including relating to the preservation, protection and access of Presidential Records as defined in the PRA. The Archivist of the United States serves as the highest ranking official at NARA. The Archivist is appointed by the President and confirmed by the Senate, and may be removed at will by the President.

35.     Defendant Ed Forst is the Acting Archivist of the United States and is sued in his official capacity only.

## BACKGROUND

### A.     History Leading Up to the PRA

36.     Following the resignation of President Nixon, Congress passed the Presidential Recordings and Materials Preservation Act (Preservation Act). *See* Pub. L. No. 93-526, 88 Stat. 1695 (1974). The Preservation Act provided for the United States to take ownership and custody of 42 million pages of documents and 880 tape records of conversations from President Nixon's terms in office. The Act directed the Administrator of General Services to take custody of President Nixon's records and promulgate regulations that (i) provided for the orderly processing and screening by Executive Branch archivists and (ii) determined the terms and conditions upon which the public would have access to the records. *See Nixon v. Administrator of General Services*, 433 U.S. 425, 429 (1977) (*Nixon v. GSA*). The Act also prohibited the destruction of the President's records. *Id.* at 434.

11

37.     The day after President Ford signed the Preservation Act into law, former President Nixon filed suit in the U.S. District Court for the District of Columbia, contending that the Act violated the constitutional separation of powers and executive privilege. Nixon's primary contention was "that the Act encroaches upon the Presidential prerogative to control internal operations of the Presidential office and therefore offends the autonomy of the Executive Branch." *Nixon v. GSA*, 433 U.S. at 439–40.

38.     A three-judge district court rejected President Nixon's challenge and upheld the law. *Nixon v. GSA*, 408 F. Supp. 321, 333 (D.D.C. 1976). As for President Nixon's argument that the Act unduly intruded on executive confidentiality, the court held that the "review of the materials by government archivists would constitute" at most a "minimal" intrusion, noting that "every President since the establishment in 1934 of the National Archives" had turned over presidential papers for governmental preservation and disclosure anyway. *Id.* at 346–47. The court also found that Congress had good reason to entrust the review of records with the General Services Administration rather than the President, as "Chief Executives are not by nature professional archivists," and "Congress could legitimately wish to establish regularized procedures to ensure that the process by which the materials would be reviewed would be adequate to the task" and that those "entrusted with reviewing such materials be . . . disinterested." *Id.* at 347–48.

39.     The district court comprehensively reviewed the legislative history of the Preservation Act and concluded that the Act supported at least two strong congressional interests in the preservation of presidential records. "First, and most broadly," such preservation "serves the national interest by preserving materials upon which historians must draw in order accurately to recount and to judge the political history of our time." *Id.* at 349 (citing S. Rep. No. 93-1181,

12

93d Cong., 2d Sess., at 1, 3 (1974); H.R. Rep. No. 93-1507, 93d Cong.2d Sess., at 2, 3, 8 (1974); Senate Hearings on GSA Regulations at 256; 120 Cong. Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18235 (daily ed. Oct. 3, 1974); *id.* at S 18248 (remarks of Sen. Ervin); id. at S 18259 (remarks of Sen. Huddleston); *id.* at S 18260 (remarks of Sen. Ribicoff); *id.* at S 18261 (remarks of Sen. Muskie); *id.* at S 18325 (daily ed. Oct. 4, 1974) (remarks of Sen. Nelson); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas)).

40.    Second, Congress believed that "preservation of these materials is needed to ensure their availability for successive administrations engaged in policymaking." *Id.* at 350 (citing S. Rep. No. 93-1181, 93d Cong., 2d Sess., at 3, 4, 5 (1974); H.R. Rep. No. 93-1507, 93d Cong., 2d Sess., at 3 (1974); 120 Cong. Rec. H 11211 (daily ed. Dec. 3, 1974) (remarks of Rep. Abzug)). As the court explained, "[g]overnmental programs and policies do not expire every four or eight years," and "the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." *Id.*

41.    The Supreme Court affirmed the district court's decision, holding that "neither [President Nixon's] separation-of-powers claim nor his claim of breach of constitutional privilege has merit." *Nixon v. GSA*, 433 U.S. at 439. As to Nixon's separation-of-powers claim, the Supreme Court "reject[ed]" the argument that "the Act's regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the separation of powers." *Id.* at 441. The Court explained that it was "highly relevant" to the separation-of-powers analysis that "the Act provides for custody of the materials in officials of the Executive Branch and that employees of that branch have access to the materials only 'for lawful Government use, subject to the (Administrator's) regulations.'" *Id.* at 443–44. The Court further emphasized that, "although some of the materials may eventually be made available for

13

public access, the Act expressly recognize[d] the need both to protect any party's opportunity to assert any legally or constitutionally based right or privilege." *Id.* at 444 (quotations omitted). The Court thus held that the Act was not "unduly disruptive of the Executive Branch" because "[t]he Executive Branch remain[ed] in full control of the Presidential materials, and the Act facially [was] designed to ensure that the materials [could] be released only when release [was] not barred by some applicable privilege inherent in that branch." *Id.* at 444–45.

42.    The Court held that there was "congressional power to regulate Executive Branch documents . . . in this instance, a power that is augmented by the important interests that the Act seeks to attain." *Id.* at 445–46. Citing myriad statutes regulating the disclosure and disposition of government records, the Court noted that "there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." *Id.* at 445.

