**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 26-cv-1169 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION AND STAY</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.    Preservation of Presidential Records Prior to the PRA ....................................... 3

    B.    The Presidential Records Act ............................................................................. 7

    C.    The OLC Opinion .............................................................................................. 13

    D.    Post-OLC White House Guidance and the Government's Refusal to Stipulate to Preserving Records .......................................................................................... 14

LEGAL STANDARD ......................................................................................................... 16

ARGUMENT ...................................................................................................................... 17

    I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims ............................... 17

        A.    Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim .......... 17

            1.    Plaintiffs Have a Constitutional Cause of Action ........................................... 17

            2.    *Nixon v. GSA* Is Controlling .......................................................................... 17

            3.    The PRA Is Constitutional on First Principles ................................................ 21

        B.    Plaintiffs Are Likely to Succeed on their Equitable, *Ultra Vires*, and Mandamus Claims ............................................................................................................. 32

        C.    Plaintiffs Are Likely to Succeed on their APA Claim Against DOJ ................ 35

        D.    Plaintiffs Are Likely to Succeed on their APA Claim Against NARA ............ 37

    II.    Plaintiffs Face Irreparable Harm Absent an Injunction .............................................. 37

    III.  The Balance of Equities and Public Interest Merit a Preliminary Injunction ............. 41

CONCLUSION .................................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Am. First Legal Found. v. Becerra*
  No. CV 24-1092, 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ...................................... 39, 40, 41

*Am. Oversight v. Hegseth*,
  788 F. Supp. 3d 14 (D.D.C. 2025) ................................................................... 38, 39

*Am. Oversight v. U.S. Agency for Int'l Dev.*,
  No. 25-CV-719 (TSC), 2026 WL 592311 (D.D.C. Mar. 3, 2026) ........................................... 38

*Am. School of Magnetic Healing v. McAnnulty*,
  187 U.S. 94 (1902) ................................................................... 32

*Armstrong v. Bush*,
  924 F.2d 282 (D.C. Cir. 1991) ................................................................... 7, 8, 38

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................... 32, 33

*Ashwander v. Tennessee Valley Auth.*,
  297 U.S. 288, 315, 330 (1936) ................................................................... 24

*Carnahan v. Maloney*,
  143 S. Ct. 2653 (2023) ................................................................... 23

*Citizens for Resp. & Ethics in Washington v. Off. of Admin.*,
  559 F. Supp. 2d 9 (D.D.C. 2008) ................................................................... 38

*Citizens for Resp. & Ethics in Washington v. Off. of Admin.*,
  566 F.3d 219 (D.C. Cir. 2009) ................................................................... 38

*Citizens for Resp. & Ethics in Washington v. Off. of Admin.*,
  565 F. Supp. 2d 23 (D.D.C. 2008) ................................................................... 39

*Ctr. for Pub. Integrity v. United States Dep't of Def.*,
  411 F. Supp. 3d 5 (D.D.C. 2019) ................................................................... 41

*Dalton v. Specter*,
  511 U.S. 462 (1994) ................................................................... 17

*Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*,
  642 F.2d 527 (D.C. Cir. 1980) ................................................................... 23, 25

*Fed. Express Corp. v. Dep't of Com.*,
  39 F.4th 756 (D.C. Cir. 2022) ................................................................... 34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ........................................................................................ 17

*In re Aiken Cnty.*,
    725 F.3d 255 (D.C. Cir. 2013) ....................................................................... 34

*Kleppe v. New Mexico*,
    426 U.S. 529 (1976) ................................................................................. 24, 25

*League of Women Voters of United States v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 44

*Maloney v. Carnahan*,
    45 F.4th 215 (D.C. Cir. 2022) ....................................................................... 22

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..................................................................................... 21, 37

*Massachusetts v. Nat'l Institutes of Health*,
    770 F. Supp. 3d 277 (D. Mass. 2025) ........................................................... 44

*Mathis v. U.S. Parole Comm'n*,
    749 F. Supp. 3d 8 (D.D.C. 2024) .................................................................. 33

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ...................................................................................... 29

*Mistretta v. United States*,
    488 U.S. 361 (1989) ...................................................................................... 28

*Nat'l Ass'n of Deaf v. Trump*,
    808 F. Supp. 3d 150 (D.D.C. 2025) .............................................................. 33

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
    26 F.4th 960 (D.C. Cir. 2022) ....................................................................... 34

*New Hampshire Lottery Comm'n v. Barr*,
    386 F. Supp. 3d 132 (D.N.H. 2019) .............................................................. 35

*New Hampshire Lottery Comm'n v. Rosen,*
    986 F.3d 38 (1st Cir. 2021) ............................................................................ 35

*\*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977) ................................................................................ *passim*

*Nixon v. GSA*,
    408 F. Supp. 321 (D.D.C. 1976) ................................................................ 3, 26

*Nixon v. Sampson*,
  389 F. Supp. 107 (D.D.C. 1975) ............................................................... 23

*Nixon v. Sampson*,
  437 F. Supp. 654 (D.D.C. 1977) ............................................................... 23

*Nken v. Holder*,
  556 U.S. 418 (2009). ............................................................................... 17

*O'Bryan v. Bureau of Prisons*,
  349 F.3d 399 (7th Cir. 2003)............................................................. 26, 28

*Public Citizen v. Burke*,
  655 F. Supp. 318 (D.D.C. 1987) ......................................................... 36, 37

*Public Citizen v. Burke*,
  843 F.2d 1473 (D.C. Cir. 1988) ............................................................... 36

*Reps. Comm. for Freedom of Press v. Sampson*,
  591 F.2d 944 (D.C. Cir. 1978) ................................................................. 23

*Scenic Am., Inc. v. U.S. Dep't of Transportation*,
  836 F.3d 42 (D.C. Cir. 2016) ................................................................... 35

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................ 37

*Trump v. Mazars USA, LLP*,
  591 U.S. 848 (2020) ................................................................................ 22

*United States v. Comstock*,
  560 U.S. 126 (2010) ................................................................................ 28

*United States v. Lue*,
  134 F.3d 79 (2d Cir. 1998)....................................................................... 26

*United States v. Walter*,
  263 U.S. 15 (1923) .................................................................................. 24

*Wayman v. Southard*,
  23 U.S. (10 Wheat.) 1 (1825)................................................................... 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................... 16

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................ 17

*Ziglar v. Abbasi*,
  582 U.S. 120 ...................................................................................................... 21

**Statutes**

3 U.S.C. § 105 ....................................................................................................... 29

3 U.S.C. § 106 ....................................................................................................... 29

3 U.S.C. § 107 ....................................................................................................... 29

3 U.S.C. § 109 ....................................................................................................... 29

5 U.S.C. § 552 ....................................................................................................... 11

5 U.S.C. § 705 ....................................................................................................... 37

5 U.S.C. § 706 ................................................................................................. 35, 37

6 U.S.C. § 491 ....................................................................................................... 29

15 U.S.C. § 1023 ................................................................................................... 29

44 U.S.C § 2201 ......................................................................................... 8, 9, 42

44 U.S.C.§ 2202 ............................................................................................ 8, 24

44 U.S.C. § 2203(a) .............................................................................................. 34

44 U.S.C § 2203(b) .............................................................................................. 34

44 U.S.C § 2203(f) ................................................................................................. 9

44 U.S.C § 2203(g) .................................................................................. 10, 11, 34, 40

44 U.S.C § 2204(a) .............................................................................................. 11

44 U.S.C § 2204(b) .............................................................................................. 11

44 U.S.C § 2204(c) .......................................................................................... 11, 12

44 U.S.C § 2204(e) .............................................................................................. 12

44 U.S.C § 2205 ........................................................................................ 10, 26, 27

44 U.S.C § 2206 .................................................................................................... 12

44 U.S.C § 2207 ...................................................................................................... 7

44 U.S.C. § 2208 ........................................................................................ 7, 12, 31

44 U.S.C. § 2209 ................................................................................ 9, 16, 33, 34

50 U.S.C. § 3021 ................................................................................................ 29

**Regulations**

36 C.F.R § 1270.20 .............................................................................................. 9

36 C.F.R § 1270.38 ....................................................................................... 11, 40

**Constitutional Provisions**

U.S. Const. art I., § 8, cl. 18 ......................................................................... 25, 29

U.S. Const. art. IV, § 3, Cl. 2 ............................................................................. 23

**Executive Orders**

E.O. 14,125 § 7 (Feb. 18, 2025) ........................................................................ 37

**Other Authorities**

John Mikhail, *The Necessary and Proper Clauses*,
    102 Georgetown L.J. 1045 (2014) ............................................................... 25

Joseph Story, Commentaries on the Constitution of the United States (1833) ............................. 24

Presidential Records Act, 50 Op. O.L.C. __ (Apr. 1, 2026) (slip op.) ................................. *passim*

The Federalist No. 47, at 325–26 (J. Cooke ed. 1961) ...................................... 28

**INTRODUCTION**

Plaintiffs seek a preliminary injunction to prevent the President, his White House staff, and the National Archives from flouting the most basic and immediately urgent requirements of the Presidential Records Act—to preserve and not destroy records of their official activities.

In an effort to avoid or limit the need for this motion, Plaintiffs inquired whether the government would provide written assurances that Defendants will preserve and not destroy official government records, as defined under the Presidential Records Act (PRA), during the pendency of this litigation. But the government categorically refused. The government would not stipulate that the President and PRA-covered staff will preserve their official records at all. Nor would it stipulate that the President and PRA-covered staff will comply with the PRA's prohibition on using Signal or other applications on personal phones that automatically delete records. The government would not even provide a written commitment that the *National Archives* (NARA) will refrain from destroying Presidential records in its custody.

The government's refusal to make any of these basic commitments, against the backdrop of the Office of Legal Counsel (OLC) having just declared the PRA void at the White House's request, presents a clear danger that official government records of the highest importance will be irretrievably lost absent relief. That will cause irreparable harm to Plaintiffs, to the American Historical Association's members who are presidential scholars, and to the public at large.

