# Exhibit B



# INDEX

|  | Page |
|---|---|
| Opinions below | 1 |
| Jurisdiction | 1 |
| Questions presented | 2 |
| Constitutional provisions and statute involved | 2 |
| Statement | 3 |
| Introduction and summary of argument | 11 |
| Argument | 22 |
| The Presidential Recordings and Materials Preservation Act is not unconstitutional on its face | 22 |
| A. The Act does not invade the autonomy of the Executive Branch | 23 |
| 1. The principle of separation of powers does not prevent employees of the Executive Branch from screening materials created by the Executive Branch | 23 |
| 2. The Act does not presage a wholesale invasion of the prerogatives of the Executive Branch | 26 |
| B. The Act does not breach appellant's privilege with respect to confidential presidential communications | 32 |
| C. The Act is not a bill of attainder | 38 |
| D. Review of the materials by archivists does not invade appellant's privacy | 48 |

II

Argument—Continued                               Page

    E.  The Act does not abridge the free-
        doms of speech and association _____    55

Conclusion _____    57

## CITATIONS

Cases:

*Administrator, Federal Aviation Admin-
    istration* v. *Robertson*, 422 U.S. 255____    27

*Andresen* v. *Maryland*, No. 74-1646, de-
    cided June 29, 1976 _____    53

*Berman* v. *Parker*, 348 U.S. 26 _____    30

*Broadrick* v. *Oklahoma*, 413 U.S. 601_____    17

*Buckley* v. *Valeo*, 424 U.S. 1_____ 17, 22, 26, 31,
                                           55, 56

*City of New Orleans* v. *Dukes*, No. 74-
    775, decided June 25, 1976 _____    39

*Civil Service Commission* v. *Letter Car-
    riers*, 413 U.S. 548 _____ 55, 56

*Colonnade Catering Corp.* v. *United
    States*, 397 U.S. 72 _____    54

*Communist Party* v. *Subversive Activities
    Control Board*, 367 U.S. 1 _____    55

*Couch* v. *United States*, 409 U.S. 322_____    53

*Cox* v. *Louisiana*, 379 U.S. 536 _____    55

*Craig* v. *Boren*, No. 75-628, decided De-
    cember 20, 1976 _____    18

*Cummings* v. *Missouri*, 4 Wall. 277 _____    39

*Dandridge* v. *Williams*, 397 U.S. 471_____    39

*Dellums* v. *Powell*, C.A.D.C., No. 76-1336,
    decided January 28, 1977 _____    35

*Department of the Air Force* v. *Rose*, 425
    U.S. 35_____ 35, 52

*De Veau* v. *Braisted*, 363 U.S. 144 _____    43

BLEED THROUGH

III

Cases—Continued                                     Page

*Environmental Protection Agency* v. *Mink*, 410 U.S. 73 _____ 27

*Fisher* v. *United States*, 425 U.S. 391 ____ 34, 53

*Flemming* v. *Nestor*, 363 U.S. 603 _____ 43, 44

*Folsom* v. *Marsh*, 9 Fed. Cas. 342 ____ 28, 29, 32

*Goldblatt* v. *Town of Hempstead*, 369 U.S. 590 _____ 30

*Katz* v. *United States*, 389 U.S. 347 _____ 49

*Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144 _____ 44

*Kerr* v. *United States District Court*, 426 U.S. 394 _____ 35

*Kleppe* v. *New Mexico*, 426 U.S. 529 ____ 29

*Lovell* v. *Griffin*, 303 U.S. 444 _____ 55

*Mathews* v. *DeCastro*, No. 75-1197, decided December 13, 1976 _____ 39

*Monitor Patroit Co.* v. *Roy*, 401 U.S. 265 __ 48

*Myers* v. *United States*, 272 U.S. 52 _____ 31

*National Labor Relations Board* v. *Sears, Roebuck & Co.*, 421 U.S. 132 _____ 31

*New York Times Co.* v. *Sullivan*, 376 U.S. 254 _____ 48

*Nixon* v. *Sampson*, 389 F. Supp. 107 ____ 10

*Parker* v. *Levy*, 417 U.S. 733 _____ 56

*Regional Rail Reorganization Act Cases*, 419 U.S. 102 _____ 46

*Sanford* v. *Texas*, 379 U.S. 476 _____ 53

*Uniformed Sanitation Men* v. *Sanitation Commissioner*, 392 U.S. 280 _____ 48

*United States* v. *Biswell*, 406 U.S. 311 __ 53, 54

*United States* v. *Brown*, 381 U.S. 437 38-39, 45

*United States* v. *Dionisio*, 410 U.S. 1 ___ 49

*United States* v. *Gettysburg Electric Ry.*, 160 U.S. 668 _____ 30

IV

Cases—Continued                                   Page

United States v. Harriss, 347 U.S. 612....    22
United States v. Lovett, 328 U.S. 303 .. 38, 47
United States v. Miller, 425 U.S. 435......    49
United States v. Mitchell, C.A.D.C., No.
    75-1409, decided October 26, 1976, peti-
    tion for a writ of certiorari pending
    sub nom. Nixon v. Warner Communi-
    cations, Inc., No. 76-944 ............ .... 37-38
United States v. National Dairy Products
    Corp., 372 U.S. 29 ........................    22
United States v. Nixon, 418 U.S. 683.... passim
United States v. Wurzbach, 280 U.S. 396 .    23
Weinberger v. Salfi, 422 U.S. 749..........    39
Williamson v. Lee Optical Co., 348 U.S.
    483 ................................................    39
Wyman v. James, 400 U.S. 309 ........    54
Young v. American Mini Theatres, Inc.,
    No. 74-312, decided June 24, 1976 ......    17

Constitution, statutes and regulations:

United States Constitution:

    Article I, Section 9, clause 3 .. .. ..    2
    Article II ......................................    30
        Section 3 .................... .    27

    Article III ....... ....................... ...    19
    Article IV, Section 3, clause 2 ....    2, 29
    First Amendment ....... .......... .... 2, 55, 56
    Fourth Amendment ....... ..........3, 52, 53
    Fifth Amendment ...... ......... ...3, 39, 53

    Federal Records Act, 44 U.S.C. 2101 et
        seq. ..........................................    5, 27
    Freedom of Information Act, 5 U.S.C.
        (Supp. V) 552 ...  ....................    6, 27

BLEED THROUGH

v

Constitution, statutes and
regulations—Continued                              Page

Government in the Sunshine Act, Pub. L.
94-409, 90 Stat. 1241, adding 5 U.S.C.
552b _____    28
Presidential Libraries Act, 44 U.S.C.
2101, 2107 and 2108 _____    38
Presidential Recordings and Materials
Preservation Act, 88 Stat. 1695 *et seq.*,
44 U.S.C. (Supp. V) 2107 note and
3315-3324 _____    7

Section 101 _____    7
Section 102 _____    9
Section 102(b) _____7, 42, 45
Section 102(c) _____7, 45
Section 102(d) _____7, 23
Section 103 _____7, 9
Section 104 _____    7
Section 104(a) _____    7
Section 104(a)(3) _____    15
Section 104(a)(5) _____*passim*
Section 104(a)(7) _____16, 21, 24, 45, 51
Section 104(b) _____8, 26, 50
Section 105 _____8, 25, 45

Privacy Act of 1974, 5 U.S.C. (Supp. V)
552a _____    27

13 U.S.C. 8-9 _____    27
26 U.S.C. 6103 _____    27
41 C.F.R. Part 105-63 _____
41 C.F.R. Subpart 105-63.2 _____    42
42 C.F.R. 105-63.205 _____    23
41 C.F.R. 105-63.206 _____    23
41 C.F.R. 105-63.301 _____    42
41 C.F.R. 105-63.302 _____    23

VI

Miscellaneous:                                          Page

Comment, *The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification*, 54 Cal. L. Rev. 212 (1966) ...    42

120 Cong. Rec. (1974):

    p. 33419 ...............................................    34
    p. 33855 ...............................................    41
    p. 33857 ...............................................    41
    pp. 33857-33863 .......................................    41
    p. 33859 ...............................................    47
    p. 33871 ...............................................    43
    p. 33872 ...............................................    44
    p. 33873 ...............................................    42
    p. 33874 ...............................................    41
    pp. 33874-33875 .......................................    44
    p. 33875 ...............................................    42, 44
    p. 33958 ...............................................    47
    p. 33959 ...............................................    41, 44, 47
    p. 33962 ...............................................    41
    p. 33963 ...............................................    43
    p. 33968 ...............................................    43
    p. 33975 ...............................................    43
    p. 37902 ...............................................    41

121 Cong. Rec. S15803-S15808 (daily ed., September 11, 1975) ...........................    8

122 Cong. Rec. (daily ed., April 8, 1976):

    p. S5290-S5291 .......................................    9
    p. S5291 ...............................................    25

122 Cong. Rec. H10043-H1044 (daily ed., September 14, 1976) ..........................    9, 25
40 Fed. Reg. 2669 ...........................................    9

BLEED THROUGH

Miscellaneous—Continued            Page

General Services Administration, Proposed Public Access Regulations, Section 105-63.401-2 (April 13, 1976)..    25

Hearings on H.R. 16902 and Related Legislation before the Subcommittee on Printing of the Committee on House Administration, 93d Cong., 2d Sess. (1974) \_\_\_\_\_    52

H.R. Rep. No. 93-1305, 93d Cong., 2d Sess. (1974) \_\_\_\_\_    51

H.R. Rep. No. 93-1507, 93d Cong., 2d Sess. (1974) \_\_\_\_\_    41, 43

H.R. Res. 1505, 94th Cong., 2d Sess. (1976) \_\_\_\_\_    9

McCormick, *Evidence* § 94 (Cleary ed. 1972) \_\_\_\_\_    34

43 Op. Att'y Gen. No. 1 (September 6, 1974) \_\_\_\_\_    4

S. Rep. No. 93-1181, 93d Cong., 2d Sess. (1974) \_\_\_\_\_    41, 43

S. Res. 244, 94th Cong., 1st Sess. (1975)    8

S. Res. 428, 94th Cong., 2d Sess. (1976)    9

Watson, *Congress Steps Out: A Look at Congressional Control of the Executive*, 63 Cal. L. Rev. 983 (1975)    26

9 Weekly Comp. of Pres. Docs. (1973):

     p. 1370 \_\_\_\_\_    51
     p. 1372 \_\_\_\_\_    51

10 Weekly Comp. of Pres. Docs. (1974):

     p. 450 \_\_\_\_\_    37
     pp. 450-458 \_\_\_\_\_    51
     p. 1104 \_\_\_\_\_    5

VIII

| Miscellaneous—Continued | Page |
| --- | --- |
| 12 Weekly Comp. of Pres. Docs. 1709 (1976) | 40 |
| p. 1711 | 40 |
| pp. 1712-1713 | 40 |
| p. 1713 | 40 |

BLEED THROUGH

# In the Supreme Court of the United States

## October Term, 1976

---

### No. 75-1605

RICHARD NIXON, APPELLANT

*v.*

ADMINISTRATOR OF GENERAL SERVICES, ET AL.