43.    As to the executive privilege claim, the Court "agree[d] with the District Court" that it could "readily resolve[]" the question because the screening of presidential records contemplated by the Act "constitutes a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns." *Id.* at 451. The Court further held that "adequate justifications are shown for this limited intrusion into executive confidentiality," endorsing the district court's "exhaustive" treatment of the legislative history. *Id.* at 452. That history "clearly reveal[ed]" that "among other purposes, Congress acted to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." *Id.* "An incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.* The Court rejected Nixon's argument that the Act was necessarily

14

unconstitutional because "the potential disclosure of communications given to [him] in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 449–50

44.     Shortly after *Nixon v. GSA*, OLC recognized that "[t]he Supreme Court's opinion in *Nixon . . .* makes clear that it is within the appropriate ambit of Congress' power to legislate with respect to the preservation of historically valuable papers of the Chief Executive." *See* Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm on Gov't Operations at 112, 95th Cong. 87–133 (1978) (statement of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel). OLC further noted that "Justice Powell's separate concurrence . . . makes the same point at somewhat greater length and concludes that Congress' power in this area is 'unquestionable.'" *Id.* (quoting *Nixon v. GSA*, 433 U.S. at 498 (Powell, J., concurring)). Given *Nixon*, OLC concluded that Congress's declaring the President's official papers to be public property "is not subject to serious challenge." *Id.*

45.     Congress also believed that the Supreme Court in *Nixon* had "established principles that would govern legislation dealing more broadly with control of and access to presidential papers." H.R. Rep. No. 95-1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 USCCAN 5732, 5737. Accordingly, a year after *Nixon* was decided, Congress enacted the PRA "to insure the preservation and public access to the official records of the President." *Armstrong v. Bush*, 924 F.2d 282, 287 (D.C. Cir. 1991) (quoting Presidential Records Act of 1978, Pub. L. No. 95-591, 1978 U.S. Code Cong. & Admin. News (92 Stat.)).

46.     In 2014, Congress amended the PRA in the Presidential and Federal Records Act Amendments of 2014. The amendments passed with bipartisan support. The amendments

modernized the PRA by expanding the definition of federal records to expressly include electronic records. The amendments also required federal officials to use official government email accounts when sending presidential records electronically or to forward emails to an official account within 20 days.

47.    Since the PRA took effect 45 years ago, no administration of either party—including the first Trump Administration—has questioned the PRA's constitutionality or contended that it unduly interferes with the President's discharge of his constitutional responsibilities.

**B.    The Presidential Records Act**

48.    In the PRA, 44 U.S.C. §§ 2201 *et seq.*, Congress set forth a reticulated statutory scheme for the preservation of official government records created or received by the President, the Vice President, and certain staff during a President's term in office, for the transfer of those records to NARA at the end of a President's term in office, and for access to those records after a President's term in office by an incumbent President, the public, Congress, and the former President himself.

49.    Like the Preservation Act that preceded it, the PRA establishes public ownership of presidential records. Specifically, the PRA declares: "The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of [the PRA]."44 U.S.C.§ 2202.

50.    The PRA defines "Presidential Records" as "documentary materials, or any reasonably seg-regable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an

effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2).

51.    The EOP currently considers the following components to be "unit[s] . . . of the Executive Office of the President whose function is to advise or assist the President," and thus subject to the PRA: the White House Office, the Office of the Vice President, the National Security Council, the Homeland Security Council, the Office of Administration, the President's Intelligence Advisory Board, the Council of Economic Advisors, the Executive Residence, and the U.S. DOGE Service. As of October 1, 2025, these components collectively had 842 full-time employees, all covered by the PRA.

52.    The PRA defines "documentary material" to include "books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form." 44 U.S.C. § 2201(1).

53.    The PRA excludes from the definition of covered Presidential records: "documentary materials relating to the political activities of the President or members of the President's staff . . . if such activities [do not] relate to or have a direct effect upon the carrying out of constitutional, statutory, or other official or ceremonial duties of the President," as well as documentary materials that are "official records of an agency" covered by the Federal Records Act, "personal records,' "stocks of publications and stationery," and "extra copies of documents." *Id.* § 2201(2).

54.    The statute in turn defines "personal records" as all "documentary materials, or any reasonably segregable portion thereof, of a purely private or nonpublic character which do

17

not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(3). Personal records include "(A) diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business; (B) materials relating to private political associations, and . . . (C) materials relating exclusively to the President's own election to the office of the Presidency." *Id.*

55. The PRA requires that the President "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records…." *Id.* § 2203(a).

56. Where the President, the Vice President, or an employee covered by the PRA sends, receives, or creates a Presidential record on an unofficial electronic messaging account—such as email, text messaging, Signal or other encrypted messaging accounts, or social media—the President or employee must either copy an official account or forward a copy to an official account within 20 days of the original creation of the record. *Id.* § 2209.

57. The PRA lays out requirements governing the maintenance and disposition of Presidential records both during and after an incumbent's term in office, including through the preservation of Presidential privileges.

58. During a President's term in office, the President "remain[s] exclusively responsible for custody, control, and access to … Presidential records." *Id.* at § 2203(f); *see also* 36 C.F.R 1270.20 (recognizing that, even when the Archivist or NARA has physical custody of

18

Presidential records, "the President remains exclusively responsible for control and access to their records until their term of office concludes").

59.     The PRA provides for a process for the President to identify and dispose of Presidential records that "no longer have administrative, historical, informational, or evidentiary value." *Id.* at § 2203(c). Before doing so, the President must "obtain[] the views…of the Archivist" and either provide notice to Congress or learn from the Archivist that the Archivist does not believe the documents are of "special interest to the Congress or [that] consultation with the Congress…is in the public interest." *Id.* at §§ 2203(c)-(e).

60.     When a President leaves office, the Archivist "shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." *Id.* at § 2203(g)(1).

61.     Even after NARA has taken custody of a former President's records, the former Presidents may access their own Presidential records notwithstanding any other limitations  at any time. *Id.* § 2205(3).

62.     In addition, "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke," Presidential records in NARA's custody "shall be made available to an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." *Id.* § 2205(2)(B).

63.     Subject to the same rights, defenses, or privileges, Presidential records in NARA's custody shall be made available "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding." *Id.* § 2205(2)(A).

19

64.     And subject to the same rights, defenses, or privileges, including of a former President, Presidential records in NARA's custody shall be made available "to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." *Id.* § 2205(2)(C).

65.     The PRA also provides for delayed public access to Presidential records in NARA's custody. Subject to the limitations and procedures described below, the Archivist has "an affirmative duty to make such records available to the public as rapidly and completely as possible." *Id.* § 2203(g)(1).