On the merits, Plaintiffs are certain to succeed, because the Supreme Court has already resolved the constitutionality of the materially identical forebearer to the PRA, in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977) (*Nixon v. GSA*). The Supreme Court rejected each and every argument that OLC now puts forward to declare the PRA facially unconstitutional. The Court held Congress possesses authority to enact legislation requiring the preservation of Presidential records, ongoing Executive Branch custody of those records, and

eventual public access subject to restrictions to protect a former President's interests. The Court held that such legislation does not violate the separation of powers, including because it does not impermissibly interfere with the Executive's Branch ability to carry out its constitutional functions. Rather than meaningfully attempt to distinguish *Nixon v. GSA*, OLC openly declares that it just thinks the Supreme Court was "wrong." But the Supreme Court settles the law in this nation, and its binding precedent controls here.

Even if *Nixon v. GSA* were not controlling, the PRA is constitutional. Congress has clear authority to enact the PRA under the Property Clause of Article IV, which the Supreme Court has held affords Congress plenary power over the disposition of government property, both real and personal. OLC remarkably ignores this source of constitutional authority, even though it was the primary authority the Department of Justice relied upon in defending the PRA's predecessor law at the Supreme Court in *Nixon v. GSA*. Congress independently has authority to enact the PRA under the latter half of the Necessary and Proper Clause, which empowers Congress to enact reasonable regulations in furtherance of "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Contrary to OLC's myopic consideration of only the preferences of the current occupant of the presidency, the PRA furthers the interests of all three branches of the federal government, which critically depend on a former administration's Presidential records to carry out their constitutional duties.

Weighed against the plain illegality of Defendants' actions and the imminent harm they will cause Plaintiffs, the government can cite no cognizable harms from the limited injunction Plaintiffs seek. The PRA has been in place for 45 years, including for five years of President Trump's terms, and Presidents have carried out their constitutional functions without hindrance. Plaintiffs seek only to preserve the status quo and prevent history from being lost forever.

2

## BACKGROUND

### A.    Preservation of Presidential Records Prior to the PRA

Following the resignation of President Nixon, Congress passed the Presidential Recordings and Materials Preservation Act (Preservation Act). *See* Pub. L. No. 93-526, 88 Stat. 1695 (1974). The Preservation Act provided for the United States to take ownership and custody of 42 million pages of documents and 880 tape recordings of conversations from Nixon's terms in office. The Act directed the Administrator of General Services to take custody of President Nixon's records and promulgate regulations that would provide for (i) the orderly processing and screening by Executive Branch archivists and (ii) public access to the records, pursuant to terms and conditions that would respect relevant Executive Branch privileges and interests. *See Nixon v. GSA*. The Act also prohibited the destruction of the President's records. *Id.* at 434.

The day after President Ford signed the Preservation Act into law, former President Nixon filed suit in the U.S. District Court for the District of Columbia, contending that the Act violated the constitutional separation of powers and executive privilege. Nixon's primary contention was "that the Act encroaches upon the Presidential prerogative to control internal operations of the Presidential office and therefore offends the autonomy of the Executive Branch." *Nixon v. GSA*, 433 U.S. at 439–40.

A three-judge district court rejected President Nixon's challenge and upheld the law. *Nixon v. GSA*, 408 F. Supp. 321, 333 (D.D.C. 1976). As for President Nixon's argument that the Act unduly intruded on executive confidentiality, the court held that the "review of the materials by government archivists would constitute" at most a "minimal" intrusion, noting that "every President since the establishment in 1934 of the National Archives" had turned over presidential papers for governmental preservation and disclosure anyway. *Id.* at 346–47. The court also found

3

that Congress had good reason to entrust the review of records with the General Services Administration rather than the President, as "Chief Executives are not by nature professional archivists," and "Congress could legitimately wish to establish regularized procedures to ensure that the process by which the materials would be reviewed would be adequate to the task" and that those "entrusted with reviewing such materials be . . . disinterested." *Id.* at 347–48.

The district court comprehensively reviewed the legislative history of the Preservation Act and concluded that the Act supported at least two strong congressional interests in the preservation of presidential records. "First, and most broadly," such preservation "serves the national interest by preserving materials upon which historians must draw in order accurately to recount and to judge the political history of our time." *Id.* at 349 (citing S. Rep. No. 93-1181, 93d Cong., 2d Sess., at 1, 3 (1974); H.R. Rep. No. 93-1507, 93d Cong.2d Sess., at 2, 3, 8 (1974); Senate Hearings on GSA Regulations at 256; 120 Cong. Rec. S 16871 (daily ed. Sept. 18, 1974) (remarks of Sen. Nelson); *id.* at S 18235 (daily ed. Oct. 3, 1974); *id.* at S 18248 (remarks of Sen. Ervin); id. at S 18259 (remarks of Sen. Huddleston); *id.* at S 18260 (remarks of Sen. Ribicoff); *id.* at S 18261 (remarks of Sen. Muskie); *id.* at S 18325 (daily ed. Oct. 4, 1974) (remarks of Sen. Nelson); *id.* at H 11207 (daily ed. Dec. 3, 1974) (remarks of Rep. Brademas)).

Second, Congress believed that "preservation of these materials is needed to ensure their availability for successive administrations engaged in policymaking." *Id.* at 350 (citing S. Rep. No. 93-1181, 93d Cong., 2d Sess., at 3, 4, 5 (1974); H.R. Rep. No. 93-1507, 93d Cong., 2d Sess., at 3 (1974); 120 Cong. Rec. H 11211 (daily ed. Dec. 3, 1974) (remarks of Rep. Abzug)). As the court explained, "[g]overnmental programs and policies do not expire every four or eight years," and "the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." *Id.*

The Supreme Court affirmed the district court's decision, holding that "neither [President Nixon's] separation-of-powers claim nor his claim of breach of constitutional privilege has merit." *Nixon v. GSA*, 433 U.S. at 439. As to Nixon's separation-of-powers claim, the Supreme Court "reject[ed]" the argument that "the Act's regulation of the disposition of Presidential materials within the Executive Branch constitutes, without more, a violation of the principle of separation of powers." *Id.* at 441. The Court explained that it was "highly relevant" to the separation-of-powers analysis that "the Act provides for custody of the materials in officials of the Executive Branch and that employees of that branch have access to the materials only 'for lawful Government use, subject to the (Administrator's) regulations.'" *Id.* at 443–44. The Court further emphasized that, "although some of the materials may eventually be made available for public access, the Act expressly recognize[d] the need both to protect any party's opportunity to assert any legally or constitutionally based right or privilege." *Id.* at 444 (quotations omitted). The Court thus held that the Act was not "unduly disruptive of the Executive Branch" because "[t]he Executive Branch remain[ed] in full control of the Presidential materials, and the Act facially [was] designed to ensure that the materials [could] be released only when release [was] not barred by some applicable privilege inherent in that branch." *Id.* at 444–45.

The Court held that there was "congressional power to regulate Executive Branch documents . . . in this instance, a power that is augmented by the important interests that the Act seeks to attain." *Id.* at 445–46. Citing myriad statutes regulating the disclosure and disposition of government records, the Court noted that "there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." *Id.* at 445.

As to the executive privilege claim, the Court "agree[d] with the District Court" that it could "readily resolve[]" the question because the screening of presidential records contemplated by the Act "constitutes a very limited intrusion by personnel in the Executive Branch sensitive to executive concerns." *Id.* at 451. The Court further held that "adequate justifications are shown for this limited intrusion into executive confidentiality," endorsing the district court's "exhaustive" treatment of the legislative history. *Id.* at 452. That history "clearly reveal[ed]" that "among other purposes, Congress acted to establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." *Id.* "An incumbent President should not be dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Id.* The Court rejected Nixon's argument that the Act was necessarily unconstitutional because "the potential disclosure of communications given to [him] in confidence would adversely affect the ability of future Presidents to obtain the candid advice necessary for effective decisionmaking." *Id.* at 449–50

Shortly after *Nixon v. GSA*, OLC recognized that "[t]he Supreme Court's opinion in *Nixon* . . . makes clear that it is within the appropriate ambit of Congress' power to legislate with respect to the preservation of historically valuable papers of the Chief Executive." *See* Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm on Gov't Operations at 112, 95th Cong. 87–133 (1978) (statement of Lawrence A. Hammond, Deputy Assistant Attorney General, Office of Legal Counsel) (attached as Jacobson Decl. Ex. D). OLC further noted that "Justice Powell's separate concurrence . . . makes the same point at somewhat greater length and concludes that Congress' power in this area is 'unquestionable.'" *Id.* (quoting *Nixon v. GSA*, 433 U.S. at 498 (Powell, J., concurring)). Given

*Nixon*, OLC concluded that Congress's declaring the President's official papers to be public property "is not subject to serious challenge." *Id.*

## B.    The Presidential Records Act

### 1.  *Passage of the Presidential Records Act*

Like OLC, Congress concluded that the Supreme Court in *Nixon v. GSA* had "established principles that would govern legislation dealing more broadly with control of and access to presidential papers." H.R. Rep. No. 95-1487, at 6 (1978), *reprinted in* 1978 USCCAN 5732, 5737. Accordingly, a year after the Supreme Court issued its decision, Congress enacted the PRA to expand the Preservation Act "to insure the preservation of and public access to the official records" of all future Presidential administrations. *Armstrong v. Bush*, 924 F.2d 282, 287 (D.C. Cir. 1991) (quoting Presidential Records Act of 1978, Pub. L. No. 95-591, 1978 U.S. Code Cong. & Admin. News (92 Stat.)).

Through the PRA, Congress permanently "establish[ed] the public ownership of records created by future presidents and their staffs … [and] procedures governing the preservation and public availability of these records at the end of a Presidential administration."[1] H.R. Rep. No. 95-1487, at 2. Congress also specifically intended to facilitate historical research and scholarship in enacting the PRA; "the statutory language and legislative history of [the PRA] indicate that one of the reasons that Congress mandated the creation and preservation of . . . presidential records was to ensure that private researchers and historians would have access to the documentary history of the federal government." *Armstrong*, 924 F.2d at 287.

---

[1] With the exception of provisions relating to Presidential privileges, 44 U.S.C. § 2208, Vice-Presidential records are treated in exactly the same way as Presidential records under the Act and the Vice President and Vice President's staff have the same preservation responsibilities as the President. *Id.* § 2207. As such, except with respect to Presidential privileges, where this brief refers to requirements of the President or refers to "Presidential records," the brief incorporates requirements of the Vice President and related to Vice-Presidential records.

With respect to public ownership of Presidential records, the PRA is clear: "The United States shall reserve and retain complete ownership, possession, and control of Presidential records; and such records shall be administered in accordance with the provisions of [the PRA]." 44 U.S.C.§ 2202.