---

*ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF COLUMBIA*

---

### BRIEF FOR THE FEDERAL APPELLEES

---

### OPINIONS BELOW

The opinion of the three-judge district court (J.S.
App. 1a-106a) is reported at 408 F. Supp. 321.
Opinions of the court of appeals concerning the con-
vening of the three-judge district court (J.S. App.
139a-202a) are reported at 513 F. 2d 427 and 430.

### JURISDICTION

The judgment of the three-judge district court
(J.S. App. 107a-108a) was entered on January 7,
1976. A notice of appeal (J.S. App. 109a) was filed
on March 4, 1976, and the jurisdictional statement

(1)

2

was filed on May 3, 1976. Probable jurisdiction was noted on November 29, 1976. The jurisdiction of this Court rests upon 28 U.S.C. 1253.

### QUESTIONS PRESENTED

Whether the Presidential Recordings and Materials Preservation Act is unconstitutional on its face as a violation of (1) the separation of powers; (2) presidential privilege doctrines; (3) the Bill of Attainder Clause; (4) appellant's privacy interests; or (5) appellant's First Amendment rights.

### CONSTITUTIONAL PROVISIONS AND STATUTE INVOLVED

Article I, Section 9, clause 3 of the Constitution provides:

> No Bill of Attainder or ex post facto Law shall be passed.

Article IV, Section 3, clause 2 of the Constitution provides:

> The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

The First Amendment to the Constitution provides in relevant part:

> Congress shall make no law * * * abridging the freedom of speech, or of the press; * * *.

BLEED THROUGH

**3**

The Fourth Amendment to the Constitution provides in relevant part:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated * * *.

The Fifth Amendment to the Constitution provides in relevant part:

> No person shall * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

The Presidential Recordings and Materials Preservation Act, 88 Stat. 1695 *et seq.*, 44 U.S.C. (Supp. V) 2107 note and 3315-3324, is set out at J.S. App. 110a-123a.

### STATEMENT

1. Appellant resigned as President of the United States effective August 9, 1974. When he left office a large quantity of documents, files, and other materials, which had been accumulated by him and his staff during his terms as President, remained in the government's custody (J.S. App. 7a-9a). These materials include approximately 42 million pages of documents (J.S. App. 40a; A. 514). Appellant estimates that he personally prepared or reviewed 200,-000 documents from this collection (A. 516). The materials also include more than 800 reels of tape recordings of conversations in the Oval Office, the Cabinet Room, and the Lincoln Sitting Room in the

4

White House, and in appellant's offices in the Executive Office Building and Camp David. Numerous dictabelt recordings of appellant's recollections of daily events also are included (J.S. App. 40a; A. 178, 218).[1] After appellant's resignation, government archivists began to collect these materials for shipment to California, in accord with appellant's instructions (J.S. App. 9a-10a).

Before releasing any materials for disposition according to appellant's pre-resignation instructions, President Ford asked the Attorney General for advice about the ownership of the materials. The Attorney General concluded that, with the possible exception of one type of document, the materials were owned by appellant by virtue of historical practice and the absence of any statute to the contrary (43 Op. Att'y Gen. No. 1 (September 6, 1974); A. 220-230).[2] Appellant's ownership interest was not regarded as unqualified, however. The Attorney General informed President Ford (A. 226):

---

[1] On leaving the White House, appellant took with him some personal notes, diaries, and dictabelts (A. 600-601). He has full possession of these materials.

[2] The Attorney General expressed no opinion concerning ownership of certain "permanent files." These files consist of materials traditionally retained in the White House from administration to administration, such as "White House budget and personnel material, and records or copies of some Presidential actions useful to the Clerk's office for such purposes as keeping track of the terms of Presidential appointments and providing models or precedents for future Presidential action" (A. 228). Appellant claims no rights to these materials in this action (J.S. 12).

BLEED THROUGH

5

> Historically, there has been consistent acknowledgement that Presidential materials are peculiarly affected by a public interest which may justify subjecting the absolute ownership rights of the ex-President to certain limitations directly related to the character of the documents as records of government activity.

The Attorney General's opinion also stated that appellant's ownership interest was qualified by exposure to court orders regarding the materials and based upon their unique nature (A. 229-230).

Following President Ford's receipt of this opinion, the Administrator of General Services executed a depository agreement with appellant (A. 38-43).[3] Under the agreement, appellant retained title to all of his presidential historical materials but agreed to donate a substantial portion of the materials to the United States at a future date so that they would "be made available, with appropriate restrictions, for research and study" (A. 38). While appellant reviewed the materials, they were to be deposited with the General Services Administration ("GSA") under the Federal Records Act, 44 U.S.C. 2101 et seq., and transferred to California, where they would be stored in locked areas. Neither appellant nor GSA could gain access to the materials without the consent of the other (A. 39).

The agreement provided that for three years appellant would not withdraw any original writing, al-

---

[3] The agreement is reported at 10 Weekly Comp. of Pres. Docs. 1104 (1974).

6

though he could make and withdraw copies. After the initial three-year period appellant could withdraw any of the materials other than tape recordings (A. 39-40). Appellant agreed not to withdraw any original tape recording of conversations in the White House or Executive Office Building for five years, and to make reproductions of the tapes only with GSA's consent.

During the three and five year periods, appellant or government archivists working under his direction were to review the materials; those he did not withdraw would be donated to the United States, with appropriate restrictions on public access (A. 43). Following the initial five-year period for the review of tape recordings, appellant would be entitled to designate any tape recording to be destroyed. All of the tape recordings were to be destroyed after the expiration of ten years (September 1, 1984) or upon appellant's death, whichever event occurred first (A. 41).

Implementation of this agreement was delayed at the request of the Watergate Special Prosecutor (J.S. App. 12a). Appellant then brought suit for specific performance of the agreement. The Special Prosecutor and Jack Anderson, a reporter, intervened; the case was consolidated with actions brought by other plaintiffs that claimed to be interested in appellant's presidential materials, all seeking to enjoin transfer of the materials and to gain access to them under the Freedom of Information Act, 5 U.S.C. (Supp. V) 552.

2. While these consolidated actions were pending,

BLEED THROUGH

7

Congress passed and the President signed the Presidential Recordings and Materials Preservation Act, 88 Stat. 1695 *et seq.*, 44 U.S.C. (Supp. V) 2107 note and 3315-3324. Section 101 of the Act abrogates appellant's depository agreement with GSA and directs the Administrator of General Services to obtain and retain possession and control of all the presidential historical materials and tape recordings from appellant's administration. Section 102(b) provides that these materials and recordings shall be made available for use in any judicial proceeding, "subject to any rights, defenses, or privileges which the Federal Government or any person may invoke * * *." Sections 102(c) and (d) provide that appellant (or his designate) and the Executive Branch shall have access to the materials, subject to the Administrator's regulations.

Section 103 requires the Administrator to issue regulations to govern custody of and access to the materials. Section 104 requires the Administrator to issue regulations providing "public access" to the materials; these regulations must "take into account" seven factors (Section 104(a)):

> (1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";
> (2) the need to make such recordings and materials available for use in judicial proceedings;

8

(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

(4) the need to protect every individual's right to a fair and impartial trial;

(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

(7) the need to give to Richard M. Nixon or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

Section 104(a) requires the Administrator to submit the "public access" regulations and any subsequent changes in them to both Houses of Congress and provides that the regulations or changes can be disapproved by a resolution of either House within 90 legislative days of submission.[4] Section 105 pro-

---

[4] The Administrator has submitted to Congress three sets of "public access" regulations. The first set was disapproved by the Senate. S. Res. 244, 94th Cong., 1st Sess. (1975); 121 Cong. Rec. S15803-S15808 (daily ed., September 11, 1975). The Administrator has not sought to enforce these disapproved regulations, and no party to this litigation claims any rights under them. The second set was withdrawn; the

BLEED THROUGH

vides for "just compensation" to any individual whose private property is taken under the Act.

Title II of the Act establishes a National Study Commission to study and recommend procedures regarding the control, disposition, and preservation of the records of all federal executive, judicial, and legislative officers. The National Study Commission has been appointed but has not yet submitted its report; it is not involved in this litigation.

3. The day after the Act became effective, appellant commenced this action for declaratory and in-

---

Senate disapproved seven provisions of those regulations, believing that the Administrator lacked power to withdraw them. S. Res. 428, 94th Cong., 2d Sess. (1976); 122 Cong. Rec. S5290-S5291 (daily ed., April 8, 1976). The third set was submitted on April 13, 1976, and on September 14, 1976, the House disapproved six of the provisions. H.R. Res. 1505, 94th Cong., 2d Sess. (1976). The six provisions disapproved by the House were among the seven that had been disapproved by the Senate after the second proposed set of regulations had been withdrawn. The sponsor of the resolution disapproving the six provisions stated that, in his view, all of the submitted regulations except the disapproved provisions thereupon became effective. 122 Cong. Rec. H10043-H10044 (daily ed., September 14, 1976). It is the position of the Administrator, however, that the regulations cannot become effective until they have been approved as a package, since the approval of isolated regulations does not leave a coherent program. The Administrator therefore is preparing a fourth set of regulations and expects to submit them to Congress soon.