66.     Although the Archivist must seek to make records publicly available, the earliest any Presidential records are generally accessible by the public is five years after the President has left office and transferred custody of the records to the Archivist. *Id.* at § 2204(b)(2); *see also* 36 CFR § 1270.38. At that point, if the President has not specified a longer withholding period as described below, members of the public can request access to the documents pursuant to the Freedom of Information Act if the Archivist has not processed and affirmatively released the records by that time. *Id.*

67.     The President has substantial control to delay the timing of any release of Presidential records. The PRA provides that, prior to leaving office, the President "shall specify durations, not to exceed 12 years, for which access shall be restricted with respect to information, in a Presidential record, within" several broad categories of records. *Id.* at § 2204(a). These include any records marked as classified pursuant to an Executive Order; relating to appointments to federal office; exempt from disclosure by another statute; including privileged

20

trade secrets, commercial information, or financial information; advice from presidential advisors or the solicitation of such advice; and personnel and medical files. *Id.*

68.    Once a Presidential record is so designated, the Archivist cannot make it public until the expiration of the designation, the Archivist receives a waiver from the former President, or the former President or President's agents otherwise make the document public. *Id.* at § 2204(b)(1).

69.    In addition to the temporal limitations discussed above, public access to Presidential records is limited by the same exceptions and exemptions that exist under the Freedom of Information Act, 5 U.S.C. § 552, except that documents otherwise available for disclosure cannot be withheld pursuant to the deliberative process privilege. *Id.* at § 2204(c)(1).

70.    In crafting the PRA and through its amendments, Congress made clear that "[n]othing in [the PRA] shall be construed to confirm, limit, or expand any constitutionally-based privilege" of a President or former President. *Id.* at § 2204(c)(2).

71.    To that end the PRA carefully balances the goal of expeditious release of information with safeguarding Presidential assertions of executive privilege.

72.    Prior to making any Presidential record public for the first time, the Archivist must notify the incumbent President as well as the relevant former President. *Id.* at § 2208(a). This notification must itself be made public. *Id.*

73.    Upon issuing that notice, the Archivist cannot make the Presidential Record(s) public for 60 business days—this period can be extended for another 30 by the President or former President. If the current or relevant former President notifies the Archivist of a claim of a constitutionally-based privilege, the Archivist shall not release the record. *Id.* at § 2208(a)(3).

74.     Any such claim of privilege must be made personally by the President or former President, who must also notify relevant Congressional committees. *Id.* at § 2208(b).

75.     If the incumbent President asserts a claim of privilege, the Archivist shall not release the document unless the President withdraws the claim or the Archivist is ordered to do so by a court order not subject to appeal. *Id.* at § 2208(d).

76.     If a former President asserts a claim of privilege, the Archivist must consult with the current President to determine whether the current President will uphold the claim. *Id.* at § 2208(c). If the current President does not uphold the claim, the document will be released subject to the former President's right to seek a court order. A former President may bring an action in the United States District Court for the District of Columbia where the former President believes that "a determination made by the Archivist violates the former President's rights or privileges." *Id.* at § 2204(e).

77.     The Archivist is required to and has promulgated regulations to effectuate the PRA, including to provide notice to a former President when documents are being made public prior to the expiration of the restricted period or where such disclosure "may adversely affect any rights and privileges which the former President may have." 44 U.S.C § 2206.

78.     With the exception of provisions relating to Presidential privileges, 44 U.S. Code § 2208, Vice-Presidential records are treated in exactly the same way as Presidential records under the Act and the Vice President and Vice President's staff have the same preservation responsibilities as the President. *Id.* at § 2207.[2]

---

[2] As such, except with respect to Presidential privileges, where this Complaint refers to requirements of the President or refers to "Presidential records" the Complaint incorporates requirements of the Vice President and related to Vice-Presidential records.

### C.   The Trump Administration's Prior Guidance on the PRA

79.   As previously stated, no Presidential administration since the PRA took effect—including the first Trump administration—has flatly refused to comply with the Presidential Records Act.

80.   On the first day of the first Trump Administration in 2017, "representatives from White House Counsel provided personal briefings to all new White House employees on ethics compliance, including recordkeeping responsibilities under the PRA."[3] White House officials invited NARA to participate in developing White House guidance on the PRA, and NARA supplied the White House with written materials on compliance.[4]

81.   On February 22, 2017, the White House Counsel's Office issued a memorandum "to remind all personnel of their obligation to preserve and maintain presidential records, as required by the Presidential Records Act (PRA)."[5] The memorandum recognized that the PRA requires that the Administration take steps to "assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained." *Id.* at 1. The memorandum included guidance on what documents constitute presidential records, and reminded personnel to "please keep in mind that presidential records are the property of the United States." *Id.* at 3. It noted that "[t]he willful destruction or concealment of federal records is a federal crime punishable by fines and imprisonment." *Id.*

---

[3] Staff Memo on White House Counsel Briefing on PRA at 3, https://www.hsgac.senate.gov/library/files/hsgac-democratic-staff-memo-on-white-house-counsel-briefing-on-pra/.

[4] *Id.*.

[5] Memorandum for All Personnel (Feb. 22, 2017), *available at* https://www.archives.gov/files/foia/Memo%20to%20WH%20Staff%20Re%20Presidential%20Records%20Act%20(Trump,%2002-22-17)_redacted%20(1).pdf.

82.     Following public reporting that certain White House advisers had used private email accounts to discuss official matters, the first Trump Administration took additional action to seek to ensure compliance with the PRA, reminding the advisers of their obligations under the PRA and admonishing them not to delete any records.[6]

83.     The current Trump Administration, too, has for at least the past year insisted that it would seek to comply with the PRA. In litigation over the retention practices of the United States DOGE Service, for example, the government—which holds the United States DOGE Service out as an entity subject to the PRA—submitted the DOGE Service's records retention policy. That policy states that, "[a]s a component of the Executive Office of the President, US DOGE Service (USDS) personnel . . . are subject to certain records retention obligations under the Presidential Records Act . . . ." *See* Dkt. 13-2 in *American Oversight v. DOGE*, No. 25-cv-409 (D.D.C. Mar. 27, 2025).