The PRA establishes public ownership not only of the records of the President and Vice President, but also of "the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President." *Id.* § 2201(2). The EOP currently considers nine of its components to be units that meet these criteria including the White House Office and the National Security Council.[2] As of October 1, 2025, these nine components collectively had 842 full-time employees, all covered by the PRA.[3]

### 2. Scope and Preservation Obligations

The PRA defines presidential records to include all "documentary materials . . . created or received" by the President, the Vice President, and PRA-covered staff "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2). However, the Act

---

[2] The nine EOP components that the EOP considers to be subject to the PRA are the White House Office, the Office of the Vice President, the National Security Council, the Homeland Security Council, the Office of Administration, the President's Intelligence Advisory Board, the Council of Economic Advisors, the Executive Residence, and the U.S. DOGE Service. *See* Memorandum for All Personnel, Presidential Records Act Obligations (Feb. 22, 2017), https://www.archives.gov/files/foia/Memo%20to%20WH%20Staff%20Re%20Presidential%20R ecords%20Act%20(Trump,%2002-22-17)_redacted%20(1).pdf; Dkt. 13-2 in *American Oversight v. DOGE*, No. 25-cv-409 (D.D.C. Mar. 27, 2025).

[3] See Letter from Joshua Fisher, Director of Management and Administration, to Russell Vought, Director of the Office of Management and Budget, Re: EOP Contingency Plan for a Shutdown Furlough (Sep. 30, 2025), https://www.whitehouse.gov/wp-content/uploads/2025/10/Executive-Office-of-the-President-EOP-Shutdown-Plan.pdf.

excludes "personal records" from this definition, such as "diaries, journals, or other personal notes" of the President, and records relating to electoral and not official activities. *Id.*

For materials that do relate to or have an effect upon the President's official duties, the PRA broadly requires preservation of all such "documentary material," which is defined to include "books, correspondence, memoranda, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, and motion pictures, including, but not limited to, audio and visual records, or other electronic or mechanical recordations, whether in analog, digital, or any other form." 44 U.S.C. § 2201(1).

In 2014, Congress unanimously amended the PRA to regulate and ensure the preservation of electronic records. Public Law 113-187, 128 Stat. 2005. The amendments require that the President, Vice President, and all PRA-covered staff use official government accounts when sending or receiving electronic messages that meet the definition of presidential records, or that they must forward such messages to an official account within 20 days if sent or received on a non-official device. 44 U.S.C. § 2209(a). Congress broadly defined "electronic messages" to include "electronic mail and other electronic messaging systems that are used for purposes of communicating between individuals." *Id.* § 2209(c)(2).

   3.   *Custody and Disclosure of Presidential Records*

The PRA balances goals of ensuring preservation of historical documents and respecting the President's autonomy in office. To the latter end, during a President's term in office, the President "remain[s] exclusively responsible for custody, control, and access to … Presidential records." 44 U.S.C. § 2203(f); *see also* 36 C.F.R 1270.20 (recognizing that, even when the Archivist or NARA has physical custody of Presidential records, "the President remains exclusively responsible for control and access to their records until their term of office

9

concludes"). And the PRA does not provide for public or congressional access to Presidential records during a President's term in office.

Upon the end of an administration, NARA "assume[s] responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President."44 U.S.C. § 2203(g)(1). But even then, the former Presidents may access their own Presidential records at any time notwithstanding any other limitations. *Id.* § 2205(3). As for access by others once NARA takes custody of a former President's records, the PRA carefully calibrates access to the materials to all three branches of government, affording such access in certain circumstances while preserving the former President's ability to delay disclosure and assert any applicable privileges or rights before release. "[S]ubject to any rights, defenses, or privileges which the United States or any agency or person may invoke," Presidential records in NARA's custody "shall be made available": (1) to an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available"; (2) "pursuant to subpoena or other judicial process issued by a court of competent jurisdiction for the purposes of any civil or criminal investigation or proceeding"; and (3) "to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed for the conduct of its business and that is not otherwise available." *Id.* § 2205.

The PRA also provides for public access to Presidential records in NARA's custody. Subject to the limitations and procedures described below, the Archivist has "an affirmative duty to make such records available to the public as rapidly and completely as possible." 44 U.S.C. § 2203(g)(1). Despite this directive to move expeditiously, the earliest any Presidential records are generally accessible by the public is five years after the President has left office and transferred

10

custody of the records to the Archivist. *Id.* § 2204(b)(2); *see also* 36 CFR § 1270.38. However, the President has substantial control over when records are released; the President has the power to specify durations of up to 12 years, "for which access shall be restricted with respect to information, in a Presidential record, within" several broad categories of records. 44 U.S.C. ] § 2204(a). These include any records marked as classified pursuant to an Executive Order; relating to appointments to federal office; exempt from disclosure by another statute; including privileged trade secrets, commercial information, or financial information; advice from presidential advisors or the solicitation of such advice; and personnel and medical files. *Id.* Once a Presidential record is so designated, the Archivist cannot make it public until the expiration of the designation, the Archivist receives a waiver from the former President, or the former President or President's agents otherwise make the document public. *Id.* § 2204(b)(1).

Once the applicable designations have expired, members of the public can request access to the documents pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), if the Archivist has not processed and affirmatively released the records by that time. *Id.* Thus, public access to Presidential records is limited by the same exceptions and exemptions that exist under FOIA, except that documents otherwise available for disclosure cannot be withheld pursuant to the deliberative process privilege. 44 U.S.C. § 2204(c)(1).

Congress provided for even greater protections for documents that touch on issues of Presidential privilege. Indeed, in crafting the PRA and through its amendments, Congress made clear that "[n]othing in [the PRA] shall be construed to confirm, limit, or expand any constitutionally-based privilege" of a President or former President. *Id.* § 2204(c)(2). To that end, through the following process, the PRA carefully balances the goal of expeditious release of information with safeguarding Presidential assertions of executive privilege.

11

Prior to making any Presidential record public for the first time, the Archivist must notify the incumbent President as well as the relevant former President. *Id.* § 2208(a). *See also id.* § 2206 (requiring the Archivist to promulgate regulations including to provide notice to a former President where disclosure "may adversely affect any rights and privileges which the former President may have."). This notification must itself be made public. *Id.* Upon issuing that notice, the Archivist cannot make the Presidential Record(s) public for 60 business days—this period can be extended for another 30 by the President or former President. If the current or relevant former President personally notifies the Archivist of a claim of a constitutionally-based privilege, the Archivist shall not release the record. *Id.* §§ 2208(a)(3), 2208(b).

Any claim of privilege raised by the incumbent President stops release of the documents unless the claim is withdrawn or the documents must be released under an unappealable court order. 44 U.S.C. § 2208(d). If a former President asserts a claim of privilege, the Archivist must consult with the current President to determine whether the current President will uphold the claim. *Id.* § 2208(c). If the current President does not uphold the claim, the document will be released subject to the former President's right to seek a court order. A former President may bring an action in the United States District Court for the District of Columbia where the former President believes that "a determination made by the Archivist violates the former President's rights or privileges." *Id.* § 2204(e).

Since the PRA took effect 45 years ago, no administration of either party—including the first Trump Administration—has questioned the PRA's constitutionality or contended that it unduly interferes with the President's discharge of his constitutional responsibilities.

**C.    The OLC Opinion**

At some point during President Trump's second term in office, White House Counsel David Warrington requested that OLC provide an opinion on whether the PRA is constitutional.

On April 1, 2026, Assistant Attorney General for OLC, T. Elliot Gaiser, issued an opinion declaring that the PRA is facially unconstitutional, in its entirety. *See* Constitutionality of the Presidential Records Act, 50 Op. O.L.C. __ (Apr. 1, 2026) (slip op.) ("OLC Op."). OLC declared that "[t]he PRA is unconstitutional for two independent but interlocking reasons: It exceeds Congress's enumerated and implied powers, and it aggrandizes the Legislative Branch at the expense of the constitutional independence and autonomy of the Executive." OLC Op. 1.

On the first reason, OLC concluded that the PRA could not be sustained as an exercise of Congress' "oversight power," its "inherent preservation power," its "implicit authority to regulate government agencies and offices created by statute," or its powers under the Appropriations Clause or Spending Clause. OLC Op. 17. OLC further concluded that Congress could not rely on "[t]he public's interest in the President's papers" as a basis for enacting the PRA. *Id.* at 22. And OLC opined that the Necessary and Proper Clause did not provide authority either, because that clause purportedly only permits legislation that "facilitates" rather than "burdens" the "exercise of executive power." *Id.* at 41.

On the second reason, OLC found that even if the PRA served a valid legislative purpose, it is "overbroad" and unduly burdensome. OLC acknowledged that "the Act may not place a severe and direct burden on the President personally," but nevertheless found a constitutionally impermissible burden because the "White House Counsel's Office spends a considerable amount of time ensuring the President's compliance with the PRA." OLC Op. 24. OLC further speculated that "the PRA *might* burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties." *Id.* at 48 (emphasis added) (citation modified).

13

OLC declared that *Nixon v. GSA* "does not save the PRA." OLC Op. 41. OLC briefly attempted to distinguish the PRA from the Preservation Act, but in the end rested on its conclusion that the Supreme Court's decision was simply "wrong." *Id.* at 45. OLC described the case as "wrong" (twice), "mistaken," and having "fail[ed] to appreciate the Article II consequences of permitting Congress to regulate presidential records." *Id.* at 45–49.

OLC then concluded in summary fashion that the constitutionally impermissible portions of the PRA were inseverable from the remainder of the PRA, leading OLC to declare that "the PRA falls entirely." OLC Op. 49–51. OLC's severability analysis was unusual in that the opinion never actually identified the specific unconstitutional provisions, let alone explained how those specific provisions were inseverable from the remaining provisions.

In its conclusion, OLC purported to provide the President permission to ignore the PRA: "For these reasons, the PRA is unconstitutional, and the President need not further comply with its dictates." OLC Op. 52.