Regulations implementing Sections 102 and 103 of the Act are not required to be submitted to Congress. These regulations were published on January 14, 1975. 40 Fed. Reg. 2669; 41 C.F.R. Part 105-63. The district court has enjoined the effectiveness of some of these regulations pending disposition of this appeal (J.S. App. 104a-108a).

junctive relief in the United States District Court for the District of Columbia. He challenged the constitutionality of the Act on various grounds, and sought the convening of a three-judge district court. The district court declined to rule upon the request; it filed an opinion in the consolidated cases growing out of appellant's agreement with GSA. *Nixon v. Sampson*, 389 F. Supp. 107 (D. D.C.). The Court of Appeals for the District of Columbia Circuit stayed entry of judgment in the consolidated cases to enable a three-judge district court to determine whether priority should be accorded to the present action (J.S. App. 139a-202a).

A three-judge district court was convened, and the court allowed the other parties to the consolidated cases, who were not originally parties to this case, to intervene. The Special Prosecutor intervened and subsequently withdrew (A. 130, 484-487). Since the court of appeals' stay barred any *res judicata* or collateral estoppel effects of the single judge's opinion in *Nixon v. Sampson, supra,* the three-judge district court independently considered appellant's arguments.

The court rejected appellant's challenges to the facial constitutionality of the Act (J.S. App. 1a-106a). Noting that the regulations to implement the Act are not yet effective and that any challenge to the implementation of the Act is premature, the court limited its inquiry to the taking of the materials into the government's custody and their screening by government archivists (J.S. App. 3a-4a, 19a-

BLEED THROUGH

11

31a). The court carefully considered and rejected each of the arguments appellant makes here.

### INTRODUCTION AND SUMMARY OF ARGUMENT

This case requires the Court to determine whether the Act of Congress allowing officials of the Executive Branch to take custody of and examine certain materials generated by the Executive Branch during appellant's terms as President is constitutional on its face. Appellant contends that it is not. His arguments are identical in function, if not in form, to those he made, and this Court rejected, in *United States* v. *Nixon*, 418 U.S. 683.

Appellant maintains nothing less than that he is the only proper judge of his claims of privilege and privacy. He contends not only that he has the final decision whether particular documents are private or privileged, but also that no person may scrutinize his decisions. Under his argument, only he can look at the materials, because for anyone else to look at or listen to the materials to determine whether they are privileged or private would itself be a breach of privacy and a violation of his privilege. The upshot of this is that appellant has not only the last say but also the only say. In *United States* v. *Nixon, supra*, appellant made similar arguments in the context of an inquiry by the Judicial Branch of government; now he makes them in the context of an inquiry by the Executive Branch.

The arguments fare no better now than they did before. The question whether particular documents

12

(or categories of documents) are private or privileged may be quite difficult, but the decision need not be left to appellant. The answer usually will depend upon the purpose for which the material was created, the extent to which the material was circulated to persons other than appellant, the effect disclosure would have upon the giving of advice and the uninhibited discussion of policies that is essential to the proper functioning of the Executive Branch, and the countervailing interests of other persons in obtaining access to the materials. No categorical answer can be given, and the problems will require sensitive tools for their resolution.

For example, the parties agree that the considerations of politics and personalities that influence the nomination of a person as a federal judge ought not to be spread upon the public record. Such disclosure would inhibit the submission and consideration of frank views, and it would invade the privacy not only of those who submitted opinions but also of those who were considered for the position. On the other hand, no privilege would attach to a revelation that a nomination had been made in exchange for a political contribution, because that would amount not to the discussion of politics or public affairs, but to the commission of a crime. Although we do not suggest that nominations were in fact exchanged for money, this example suggests that a blanket claim of privacy or privilege cannot be sustained.

Moreover, the files of the White House Office contain many types of documents that are inter-

BLEED THROUGH

**13**

mingled. Copies of the Congressional Record and committee prints are among the documents; photocopies of newspaper and magazine articles are there; documents that were circulated among Cabinet departments but never seen by appellant are there. Appellant has not argued that these documents are privileged or that disclosure of them would invade his privacy. Separation of the privileged from the unprivileged, the private from the public, cannot be accomplished merely by naming categories of documents, however; because many documents are commingled, someone must sort through them.

Appellant argues that he is the only person who may do the sorting, the only person who may separate the public from the private, the privileged from the unprivileged. This claim entails assertion of authority over all materials, whatever their status; in appellant's view, no one may second-guess his decisions, because no one else legitimately may have access to the information necessary to second-guess him. This assertion fails because not all materials accumulated during appellant's terms of office are privileged or private.

Appellant contends that he can be counted upon to decide fairly and accurately which information is privileged and which is not. Whether or not this is correct, the archivists who will do the screening under the Act challenged here also can be counted upon to decide fairly and correctly which information is privileged or private and which is not. Their record for discretion is unblemished.

14

Appellant responds that the archivists will apply incorrect standards. They will, appellant contends (Br. 69, 80-81), require him to justify every claim of privilege, thus turning the presumptive privilege recognized in *United States* v. *Nixon, supra,* into a presumptive absence of privilege. But appellant overlooks the fact that he is challenging the Act on its face, and that such a challenge limits the range of arguments that may be considered.

The most important feature of this case, one we emphasize repeatedly in this brief, is that almost all appellant's arguments are based upon hypothetical possibilities, none of which has occurred. There has been no public access; he has never been denied access to any of his presidential materials; no claims of privilege have been determined adversely to him; no presumption has been reversed. Appellant argues as if massive disclosures of private or privileged documents or tapes are imminent, but they are not.

The portions of the Act at issue here do three things. First, the Act provides that appellant does not have sole control of the materials of his presidency. Under the Act, appellant receives, on request, a copy of any of the materials that have been impounded. In this respect, the Act is not significantly different from the depository agreement appellant voluntarily proposed to the GSA; that depository agreement established a two-key system under which appellant could not gain access to any materials without the permission of GSA.

BLEED THROUGH

15

Second, the Act provides that employees of the Executive Branch have access to the materials for lawful purposes. There is no flaw here for, as appellant recognizes (Br. 116-117), legal principles establish that employees of the Executive Branch have access to presidential papers when necessary for the conduct of governmental business. Appellant has not argued that any access provided to employees of the government has to date infringed any privilege of his or invaded his privacy.

Third, the Act provides that government archivists will screen the materials, sorting out those of general historical interest or related to abuse of power.[5] The Administrator is directed to promulgate regulations that will govern both the screening of the materials and the conditions of eventual access to some of them by persons outside the government.

The Act has not left the Administrator without standards in executing this sensitive task. It explicitly provides that there is a "need to prevent general access * * * to information relating to the Nation's security" (Section 104(a)(3)). It directs that the regulations recognize "the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege" (Section 104(a)(5)). And it directs that the regulations recognize

---

[5] The Act also provides that the materials must be held available to the judicial process, but in this respect it does not change any expectation of appellant. Appellant does not argue that this exposure is unconstitutional, nor could he. *United States* v. *Nixon, supra.*

16

"the need to give to Richard M. Nixon or his heirs, for his sole custody and use, tape recordings and other materials" not related to abuse of power and "not otherwise of general historical significance" (Section 104 (a) (7) ). These standards deprive appellant's arguments of much of their force and demonstrate that most of his claims are premature.

In light of these statutory standards, three general questions must be decided before any presidential material will be made public. First, will personnel of the Executive Branch have access to any of the materials, for any purpose? Second, how will the archivists screen the materials and go about making decisions concerning them? Third, what should be done with particular materials? Only the first of these questions is presented in this case, because only it can be resolved by comparing the Act on its face with the requirements of the Constitution.

Most of appellant's arguments rest upon the premise that already his privileges have been abrogated and his privacy invaded. Yet the Act, on its face, carefully preserves all of his privileges and provides for the return of private materials to appellant. Appellant responds that these guarantees are illusory because his privileges will be ignored in fact and private documents will not be returned. These arguments, however, do not attack the statute on its face. To the contrary, Section 104 (a) (5) guarantees appellant all of his privileges—including the presumptive privilege for presidential communications recognized in *United States* v. *Nixon, supra.*

BLEED THROUGH

17

The only claim properly before the Court is that no constitutional set of regulations implementing the Act could be drafted. That claim could be correct only if no eyes other than appellant's may see the materials for any purpose. We do not argue that that claim is unripe—far from it; the Act is in operation, the Administrator has custody of the materials, and screening by archivists is inevitable. The fact that this attack on the face of the statute is ripe for decision does not mean, however, that every hypothetical question concerning future administration of the Act also is ripe for decision. The claim is ripe, but narrow.[6]

Appellant attempts to evade the limitations upon facial challenges by invoking the rights of future Presidents and by arguing against the portions of the regulations already issued. Appellant's attempt to invoke the rights of other Presidents, even if otherwise permissible, fails because the Presidents follow-

---

[6] Appellant's discussion of ripeness (Br. 46-48) is therefore beside the point. The question is not whether this Court should abstain altogether, but whether it should dissect all of the arguments appellant presents. Cf. *Young* v. *American Mini Theatres, Inc.*, No. 74-312, decided June 24, 1976, slip op. 7-11 (declining to decide all tendered challenges to an ordinance affecting First Amendment interests); *Broadrick* v. *Oklahoma*, 413 U.S. 601, 611-614. Some of the consequences of the Act are inevitable and therefore ripe for disposition (see *Buckley* v. *Valeo*, 424 U.S. 1, 114-118), but other consequences predicted by appellant are speculative, abstract, and contingent on the promulgation of regulations and the taking of discretionary action in particular circumstances under those regulations; they therefore are unripe.

18

ing appellant do not agree with the position he attempts to assert on their behalf; President Ford signed and defended the Act, and the incumbent President also supports the Act.[7] Moreover, although some presently effective regulations may be causing appellant cognizable harm, his complaint (A. 17-35) does not challenge any of these regulations, and none was considered by the district court.

If, as appellant contends, the regulations that have been and will be issued conflict with the Act or give insufficient weight to his legitimate interests, those regulations may be attacked and set aside *as violations of the Act*. That hardly would demonstrate that the Act is unconstitutional on its face. Appellant's assertion (Br. 48) that regulations sufficient to protect his interests "are remote from the Administrator's mind" therefore tells us nothing about the facial constitutionality of the Act.