84.     To be sure, in both the first Trump administration and in the first thirteen months of the second Trump administration, there were numerous incidents of high-level White House officials, including (as set forth in section E below) President Trump himself, acting in a manner inconsistent with PRA requirements.

85.     But before April of this year, neither the President nor his Administration suggested that the PRA unduly interfered with the Executive Branch or that they believed the PRA to violate the constitutional separation of powers. No Administration had openly declared that it was free to "not further comply with [the PRA's] dictates," *see* Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr. 1, 2026) (OLC Op.) (slip op. at 52), nor had any

---

[6] Staff Memo, *supra* note 3, at 4–5; *see, e.g.*, Josh Dawsey, *Kushner Used Private Email to Conduct White House Business*, POLITICO (Sept. 24, 2017, 7:27 PM), https://www.politico.com/story/2017/09/24/jared-kushner-private-email-white-house-243071.

prior Administration advised officials and staff covered by the PRA that they need not preserve all Presidential records as defined under the PRA. To the contrary, as explained, the Trump Administration—like every presidential administration over the last five decades—made at least some effort to comply with the PRA. Indeed, far from denying the applicability or constitutionality of the PRA, President Trump rather argued in federal court that the PRA authorized him to retain once-classified records from his administration after his presidency, and therefore shielded him from criminal liability.

**D.     The OLC Opinion and Subsequent White House Policy Guidance**

86.     At some point during President Trump's second term in office, the White House Counsel David Warrington requested that OLC provide an opinion on whether the PRA is constitutional.

87.     On April 1, 2026, Assistant Attorney General for OLC, T. Elliot Gaiser, issued an opinion declaring that the PRA is facially unconstitutional, in its entirety. *See generally* OLC Op. OLC declared that "[t]he PRA is unconstitutional for two independent but interlocking reasons: It exceeds Congress's enumerated and implied powers, and it aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive." OLC Op. 1.

88.     On the first reason, OLC concluded that the PRA could not be sustained as an exercise of Congress' "oversight power," its "inherent preservation power," its "implicit authority to regulate government agencies and offices created by statute," or its powers under the Appropriations Clause or Spending Clause. OLC Op. 17. OLC further concluded that Congress could not rely on "[t]he public's interest in the President's papers" as a basis for enacting the PRA. *Id.* at 22. And OLC opined that the Necessary and Proper Clause did not provide authority either, because that clause purportedly only permits legislation that "facilitates" rather than "burdens" the "exercise of executive power." *Id.* at 41.

25

89.     On the second reason, OLC found that even if the PRA served a valid legislative purpose, it is "overbroad" and unduly burdensome. OLC acknowledged that "the Act may not place a severe and direct burden on the President personally," but nevertheless found a constitutionally impermissible burden because "the White House Counsel's Office spends a considerable amount of time to ensure the President's compliance with the PRA." OLC Op. 24. OLC further speculated that "the PRA *might* burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties." *Id.* at 48 (emphasis added) (cleaned up).

90.     Despite the controlling nature of *Nixon v. GSA*, OLC declared that this on-point Supreme Court decision "does not save the PRA." OLC Op. 41. OLC briefly attempted to distinguish the PRA from the Preservation Act. Despite claiming that "[t]he PRMPA and the PRA could not be more different," OLC did not attempt to meaningfully distinguish the substantive requirements of the two laws. *See id.* at 41–42. Instead, OLC merely pointed to the fact that the PRMPA was specific to President Nixon and enacted "in the wreckage of Watergate." *Id.*

91.     OLC quickly made clear, however, the real reason it did not treat *Nixon v. GSA* as controlling: OLC simply believes the Supreme Court's decision was "wrong." OLC Op. 45. OLC described the case as "wrong" (twice) and "mistaken," and asserted that the Supreme Court "fail[ed] to appreciate the Article II consequences of permitting Congress to regulate presidential records." *Id.* at 45–49. OLC relied almost exclusively on its own prior opinions to explain why it was right and the Supreme Court was wrong; over the span of four single-spaced pages of analysis, OLC did not cite a single judicial precedent to support its analysis or conclusions. *See id.* at 46–49.

26

92.     OLC then concluded in summary fashion that the constitutionally impermissible portions of the PRA were inseverable from the remainder of the PRA, justifying nullifying the entire Act. OLC Op. 49–51. OLC's severability analysis is difficult to follow, since it never actually identified the specific unconstitutional provisions, let alone explained how those specific provisions were inseverable from the remaining provisions. Nevertheless, based on its self-described "rigorous severability analysis," OLC declared that "the PRA falls entirely." *Id.* at 51.

93.     In its conclusion, OLC provided the President permission to ignore the law: "For these reasons, the PRA is unconstitutional, and the President need not further comply with its dictates." OLC Op. 52.

94.     Contemporaneous with the release of the OLC Opinion, White House spokesperson Abigail Jackson described Defendants' new policy for the collection, retention, and preservation of their official records (the "Post-OLC PRA Policy"). Jackson stated that staff covered by the PRA "must undertake records training so they properly preserve all materials related to: the performance of their duties for historical value, the administrative record of policy decisions and actions, and litigation needs." Jackson added that "[t]he President will also retain the program currently in place for electronic records – emails and documents cannot be deleted from the White House system."

95.     Jackson did not indicate whether the President himself would preserve records falling into these three limited categories of records that she said staff would be trained to preserve. Nor did Jackson indicate that staff covered by the PRA will be required to comply with the PRA's restriction on using non-official electronic messaging accounts. Messages on such non-official platforms—including personal email, text messages, Signal, or other applications in which users can set messages to automatically delete—are not saved to "the White House

27

system" by default. These messages are preserved only if a staff member manually forwards the message to their official account or otherwise saves the message onto the White House network.