### D.    Post-OLC White House Guidance and the Government's Refusal to Stipulate to Preserving Records

Contemporaneously with the release of the OLC Opinion, White House spokesperson Abigail Jackson described Defendants' new policy for the collection, retention, and preservation of official records of PRA components of the EOP (the "Post-OLC PRA Policy"). Jackson stated that staff covered by the PRA "must undertake records training so they properly preserve all materials related to: the performance of their duties for historical value, the administrative record of policy decisions and actions, and litigation needs." Jackson added that "[t]he President will

14

also retain the program currently in place for electronic records – emails and documents cannot be deleted from the White House system."[4]

Jackson did not indicate whether the President himself would preserve records falling into these three limited categories of records that she said staff would be trained to preserve. Nor did Jackson indicate that staff covered by the PRA will be required to comply with the PRA's restriction on using non-official electronic messaging accounts. Messages on such non-official platforms—including personal email, and messages on personal phones via texts, Signal, or other applications in which users can set messages to automatically delete—are not saved to "the White House system" by default. These messages are preserved only if a staff member manually forwards the message to their official account or otherwise saves the message onto the White House network. The White House did leave little doubt, however, that the Post-OLC PRA policy would not require preserving all records that the PRA requires to be retained, which are far broader than the three categories Jackson described under the Post-OLC PRA policy, with a spokesperson suggesting that Defendants would no longer "save every single possible piece of paper" that Congress had required.[5]

In an effort to limit emergency motions practice, Plaintiffs reached out to counsel for Defendants after filing this lawsuit seeking a meet and confer on whether Defendants would stipulate that they will preserve Presidential records and take other actions required by the PRA

---

[4] Tierney Sneed, *Trump's DOJ Tells Trump He Can Hold Onto Government Docs When He Leaves Office, Contrary to Watergate-era Law*, CNN (Apr. 3, 2026), https://www.cnn.com/2026/04/03/politics/trump-presidential-records-act-watergate#:~:text=%E2%80%9CThe%20President%20will%20also%20retain,NARA%20how%20to%20move%20forward.%E2%80%9D.

[5] Alex Isenstadt, *Exclusive: Trump's DOJ Says He's Not Required to Turn Over Official Records*, AXIOS (Apr. 1, 2026), https://www.axios.com/2026/04/01/trump-doj-presidential-records-act-national-archives (attached as Jacobson Decl. Ex. C).

during the pendency of this litigation. *See* Jacobson Decl. Ex. A. Plaintiffs asked whether Defendants would agree to stipulate that, for the pendency of the litigation:

- NARA will (1) not destroy and will otherwise maintain any Presidential records (as defined by the PRA) already in its custody; (2) fulfill its obligations under the PRA to work expeditiously to make public Presidential records of prior administrations, subject only to the exceptions set forth in the PRA; and (3) fulfill its obligations under the PRA to timely process FOIA requests for Presidential records of prior Administrations, subject only to the exceptions set forth in the PRA;

- PRA components in the EOP will collect and preserve all records that qualify as presidential records under the PRA;

- All persons covered by the PRA will comply with the requirements of 44 U.S.C. § 2209, where such compliance requires treating all emails, text messages, and messages on encrypted messaging apps like Signal and What's App that relate to their official duties as Presidential records that must be preserved on official accounts;

- The President and Vice President will comply with the PRA's requirements, including by preserving all presidential records as defined by the PRA.

*Id.*

On Friday, April 10, Defendants responded that they "cannot agree to a stipulated order regarding the issues" that Plaintiffs had raised, and that Defendants "are not yet in a position to make additional representations about the Government's approach to those issues." *Id.*

With Defendants unwilling to stipulate that they will not destroy records and will otherwise preserve records during the pendency of this litigation, Plaintiffs file this motion for a preliminary injunction.

16

**LEGAL STANDARD**

To obtain a preliminary injunction, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely without preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that a preliminary injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the government is the opposing party, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs also seek a stay under 5 U.S.C. § 705. "The standard of review for relief under 5 U.S.C. § 705 is the same as the standard of review for preliminary injunctions." *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020).

**ARGUMENT**

**I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

**A.    Plaintiffs Are Likely to Succeed on Their Separation-of-Powers Claim**

**1.    Plaintiffs Have a Constitutional Cause of Action**

Plaintiffs have an equitable right of action to declare unlawful and enjoin Defendants' unconstitutional actions, including pursuant to a "separation-of-powers claim." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). As relevant here, Plaintiffs may bring a separation of powers challenge where, as here, the Executive Branch openly disregards a federal statute, there is a "conceded *absence* of *any* statutory authority" for the Executive Branch's actions, and the "only basis of authority asserted" for the Executive Branch to disregard the statute is a constitutional defense. *Dalton v. Specter*, 511 U.S. 462, 473 (1994) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)).

Here, Defendants are openly disregarding the PRA's requirements, there is a conceded absence of statutory authority as Defendants do not claim that any statute authorizes them to

17

ignore the PRA's dictates, and the sole asserted basis for those actions is that the Executive Branch is not constitutionally bound to comply with this law. But Defendants' constitutional justifications for violating the statute are egregiously wrong. The PRA is constitutional, as the Supreme Court made clear decades ago.

### 2.  *Nixon v. GSA* Is Controlling

On the merits of Defendants' constitutional argument, *Nixon v. GSA* is controlling and forecloses Defendants' arguments that the PRA facially violates the separation of powers. The Preservation Act at issue in *Nixon* was materially identical to the PRA in all respects relevant to Defendants' separation-of-powers arguments. Like the PRA, the Preservation Act provided for government ownership and possession of all of Nixon's records reflecting his official activities, and prohibited the destruction of such records. *Nixon v. GSA*, 433 U.S. at 434. Like the PRA, the Preservation Act provided for access to the records by future Administrations and the judiciary, as needed for official business, but "subject . . . to any rights, defenses, or privileges which the Federal Government or any person may invoke," including the former President. *Id.* And just as under the PRA, the Preservation Act provided for future public access to the materials, but only pursuant to regulations that, among other things, ensured the former President could "assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials." *Id.* at 435.

*Nixon v. GSA* is controlling not just because of the statutory parallels, but because the Supreme Court rejected virtually each and every argument OLC now advances for why the PRA is facially unconstitutional. The Supreme Court rejected OLC's top-line conclusion that the statute violates the separation of powers—the Court held that "the [Preservation] Act's regulation of the disposition of Presidential materials within the Executive Branch" does not

18

facially constitute "a violation of the principle of separation of powers." 433 U.S. at 441. And the

Supreme Court specifically rejected each of the two constituent components of OLC's

conclusion: (1) that the statute "exceeds Congress's enumerated and implied powers," and (2)

that the statute intrudes upon "the constitutional independence and autonomy of the Executive."

OLC Op. 1.

Contrary to OLC's contention that the PRA "exceeds Congress's . . . powers," *id.*, the

Supreme Court held that "congressional power to regulate Executive Branch documents *exists*"

with respect to records held by a President, "a power that is augmented by the important

interests" that Congress "seeks to attain" in preserving and providing future access to

Presidential records, 433 U.S. at 445–46. The Court detailed the "legitimate" and "important

congressional purposes" that such legislation serves, including ensuring future Presidents have

access to important information on prior Executive Branch activities as needed, and providing

the American people a historical record of their government's operations. *Id.* at 453–54. The

Court thus rejected OLC's assessment that a statute such as the PRA lacks "any valid legislative

purpose." OLC Op. 21.

The Supreme Court just as squarely rejected OLC's determination that a law like the

PRA imposes an "improper burden on the Executive" and "threatens to impede" the President's

performance of his duties. OLC Op. 20, 41. The Court held that "nothing contained in the

[Preservation] Act renders it unduly disruptive of the Executive Branch and, therefore,

unconstitutional on its face," 433 U.S. at 445. The Court rejected the very same argument that

OLC now advances—that a law like the PRA "encroaches upon the Presidential prerogative to

control internal operations of the Presidential office and therefore offends the autonomy of the

19

Executive Branch." *Id.* at 339–40 (emphasis added); *cf.* OLC Op. 49 (suggesting that "the PRA . . . vitiate[s] the Article II interests in executive autonomy and independence").

And the Court specifically rejected the claim, identical to the claim OLC makes now, that the Preservation Act would "chill the future exercise of constitutionally protected executive functions, thereby impairing the ability of future Presidents to obtain the candid advice necessary to the conduct of their constitutionally imposed duties." *Id.* at 441; *cf.* OLC Op. 47 ("the PRA may chill the President's advisers from offering candid or unpopular advice"). The Supreme Court found the "intrusion into the confidentiality of the Presidency" to be "minimal," *id.* at 454, especially given that the former President could bring a future privilege-based challenge to any actual, specific disclosure of information, pursuant to the Act's procedures for bringing such a challenge. *See id.* at 450. In this regard, the Court emphasized that, as with NARA under the PRA, the Preservation Act kept custody of the Presidential records "within the Executive Branch" prior to any disclosure that the former President could challenge. *Id.* at 444. Whatever the merits to a potential future challenge by the former President to a particular disclosure, the Act did not, on its face, "impermissibly interfere with candid communication of views by Presidential advisers." *Id.* at 451.

Given that the Court rejected virtually every argument that Defendants make now regarding the PRA, there can be little dispute that the PRA is constitutional under *Nixon v. GSA*. The OLC Opinion only half-heartedly tries to argue otherwise. OLC seeks to distinguish solely on the ground that Congress enacted the Preservation Act "in the wreckage of Watergate" and Nixon's resignation, when the nation was facing "extraordinary circumstances" and the possibility that Nixon would destroy documents from his time in office. OLC Op. 41. But *nothing* in the Supreme Court's reasoning as to why the Preservation Act did not violate the

20

separation of powers and did not otherwise impermissibly intrude on the President's autonomy turned on circumstances specific to President Nixon. *See id.* at 441–55 (sections on "Separation of Powers and "Presidential Privilege"). In the 21 paragraphs of analysis in the relevant sections of the Court's opinion, *see id.*, just a single paragraph even mentioned the specific context of Nixon's records, and that paragraph described "[o]ther substantial public interests" that supported the Preservation Act after the Court had already found "adequate justifications" for the Act that would apply to any President, *id.* at 452–53.