The Court should not accept appellant's invitation to reach out to decide the difficult questions that may be presented by future administration of this Act. It is enough at the present time to determine whether depriving appellant of absolute custody over the materials, and allowing the materials to be screened by disinterested archivists, is constitutional. It would not be a proper exercise of the judicial func-

---

[7] None of this Court's cases allowing parties to invoke the rights of third persons (see, *e.g.*, *Craig* v. *Boren*, No. 75-628, decided December 20, 1976, slip op. 4-6) has dealt with a situation in which the third persons explicitly repudiated the litigant who purported to act in their best interests.

BLEED THROUGH

19

tion under Article III of the Constitution for this Court now to rush to judgment on the many serious and sensitive issues that, in time, may have to be decided. Those issues are not yet so squarely presented that definitive resolution by this Court is necessary or appropriate. As the district court put it (J.S. App. 21a): "Objections [appellant] now presses might be mooted by regulations that protect the very rights whose infringement he now alleges; hypothetical horrors paraded before us as abstract possibilities might never come to pass * * *."

A. Appellant first argues that, under the principle of separation of powers, each branch of government must have the ability to control the disposition of its own papers. Nothing is being done under the Act, however, against the will of the Executive Branch. The Administrator of GSA, the custodian of the materials, is an Executive Branch official, appointed by the President. The Administrator makes all regulations; Executive Branch archivists will do the screening. All that is at stake now is whether employees of the Executive Branch can take custody of and examine materials accumulated during appellant's tenure. A former President cannot rely upon the separation of powers to keep the incumbent President and Executive Branch personnel from examining materials generated and held by the Executive Branch.

In any event, the argument that the Executive Branch is immune from all congressional regulation of its papers is incorrect. The Freedom of Informa-

**20**

tion Act and many other laws demonstrate this. There is no general principle, based on the separation of powers, forbidding Congress to require that some Executive Branch papers must be made available to the public. The inhibition on disclosure comes, if at all, from presidential or executive privileges.

B. Appellant's argument that the Act annuls his presidential privilege is incorrect. Although a President has a presumptive privilege vis-a-vis the public, he has no similar privilege vis-a-vis his successors and the Executive Branch. The papers appellant seeks to withhold from the archivists were generated by the Executive Branch and paid for with public funds. Many of them may be important to the continuing conduct of the affairs of state. No blanket privilege exists with respect to these documents.

Appellant's privilege might well be breached by exposure of some of these materials to persons outside the Executive Branch. But the Act states (Section 104(a)(5)) that no documents shall be released in violation of such a privilege, and it therefore is not unconstitutional on its face. Whether particular materials or categories of materials are privileged is a question that must be resolved at a later date. Appellant does not argue that all of the 42 million pages of documents the Administrator now holds are privileged, and he therefore cannot maintain that any public disclosure of any document would be inconsistent with his privilege.

C. The Act is not a bill of attainder or of pains and penalties. Appellant argues that he was singled

BLEED THROUGH

21

out for special treatment, and that he has suffered trial by legislature. But the Act was narrow because the need for legislation was narrow. Because of his resignation, appellant's status is unique, and the documents of his presidency thereby assume unusual historical significance. Moreover, at the time of enactment appellant was the only former President whose materials were not in a presidential library. The Act draws a distinction that was justified by the problems confronting Congress. Moreover, it is difficult to understand how an act providing for just compensation for any property taken can be thought to be a bill of pains and penalties.

D. Appellant's argument that the process of screening the materials itself will invade his privacy is unpersuasive. Appellant was a public figure; he willingly sought the office of President, and by doing so he surrendered any "privacy" interest in the way he discharged his duties and administered his public trust.

It is true that, among the documents now held by the Administrator, many are genuinely private because they do not pertain to appellant's performance of his duties. But a relatively small proportion of the documents meet that description, and the Act provides (Section 104(a)(7)) that these shall be returned to appellant once they are identified. Appellant contends that this provision might be narrowly interpreted in a way that enables the public to view his private letters and communications with his family, but there is no reason to suppose that

22

this will be so. The Act should not be construed in a way that makes it unconstitutional; the Court's duty, rather, is to give the Act a construction that preserves it against constitutional challenge.[8]

E. Appellant's assertion that the Act chills his freedom of speech and association must fall with his argument concerning privacy. Not every statute having an incidental effect upon speech is unconstitutional. *Buckley* v. *Valeo*, 424 U.S. 1. The Act would affect appellant's speech only insofar as it improperly invaded his privacy, and there is no facially invalid invasion of privacy here. Moreover, the Act applies only to presidential papers and does not apply to any statements made or received by appellant after leaving office. The Act therefore has no prospective effect upon his speech.

## ARGUMENT

### THE PRESIDENTIAL RECORDINGS AND MATERIALS PRESERVATION ACT IS NOT UNCONSTITUTIONAL ON ITS FACE

Appellant makes a number of sweeping arguments, which he augments with multiple hypothetical illustrations. He then discusses the illustrations and endeavors to show why the Act would be unconstitutional if it brought about such a parade of horribles. We have argued at pages 11-19, *supra*, that this Court should not now consider these elaborate hypotheticals and the abstract legal principles that might per-

---

[8] See, *e.g.*, *United States* v. *National Dairy Products Corp.*, 372 U.S. 29, 32; *United States* v. *Harriss*, 347 U.S. 612, 618.

BLEED THROUGH

tain to them. There will be time enough to pass upon them when the public access regulations have been promulgated and when decisions with respect to particular materials are being made. Review of such regulations and decisions would provide the courts with the concrete situations that are conducive to proper resolution of the difficult problems that may be involved.

As to what remains, appellant's position is not persuasive. Appellant's "elaborate argument * * * does not need an elaborate answer." *United States* v. *Wurzbach*, 280 U.S. 396, 399 (Holmes, J.).

### A. The Act Does Not Invade The Autonomy Of The Executive Branch

#### 1. *The principle of separation of powers does not prevent employees of the Executive Branch from screening materials created by the Executive Branch*

Appellant's principal argument is that the Act is an unconstitutional encroachment on powers reserved to the Executive Branch. Far from invading the autonomy of the Executive Branch, however, the Act places the materials in the custody of the Administrator, an executive official responsible to the President, and provides that Executive Branch employees have access to the materials "for lawful Government use, subject to the [Administrator's] regulations" (Section 102(d)). See 41 C.F.R. 105-63.205, 105-63.206 and 105-63.302.

The Act also provides that the materials are to be made available for use in judicial proceedings, but

24

such availability is expressly subject to any rights, defenses, or privileges which any person may invoke. Although the Act contemplates that the public ultimately will have access to some of the materials of historical value, it also recognizes the need "to protect any party's opportunity to assert any legally or constitutionally based right or privilege" (Section 104(a)(5)) and provides for the return of other materials to appellant (Section 104(a)(7)). The Act thus ensures that there will be no disclosure of the materials to persons outside the Executive Branch in violation of any defenses or privileges asserted by appellant or the Executive Branch. Cf. *United States v. Nixon*, 418 U.S. 683.

Appellant is in much the same position he would have occupied if the Administrator, instead of entering into a depository agreement, had refused to allow appellant to take physical possession of the materials and had asserted that the Executive Branch has full dominion over them. Appellant could not have objected to this on separation of powers grounds.

The central point, in this regard, is that nothing is being done against the will of the Executive Branch. All that is at stake now, in a challenge to the facial validity of the Act, is whether Executive Branch employees may have access to papers and other materials accumulated during appellant's terms of office, either to screen the papers and materials for the purposes set forth in the Act or to use them to the extent necessary in carrying out their executive

BLEED THROUGH

25

responsibilities.[9] No case suggests that a former official of the Executive Branch, even a former President, can raise a separation of powers argument to keep the incumbent President and Executive Branch personnel from examining materials generated and held by the Executive Branch.[10]

In short, there is no violation of the principle of separation of powers when Congress acts to preserve the Executive Branch's access to executive papers and materials, and that is all that is involved at this stage of the operation of the Act. Nor, as we discuss immediately below, does the perhaps inevitable dis-

---

[9] Appellant concedes that the Act "does not make the presidential materials available to the Congress—except insofar as Congressmen are members of the public and entitled to access when the public has it" (Br. 119).

[10] Section 105-63.401-2 of the Administrator's proposed public access regulations provides that the Senior Archival Panel of Executive Branch employees processing the materials shall, in limited circumstances, submit specific materials to a Presidential Materials Review Board for a determination whether the materials relate to abuses of government power or otherwise have general historical significance. Cf. 122 Cong. Rec. S5291 (daily ed., April 8, 1976). Two of the four members of this Board (the Librarian of Congress and a nominee of the Council of the Society of American Archivists) are not Executive Branch officials. This provision was disapproved by the House on September 14, 1976 (122 Cong. Rec. H10043-H10044 (daily ed., September 14, 1976)). If it or a similar provision becomes effective, Section 105 of the Act expressly authorizes a judicial action to determine whether such screening of materials by personnel outside the Executive Branch would offend the Constitution. There is no need for this Court to render an advisory opinion on that issue in this case.

26

closure of nonprivileged materials threaten interference with the operations or proper independence of the Executive Branch. Accordingly, appellant's contention that the public interest in preserving the materials is not sufficiently substantial to justify, or could not under any circumstances justify, a violation of the principle of separation of powers (Br. 102-121) is simply beside the point; no such violation has occurred or is threatened.

### 2. *The Act does not presage a wholesale invasion of the prerogatives of the Executive Branch*

Notwithstanding the fact that the Act is administered by the Executive Branch, that the incumbent President does not object to its provisions, and that all legitimate privileges are preserved by Section 104(a)(5), appellant argues that the Act is unconstitutional because it invades the autonomy of the Executive Branch to control its own affairs. This argument fails because its premise is false; with a possible exception not here relevant,[11] the Act does

---

[11] As the district court noted (J.S. App. 25a-26a n. 17), the constitutionality of Section 104(b), which authorizes a single House of Congress to disapprove regulations of the Administrator, is unsettled. See *Buckley* v. *Valeo, supra,* 424 U.S. at 140 n. 176. Cf. *id.* at 120-124, 137-141. At least in some forms, one-house veto provisions may well be unconstitutional attempts by Congress to participate in the detailed administration of a statute, which is fundamentally an Executive Branch function. See Watson, *Congress Steps Out: A Look at Congressional Control of the Executive,* 63 Cal. L. Rev. 983 (1975). The one-house veto provision, however, is not in issue here. The district court did not pass upon it, and appellant does not claim any right under the disapproved regulations.