96.     On information and belief, the Post-OLC PRA Policy does not prohibit the President, the Vice President, and staff covered by the PRA from sending from their personal devices, including text messages and direct messages on applications that feature auto-deletion options, like Signal or WhatsApp. On information and belief, nor does the Post-OLC PRA Policy require such persons to forward all such communications to their official accounts as the PRA requires. On information and belief, the Post-OLC PRA Policy does not prohibit the President, the Vice President, and staff covered by the PRA from deleting electronic messages on personal accounts or devices that constitute Presidential records under the PRA.

97.     On information and belief, the Post-OLC PRA Policy does not require the President to preserve all paper records and other physical records in his possession that constitute Presidential records under the PRA. On information and belief, the Post-OLC PRA Policy also does not prohibit the President from taking records that constitute Presidential records under the PRA with him after his term in office for his personal use.

98.     On information and belief, Defendants' position is that not even records containing national defense information held by the President legally must be retained within the government and sent to NARA after the President's term concludes. On information and belief, Defendants' position is that the President may lawfully take records containing national defense information within him at the end of his Administration.

99.     On information and belief, Acting Archivist Ed Forst has adopted the position that NARA "need not further comply with [the PRA's] dictates," OLC Op. 52, because the President has commanded by Executive Order that "[t]he President and the Attorney General's opinions on

questions of law are controlling on all employees in the conduct of their official duties," and that "[n]o employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law." E.O. 14,125 § 7 (Feb. 18, 2025). Indeed, Acting Archivist Forst is also the politically appointed Administrator of the General Services Administration, and he was installed as Acting Archivist on the same day that OLC issued its opinion declaring the PRA unconstitutional.

**E.    There Is Strong Reason to Believe President Trump Will Retain Presidential Records for Himself after His Term in Office**

100.    As with prior Administrations, shortly after taking office in 2017, President Trump's White House Counsel, Donald McGahn II, issued a memorandum for all White House personnel detailing their obligations under the PRA. The memorandum provided the statutory definition of a "Presidential record," directed staff not to use personal electronic communications for official business, and directed: "[y]ou may not dispose of presidential records."[7]

101.    Still, President Trump repeatedly violated and disregarded the PRA, both during and after his first term in office.

102.    Upon leaving office, President Trump kept significant numbers of official records, rather than transferring them to NARA as required. NARA ultimately collected 15 boxes containing thousands of documents from President Trump's personal residence at Mar-a-Lago.

---

[7] Memorandum for All Personnel (Feb. 22, 2017), *available at* https://www.archives.gov/files/foia/Memo%20to%20WH%20Staff%20Re%20Presidential%20Records%20Act%20(Trump,%2002-22-17)_redacted%20(1).pdf.

103.    Following NARA's collection, the Federal Bureau of Investigation conducted a search of Mar-a-Lago, identifying more official documents, including over 100 documents marked as classified.

104.    President Trump later claimed that he was authorized, including under the PRA, to retain sole possession of all of these records, to the exclusion of the government. President Trump maintained his claim that the documents were personal despite the fact that hundreds of documents were found to be marked classified and others clearly related to his official duties, such as the exercise of his clemency power, immigration policies,[8] and intelligence matters.[9]

105.    A memorandum from federal prosecutors in 2023 reportedly stated that the FBI had found that certain classified documents President Trump had retained "would be pertinent to certain business interests," which may have been "a motive for retaining them."[10]

106.    At no point has President Trump stated or otherwise accepted that he was required under the PRA to turn over custody and control over his documents to the National Archives upon leaving office. Rather, he has declared a right to keep classified and other documents that are squarely Presidential records under the PRA.

---

[8] See Erin Snodgrass, *Trump Claims First Batch of Reviewed White House Documents are His Personal Property in Likely Sign of Further Legal Battles*, BUSINESS INSIDER (Oct. 21, 2022), https://www.businessinsider.com/trump-claims-9-white-house-records-are-his-personal-property-2022-10.

[9] See Andrew Goudsward, *US Pushes Back on Judge over Trump Claim that Classified Records he Kept Were Personal*, REUTERS (Apr. 3, 2024), https://www.reuters.com/world/us/us-pushes-back-judge-over-trump-claim-that-classified-records-he-kept-were-2024-04-03/.

[10] *See* Letter from Jamie Raskin, Ranking Member of the House Committee on the Judiciary, to Pamela Bondi, Attorney General (Mar. 24, 2026), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-03-24-raskin-to-bondi-doj-re-classified-docs.pdf.

107.    In light of this history of conduct, and OLC's permission to President Trump to disregard the PRA, there is a substantial likelihood that President Trump will keep or destroy numerous records after his term in office that the PRA requires to be sent to NARA.

F.    **Plaintiffs Will Be Harmed By Defendants' Attempted Nullification of the PRA**

108.    Plaintiffs—both organizations that rely heavily on access to historical records about the inner-workings of the federal government to undertake their missions—will be significantly harmed by Defendants' actions.

*Harms to Plaintiff American Historical Association*

109.    The AHA is an association whose members include historians, researchers, and educators who routinely seek and use Presidential records covered by the PRA as part of their academic research and educational work. Such members include Matthew Connelly, Professor of History and Vice Dean for AI Initiatives in Arts and Sciences at Columbia University; Natalia Mehlman Petrzela, Professor of History at The New School; Timothy Naftali, Senior Research Scholar in the Faculty of International and Public Affairs at Columbia University; Kyle Longley, Salvatori Professor at Chapman University; and Kathryn Brownwell, Professor of History at Purdue University. AHA's members rely on Presidential records to explore and reveal the functioning of every aspect of the executive branch—from policy consideration to policy implementation. AHA's members use Presidential records preserved and made public under the PRA for the purposes Congress intended in enacting the PRA, including producing historical scholarship, teaching, and museum work. Records made accessible under the PRA also enable AHA members to serve as expert witnesses.

110.    If Presidential records are not preserved and made publicly accessible as the PRA requires, AHA's members will be directly injured. They will lose access to information that would create the historical record of presidential activities, and that would help to educate the

31

public about that history. AHA members would be left with an incomplete historical record by which to professionally research, produce scholarship on, and teach U.S. history. Once lost, this information is irretrievable and thus the harm irreparable. Absent relief, AHA and its members will lose access to the documents and other materials essential to understanding, and learning from, our past.