OLC's conclusion, and Defendants' refusal to comply with the PRA in reliance on OLC's conclusion, ultimately rests on its declaration that the Supreme Court was "wrong." OLC Op. 45. OLC explains at length why it believes *Nixon v. GSA* was "mistaken in reasoning that the [Preservation Act] was not 'unduly disruptive of the Executive Branch,'" was "wrong to suggest the executive privilege provisions of the [Preservation Act] avoided separation of powers concerns," and "fail[ed] to appreciate the Article II consequences of permitting Congress to regulate presidential records." *Id.* at 45–49. Remarkably, OLC cited almost exclusively to other OLC opinions to justify overriding Supreme Court precedent, *see id.*; the sole judicial decision cited in the five pages of analysis is a case about *Bivens* claims that has nothing to do with congressional or presidential powers, *id.* at 46 (citing *Ziglar v. Abbasi*, 582 U.S. 120, 125).

But under our Constitution, "[i]t is emphatically the province and duty of the judicial department"—not the Executive Branch—"to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Defendants lack constitutional authority to override the Supreme Court on a constitutional question, and the Supreme Court's controlling holding forecloses Defendants' constitutional defense for disregarding the PRA.

The Court should find Plaintiffs likely to succeed on the merits based on the Supreme Court's binding precedent. Defendants' claim to be able to nullify a Supreme Court decision sets a dangerous precedent, and Plaintiffs respectfully submit that the courts should not indulge it by revisiting the relevant constitutional question *de novo*. That only incentivizes the Executive Branch to try the same tactic again and again, casting aside Supreme Court decisions and then seeking to have the courts overturn them when the Executive's conduct is challenged. That *Nixon v. GSA* remains binding definitively resolves the unlawfulness of Defendants' actions.

### 3.   The PRA Is Constitutional on First Principles

Even if *Nixon v. GSA* were not controlling, the PRA is constitutional. Congress has multiple sources of constitutional authority to enact the PRA, and it does not impermissibly interfere with the President's discharge of his Article II responsibilities.

### a)   Congress Has Authority to Enact the PRA

In attempting to demonstrate otherwise, OLC analyzes the PRA under constitutional tests that either have no application to enacted legislation or that simply do not exist. For instance, OLC leads its analysis with applying the four-part test set forth in *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020), for evaluating the propriety of unilateral congressional *subpoenas* for a President's records. See OLC Op. 19–20. But the *Mazars* test has no application to *legislation* enacted by Congress pursuant to its enumerated lawmaking powers and signed into law by the President.

The distinction is clear from *Mazars* itself. The Court noted that "Congress has no enumerated constitutional power to conduct investigations or issue subpoenas," and the implied power Congress does have to investigate is "auxiliary to the legislative function." *Mazars*, 591 U.S. at 862 (quotations omitted). "*Because* this power is justified solely as an adjunct to the

22

legislative process," the Court held, "it is subject to several limitations," and those limitations underlie the balancing test the Court delineated. *Id.* (quotations omitted) (emphasis added). *Mazars* simply has no bearing on the constitutionality of a statute that Congress enacts pursuant to its express powers, with the President's agreement, in accordance with bicameralism and presentment. *See Maloney v. Carnahan*, 45 F.4th 215, 216 (D.C. Cir. 2022) (Millet, J., concurring in the denial of rehearing en banc) (contrasting Congress's "power of inquiry" in *Mazars* with a "statutory right" to information that is the "product of Congress's Article I authority").[6]

Just as perplexingly, OLC ignores the most obvious enumerated authorities for Congress's enactment of the PRA. Most notably, OLC fails to address Congress's authority to enact the PRA under the Property Clause in Article IV, Section 3, Clause 2. OLC's failure to address the Property Clause is astonishing because it was *the* primary congressional power that DOJ relied upon in its brief to the Supreme Court defending the constitutionality of the Preservation Act. *See* Br. for the Federal Appellees, *Nixon v. GSA*, No. 75-1605, at 28–29 (attached as Jacobson Decl. Ex. B). And a year later, a district court held that Congress has authority to claim ownership and dispose of Nixon's records pursuant to the Property Clause n.80. *Nixon v. Sampson*, 389 F. Supp. 107, 164 (D.D.C. 1975), *case dismissed*, 437 F. Supp. 654 (D.D.C. 1977), *rev'd sub nom. Reps. Comm. for Freedom of Press v. Sampson*, 591 F.2d 944 (D.C. Cir. 1978).

For whatever reason DOJ ignores the Property Clause now, it clearly authorizes the PRA, as does the Necessary and Proper Clause and other congressional powers.

---

[6] The Supreme Court vacated the underlying panel decision in *Maloney* on mootness grounds. Carnahan v. Maloney, 143 S. Ct. 2653 (2023).

23

Property Clause:

The Property Clause provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. This clause "provides a specific and independent constitutional basis for congressional action respecting federal property." *Don't Tear It Down, Inc. v. Pennsylvania Ave. Dev. Corp.*, 642 F.2d 527, 535 n.73 (D.C. Cir. 1980).

The Supreme Court has held that "other Property" subject to congressional regulation under the Property Clause is not limited to land or real property, but instead allows for "the due regulation of all other personal . . . property belonging to the United States." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 315, 331) (1936) (quoting Joseph Story. Commentaries on the Constitution of the United States §§ 1325, 1326 (1833)). The Court has held that Congress may regulate all manner of tangible and intangible government property pursuant to the Property Clause, such as "transmission lines," coal, silver, and oil found on government property, and "electric energy" itself. *Ashwander.*, 297 U.S. at 336; *see also United States v. Walter*, 263 U.S. 15, 17 (1923) (Congress may regulate a corporation it creates as government property).

The Supreme Court has further held that Congress's power to regulate and dispose of government property pursuant to the Property Clause is vast and exclusive. The Court has given the clause a "broad[] construction," holding that it empowers Congress to "exercise . . . complete power" over federal property, "a power . . . analogous to the police power of the several states." *Kleppe v. New Mexico*, 426 U.S. 529, 539–40 (1976) (citations omitted). With federal property, "it lies in the discretion of the Congress, acting in the public interest, to determine" how to "dispose" of it. *Ashwander*, 297 U.S. at 336.

24

The PRA easily falls within Congress's plenary authority to regulate the handling and disposition of federal government property. The PRA establishes that all official records created and received by the President, the Vice President, and PRA-covered staff are the property of the United States, which "shall reserve and retain complete ownership, possession, and control of [such] records [. . .]." 44 U.S.C. § 2202. The PRA's assertion of public ownership of Presidential records—in advance of each new President taking office, and thus before any President could claim a vested ownership interest in the records—is likely unreviewable, but in any event it is well-founded. Presidential records are created or received by federal officials in the course of their official duties under the Constitution and federal law, solely for the public's benefit. All covered officials generate these official records while paid a government salary, and most of the records are created with keyboards, computers, printers, paper, toner, pens, and notepads paid for by the federal government, or while the relevant official is on federal land. *See* Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, tit. II (appropriating funds for salaries of White House staff). It is well within Congress's power to enact legislation clarifying that Presidential records are property of the United States.

And as government property, Congress has "complete power" to ensure that these government records remain in the custody of the federal government, and to provide for a disposition of these records that includes eventual public access, subject to carefully calibrated limitations. *Kleppe*, 426 U.S. at 540. Congress's power to enact the PRA under the Property Clause "provides a specific and independent constitutional basis for" the statute. *Don't Tear It Down*, 642 F.2d at 535 n.73.

The Necessary and Proper Clause:

Congress independently has authority to enact the PRA pursuant to the second and third provisions of the Necessary and Proper Clause. Article I, section 8, clause 18 provides Congress

25

authority "[t]o make all Laws which shall be necessary and proper" not only in carrying out its other enumerated Article I powers, but also for carrying out "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art I., § 8, cl. 18; *see also* John Mikhail, *The Necessary and Proper Clauses*, 102 Georgetown L.J. 1045, 1045-46, 1058-59 (2014).

These latter two provisions enable Congress to enact "legislation affecting the internal operations of the national government," including the other two branches. *O'Bryan v. Bureau of Prisons*, 349 F.3d 399, 401 (7th Cir. 2003). "[W]hat the Executive Branch may elect" to do in carrying out its responsibilities, "the Legislative Branch may require." *Id.*; *see also Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43, 6 L.Ed. 253 (1825) (holding that these provisions of the Necessary and Proper Clause enable Congress to legislate on the judiciary's operations); *United States v. Lue*, 134 F.3d 79, 82 (2d Cir. 1998) (under the Necessary and Proper Clause, "Congress may enact laws necessary to effectuate the treaty power, enumerated in Article II").

The OLC Opinion concedes that the Necessary and Proper Clause "authorizes Congress to enact legislation that assists the coordinate branches in the execution of their powers," but OLC maintains that "[a] statute that burdens rather than facilitates the exercise of executive power is not 'necessary and proper' to carry that power into execution." OLC Op. 40–41. OLC cites no judicial authority for the proposition that Congress may only pass legislation under the Necessary and Proper Clause that aggrandizes rather than structures or restrains "the exercise of executive power," and the Supreme Court has rejected that conception of the separation of powers as described below. But even under OLC's own test, the PRA is clearly valid.

The PRA aids all three branches of the federal government in exercising their constitutional responsibilities. The PRA aids the presidency by ensuring that all Presidents will

be able to access a former President's materials "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available." 44 U.S.C. § 2205(2)(B). "Governmental programs and policies do not expire every four or eight years; the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." *Nixon*, 408 F. Supp. at 350; *see also id*. at 351 n.41 (listing examples of Presidents requesting prior administration records). Future Presidents may need all manner of records of a prior President, including records on diplomatic negotiations, national security programs, continuity of government operations, legal opinions, policy studies, and more. By providing for the preservation of Presidential records and ongoing custody of the records for a future President to access, the PRA ensures that "[a]n incumbent President [is not] dependent on happenstance or the whim of a prior President when he seeks access to records of past decisions that define or channel current governmental obligations." *Nixon v. GSA*, 433 U.S. at 452.