BLEED THROUGH

not interfere with the constitutional prerogatives of the Executive Branch.

An Act of Congress does not invade the "autonomy" of the Executive Branch simply because it requires the Executive Branch to act in specified ways. The Constitution, which commands the President to "take Care that the Laws be faithfully executed" (Article II, Section 3), makes the President a servant of laws passed within the scope of a grant of power to Congress. Congress has frequently enacted measures providing for disclosure of documents in the possession of the Executive Branch. The Freedom of Information Act, 5 U.S.C. (Supp. V) 552, the Privacy Act of 1974, 5 U.S.C. (Supp. V) 552a, the Federal Records Act, 44 U.S.C. 2101 *et seq.*, and the statutes regarding census data, 13 U.S.C. 8-9, and tax returns, 26 U.S.C. 6103, are a few of many such acts. Legislation of this sort has never been considered a facially invalid invasion of the autonomy of the Executive Branch. Cf. *Environmental Protection Agency* v. *Mink*, 410 U.S. 73; *Administrator, Federal Aviation Administration* v. *Robertson*, 422 U.S. 255.[12]

---

[12] Appellant's analogy of presidential materials to judicial drafts (Br. 109-112) is not convincing. Each case reaching a court is a separate event, and only the opinion of the court is a precedent. But the situation with respect to executive papers is otherwise. The conduct of the Nation's government by the Executive Branch is a continuous process, in which unpublished documents may hold the key not only to proper historical understanding but also to successful conduct of ongoing affairs. As the district court put it (J.S. App. 52a-53a), "[g]overnmental programs and policies do not expire every

28

Like the documents governed by these statutes, presidential materials are an appropriate subject for legislation.[13] Since *Folsom* v. *Marsh*, 9 Fed. Cas. 342, it has been recognized that regardless of where legal title lies, the government's interest in disclosure or nondisclosure of presidential materials can take precedence over the desires of the authors. As Mr. Justice Story there noted (*id.* at 347), "from the nature of the public service, or the character of the documents, embracing historical, military, . diplomatic information, it may be the right, and even the duty, of the government, to give them publicity, even against the will of the writers."

Legislation regulating access to the materials from appellant's tenure as President is supported not only by the strong need for access by government officials to the materials but also by the need to have access for general historical purposes. For example, in carrying out their duties, officials of the succeeding administration found it necessary to review portions of the presidential materials from appellant's adminis-

_____

four or eight years; the information and lessons gained from past experience do not evaporate the moment a new President is inaugurated." Procedures suitable for the records of individual jurists therefore may be quite intolerable if applied to executive officials.

[13] So are meetings by federal agencies. The Government in the Sunshine Act, Pub. L. 94-409, 90 Stat. 1241, adding 5 U.S.C. 552b, requires federal agencies to transact their business in open meetings. Although this may inhibit discussion to some extent, it would be difficult to argue that the Government in the Sunshine Act is a facially invalid invasion of the autonomy of the Executive Branch.

BLEED THROUGH

29

tration concerning SALT negotiations with the Soviet Union, our relations with the People's Republic of China, the Vietnamese negotiations concluded in 1973, and negotiations regarding the Middle East situation (A. 259-261). Some important documents, such as memoranda of conversations between appellant and foreign leaders, can be found only in the materials at issue here (A. 259, 261, 698-701). Far from constituting a breach of executive autonomy, the Act therefore is an appropriate means of ensuring that the Executive Branch will have access to the materials necessary to the performance of its duties.

Presidential materials, which by and large are produced by public employees at public expense, are affected at their creation by a public interest (*Folsom* v. *Marsh*, *supra*) that gives the Nation important rights to them. Congress is empowered by the Property Clause (Article IV, Section 3) to "make all needful Rules and Regulations respecting * * * Property belonging to the United States." Although the Property Clause would not enable Congress to override a legitimate claim of privilege, it establishes authority to legislate with respect to materials in which the United States has an interest.[14]

As a regulation of property affected by the public interest, the Act is constitutional without regard to

_____

[14] "[D]eterminations under the Property Clause are entrusted primarily to the judgment of Congress" (*Kleppe* v. *New Mexico*, 426 U.S. 529, 536), and this Court has repeatedly given the Property Clause an "expansive reading" (*id.* at 539). See also J.S. App. 63a-66a n. 49.

whether appellant has a valid claim of ownership to the materials. Appellant's discussion of the tradition of presidential ownership of such materials (Br. 90-102) therefore is not pertinent.[15] To the extent that the Act interferes with any of appellant's property interests, Congress has exercised its power of eminent domain and provided for whatever compensation may be constitutionally necessary.[16] Use of the eminent domain power to acquire and preserve the historical record is proper. Cf. *Berman* v. *Parker*, 348 U.S. 26, 32; *United States* v. *Gettysburg Electric Ry.*, 160 U.S. 668. Once the materials have been so acquired, the Property Clause confers amply authority for their disposition under the Act.

We would have greater pause if the Act hindered the Executive Branch in carrying out its functions under Article II of the Constitution. The Executive Branch has a right to "autonomy" in the sense that Congress cannot so hamstring its operations in executing the laws that its ability to function as an

---

[15] Appellant concedes that his alleged ownership interest may be subjected to some forms of legislative restriction, apparently without any requirement of compensation (Br. 121).

[16] We do not concede that the Act is a "taking." The Act preserves appellant's access to the materials. Although it may diminish their monetary value to appellant, that is not always enough to constitute a "taking." *Goldblatt* v. *Town of Hempstead*, 369 U.S. 590. This issue is not before the Court, however; appellant seeks not just compensation but full possession and control of all the materials at issue.

BLEED THROUGH

31

executive is frustrated.[17] Thus the Act would be open to question if it so threw open the process of decision-making in the Executive Branch that it became difficult for the President to obtain candid advice from the other Executive Branch officials, or for those officials to speak frankly to each other. Cf. *United States* v. *Nixon, supra,* 418 U.S. at 705-706, 715; *National Labor Relations Board* v. *Sears, Roebuck & Co.,* 421 U.S. 132, 149-155.

The Act does not create this sort of hazard, however; because it recognizes the importance of privacy and preserves existing privileges, and because the Executive Branch, acting through the Administrator, is entrusted with control of the day-to-day administration of the materials, we submit that the Act does not create such dangers of widespread breach of confidence that it is unconstitutional on its face. Any prospect of widespread breach of confidence can be detected, and rectified, when the Act is placed into operation. Cf. *Buckley* v. *Valeo, supra,* 424 U.S. at 68-72 (constitutionality of disclosure of names of contributors must be assessed case-by-case rather than on the face of the statute).

---

[17] Appellant incorrectly relies (see, *e.g.,* Br. 103-108) upon *Buckley* v. *Valeo, supra, Myers* v. *United States,* 272 U.S. 52, and similar cases for the proposition that the Executive Branch is entitled to some broader scope of freedom from congressional interference. Those cases, however, involved only the President's power to select and dismiss officers of the United States, the persons who would execute the laws. They do not establish any limitation upon the power of Congress to prescribe substantive rules that properly appointed officers of the United States must follow.

32

## B. The Act Does Not Breach Appellant's Privilege With Respect To Confidential Presidential Communications

The Act is consistent with the qualified privilege for confidential presidential communications, which, as this Court recognized in *United States* v. *Nixon, supra*, 418 U.S. at 715, is founded upon "the singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article."

That privilege is based upon the harm that could be done to the decision-making process by public disclosure of confidential communications. It therefore does not pertain to all presidential materials (although an incumbent President may have other privileges with respect to other presidential materials), and it does not pertain to disclosure to incumbent officials of the Executive Branch. See *Folsom* v. *Marsh, supra*. The business of government requires that the President and other executive officials have access to the governmental papers of their predecessors. The privilege for confidential communications does not bar access by the Executive Branch to papers and materials generated by the Executive Branch for the use of the Executive Branch.[18] Indeed, the pur-

---

[18] Appellant asserts that *United States* v. *Nixon, supra*, recognized a presidential privilege that would bar access by an executive official. That is incorrect. *United States* v. *Nixon* involved a judicial subpoena for papers that were required to be used in the judicial process. The subpoena required the delivery of the materials to the court. In a very real sense, therefore, that case involved not only public access (the materials were to be introduced in evidence in open court) but also

BLEED THROUGH

**33**

pose of the privilege is to facilitate the flow of information within the Executive Branch; it would be an ironic frustration of that purpose to permit the privilege to place each administration in a separate watertight compartment and thereby dam the flow from one administration to the next.

We do not imply that appellant has no presidential privilege. The district court expressed doubt (J.S. App. 39a-40a) whether a former President may assert a presidential privilege, but we do not share that doubt. This Court held in *United States* v. *Nixon, supra,* that the privilege is necessary to provide the confidentiality required for the President's conduct of office. Unless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends. The confidentiality necessary to this exchange cannot be measured by the few months or years between the submission of the information and the end of the President's tenure; the privilege is not for the benefit of the President as an individual, but for the benefit of the Republic. Therefore the privilege survives the individual President's tenure.[19]

---

access by a separate branch of government. In its present posture, this case involves neither public access nor access by anyone outside the Executive Branch.

[19] For similar reasons, the attorney-client privilege survives disbarment of the lawyer and termination of the confidential relationship. It is for the benefit of the client, not for the

**34**

Furthermore, in view of the fact that the privilege serves societal, not individual, purposes, when a private person seeks access to presidential communications it should not matter whether the issue of privilege is raised by an incumbent President, a former President, or no one at all. The need for confidentiality exists no matter who raises the privilege.[20] Cf. Letter of Harry S. Truman to Harold H. Velde, dated November 12, 1953, reprinted at 120 Cong. Rec. 33419 (1974), in which former President Truman invoked a privilege of confidentiality after leaving office.

Our agreement with appellant in these regards, however, does not help him in the instant case. The privilege of confidentiality pertains to disclosures outside the Executive Branch, but not to disclosures within it. The President is a public trustee with inside knowledge and awesome responsibilities. He is answerable at the polls for his mistakes, and he is subject to political pressure from Congress. These

---

benefit of the lawyer. There, as here, the free exchange of views can be promoted only by the promise of enduring confidentiality. See McCormick, *Evidence* § 94 (Cleary ed. 1972) (the privilege survives the death of the client in most cases). Cf. *Fisher* v. *United States*, 425 U.S. 391, 402-405.