111.    AHA is well aware of the perils of failing to preserve and make available historical information about the functioning of the federal government. In 1910, having found that many governmental records from the previous century had been lost or destroyed, AHA petitioned Congress to construct a "national archive depository, where the records of the Government may be concentrated, properly cared for, and preserved."[11] These records, AHA asserted, were both "muniments of our national advancement" and "material which historians must use in order to ascertain the truth." The resulting institution became the National Archives and Records Administration.

*Harms to Plaintiff American Oversight*

112.    American Oversight regularly requests public records—including presidential records subject to the PRA—under FOIA and disseminates those records to the public via its website in order to educate the public and further its mission of promoting transparency in government.

113.    Since its inception in 2017, American Oversight has submitted multiple FOIA requests to Defendant NARA seeking presidential records of past administrations.

---

[11] First Annual Report of the Archivist of the United States, 1934-1935, https://perma.cc/HS62-USWD.

114. Currently, at least five requests submitted by American Oversight under FOIA seeking presidential records from President Trump's first administration are pending with NARA.

115. Most recently, on January 20, 2026, American Oversight submitted multiple FOIA requests to NARA seeking presidential records from President Trump's first term.

116. The first request, bearing American Oversight internal tracking number NARA-26-0108, seeks records reflecting external email communications sent by or on behalf of Senior Advisor for Policy Stephen Miller.

117. On February 17, 2026, NARA acknowledged the request and assigned it two tracking numbers, NW 90931 and 26-19758-F, for classified and non-classified searches respectively.

118. On April 1, 2026, NARA notified American Oversight that no classified records responsive to the second request exist. The non-classified search remains pending.

119. The second request, bearing American Oversight internal tracking number NARA-26-0109, seeks records reflecting external email communications sent by or on behalf of Director of Social Media Dan Scavino.

120. On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-19821-F.

121. American Oversight's second request remains pending.

122. The third request, bearing American Oversight internal tracking number NARA-26-0110, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Jared Kushner.

123. On February 17, 2026, NARA acknowledged the request and assigned it two tracking numbers, NW 90930 and 26-19724-F, for classified and non-classified searches respectively.

124. On April 1, 2026, NARA notified American Oversight that no classified records responsive to the third request exist. The non-classified search remains pending.

125. The fourth request, bearing American Oversight internal tracking number NARA-26-0111, seeks records reflecting external email communications sent by or on behalf of Domestic Policy Council Director Brooke Rollins.

126. On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-20344-F.

127. American Oversight's fourth request remains pending.

128. The fifth request, bearing American Oversight internal tracking number NARA-26-0112, seeks records reflecting external email communications sent by or on behalf of Senior Advisor Ivanka Trump.

129. On February 17, 2026, NARA acknowledged the request and assigned it tracking number 26-20575-F.

130. American Oversight's fifth request remains pending.

131. The Post-OLC PRA Policy will harm American Oversight by impeding its access to presidential records and impeding its ability to share those records with the public in furtherance of its mission.

132. If presidential records are not preserved and made publicly accessible as required by the PRA, American Oversight will be directly injured.

34

133.    Specifically, failure by Defendants to preserve and make available information that should be publicly accessible will impede American Oversight's activities because it will be unable to disseminate to the public the records that it would otherwise be entitled to under FOIA.

134.    The records that are at risk of destruction due to Defendants' implementation of the Post-OLC PRA Policy include (1) records from President Trump's first term that are already in NARA's custody and for which American Oversight has already submitted FOIA requests, (2) records from President Trump's first term that are already in NARA's custody but for which American Oversight has not yet submitted FOIA requests, (3) records from President Trump's first term that are required by the PRA to be in NARA's custody but are not, and which would be responsive to American Oversight's current or future FOIA requests; and (4) records from President Trump's second term, which American Oversight may seek to request under FOIA once they become available under the PRA.

135.    Additionally, American Oversight is currently in litigation with Defendants U.S. DOGE Service and Gleason in *American Oversight v. DOGE*, No. 25-cv-409 (D.D.C. filed Feb. 11, 2025). In that case, Defendants argued that they should *not* be subject to a judicial preservation order for records subject to Freedom of Information Act requests because they are purportedly subject to, and preserving records consistent with, the PRA. *See* ECF No. 13. Since these Defendants now view themselves as not bound by the PRA, if that case is resolved with a finding that (as Defendants argued) they are subject to the PRA rather than FOIA, then (without judicial relief in *this* case) Defendants may destroy these records. The destruction or disposal of those records will result in irreparable harm to American Oversight.

136. The unlawful Post-OLC PRA Policy presents an imminent threat that Presidential records may be destroyed, transferred, or otherwise disposed of under the theory that the individuals and entities subject to the PRA have no legal obligation to preserve records.

137. If Presidential records are not preserved in accordance with the PRA, the information will be irretrievably lost and the harm to American Oversight will be irreparable.

138. Absent relief, American Oversight will be foreclosed from accessing important Presidential records and prevented from vindicating its mission of educating the public and promoting transparency in government.

## CLAIMS FOR RELIEF

### COUNT I – Separation of Powers
### (Against All Defendants)

139. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

140. Plaintiffs have an equitable right of action to declare unlawful and enjoin Defendants' unconstitutional actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010), including through separation-of-powers claims where the Executive Branch openly disregards a statute on the ground that it is unconstitutional, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).

141. It undisputed that there is a complete "absence of any statutory authority" for Defendants' disregard of the PRA's requirements. *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (citing *Youngstown*, 343 U.S. 579). Rather, the only basis upon which Defendants are disregarding the PRA's requirements is their contention that the PRA is facially unconstitutional in its entirety. That assertion of unconstitutionality is erroneous, and the Executive Branch's

36

refusal to comply with a statute based on erroneous assertions of Executive power violates the separation of powers.