The PRA facilitates the work of the federal courts and Congress as well. It ensures that federal courts will have access to relevant evidence necessary to carry out their truth-seeking function—and to protect the rights of litigants—in any "civil or criminal investigation or proceeding." 44 U.S.C. § 2205(2)(A). The PRA also provides circumstances for access to Presidential records "to either House of Congress, or, to . . . any [authorized] committee or subcommittee thereof[,] if such records contain information that is needed for the conduct of its business and that is not otherwise available" *Id.* § 2205(2)(C). The current Congress is indeed availing itself of the PRA to seek records of President Biden, in furtherance of its stated legislative and oversight needs.[7]

---

[7] *See, e.g.*, Emma Colton, *EXCLUSIVE: Trump White House torpedoes Biden attempt to shield 'autopen presidency' files*, Fox News, Dec. 16, 2025

In all events, OLC's gloss that Necessary and Proper Clause legislation may not, in any way, burden or constrain the current occupants of the other branches is wrong as a matter of law. In upholding Congress's broad authority under the Necessary and Proper Clause to enact legislation concerning the operations of the other branches, the Supreme Court has "recognized Madison's teaching that the greatest security against tyranny-the accumulation of excessive authority in a single Branch-lies . . . in a carefully crafted system of checked and balanced power within each Branch." *Mistretta v. United States*, 488 U.S. 361, 381 (1989). The "[s]eparation of powers . . . does not mean that these three departments ought to have no *partial agency* in, or no *controul* over the acts of each other," but rather that Congress may not control "the *whole* power" of the other branches." *Id.* at 380–81 (quoting The Federalist No. 47, at 325–26 (J. Cooke ed. 1961)).

Here, Congress exercised its reasonable judgment that preservation and calibrated future access to Presidential records is necessary and proper not only for the carrying out of each branch's future performance of its constitutional responsibilities, but also for the integrity of the institution of the presidency, and for the public's confidence and participation in government as a whole. That the current occupant of the Oval Office finds the PRA cumbersome or inconvenient does not render the law unconstitutional.[8]

---

https://www.foxnews.com/politics/exclusive-trump-white-house-torpedoes-biden-attempt-shield-autopen-presidency-files

[8] The Supreme Court has applied a five-factor test for assessing the propriety of legislation enacted pursuant to the first provision of the Necessary and Proper Clause, for laws in furtherance of Congress's enumerated Section 8 powers. *United States v. Comstock*, 560 U.S. 126, 133 (2010). No court, to Plaintiffs' knowledge, has applied this framework to laws enacted pursuant to the final two provisions of the Clause. But the PRA is constitutional under the five-factor framework in any event. First, "the Necessary and Proper Clause grants Congress broad authority to enact federal legislation," *id.* at 133, including legislation "affecting the internal operations of the national government," *O'Bryan*, 349 F.3d at 401. Second, there is a "history of related federal action," *Comstock*, 560 U.S. at 137, in this arena, both with respect to Presidential records (in the Preservation Act) and mandatory preservation and disclosures of government

28

OLC's remaining rejoinder on the Necessary and Proper Clause can be quickly disposed of. OLC suggests that Congress may only "regulate agencies and officers it has created," and not the activities of the President or PRA components within the EOP. OLC Op. 30–32. OLC again cites no judicial precedent in support of that proposition, and the express text of the Necessary and Proper Clause refutes it: Congress may enact laws that are necessary and proper to the execution of "*all* other Powers vested by this Constitution in the Government of the United States" —including under Article II—"or in *any* Department or Officer thereof." U.S. Const. art I., § 8, cl. 18 (emphases added). The plain language of the Clause reaches powers vested in the President and every other component and official of the federal government.

What's more, OLC ignores that for the nearly 1,000 full-time employees of PRA components of the EOP, Congress has created or regulated the terms of their positions. Congress established several PRA components, *see* 15 U.S.C. § 1023(a)(1) (Council of Economic Advisors), 6 U.S.C. § 491 (Homeland Security Council), prescribes the functions of others, see 50 U.S.C. § 3021 (National Security Council), and has set the pay rates and number of positions for nearly all of the other PRA components, 3 U.S.C. §§ 105, 107(a), 109 (White House Office), 3 U.S.C. § 107(b) (Office of Administration), 3 U.S.C. § 106 (the Office of the Vice President). The OLC Opinion contains essentially no explanation why Congress lacks authority to enact the PRA as to all of the employees of these components.

---

records more generally. Third, there are "sound reasons for the statute's enactment in light of the Government's … interest." *Id.* at 149; *see supra* Section I.A.2. Fourth, the PRA does not invade any state interests. *See Comstock*, 560 U.S. at 143–44. And fifth, the PRA is not "too attenuated" from the government's enumerated powers. *Id.* It is in furtherance of the powers of all three branches of government, and Congress' enumerated power under the Property Clause.

Congress' Implied Powers

In addition to the above enumerated powers, Congress has implied powers to enact the preservation requirements of the PRA. The Constitution grants Congress implied powers to conduct oversight of the Executive Branch. *See McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). This power encompasses the right to subpoena documents. *Id.* at 175. And as OLC itself recognizes, implicit in Congress' power to investigate is its power to require preservation of records. OLC Op. 17. Indeed, the power to investigate through document demands would be meaningless without the ability to impose legal obligations that require preservation of those very documents. In all contexts where authority exists to demand production of documents— from grand juries to civil litigation—there exists the right to demand preservation of those same documents. If the President, the Vice President, and the White House could destroy their documents at will, they could nullify Congress' implied constitutional right of inquiry. The PRA record collection and preservation requirements are thus essential to Congress's maintenance of its critical constitutional power to conduct oversight.

### b) The PRA Does Not Prevent the President from Carrying Out His Constitutional Functions

Congress, in exercising its constitutional authority to enact the PRA, has not "prevent[ed] the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. GSA*, 433 U.S. at 425. For the reasons explained above in relation to the Necessary and Proper Clause and further below, the PRA affords due regard to the autonomy of the Executive Branch and poses no constitutionally cognizable burden on the Executive Branch's functioning.

The OLC Opinion contends otherwise, but it notably concedes that the PRA does "not place a severe and direct burden on the President personally." OLC Op. 25. That concession is fatal to Defendants' claim that the PRA interferes with the President's execution of his

30

constitutional responsibilities, and Defendants make that concession for good reason. The PRA does not impose any cognizable burdens on the President during his time in office; it merely requires that he preserve and not destroy his records.

Tellingly, OLC's only specific claim of a burden imposed by the PRA is that the "White House Counsel's Office spends a considerable amount of time ensuring the President's compliance with the PRA, which detracts from its capacity to advise the President on sensitive questions of law and policy." OLC Op. 24. But advising the President on complying with the law is the White House Counsel's Office's job. That the White House Counsel's Office may have to devote time ensuring compliance with a law it disfavors does not make that law unconstitutional.

OLC's remaining arguments for why the PRA impermissibly interferes with the Executive Branch's functioning are all speculative concerns that have no grounding in the law or the realities of the last 45 years of history. OLC speculates that "the PRA *may* chill the President's advisers from offering candid or unpopular advice." OLC Op. 47 (emphasis added). Multiple aspects of the statutory scheme guard against any such chill, particularly in the context of a facial attack on the statute like Defendants have made. The PRA does not provide for any public release of records while the President remains in office. After the President's term, the Act "provides for custody of the materials in officials of the Executive Branch," at NARA. *Nixon v. GSA*, 433 U.S. at 443. The President can prohibit NARA from releasing most records from his administration—including all emails—until at least 12 years after his administration ends. And before any disclosures may occur, the former President and the incumbent President may assert privilege and other challenges to prevent disclosure. 44 U.S.C. § 2208. Given these provisions, it is hardly surprising that no President or senior White House Official has asserted in the PRA's

31

45-year history that the law has chilled or prevented the rendering of candid communications and advice.

OLC also expresses concern that "the PRA poses a risk of inadvertent disclosure of sensitive or privileged information." OLC Op. 48. OLC ignores that both the former President's team and the incumbent President's team have the opportunity to review all records of the former President before they are disclosed, 44 U.S.C. 2208, mitigating any risk of inadvertent disclosure. And OLC again points to no specific facts or examples to justify this concern; it cites no evidence of any inadvertent disclosure over the last 45 years that the PRA has been in effect.

The lack of evidence that OLC puts forward to substantiate its speculative concerns underscores the broader reason why its claim that the PRA prevents the President from accomplishing his constitutional functions cannot be taken seriously: Presidents have complied with the law for the last 45 years and the presidency has endured. Every President since the PRA took effect in 1981—Reagan, George H.W. Bush, Clinton, George W. Bush, Obama, Trump I, and Biden—has carried out his constitutional functions with no suggestion that the PRA was restraining their performance, unconstitutionally or otherwise. OLC does not point to a *single* concrete example over that 45-year history where the PRA has actually hindered the President's execution of his responsibilities in some way. This is not just a case of "seeming acquiescence of the Executive Branch since the PRA's enactment." OLC Op. 26. It is a case where the last half-century of history disproves OLC's speculation about the effects of this statute.

B.    **Plaintiffs Are Likely to Succeed on their Equitable, *Ultra Vires*, and Mandamus Claims**

Plaintiffs are also likely to succeed on their equitable claim to enjoin Defendants' statutory violations. *See* Compl. Counts II-III, VII. This Court possesses inherent equitable power to enjoin federal officials from violating federal statutes. *Armstrong v. Exceptional Child*

*Ctr., Inc.*, 575 U.S. 320, 326 (2015). The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* When "an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902). This power extends "to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. Thus, "even in the absence of a statutory cause of action," the "[c]ourts possess inherent equitable power to enjoin the [federal] Government from violating [a federal statute]," "absent only 'the clearest command' otherwise in a statute." *Mathis v. U.S. Parole Comm'n*, 749 F. Supp. 3d 8, 22–23 (D.D.C. 2024) (quotations omitted) (holding that the court had inherent equitable authority to enjoin violation of the Rehabilitation Act); *see also Nat'l Ass'n of the Deaf v. Trump*, 808 F. Supp. 3d 150, 161 (D.D.C. 2025) (same).

Here, Defendants are "violating, or planning to violate," the PRA. *Armstrong*, 575 U.S. at 326. OLC has openly announced that the President need not comply with any of the PRA's dictates, OLC Op. 52, and Defendants have made clear in the days since the OLC opinion that they do not intend to comply with the PRA going forward. The White House has announced that staff will collect and retain only a limited subset of records that the PRA requires to be retained, and the White House has not said that the President or Vice President will preserve even those few, inadequate categories of records. *See, e.g.*, Sneed, *supra* n.4. And although the White House stated that it will not delete electronic emails and documents on the official White House network, Defendants have refused to confirm that the President, the Vice President, and PRA-covered staff will comply with 44 U.S.C § 2209's prohibition on using personal email, text messages, Signal, or other applications for official business. *See* Jacobson Decl. Ex. A. Defendants have likewise refused to commit that any messages on such platforms that meet the

definition of Presidential records will be collected or preserved. *See id.* Indeed, when asked by Plaintiffs if they would stipulate that they are complying with various of the PRA's requirements to avoid emergency motions practice, Defendants categorically refused to agree to comply with *any* of the PRA's requirements. They even refused to agree in writing that NARA is not destroying Presidential records in its custody. This Court possesses inherent equitable authority to enjoin Defendants from violating the PRA's basic preservation requirements.