[20] We discuss here only the privilege for confidential communications. As appellant himself acknowledges (Br. 81-90), a difference must be recognized between the privilege for state secrets and sensitive information, which may be raised only by the incumbent officeholder, and the privilege for confidential communications and pre-decisional advice, which may be raised by a former President.

BLEED THROUGH

35

things separate an incumbent from a former President, and they counsel against allowing a former President to stop up the flow of information to the incumbent and his staff. The government should not be required to start from scratch each time a new President assumes office.

At the present time, and for the foreseeable future, only appellant, officials of the Executive Branch in the conduct of their official duties, and archivists who will screen and classify the materials, have access to them. No access by the public is imminent, and before any such access is provided all materials will undergo a rigorous scrutiny designed to separate privileged matters (which will not be disclosed) from nonprivileged matters (which, if they are not private, will be disclosed under appropriate restrictions). Appellant has not made a persuasive argument that this screening process must lead to disclosures in violation of his privilege; indeed, it would be difficult to do so, in light of Section 104(a)(5)'s explicit preservation of his privilege.

Access by the archivists themselves is not meaningfully different from screening by a court *in camera;* it poses no realistic danger of breach of confidence or inhibition of discussions among executive officials. See *United States* v. *Nixon, supra,* 418 U.S. at 706, 714-716. See also *Department of the Air Force* v. *Rose,* 425 U.S. 352, 381-382 (*in camera* inspection, together with redaction of private details, will safeguard privacy); *Kerr* v. *United States District Court,* 426 U.S. 394, 404-406; *Dellums* v. *Powell,* C.A.D.C., No. 76-1336, decided January 28, 1977, slip op. 16-17.

Difficult questions still may arise concerning particular screening techniques and eventual public access to particular types of materials and subject matters, but consideration of these questions should not take place in the relatively abstract setting afforded by this case. A more concrete dispute, concerning particular techniques or subject matters, would provide a better perspective. The opinion of the district court manifests great solicitude for appellant's rights. It observes that access by nonarchivist executive officials to certain tyes of documents may be forbidden (J.S. App. 26a-27a n. 18) and that concern for appellant's rights must be "paramount" (*id.* at 22a); it suggests ways in which the screening of the materials can be accomplished with a minimum of intrusion (*id.* at 29a-31a).

There is no basis for appellant's apparent belief either that his legitimate interests will be overlooked if and when he seeks judicial review of the regulations governing screening and public access or that the presumption in favor of privilege has been reversed (Br. 69). The privilege is no more "reversed" by the Act than it is when a person attempts to secure materials, by subpoena, from appellant's hands. In either case appellant would be required to invoke his privilege; once it had been invoked, however, the burden would be on the proponent of disclosure.

In any event, only a small portion of the 42 million pages of documents and more than 800 reels of tape in issue could be subject to a legitimate claim

BLEED THROUGH

37

of privilege by appellant.[21]  The privilege does not attach to materials unrelated to the performance of executive duties.[22]  *United States* v. *Nixon, supra,* 418 U.S. at 703-714.  Not even all materials related to the performance of executive duties are privileged; the privilege applies only to communications originating in confidence [23] and not yet disclosed to the public.  Some of the materials have become matters of public record through appellant's voluntary disclosures and are no longer privileged.  See, *e.g.,* 10 Weekly Comp. of Pres. Docs. 450 (1974).  Between 16 and 20 hours of edited tapes were played at the criminal trial of four of appellant's aides.  These tapes are no longer confidential.  *United States* v. *Mitchell,* C.A.D.C., No. 75-1409, decided October 26, 1976, petition for a writ of certiorari pending *sub*

---

[21] Appellant states that he is primarily concerned about the 200,000 documents that he personally prepared or reviewed (A. 514-516), and about "records of the 'internal operations' of a President's office" (Br. 13).

[22] Some materials unrelated to appellant's presidential duties may be subject to another privilege, such as attorney-client or husband-wife.  But it may be anticipated that few of the documents are subject to such privileges, and it is impossible to determine which these are until the archivists have examined them.

[23] Appellant would define the scope of the privilege more broadly (Br. 70-73).  But since much of the materials at issue would be unprivileged under any conceivable definition, and because public disclosure of even arguably privileged material is not imminently threatened, judicial resolution of this aspect of the disagreement between the parties must await a more concrete dispute, if one ever arises, involving a determination to disclose specified materials.

38

*nom. Nixon* v. *Warner Communications, Inc.,* No. 76-944. Most of the material therefore falls outside the scope of any recognizable privilege.

Finally, appellant cannot claim that all of the materials were created with the expectation that they would be kept privileged or private in perpetuity. Every President since Hoover has deposited most of his presidential materials in a library pursuant to the Presidential Libraries Act, 44 U.S.C. 2101, 2107 and 2108 (see J.S. App. 43a). Only a few presidential materials have been withheld. Each President or his representative has allowed professional archivists to screen the materials and to suggest appropriate restrictions upon access; appellant had planned to follow a similar course (A. 182-184). The sheer bulk of the materials would make any other course infeasible (J.S. App. 72a, 83a n. 59). With or without the Act, then, eyes other than appellant's would screen most of the materials and separate the public from the private, the privileged from the unprivileged, the sensitive from the mundane.

### C. The Act Is Not A Bill Of Attainder

Bills of attainder are "legislative acts, no matter what their form, that [1] apply either to named individuals or to easily ascertainable members of a group [2] in such a way as to inflict punishment on them [3] without a judicial trial * * *." *United States* v. *Lovett,* 328 U.S. 303, 315; *United States*

BLEED THROUGH

v. *Brown*, 381 U.S. 437, 448-449.[24] Noting that Title I of the Presidential Recordings and Materials Preservation Act applies only to the presidential materials of his administration and refers to him by name, appellant argues that the Act is a bill of attainder (Br. 130-141). The Act, however, lacks two necessary elements of a bill of attainder: it does not inflict punishment, and it does not encroach upon the judicial function.

That Title I of the Act refers to appellant by name and applies only to his presidential materials does not render the Act unconstitutional.[25] As the district

---

[24] At common law, "bills of attainder" imposed the death sentence, while legislative acts imposing lesser sanctions were known as "bills of pains and penalties." The Constitution proscribes bills of attainder and bills of pains and penalties alike. *United States* v. *Brown, supra,* 381 U.S. at 441, 447; *Cummings* v. *Missouri,* 4 Wall. 277, 323.

[25] This Court's equal protection decisions show that a legislature can constitutionally address specific problems directly. See, *e.g., City of New Orleans* v. *Dukes,* No. 74-775, decided June 25, 1976; *Williamson* v. *Lee Optical Co.,* 348 U.S. 483, 489. Congress also can attack a problem piecemeal. See, *e.g., Mathews* v. *DeCastro,* No. 75-1197, decided December 13, 1976; *Dandridge* v. *Williams,* 397 U.S. 471. The test of validity under equal protection principles is whether the classification is rationally related to the problem at hand. *Weinberger* v. *Salfi,* 422 U.S. 749, 768-769. These precepts apply to the Act at issue no less than to broad social welfare measures such as the Social Security Act, and the decision by Congress to address in detail the problems of the disposition of appellant's papers therefore comports with equal protection principles. Appellant apparently concedes this much, for he has abandoned his former argument (J.S. 28) that the Act violates the equal protection component of the Due Process Clause of the Fifth Amendment.

40

court observed (J.S. App. 93a-94a), appellant's status and the materials of his administration are unique. Appellant, alone among all Presidents, resigned in the face of impending impeachment by the House of Representatives; indeed, the allegations against him were sufficiently serious that after his resignation appellant accepted a pardon for all crimes he may have committed while in office. The circumstances leading to the recommendation by the House Judiciary Committee that appellant be impeached cast a pall over his conduct in office. The materials of his administration are "peculiarly informative" (J.S. App. 58a) with regard to these unusual circumstances and therefore are especially fit for historic preservation.

Other more mundane things also set appellant apart. When Congress acted, the presidential papers of all other recent past Presidents were already available in presidential libraries, former President Ford, then the incumbent, needed his presidential papers to carry out his duties,[26] and the papers of future Presi-

---

[26] On December 13, 1976, President Ford donated his presidential, vice-presidential, and congressional materials to the United States for preservation in a presidential library and museum. 12 Weekly Comp. of Pres. Docs. 1709 (1976). The deed provides for the prompt processing of all materials by archivists, and Mr. Ford did not retain any power to select them or influence their conduct (id. at 1712-1713). Specified personal items, however, are excluded from the gift (id. at 1711), and Mr. Ford restricted access (except by archivists) to designed classes of materials such as personnel investigations, confidential communications, and classified materials (id. at 1713).

BLEED THROUGH

41

dents posed no immediate problem. Moreover, Title II of the Act establishes a special commission to study and recommend appropriate legislation regarding the preservation of the records of future Presidents and all other federal executive, legislative, and judicial officials.

Congress considered bills that would have governed the papers of all federal officials. 120 Cong. Rec. 33855, 33857-33863, 37902 (1974). That approach was rejected, however, after sponsors of the Act emphasized the urgency of the situation regarding appellant's materials. Members of Congress also pointed out differences between a President's and a legislator's papers; they expressed concern about the fact that the costs of a statute applicable to all officials were unknown. 120 Cong. Rec. 33857, 33959, 33962, 37902 (1974) (remarks of Senators Nelson and Ervin and Representative Brademas).

Congress believed that it should act promptly with respect to appellant's presidential materials; in the view of the responsible committees, appellant's depository agreement with GSA created an imminent danger that the tape recordings would be destroyed if appellant, who had contracted phlebitis, were to die. S. Rep. No. 93-1181, 93d Cong., 2d Sess. 4 (1974); H.R. Rep. No. 93-1507, 93d Cong., 2d Sess. 2-3 (1974); 120 Cong. Rec. 33874 (1974) (remarks of Senator Huddleston).[27] In addition, several legis-

---

[27] There was some confusion whether the depository agreement (A. 41) called for the destruction of the tapes immediately upon appellant's death or only upon his death more than

42

lators believed that Congress should act promptly to overcome the "greatly lower public confidence in our Government" attributable to the events that almost led to appellant's impeachment. 120 Cong. Rec. 33873 (1974) (remarks of Senator Cranston); 120 Cong. Rec. 33875 (1974) (remarks of Senator Huddleston).