142.    *Nixon v. GSA* conclusively resolves the question of the constitutionality of the Act. The Supreme Court in fact specifically addressed and rejected each of the arguments that OLC now makes for the Act's unconstitutionality. For instance:

a.  OLC concludes that the PRA violates the separation of powers, but the Supreme Court unambiguously held that "the [Preservation] Act's regulation of the disposition of Presidential materials within the Executive Branch" does not facially constitute "a violation of the principle of separation of powers." 433 U.S. at 441.

b.  OLC asserts that the PRA "exceeds Congress' enumerated and implied powers," OLC Op. 1, but the Supreme Court held that "congressional power to regulate Executive Branch documents exists" with respect to a President's records, and indeed is a "a power that is augmented by the important interests that the Act seeks to attain," 433 U.S. at 445–46.

c.  OLC asserts that the PRA is unduly burdensome and "threatens to impede" the President's performance of his duties, OLC Op. 41, but the Supreme Court held that "nothing contained in the [Preservation] Act renders it unduly disruptive of the Executive Branch and, therefore, unconstitutional on its face," 433 U.S. at 445.

d.  OLC asserts that Congress lacked any "valid legislative purpose," OLC Op. 21, but the Supreme Court held that preserving and ultimately providing public access to Presidential records serves valid and "important congressional purposes." 433 U.S. at 453–54. There, the Preservation Act served "legitimate historical and governmental purposes" such as

ensuring future Presidents have access to important information as needed, and providing

the American people a historical record of their government's operations. *Id.*

e.  OLC asserts that "the PRA may chill the President's advisers from offering candid or

unpopular advice," OLC Op. 47, but the Supreme Court rejected the identical argument

made by President Nixon—that retaining and possibly disclosing presidential materials

"will chill the future exercise of constitutionally protected executive functions, thereby

impairing the ability of future Presidents to obtain the candid advice necessary to the

conduct of their constitutionally imposed duties," 433 U.S. at 441.

143.    *Nixon v. GSA* is squarely controlling on the PRA's constitutionality, and the

Executive Branch lacks constitutional authority to nullify Supreme Court decisions by declaring

that the Supreme Court simply got it "wrong."

144.    Even putting aside the controlling nature of *Nixon v. GSA*, the PRA is

constitutional. Congress has multiple sources of authority for enacting the PRA, including but

not limited to:

a.  The Property Clause, which grants Congress plenary "[p]ower to dispose of and make all

needful Rules and Regulations respecting the Territory or other Property belonging to the

United States." U.S. Const. art. IV, § 3, cl. 2.

b.  The Necessary and Proper Clause, which gives Congress the authority "[t]o make all

Laws which shall be necessary and proper for carrying into Execution the foregoing

Powers, and all other Powers vested by this Constitution in the Government of the United

States, or in any Department or Officer thereof." U.S. Const. art. I, § 8, cl. 18.

c.  The Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7; and

d.  Congress' implied and implicit authorities.

145.    The PRA serves numerous valid purposes, including preventing the destruction or removal of government property, including government records that could be used against the interests of the United States if shared outside the federal government; preserving records of the Executive Branch's activities so that information is available as needed by a future President, by Congress for legislative or oversight purposes, or by the Judiciary in adjudicating cases; and providing a historical record for the public to assess, study, and understand presidential conduct and the Executive Branch's activities. The PRA further facilitates continuity and the orderly transition of power across Presidential administrations. During any transition there is a high turnover of personnel within the White House, and accordingly the need for access to information of a prior administration on pressing public interest matters is acute. If an incumbent Administration were free to delete or destroy all of its records covered by the PRA before a transition, the risks to government operations and the public interest would be enormous.

146.    The PRA does not impermissibly burden or intrude upon the functioning of the Executive Branch. During a President's term in office, the PRA requires only preservation of records and does not provide for any disclosure of records to the public or Congress. The PRA provides for screening and maintenance of Presidential records within the Executive Branch after a President's term in office, and the President can ensure that most records do not become publicly available until at least 12 years after the President's term in office. Even then, the PRA

provides the incumbent and former Presidents the ability to shield or attempt to shield records from disclosure based on executive privilege or other applicable bases for withholding.

147.    The PRA is constitutional, and Defendants' disregard of this duly enacted law violates the separation of powers.

### COUNT II – Equitable Claim to Enjoin Violations of PRA
### (Against All Defendants)

148.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

149.    Federal courts possess inherent equitable power to enjoin federal officials from violating federal law. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). This power also extends "to violations of federal law by federal officials." *Id.*

150.    As set forth above, the PRA imposes various duties on the President, the Vice President, and the heads of EOP components subject to the PRA, including to collect and preserve Presidential records, and to provide those records to NARA at the conclusion of a presidential administration. The PRA imposes restrictions on the use of non-official messaging accounts for communications that constitute Presidential records under the PRA.

151.    The PRA also imposes duties on the Archivist in maintaining Presidential records once in NARA's custody and in providing access to Presidential records to the public, incumbent Presidents, and Congress subject to the PRA's parameters.

152.    The OLC opinion concludes that "the PRA is unconstitutional, and the President need not further comply with its dictates." OLC Op. 52.

153.    The White House has announced that those covered by the PRA will no longer comply with the PRA. Under the Post-OLC PRA Policy, covered persons will be trained to

collect and retain only a limited subset of records that fall far short of all Presidential records that the PRA requires to be retained. On information and belief, persons covered by the PRA will no longer be required to use official messaging accounts for their communications and will not be required to forward communication about official work from non-official messaging accounts to official ones.

154.    On information and belief, NARA no longer considers itself bound to comply with the PRA in light of the OLC Opinion and the President's determination to follow the OLC Opinion. The Court has inherent equitable authority to enjoin the Defendants from violating the PRA on an ongoing basis.

**COUNT III – Ultra Vires Actions**
**(Against All Defendants)**

155.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

156.    A nonstatutory right of action is available to challenge federal officials' ultra vires violations of, or actions in excess of authority under, federal statutes. Plaintiffs may assert such claims where an official's ultra vires actions are a "clear departure" from a "statutory mandate" and are "blatantly lawless" violations of statutory requirements. *Fed. Express Corp. v. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

157.    Defendants lack legal authority to disregard the prohibitions and mandates of the PRA, including because the PRA is constitutional. Defendants' open refusal to comply with the PRA's dictates is "blatantly lawless" and a "clear departure" from the PRA's requirements.