In the alternative, this Court may enjoin Defendants from taking *ultra vires* actions that "exceed[] [their] statutory authority" under the PRA. *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 966 (D.C. Cir. 2022). Defendants' actions here meet the standards for *ultra vires* review because they are acting in contravention of a "clear and specific statutory mandate," *id.* at 971, and in a manner that is "blatantly lawless," *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764 (D.C. Cir. 2022).

The PRA imposes numerous mandatory requirements on Defendants, such as: "the President shall take all such steps as may be necessary" to preserve Presidential records (44 U.S.C. § 2203(a)); records created or received by the President or PRA components of the EOP "shall, to the extent practicable, be categorized as Presidential or personal records upon their creation or receipt and be filed separately" (*id.* § 2203(b)); the President, Vice President, and any PRA-covered staff "may not create or send a Presidential . . . record using a non-official electronic messaging account" (*id.* § 2209(a)); and "the Archivist . . . shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of [a] President" after his term in office, and "shall deposit all such Presidential records in a Presidential archival depository or another archival facility operated by the United States" (*id.* §

2203(g)(1)–(2)). It is "blatantly lawless" and in excess of Defendants' authority under the PRA to disregard these "clear and specific statutory mandate[s]." *Fed. Express Corp.*, 39 F.4th at 764.

For similar reasons, if no other adequate remedy exists, Plaintiffs are entitled to mandamus relief. "[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress," and where they do, mandamus relief is available "to correct transparent violations of a clear duty to act." *In re Aiken Cnty.*, 725 F.3d 255, 258–60 (D.C. Cir. 2013) (quotations omitted) (issuing writ of mandamus against agency for failing to carry out statutory mandate). If no other adequate form of relief is available, mandamus is warranted to compel Defendants to comply with their mandatory duties.

**C.      Plaintiffs Are Likely to Succeed on their APA Claim Against DOJ**

Plaintiffs are likely to succeed in their claim that the OLC Opinion violates the APA. Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). The OLC Opinion is a quintessential example of an agency action taken not in accordance with law—indeed, it instructs the President and federal officials that they need not comply with a duly enacted, facially constitutional statute, and it purports to override a Supreme Court decision that it considers to be "wrong."

As an initial matter, the OLC Opinion constitutes final agency action for purposes of the APA. It "represents the culmination of the Justice Department's review of the [issue] and is a definitive statement of the agency's position." *N.H. Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132, 145 (D.N.H. 2019), *aff'd in part, vacated in part on other grounds sub nom. N.H. Lottery Comm'n v. Rosen,* 986 F.3d 38 (1st Cir. 2021) (citation modified) (finding OLC opinion to be

final agency action). And the OLC Opinion "is an action by which rights or obligations have been determined, or from which legal consequences will flow." *Scenic Am., Inc. v. U.S. Dep't of Transportation*, 836 F.3d 42, 55 (D.C. Cir. 2016). By concluding that "the PRA is unconstitutional, and the President need not further comply with its dictates," OLC Op. 52, OLC has "determined" that the President, Vice President, and PRA-covered staff do not have "obligations" to comply with the PRA, and "legal consequences will flow" from that determination, in that the Executive Branch will be under no legal compulsion to preserve Presidential records and eventually make them publicly available.

On the merits, OLC's instruction that the President "need not further comply" with the PRA is contrary to law and in excess of DOJ's authority because the PRA is a facially constitutional statute that the President must faithfully execute under the Take Care Clause. DOJ has no authority to direct the President to ignore a constitutionally-compliant statute, and its instruction that the President may do so violates the separation of powers.

The district court's decision in *Public Citizen v. Burke*, 655 F. Supp. 318 (D.D.C. 1987) is directly on point. There, the court addressed a challenge to an OLC memorandum on the Preservation Act. OLC had concluded that, in implementing the Preservation Act, the Executive Branch was required to honor former President Nixon's assertions of executive privilege, even if the incumbent President would not have invoked the privilege or does not believe that the documents at issue fall within the scope of the privilege. *Id.* at 320. After a group of plaintiffs brought suit to challenge the OLC memorandum, the government defended it on the ground that OLC's opinion was "compelled by the Constitution." *Id.* at 322. But the district court disagreed with the government, declared that the OLC memorandum was contrary to the Preservation Act,

36

and ordered NARA not to comply with the OLC memorandum. *Id.* The D.C. Circuit affirmed. 843 F.2d 1473 (D.C. Cir. 1988).

The OLC Opinion here is equally wrong on the law, and it is doubly contrary to law because it purports to override Supreme Court precedent. Although OLC briefly sought to distinguish *Nixon v. GSA*, it dedicated more space to explaining why the Supreme Court's decision was purportedly "wrong." OLC's conclusion that the PRA is unconstitutional and its direction that the President "need not further comply" with the PRA clearly rested, superficially in part and in reality entirely, on its disagreement with the Supreme Court's constitutional holding. But OLC lacks any constitutional authority to nullify Supreme Court precedent. *See Marbury*, 5 U.S. at 177. And for the same reason that DOJ cannot overturn Supreme Court precedent, it has no authority to advise the President and other Executive Branch officials that they may act in contravention of Supreme Court precedent.

The OLC Opinion is thus contrary to law, and the district court's order in *Burke* provides a model for the ultimate relief that this Court should order with respect to it. *See* 655 F. Supp. at 322. At this preliminary stage, the Court should stay or "postpone the effective date" of the OLC Opinion pursuant to 5 U.S.C. § 705, or "preliminarily set[] aside" the OLC Opinion as a precursor to final relief under 5 U.S.C. § 706(2). *See Trump v. CASA, Inc.*, 606 U.S. 831, 873, 145 S. Ct. 2540, 2569 (2025) (Kavanaugh, J., concurring).

**D.    Plaintiffs Are Likely to Succeed on their APA Claim Against NARA**

Plaintiffs are also likely to succeed on their APA claim challenging NARA's failure to comply with the PRA. *See* Compl. Count IV. Pursuant to President Trump's Executive Order 14215, the OLC Opinion is binding on NARA and its officials. *See* E.O. 14215 § 7, 90 Fed. Reg. 10447 (Feb. 18, 2025). Thus, as of today, it is NARA's policy (as it is the policy of the rest of the

37

Executive Branch) that it has no legal obligations under the PRA, including no legal obligations to preserve and not to destroy Presidential Records. OLC Op. 52. That policy is directly contrary to the PRA and the separation-of-powers. *See Burke*, 655 F. Supp. at 322.

Indeed, as mentioned, Plaintiffs asked counsel for Defendants whether NARA would agree that it would preserve Presidential records in its custody and comply with its other obligations under the PRA, and NARA would not agree to *any* of these stipulations. *See* Jacobson Decl. Ex. A. That confirms that NARA has decided that it is no longer legally required to abide by the PRA. That determination is contrary to law.

## II.    Plaintiffs Face Irreparable Harm Absent an Injunction

Plaintiffs will suffer irreparable injury absent preliminary relief. Defendants' destruction of, or otherwise failure to collect and preserve, Presidential records will result in irreparable harm to the American Historical Association's members, to American Oversight, and to the audiences they serve. And Defendants have provided every reason to believe that they are failing to preserve Presidential records as we speak, given OLC's direct statement that the President "need not further comply" with the PRA, given that it was the White House Counsel who solicited the OLC Opinion, given the White House statement following the OLC Opinion that Congress cannot require them to "save every single possible piece of paper," Jacobson Decl. Ex. C (Axios article), and most notably, given the government's refusal to stipulate that they are currently preserving all Presidential records, even when Plaintiffs inquired into such a stipulation to avoid or limit the need for this motion, Jacobson Decl. Ex A.

In the context of records, the destruction or failure to preserve records is literally irreparable. "When Signal messages are deleted," as they are typically set to do automatically, "such messages are apparently 'lost to history forever.'" *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 29 (D.D.C. 2025) (quoting *Armstrong*, 924 F.2d at 288). Likewise, when paper records

are put in "burn bags" and incinerated, they are "fatally lost" and the bell cannot be unrung. *Am. Oversight v. U.S. Agency for Int'l Dev.*, No. 25-CV-719 (TSC), 2026 WL 592311, at *1, 5 (D.D.C. Mar. 3, 2026) (quotations omitted); *see also Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 559 F. Supp. 2d 9, 25 (D.D.C. 2008), *aff'd*, 566 F.3d 219 (D.C. Cir. 2009) (noting that the EOP uses burn bags to dispose of paper records).

It is for these reasons that courts in this District regularly grant preliminary injunctions or similar relief in records cases—because "the loss or destruction of federal records . . . is a harm that cannot be cured once the records are lost or destroyed." *Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402, at *14–16 (D.D.C. Aug. 9, 2024); *see also Am. Oversight*, 788 F. Supp. 3d at 29–30 (granting preliminary injunction to prevent records from being "permanently lost"); *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 565 F. Supp. 2d 23, 29 (D.D.C. 2008) (granting stay because "CREW convincingly argues it will suffer irreparable harm if the records . . . are not preserved").

These risks are especially acute here for several reasons. First, under the OLC Opinion, Defendants are not subject to *any* legal requirements to preserve their official records. The President, the Vice President, and the PRA-covered components of the EOP are not subject to FOIA or the Federal Records Act. And Defendants' position is that all records meeting the PRA's definition of Presidential records are personal records of the President, and not property of the United States. In Defendants' view, there is no statutory obligation for Defendants to preserve Presidential records at all, and thus nothing legally prohibits them from mass-deleting records tomorrow. Moreover, it is hardly speculative that Defendants will not preserve records during the pendency of this litigation, given that Defendants categorically refused to stipulate to that when Plaintiffs inquired before filing this motion.