The Act Congress designed to cope with these pressing problems lacks the punitive intent that is an essential element of a bill of attainder. The Act does not contain an express declaration of guilt, nor does it impose a punitive sanction. Cf. Comment, *The Supreme Court's Bill of Attainder Doctrine: A Need for Clarification*, 54 Cal. L. Rev. 212, 214 (1966).

Appellant asserts that the Act is punitive because it has deprived him of ready access to his presidential materials and because the materials are to be processed by archivists whom he has not selected (Br. 104). Under appellant's depository agreement with GSA, however, appellant willingly surrendered access to the materials for an initial three years (five years in the case of the tape recordings), except through a two-key system under which the consent of the Administrator was necessary (J.S. App. 135a). The Act (Section 102(b)), and its implementing regulations (41 C.F.R. Subpart 105-63.2, 105-63.301), do not deprive appellant of substantial

---

five years after the initial deposit. Cf. Appellant's Br. 159 n. 69.

BLEED THROUGH

43

rights of access preserved in the depository agreement; to the contrary, they ensure appellant's right of access to the materials, including his right to obtain copies on request (see J.S. App. 13a, 107a). The latter provision minimizes any inconvenience to appellant that might otherwise arise from the fact that the materials are stored in the Washington, D.C., area rather than in California, as the depository agreement had envisaged.

Even if the Act were seen as imposing discomfort or inconvenience, this would not make it a bill of attainder.

> The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation * * *.

*Flemming* v. *Nestor*, 363 U.S. 603, 614, quoting from *De Veau* v. *Braisted*, 363 U.S. 144, 160 (plurality opinion). The legislative history of the Act demonstrates that it is a regulatory statute designed to preserve, process, and make available, with appropriate limitations, the materials relating to appellant's Presidency. S. Rep. No. 93-1181, *supra*, at 1; H.R. Rep. No. 93-1507, *supra*, at 1.[28] The object

---

[28] Some members of Congress who opposed the Act characterized it as a bill of attainder or a punitive measure. *E.g.*, 120 Cong. Rec. 33871, 33963, 33968, 33975 (1974) (remarks of Senators Hruska, H. Scott, Thurmond, W. Scott). Those

44

"on which the enactment in question was focused" (*Flemming* v. *Nestor*, 363 U.S. 603; see also *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168-169), was the legitimate concern relating to the materials of appellant's Presidency. Congress was not seeking to punish him.[29] See J.S. App. 100a.

---

who sponsored or supported the Act, however, expressly disavowed that purpose. *E.g.*, 120 Cong. Rec. 33872, 33959, 33874-33875 (1974) (remarks of Senators Ervin and Huddleston). For example, Senator Huddleston stated (120 Cong. Rec. 33875 (1974)):

> I[t] seems to me that the most important thing we can do in the aftermath of a tide of events that led to the resignation of a President of the United States and numerous indictments and convictions of high public officials is to assure that the American people know the complete story—not just the present generation, but all generations to come.

> It should be made clear that this proposed legislation is not designed to cause Mr. Nixon any additional embarrassment, humiliation or suffering. In my opinion his resignation from the highest office of the land has been substantial punishment in itself and we should not seek to inflict more. This is why the pending legislation affords the former President every protection and consideration while at the same time protecting the right of the public to be completely informed about a matter that affects us all so intimately.

[29] Appellant argues that the Act effectively punishes him because it will compel him to devote time and money to making arguments (both to the Administrator and in court) designed to avert disclosure of private or privileged matters. He contends, in short, that he has been condemned to become a continual litigant. Although we do not gainsay the hardship such a status may entail, we believe that here, too, appellant's arguments are premature. Once regulations have been promulgated and the process of classification has begun,

BLEED THROUGH

**45**

The Act also lacks a further element of a bill of attainder, a "trial by legislature." *United States* v. *Brown, supra,* 381 U.S. at 442. Section 105 of the Act expressly provides for judicial determination of whether the Act deprives any individual of property and, if so, what amount should be paid as just compensation. Section 104(a)(5) preserves appellant's privileges, and any question concerning their applicability can, if necessary, be resolved by a court. Section 104(a)(7) protects appellant's right to purely personal materials; Section 102(c) ensures his access to all of the materials. These provisions, and others that safeguard appellant's interests,[30] refute the claim that the Act supplants the judicial process in the manner of a bill of attainder.

Appellant's argument that the Act is a bill of attainder would appear to reach every legislative exercise of the power of eminent domain over specifically designated property of a specific individual. In each

it may become clear that appellant and the Administrator agree on the proper disposition of many categories of materials. In any event, appellant would have faced the need to litigate many of his claims of privilege and privacy whether or not the Act had been passed. Several suits seeking access to the materials had been filed (see pages 6, 10, *supra*), and appellant would have been required to raise his privilege and privacy arguments in defense to these and other suits, subpoenas, and requests for discovery.

[30] See, *e.g.,* Section 102(b), which preserves all of appellant's "rights, defenses, or privileges" in any judicial proceeding involving a subpoena of the materials.

46

case there is a legislative assertion of control over property on the basis of legislative determinations of fact and purpose. But an Act of Congress expressly providing for a judicially-computed award of "just compensation" for any property interest taken cannot be thought to be either an invasion of the province of the judiciary or an imposition of penalties.

For example, the Act appellant challenges is functionally little different from the statute upheld in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, which provided for the transfer of the railroad properties of a small number of railroad companies to a governmentally organized corporation. No one supposed that that statute was a bill of attainder. Neither is the Act involved here. Indeed, to the extent the statutes can be distinguished, the present Act effects the lesser intrusion: Congress simply has placed conditions on the authority of the Administrator of General Services to release materials that were generated by and are in the possession of the United States, and appellant ultimately will be given the materials or facsimiles.

In contending that the Act unconstitutionally invades the province of the judiciary, appellant argues that the Act makes the implicit determination that he would be an unreliable custodian of the materials, and that such a finding can be made only by a court (Br. 137). It is true that, in debating the Act, legislators reviewed the Watergate events, including the 18½ minute erasure in the June 20, 1972, tape made

BLEED THROUGH

while appellant had custody of the recordings, the discrepancies between appellant's transcripts of the recordings and those of the House Judiciary Committee, and the fact that appellant had been named by a grand jury as an unindicted conspirator. See, *e.g.*, 120 Cong. Rec. 33859, 33958, 33959 (1974) (remarks of Senators Javits and Ervin). These factors, however, were relevant to the legislative task of determining how best to safeguard the materials. The very fact that questions had arisen concerning appellant's reliability as a custodian [31] made it reasonable for Congress, in the exercise of caution, to preserve the Executive Branch's control over the original materials and to provide for their processing by disinterested archivists.

In sum, although the Act specifies appellant by name, Congress was acting to resolve a situation unique to him and the materials of his presidency. [32]

---

[31] Appellant's argument that only the courts may determine whether he would be a reliable custodian rings hollow in light of his responses at the deposition taken in the present case. When appellant was asked whether he had deliberately misrepresented in his public statements as President the contents of the tape recordings, he refused to answer, invoking a claim of privilege and asserting that the question was irrelevant (A. 581-590).

[32] *United States* v. *Lovett, supra*, does not support appellant. In *Lovett* the Court held that a statute removing from government employment three persons designated by name was a bill of attainder. The statute at issue in *Lovett* was intended to bypass the judicial process by branding the three persons as subversives and penalized them for their past ac-

48

The Act lacks the punitive design and consequences, and the invasion of the judicial function, that are essential elements of a bill of attainder.

### D. Review Of The Materials By Archivists Does Not Invade Appellant's Privacy

Appellant renews his arguments, rejected by the district court (J.S. App. 67a-93a), that the Act invades his privacy and abridges his freedom of expression and association. We discuss these in turn.

Appellant was, for the term of his Presidency, the quintessential "public figure." See, *e.g.*, *Monitor Patroit Co.* v. *Roy*, 401 U.S. 265; *New York Times Co.* v. *Sullivan*, 376 U.S. 254. His voluntary decision to seek the Presidency relinquished any "privacy" interest in the way he conducted that office and administered the public trust. See *Uniformed Sanitation Men* v. *Sanitation Commissioner*, 392 U.S. 280, 284.

A former President may have a "privacy" interest in some of his documents, but that interest would pertain to only a few of the materials in issue here. Most of the papers were prepared or seen by others; many were circulated widely within the government,

---

tivities. For the reasons discussed in the text, the Presidential Recordings and Materials Preservation Act does not have these features. In it, Congress simply expressed a judgment that the *materials* accumulated during appellant's terms should be preserved; any judgment it expressed about appellant was incidental to this end, and specifying appellant by name was simply a convenient way of designating the materials sought to be preserved.

BLEED THROUGH

**49**

and appellant would have no privacy interest in them. *United States* v. *Miller*, 425 U.S. 435. Appellant himself prepared or reviewed relatively few of the documents. Portions of some of them have been disclosed or discussed in public and therefore no longer are private. See *United States* v. *Dionisio*, 410 U.S. 1, 14; *Katz* v. *United States*, 389 U.S. 347, 351.

Appellant expected to donate most of his materials to a presidential library, where they would be screened by archivists and read by historians and members of the public. Appellant's principal purpose in making the tape recordings was to preserve the conversations for historical purposes (A. 562-563), a purpose that could be fulfilled only by allowing individuals other than appellant to have access to them. The nature of the tapes and most of the documents, and the purpose of their creation, thus demonstrate that as to them the Act does not invade an area in which appellant had an expectation of privacy.

Whatever "privacy" interest appellant may have in the remaining materials (such as communications to and from his family) is insufficent, in light of the strong public interest in preservation of most of the nonprivate materials, to bar archivists from reviewing all the materials initially for the narrow purpose of separating the public from the private.

The substantiality of the interests served by preservation of the materials is self-evident. We have discussed the need of officials of the Executive Branch to have access to the materials in order to

50

conduct the affairs of state. The Act also ensures that materials of historical significance will be preserved and professionally processed in order to make available an accurate historical record (J.S. App. 49a-52a), and it ensures that materials will be preserved for use in judicial proceedings (Section 104 (b)).