**COUNT IV – Administrative Procedure Act:**
**NARA Actions Contrary to Law**
**(Against Defendants NARA and Forst)**

158.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

41

159.    Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

160.    On information and belief, NARA has decided that it is no longer legally bound to comply with the PRA in light of the OLC Opinion and the President's determination to follow the OLC Opinion. That decision is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

161.    NARA's decision violates the constitutional separation of powers and the PRA, and therefore is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." The Court must declare unlawful and set aside NARA's unlawful decision and actions under 5 U.S.C. § 706(2).

**COUNT V – Administrative Procedure Act:**
**NARA Actions Unlawfully Withheld or Unreasonably Delayed**
**(Against Defendants NARA and Forst)**

162.    Plaintiffs re-allege and incorporate by reference all prior and subsequent paragraphs.

163.    Under the Administrative Procedure Act, a reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

164.    On information and belief, in reliance on the OLC Opinion and as required by the President's determination to follow the OLC Opinion, NARA is also unlawfully withholding or unreasonably delaying proactively making Presidential records from prior administrations, including from the first Trump administration, publicly available.

42

165.    NARA's withholding in proactively making such records publicly available, is "unlawful." 5 U.S.C. § 706(1).

166.    Alternatively, NARA is unreasonably delaying in proactively making Presidential records publicly available.

167.    The Court must compel NARA to not take these unlawfully withheld or unreasonably delayed actions pursuant to 5 U.S.C. § 706(1).

**COUNT VI – Administrative Procedure Act:**
**DOJ Action Contrary to Law**
**(Against Defendants DOJ and Bondi)**

168.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

169.    Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C).

170.    The OLC Opinion declaring the PRA facially unconstitutional in its entirety, and directing the President that he "need not further comply with its dictates," OLC Op. 52, is contrary to law.

171.    DOJ lacks legal authority to purportedly overrule on-point Supreme Court precedent, or to advise the President and other Executive Branch officials that they may act in contravention to Supreme Court precedent, on the basis that OLC deems the Supreme Court to be "wrong." Article III of the Constitution provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, §1. "It is emphatically the province and duty of the judicial department"—and not the Executive Branch—"to say what the law is."

*Marbury v. Madison*, 5 U.S. 137, 177 (1803). The OLC Opinion purporting to overrule Supreme Court precedent and advising the President that he may act in contravention of Supreme Court precedent violates the separation of powers.

172. The OLC Opinion advising the President that he may disregard the dictates of the PRA is also not in accordance with the PRA.

173. Because the OLC Opinion is contrary to law, the Court must declare it unlawful and set it aside pursuant to 5 U.S.C. § 706(2).

### COUNT VII – Mandamus
### (Against Individual Defendants)

174. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

175. If relief is not available on Plaintiffs' other claims, the Court should enter a writ of mandamus compelling the individual Defendants to comply with their affirmative, mandatory duties under the PRA.

176. Mandamus is warranted "to correct transparent violations of a clear duty to act" by federal officials. *In re Aiken Cnty.*, 725 F.3d 255, 258 (D.C. Cir. 2013) (quotations omitted).

177. The PRA imposes non-discretionary duties on the President, the Vice President, and the heads of EOP components subject to the PRA to collect and preserve Presidential records, and to provide those records to NARA at the conclusion of a presidential administration.

178. The PRA also imposes non-discretionary duties on the Archivist in maintaining Presidential records once in NARA's custody and in providing access to Presidential records to the public, incumbent Presidents, and Congress subject to the PRA's parameters.

179. Mandamus is warranted here to compel the individual Defendants to comply with their non-discretionary duties under the PRA, if Plaintiffs are unable to obtain complete relief on their other claims.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.      Declare that the PRA is constitutional, that the OLC Opinion is contrary to law and cannot be relied upon by Defendants, and that Defendants remain bound by the requirements of the PRA.

B.      Declare unlawful, vacate, set aside, postpone the effective date of, and enjoin NARA's decisions not to comply with all of the PRA's requirements of NARA.

C.      Compel NARA, pursuant to 5 U.S.C. § 706(1), to proactively make such records publicly available, in accordance with the PRA's requirements.

D.      Enjoin Defendants from relying on the OLC Opinion or otherwise treating the PRA as non-binding, and to comply with their mandatory duties under the PRA.

E.      Enjoin the individual Defendants, other than President Trump in his official capacity, to disclose to the Court any known instances in which the President destroys, converts for personal use, or otherwise fails to maintain Presidential records as required by the PRA.

F.      Enjoin President Trump, in his personal capacity after the conclusion of his term in office, from retaining, destroying, disposing, or otherwise handling Presidential records in a manner not in accordance with the PRA, and to turn over all Presidential records in his actual or constructive possession to NARA as required by the PRA.

G.      Issue a writ of mandamus compelling Defendants to carry out their non-discretionary duties under the PRA, if complete relief is not available under Plaintiffs' other claims.

H.      Grant Plaintiffs an award of attorneys' fees and other litigation costs reasonably incurred in this action.

45

I.      Grant Plaintiffs any other relief this Court deems appropriate.


April 6, 2026                                    Respectfully submitted,

                                                */s/ Daniel F. Jacobson*
                                                Daniel F. Jacobson (D.C. Bar 1016621)
                                                Lynn D. Eisenberg (D.C. Bar 1017511)
                                                John Robinson (D.C. Bar 1044072)
                                                JACOBSON LAWYERS GROUP PLLC
                                                5100 Wisconsin Ave NW, Suite 301
                                                Washington DC, 20016
                                                (301) 823-1148
                                                dan@jacobsonlawyersgroup.com


                                                */s/ Loree Stark*
                                                Loree Stark
                                                D.C. Bar No. 90021926
                                                American Oversight
                                                1030 15th Street NW, B255
                                                Washington, D.C. 20005
                                                (202) 869-5246
                                                loree.stark@americanoversight.org

                                                *Counsel for Plaintiffs*