39

Plaintiffs will be acutely injured by the failure to preserve Presidential records, of both the current administration and prior ones. AHA and its members regularly request and make use of presidential and vice-presidential records in their scholarship and work collecting and documenting American History. Compl. ¶ 9; *see, e.g.*, Weicksel Decl. ¶ 8; Connelly Decl. ¶ 3–7; Naftali Decl. ¶¶ 3–5; Brownell Decl. ¶¶ 3–5; Petrzela Decl. ¶¶ 3–7. For example, Matthew Connelly, a professor of history at Columbia University, has authored three books that rely on Presidential records, including records from the Johnson, Nixon, Ford, Carter, and Reagan Presidential libraries. Connelly Decl. ¶ 3. Professor Connelly and other AHA members intend to continue to use Presidential records in the future, including records of the current administration. *Id.* ¶ 3 ("As the National Archives takes custody of additional Presidential records, including records of the current administration, I plan to use them in my scholarship, as I have throughout my career."); *see also* Naftali Decl.¶ 5 ("Once the current President's term ends and the National Archives assumes legal custody of his records, I intend to make use of those records as permitted under the Presidential Records Act."). Professor Connelly is currently using Presidential records in his research on the "history of expert predictions of catastrophic global risk." Connelly Decl. ¶ 4; *see also, e.g.*, Brownell Decl. ¶ 5 (discussing current use of Presidential records for book project); Petrzela Decl. ¶ 6 (describing current use of Presidential records). If Presidential records are not preserved, they will be irretrievably lost to research scholars that intend to use them. *See* Naftali Decl. ¶ 5; Weicksel Decl. ¶ 15. This is a clear irreparable harm. *Am. First Legal Found.*, 2024 WL 3741402, at *14–16.

American Oversight has an established history of seeking presidential records that become subject to FOIA by operation of the PRA, with the goal of using them to promote transparency and educate the public about the activities and operations of the federal

40

government. Marx Decl. ¶¶ 4-6, 9-14; *see* 44 U.S.C. § 2203(g)(1), 36 C.F.R. § 1270.38. Consistent with its mission, American Oversight has submitted multiple FOIA requests to NARA seeking presidential records—including emails sent on or on behalf of prominent officials from President Trump's first administration, as well as records from other administrations. Marx Decl. ¶¶ 4-6, 9-14. If NARA does not preserve the former administration records in its custody, American Oversight will permanently be deprived of information that it seeks in these records and will seek in similar future requests. *Id.* ¶ 19. In addition, American Oversight fully intends to request Presidential records of the current Administration—if they are preserved and sent to NARA at the end of the Administration, as the PRA requires. *Id.* ¶ 16. Although those requests for this Administration's records would not be submitted until years from now, the failure to preserve records is happening *now*, and the loss of records now is irreparable forever. *See id.* ¶¶ 20-21.

The loss of access to Presidential records, including records created and held by the President himself, cuts to the core of American Oversight's mission. It will suffer significant irreparable harm absent a preliminary injunction.

The irreparable harm that Plaintiffs face strongly weighs in favor of a preliminary relief.

### III.    The Balance of Equities and Public Interest Merit a Preliminary Injunction

The balance of equities and public interest tip sharply in Plaintiffs' favor. The public and the federal government itself will suffer immensely if Presidential records are not preserved and become lost to history during the pendency of this litigation, and Defendants will suffer no cognizable harm if they are required to comply with their legal obligations under the PRA, as they and every other Presidential administration have been required to do for the last 45 years.

Permitting Defendants to ignore the PRA and fail to retain Presidential records would cause severe harm. This Court has recognized that upholding federal record preservation laws

41

serves the public interest, *see, e.g.*, *Am. First Legal Found.*, 2024 WL 3741402, at \*16; *Ctr. for Pub. Integrity v. United States Dep't of Def.*, 411 F. Supp. 3d 5, 15 (D.D.C. 2019), and the public interest is even more paramount here in the context of Presidential records.

History shows that the most consequential reassessments of presidential power have depended precisely on the types of Presidential records that the PRA requires to be preserved. The paradigmatic example is the cache of secret recordings known as the Nixon White House tapes, which were preserved only because Congress intervened in enacting the Preservation Act. Without those contemporaneous records, the official narrative would have rested largely on incomplete transcripts and executive characterizations that were later shown to be untrue.

This same dynamic has played out in subsequent administrations. For instance, after the Reagan Administration, investigators and historians looking at the Iran Contra affair relied heavily on documentary records to reconstruct a pattern of systematic deception at the highest levels of government, which in turn educated the public. *See* Report of the Congressional Committees Investigating the Iran-Contra Affair, H.R. Rep. No. 100-433, S. Rep. No. 100-216 (1987). This and similar episodes underscore that preservation obligations are most critical when they are least convenient—when records may contradict official accounts or expose misconduct. The destruction of such records, or any historical records, "render[s] information unknown and unknowable." Connelly Decl. ¶ 10.

Absent relief, the President and his advisors will choose which records to keep and which to destroy, creating a curated archive that portrays the administration precisely as the President desires. Indeed, historians researching records from the pre-PRA era find gaps in the historical record. *See, e.g.*, Naftali Decl. ¶ 4. This is exactly what Congress rejected in the wake of Watergate, declaring Presidential records to be the property of the American people that must be

preserved to ensure that future generations can "ascertain the truth." First Annual Report of the Archivist of the United States, 1934-35, https://perma.cc/HS62-USWD.

Permitting Defendants to ignore the PRA's preservation requirements will not just leave gaping holes in the American historical record, it will damage public confidence in our government as well. As an AHA member and famed Presidential historian writes in his declaration: "The Presidential Records Act inspires confidence in official transparency by establishing a legal chain of preservation and custody for presidential records" and assurance that these records will not be destroyed. Naftali Decl. ¶ 5. This confidence that the truth about Presidential actions and decisionmaking will come to light–even years later–is "essential to fostering faith in democratic institutions." *Id.* Another renowned historian and AHA member notes: "When Presidential records are withheld indefinitely, or made inaccessible, it becomes impossible to reconstruct what officials did in the name of the people who elected them. And if our government is not accountable even in the court of history, it is accountable to no one. The costs of that loss — diminished public confidence in political institutions, the proliferation of conspiracy theories, and the deepening inability of citizens to evaluate or even understand critical policy choices — are incalculable." Connelly Decl. ¶ 8.

It is not just the public that will be harmed by a failure to preserve Presidential records— all three branches of the government would be as well. Future Presidents will be "dependent on happenstance or the whim of a prior President" when they need "access to records of past decisions that define or channel . . . current governmental obligations." *Nixon v. GSA*, 433 U.S. at 452. The National Security Council falls under the PRA, and under Defendants' view, a President would be free to order the destruction of NSC records essential to national security, managing future conflicts, and continuity of government. Congress will also be impaired in

43

conducting oversight of the activities of the President and  White House, and the judiciary will lose access to documents that may be relevant to future civil or criminal proceedings.

The harms to Defendants from a temporary injunction to preserve the status quo pale in comparison. For one, "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Massachusetts v. Nat'l Institutes of Health*, 770 F. Supp. 3d 277, 326 (D. Mass. 2025) (citation modified); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.") (citation modified). And here, preliminary relief will simply require Defendants to continue to comply with a law they and their predecessors have been complying with for the last 45 years, after the Supreme Court upheld the constitutionality of a materially identical law. The balance of equities could not be more lopsided.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction and enter the relief requested in Plaintiffs' proposed order. Specifically, the Court should order that:

- All Defendants and their employees are preliminarily enjoined not to destroy and preserve in the custody of the federal government Presidential or Vice Presidential records, as defined under the Presidential Records Act, 44 U.S.C. §§ 2201(2) and 2207, except where the Presidential Records Act permits disposal of such records under 44 U.S.C. § 2203(c);

- All Defendants and their employees are preliminary enjoined not to create or send a Presidential or Vice Presidential record using a non-official electronic message account unless the President, Vice President, or covered employee (1) copies an official electronic messaging account of the President, Vice President, or covered employee in the original creation or transmission of the Presidential record or Vice Presidential record; or (2)

44

forwards a complete copy of the Presidential or Vice Presidential record to an official electronic messaging account of the President, Vice President, or covered employee not later than 20 days after the original creation or transmission of the Presidential or Vice Presidential record. 44 U.S.C. § 2209. The obligation to comply with § 2209 applies to all Presidential and Vice Presidential Records created or sent via email, text message, and messages on messaging applications such as Signal and WhatsApp;

- All Defendants and their employees are preliminarily enjoined to establish or reestablish record retention policies for capturing and preserving all documentary material that the Presidential Records Act requires to be captured and preserved by Defendants;

- All Defendants and their employees are preliminary enjoined to notify the Court if they know or become aware that the President is disregarding the requirements of the Presidential Records Act, including by destroying or not preserving in the custody of the government Presidential or Vice Presidential records, as defined under 44 U.S.C. § 2201(2), except where the Presidential Records Act permits disposal of such records under 44 U.S.C. § 2203(c);

- All Defendants and their employees are preliminary enjoined to notify the Court if they know or become aware that the President is disregarding the requirements of 44 U.S.C. § 2209 regarding the use of non-official messaging accounts;

- The Office of Legal Counsel Opinion, Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr. 1, 2026), which concluded that "the PRA is unconstitutional, and the President need not further comply with its dictates," *id.* at 52, is preliminarily set aside and stayed under 5 U.S.C. § 705 and preliminarily enjoined;

- NARA's policy (pursuant to the OLC Opinion) that it has no legal obligations under the PRA is preliminarily set aside and stayed under 5 U.S.C. § 705 and preliminarily enjoined.

45

April 14, 2026                         Respectfully submitted,

                                       */s/ Daniel F. Jacobson*
                                       Daniel F. Jacobson (D.C. Bar 1016621)
                                       Lynn D. Eisenberg (D.C. Bar 1017511)
                                       John Robinson (D.C. Bar 1044072)
                                       JACOBSON LAWYERS GROUP PLLC
                                       5100 Wisconsin Ave NW, Suite 301
                                       Washington DC, 20016
                                       (301) 823-1148
                                       dan@jacobsonlawyersgroup.com

                                       */s/ Loree Stark*
                                       Loree Stark
                                       D.C. Bar No. 90021926
                                       American Oversight
                                       1030 15th Street NW, B255
                                       Washington, D.C. 20005
                                       (202) 869-5246
                                       loree.stark@americanoversight.org

                                       *Counsel for Plaintiffs*

46