Congress reasonably perceived that these and other legitimate public interests would be jeopardized if appellant had the sole right to screen the materials and to separate the private from the public. For one thing, appellant's view of what is "private" may be more generous than that which would be taken by Congress, the Executive Branch, or a reviewing court. Use of disinterested archivists to do the screening leads to the application of generally uniform standards; if the archivists use incorrect standards, their errors may be corrected by a court.[33] If appellant alone had access to the materials, however, no correction of errors could occur.

Congress also was concerned about the possibility of other sorts of errors or distortions during the sorting process. For example, during the time appellant had custody of the tape recordings an unexplained $18\frac{1}{2}$ minute erasure was made in one tape sought by the Special Prosecutor. 9 Weekly Comp.

---

[33] Appellant's argument (Br. 174-177) that archivists are not judges and cannot be relied upon to protect his privacy is beside the point. If it is deemed necessary, the archivists' decisions will be reviewed by a judge or judges, and the appropriate legal standard of privacy will be judicially enforced.

BLEED THROUGH

of Pres. Docs. 1370, 1372 (1973); H.R. Rep. No. 93-1305, 93d Cong., 2d Sess. 127 (1974). During the hearings on the proposed articles of impeachment appellant released documents that he represented to be transcripts of the taped conversations. 10 Weekly Comp. of Pres. Docs. 450-458 (1974). After the House Judiciary Committee obtained the recordings, it concluded that appellant's transcripts had "proven to be untrustworthy" and contained "significant omissions, misattributions of statements, additions, paraphrases, and other signs of editorial intervention * * *" (H.R. Rep. No. 93-1305, *supra*, at 205, 129).

Congress took pains to establish a mechanism to mitigate the problems caused by the archivists' review of genuinely private materials. The Act acknowledges the need to give appellant "sole custody and use" of all materials not related to the abuses of power generically referred to as "Watergate" and not of general historical significance (Section 104(a) (7)).[34] The initial screening will be conducted by disinterested archivists; screening of this sort, like submission of materials to a court *in camera*, does not

---

[34] Appellant asserts (Br. 143-145) that the Administrator will construe Section 104(a)(7) in a way that fails to recognize appellant's legitimate privacy interests. This assertion does not, however, establish that the Act is unconstitutional on its face. Improper decisions by the Administrator may be attacked as violations of the Act, without resort to constitutional arguments. Moreover, when there is need to do so, the Court should construe the Act in a way to save its constitutionality and not, as appellant seemingly contends, in a way to defeat its constitutionality.

52

create a significant invasion of privacy. *Department of the Air Force* v. *Rose, supra.*

To the extent screening by the archivists is itself an invasion of privacy, the intrusion is attributable in part to appellant's practice of commingling public and private documents (see J.S. App. 63a). He should not now be entitled to claim that the statute is unconstitutional on its face because the archivists, "whose record for discretion in handling confidential material is unblemished" (*id.* at 45a),[35] will be required to sift through private documents.[36]

---

[35] Appellant suggests (Br. 174-177), but does not expressly argue, that this finding by the district court is clearly erroneous. It is not. The finding is amply supported by the record (*e.g.*, A. 232-235, 245-246, 264, 266-267, 346-347), and appellant cites no record evidence of any past abuses of confidentiality by archivists. Indeed, Dr. Herman Kahn, upon whom appellant relies (Br. 31-32), testified at the hearings on an alternative bill to the Act:

> [S]ince 1945 the papers of the Presidents have become the property of the Government immediately upon the President's leaving the White House and it has been the responsibility of the appropriate officials of the Government to see that no one lays hands on them who might do them harm. I think that responsibility has been very faithfully carried out.

Hearings on H.R. 16902 and Related Legislation before the Subcommittee on Printing of the Committee on House Administration, 93d Cong., 2d Sess. 97 (1974).

[36] Appellant argues that this sifting violates the Fourth Amendment (Br. 147-164, 173-174). This argument overlooks the fact that the materials always have been, and still are, in the lawful possession of the United States. They never were seized from appellant within the meaning of the Fourth

BLEED THROUGH

53

Finally, as is the case with appellant's other : rguments, more particularized claims can be made once the regulations have become effective and initial de-

Amendment. *Couch* v. *United States*, 409 U.S. 322, 335-336. Accordingly, appellant's effort to analogize the Act to a general warrant (Br. 147-152) is mistaken, and his reliance upon *Sanford* v. *Texas*, 379 U.S. 476, erroneous. Moreover, the proscription of general warrants would not in any event extend to a governmental assertion of a possessory interest subject to the safeguard of just compensation.

Appellant contends that, if the materials were in his hands, the government could not obtain all of them by subpoena (Br. 151-152). This might well be so, but in light of the special public interest that affected the materials at their creation and the fact that most of them were generated by government employees, the Fourth Amendment standards of reasonableness that apply to subpoenas served upon private persons would not apply: there should be no need to establish reasonableness before personnel of the Executive Branch may examine documents created by the Executive Branch itself. Ordinarily the Self-Incrimination Clause of the Fifth Amendment would be the most important safeguard against intruding subpoenas, but it would apply only when the act of production was itself a testimonial act. See *Fisher* v. *United States*, *supra*. The Self-Incrimination Clause does not apply to appellant's materials, however, because he has been pardoned for all crimes he may have committed as President, and the materials therefore cannot incriminate him.

Furthermore, neither the Fourth nor the Fifth Amendment prevents officials of the government from seizing and searching through documents to find that which they seek. *Andresen* v. *Maryland*, No. 74-1646, decided June 29, 1976 (upholding a comprehensive examination of an attorney's files to find papers related to a specified fraudulent transaction). Appellant observes that the inspection under the Act is not a search for evidence of a particular crime, but that does not help him. Searches can be conducted to find out whether crimes (or civil violations of regulations) have occurred in the first place. See *United States* v. *Biswell*, 406 U.S. 311. In *Biswell* the Court

54

terminations are made with respect to what is private and what is public. "Objections [appellant] now presses might be mooted by regulations that protect the very rights whose infringement he now alleges; hypothetical horrors paraded before us as abstract possibilities might never come to pass * * *" (J.S. App. 21a). There will be time enough for further consideration of appellant's privacy claims if it should become clear that the archivists are abusing their offices, or if the Administrator should designate as "public" any category of materials that appellant believes are "private."

---

upheld a warrantless entry upon private property to make an inspection of business records and inventory to determine whether the proprietor was complying with a federal statute; contrary to appellant's suggestion (Br. 163), that thorough inspection of the sole proprietor's records and storeroom was neither "modest" nor "impersonal." See also *Colonnade Catering Corp.* v. *United States*, 397 U.S. 72; *Wyman* v. *James*, 400 U.S. 309. The decisions in *Biswell, Colonnade* and *Wyman* were based upon the special relationship between the government and the premises visited. In the instant case there is an even stronger relationship between the government and the papers inspected: with only minor exceptions, they are government documents, created with federal money. Thus even if they had not been held in the possession of the Executive Branch, they could constitutionally have been searched by Executive Branch officials in order to secure and preserve those materials of value and legitimate concern to the government. *A fortiori* they are subject to such search when voluntarily left in the custody of the Executive Branch.

BLEED THROUGH

55

### E. The Act Does Not Abridge The Freedoms Of Speech And Association

The arguments demonstrating that the Act does not invade appellant's privacy also demonstrate that it does not abridge his freedoms of speech and association. The district court therefore properly rejected appellant's First Amendment contentions (J.S. App. 89a-93a). "[C]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Buckley* v. *Valeo, supra,* 424 U.S. at 64. This Court has recognized, however, that "particularly when the 'free functioning of our national institutions' is involved," the need for disclosure may outweigh the First Amendment interests. *Id.* at 66, quoting from *Communist Party* v. *Subversive Activities Control Board,* 367 U.S. 1, 97.

Appellant's conversations and documents were not those of a private citizen. His interest in speech is affected by his status as a public servant (*Civil Service Commission* v. *Letter Carriers,* 413 U.S. 548), and the cases upon which he relies (Br. 164-173) therefore apply here, if at all,[37] with substantially diminished force. Moreover, as we have discussed, the Act will allow public access only to those mate-

---

[37] Indeed, many of the cases upon which appellant relies involve governmental restrictions upon or prohibition of public expression. See, *e.g., Cox* v. *Louisiana,* 379 U.S. 536; *Lovell* v. *Griffin,* 303 U.S. 444. No such restriction or prohibition is involved here.

56

rials related to "Watergate" or having general historical significance.[38]

The initial screening of all the materials by disinterested archivists does not infringe appellant's First Amendment rights. The private knowledge of the archivists will pertain only to past events, and that knowledge should not deter appellant from expressing himself in the future concerning public issues; it could not prevent other individuals from associating with appellant (J.S. App. 92a-93a). Nor should such a mere screening chill the discussions of public servants in the current or future administrations: the privilege against disclosure of confidential communications, which comes into play only after the archivists' initial review, is sufficient to protect against any chilling effect on future intra-governmental communications.

---

[38] Appellant argues (Br. 121-130) that the Act is "overbroad" because it will entail publication of other matters as well. But it is far too early for this Court to pass upon that contention. The regulations eventually promulgated, and judicial review of those regulations and the decisions made under them, can narrow the effect of the statute and avert improper disclosures. Such narrowing constructions and administrative practices were relied upon in cases like *Parker* v. *Levy*, 417 U.S. 733, and *Civil Service Commission* v. *Letter Carriers*, *supra*, to save statutes against claims of overbreadth. Similarly, in *Buckley* v. *Valeo*, *supra*, 424 U.S. at 64-74, the Court concluded that although a broad disclosure requirement might on some occasions inhibit speech and association, such claims must be resolved case-by-case rather than in one blunderbuss attack. And so it is here; if disclosure of particular materials or classes of materials would have a particular adverse effect upon appellant's interests, such questions can be resolved when and if they arise.

BLEED THROUGH

57

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

DANIEL M. FRIEDMAN,
  *Acting Solicitor General.*

BARBARA ALLEN BABCOCK,
  *Acting Assistant Attorney General.*

FRANK H. EASTERBROOK,
  *Assistant to the Solicitor General.*

IRWIN GOLDBLOOM,
  *Deputy Assistant Attorney General.*

ROBERT E. KOPP,
ANTHONY J. STEINMEYER,
  *Attorneys.*

MARCH 1977.