**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION; AMERICAN OVERSIGHT, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Case No. 1:26-cv-01169-JDB |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION AND STAY**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

I.      HISTORY OF PRESIDENTIAL RECORDS ........................................................ 2

II.     THE OLC OPINION AND CURRENT PRA POLICIES ...................................... 4

III.    THIS LAWSUIT, PLAINTIFFS, AND THEIR ASSERTED INJURIES .......................... 6

IV.     PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY .................. 7

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ..................................................................................................................... 8

I.      PLAINTIFFS DO NOT SHOW IRREPARABLE HARM ........................................ 9

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ............................ 12

        A.     Plaintiffs Lack Standing to Obtain the Sweeping Preliminary Relief They
               Seek ............................................................................................................. 12

        B.     Plaintiffs' APA Claims Fail .......................................................................... 13

               1.     The OLC opinion is not final agency action. ........................................... 14

               2.     NARA has taken no final agency action .................................................. 16

        C.     Plaintiffs' Non-Statutory Claims Fail .......................................................... 17

               1.     The PRA precludes judicial review of compliance with the Act. ............. 18

                      a.     *Armstrong I* forecloses judicial review of Plaintiffs' PRA
                             claims. ................................................................................... 18

                      b.     The *Armstrong II* exception does not apply. .............................. 21

                      c.     Plaintiffs may not restyle their statutory claim as
                             constitutional. ....................................................................... 23

               2.     Plaintiffs' mandamus and ultra vires claims fail. .................................... 24

               3.     The 2026 Policy is consistent with the PRA's preservation
                      requirements. ........................................................................................... 27

        D.     The PRA is Unconstitutional ........................................................................ 30

1.     The PRA has little historical precedent and imposes significant burdens on the presidency ............................................................... 31

2.     The PRA cannot be justified by any express or implied congressional power ................................................................... 33

     a.     Power of inquiry ........................................................... 33

     b.     Necessary and Proper Clause ....................................... 35

     c.     Property Clause ............................................................ 39

3.     *Nixon v. GSA*'s evaluation of the PRMPA does not control here. ............. 40

4.     No part of the PRA can be constitutionally applied. ................................. 42

III.     THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF ......................... 43

IV.     PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED AS TO THE  PRESIDENT AND VICE PRESIDENT ................................................. 44

CONCLUSION ................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*13th Reg'l Corp. v. U.S. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980)......................................................................... 24, 25

*Alaska Airlines, Inc. v. Brock*,
    480 U.S. 678 (1987) .......................................................................................... 43

*Allen v. Wright*,
    468 U.S. 737 (1984) .......................................................................................... 13

*Am. Foreign Serv. Ass'n v. Trump*,
    No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025)..................................... 45

*\*Armstrong v. Bush* (*Armstrong I*),
    924 F.2d 282 (D.C. Cir. 1991)..................................................................... *passim*

*Armstrong v. EOP* (*Armstrong II*),
    1 F.3d 1274 (D.C. Cir. 1993)........................................................................ 21, 22

*Armstrong v. EOP*,
    810 F. Supp. 335 (D.D.C. 1993) ........................................................................ 21

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
    997 F.2d 898 (D.C. Cir. 1993)........................................................................... 37

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................... 17

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................................... 14

*Buckley v. Valeo*,
    424 U.S. 1 (1976)............................................................................................ 36

*Campaign for Accountability v. U.S. Dep't of Justice*,
    155 F.4th 724 (D.C. Cir. 2025) ......................................................................... 15

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936).......................................................................................... 30

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.*,
    601 U.S. 416 (2024).......................................................................................... 37

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006)......................................................................... 9, 10

*Cheney v. U.S. Dist. Ct. for D.C.*,
542 U.S. 367 (2004).................................................................................................. 30

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001).................................................................................................. 39

*Citizens for Responsibility & Ethics in Wash. ("CREW") v. DOJ*,
922 F.3d 480 (D.C. Cir. 2019)................................................................................. 15

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013).............................................................................................. 13, 14

*Clinton v. Jones*,
520 U.S. 681 (1997).................................................................................................. 30

*Consol. Edison Co. of N.Y. v. Ashcroft*,
286 F.3d 600 (D.C. Cir. 2002)................................................................................. 25

*CREW v. EOP*,
587 F. Supp. 2d 48 (D.D.C. 2008) ........................................................................... 22

*\*CREW v. Trump*,
924 F.3d 602 (D.C. Cir. 2019)..................................................................... 21, 22, 24

*CREW v. Trump*,
438 F. Supp. 3d 54 (D.D.C. 2020) ............................................................ 21, 22, 23, 25

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022).................................................................................................. 37

*Dalton v. Specter*,
511 U.S. 462 (1994)............................................................................................. 23, 45

*Democracy Forward Found. v. White House Office of Am. Innovation*,
356 F. Supp. 3d 61 (D.D.C. 2019) ............................................................................. 4

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969).................................................................................. 8

*Dubin v. United States*,
599 U.S. 110 (2023).................................................................................................. 29

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024).................................................................................................. 13

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) .................................................................................. 26

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................................................... 44

*Georgia v. DOJ*,
  148 F.4th 724 (D.C. Cir. 2025) ..................................................................................... 29

*Glob. Health Council v. Trump*,
  153 F.4th 1 (D.C. Cir. 2025) ......................................................................................... 23

*In re Cheney*,
  406 F.3d 723 (D.C. Cir. 2005) ....................................................................................... 24

*INS v. Chadha*,
  462 U.S. 919 (1983) ...................................................................................................... 32

*Judicial Watch, Inc. v. NARA*,
  845 F. Supp. 2d 288 (D.D.C.  2012) ........................................................................ 22, 24

*Kissinger v. Reporters Comm. for Freedom of the Press*,
  445 U.S. 136 (1980) ..................................................................................................... 3-4

*L.W. ex rel Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) .......................................................................................... 24

*Leedom v. Kyne*,
  358 U.S. 184 (1958) ...................................................................................................... 26

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................................... 13

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ........................................................................................................ 8

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ........................................................................................................ 35

*Mississippi v. Johnson*,
  71 U.S. 475 (1866) ........................................................................................................ 44

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  584 U.S. 453 (2018) .................................................................................................. 42, 43

*Navajo Nation v. Azar*,
  292 F. Supp. 3d 508 (D.D.C. 2018) ................................................................................ 9

*New Hampshire Lottery Comm'n v. Barr*,
  386 F. Supp. 3d 132 (D.N.H. 2019) ............................................................................... 16

*New Hampshire Lottery Comm'n*,
　986 F.3d ........................................................................................................ 16-17, 17

*Newdow v. Bush*,
　355 F. Supp. 2d 265 (D.D.C. 2005) ..................................................................... 44

*Newdow v. Roberts*,
　603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 44

*Nixon v. Administrator of General Services* (*Nixon v. GSA*),
　433 U.S. 425 (1977) .................................................................................... *passim*

*Nixon v. United States*,
　978 F.2d 1269 (D.C. Cir. 1992) ....................................................................... 2, 31

*Nken v. Holder*,
　556 U.S. 418 (2009) ............................................................................................. 43

*NLRB v. Sears, Roebuck & Co.*,
　421 U.S. 132 (1975) ............................................................................................. 15

*Nuclear Regul. Comm'n v. Texas*,
　605 U.S. 665 (2025) ....................................................................................... 26, 27

*Pennsylvania v. DeVos*,
　480 F. Supp. 3d 47 (D.D.C. 2020) ......................................................................... 8

*Printz v. United States*,
　521 U.S. 898 (1997) ............................................................................................. 43

*Public Citizen v. Burke*,
　655 F. Supp. 318 (D.D.C. 1987) ........................................................................... 16

*Rodriguez v. U.S. Dep't of the Air Force*,
　387 F. Supp. 3d 130 (D.D.C. 2019) ...................................................................... 17

*Spokeo, Inc. v. Robins*,
　578 U.S. 330 (2016) ....................................................................................... 12, 13

*Swan v. Clinton*,
　100 F.3d 973 (D.C. Cir. 1996) .................................................................. 25, 44, 45

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
　581 U.S. 433 (2017) ............................................................................................. 12

*Trump v. Anderson*,
　601 U.S. 100 (2024) ............................................................................................. 31

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020)................................................................................ 33, 34, 42

*Trump v. Thompson,*
   20 F.4th 10 (D.C. Cir. 2021) .......................................................................... 31, 32

*Trump v. United States,*
   603 U.S. 593 (2024)............................................................................................ 36

*United States v. Comstock,*
   560 U.S. 126 (2010)............................................................................................ 35

*United States v. Morrison,*
   529 U.S. 598 (2000)............................................................................................ 30

*United States v. Nixon,*
   418 U.S. 683 (1974)............................................................................................ 42

*Watkins v. United States,*
   354 U.S. 178 (1957)............................................................................................ 33

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008).................................................................................................. 8

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)............................................................................................ 23

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
   576 U.S. 1 (2015)................................................................................................ 31

## Constitution

U.S. Const. art I., § 8, cl. 18............................................................................. 36

U.S. Const. art. IV, § 3, cl. 2 ............................................................................ 39

## Statutes

4 Rev. Stat. § 161 (2d ed. 1878).......................................................................... 36

5 U.S.C. § 22 (1958)............................................................................................. 36

5 U.S.C. § 301 (1970)........................................................................................... 36

5 U.S.C. § 551...................................................................................................... 17

5 U.S.C. § 552...................................................................................................... 10

5 U.S.C. § 702...................................................................................................... 17

5 U.S.C. § 704 .................................................................................................................... 14

28 U.S.C. § 1361 ................................................................................................................. 25

44 U.S.C. § 2201 ........................................................................................................... *passim*

44 U.S.C. § 2203 ........................................................................................................... *passim*

44 U.S.C. § 2204 .............................................................................................................. 4, 10

44 U.S.C. § 2205 ................................................................................................................. 38

44 U.S.C. § 2209 ................................................................................................................. 11

44 U.S.C. §§ 2201–09 .......................................................................................................... 2

50 U.S.C. § 3021 ................................................................................................................. 36

Act of July 27, 1789,
    ch. 14, § 7, 1 Stat. 68 ..................................................................................................... 35

Presidential Recordings & Materials Preservation Act,
    Pub. L. No. 93-526, § 102(b), 88 Stat. 1695 (1974) ...................................................... 41

**Legislative Materials**

H.R. Rep. No. 95-1487 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732 ...................................... 2

**Administrative & Executive Materials**

28 C.F.R. § 0.25(a) ............................................................................................................. 14

28 C.F.R. § 0.25(c) ............................................................................................................. 14

*Constitutionality of the Presidential Records Act*,
    50 Op. O.L.C. __ (slip op.) (April 1, 2026),
    https://www.justice.gov/olc/media/1434131/dl ................................................................ *passim*

E.O. 14215,
    90 Fed. Reg. 10447 (Feb. 18, 2025) .............................................................................. 16

*Presidential Authority to Decline to Execute Unconstitutional Statutes*,
    18 Op. O.L.C. 199, 202 (1994) ...................................................................................... 32

**INTRODUCTION**

The Presidential Records Act (PRA) is an unconstitutional and ahistorical imposition on presidential autonomy. Just as it would flout the separation of powers for Congress to require the Supreme Court to broadly disclose its deliberative records to the public pursuant to legislative edict, so it is with the PRA. But the Court need not consider that issue in denying Plaintiffs' Motion for a Preliminary Injunction and Stay (Mot.), ECF No. 13. To start, Plaintiffs have not established irreparable harm sufficient to obtain emergency injunctive relief. Their theories of harm are speculative and hypothetical. Plaintiffs suppose that eight years from now they will request and be unable to obtain certain records that they say will not be preserved absent judicial intervention. And they claim this even though the White House's preservation policy from earlier this month broadly mandates preservation. As for the National Archives and Records Administration (NARA), Plaintiffs fail to identify anything NARA has done that injures them. Plaintiffs lack standing to obtain preliminary relief for the same reasons that their irreparable harm showing fails.

In addition, Plaintiffs lack a cause of action to enforce the PRA. Binding precedent from the D.C. Circuit recognizes that Congress implicitly precluded private enforcement of the PRA. Nor can Plaintiffs circumvent Congress's implicit preclusion through the Administrative Procedure Act (APA). The Department of Justice (DOJ) Office of Legal Counsel (OLC) memorandum is a legal opinion that does not constitute final agency action subject to the APA. And Plaintiffs identify no final agency action of NARA suitable for APA review. If, however, the Court reaches the merits of Plaintiffs' arguments, their claims still fail. The PRA is unconstitutional, and even if it were not, the White House's April 2026 preservation policy is consistent with the statute. There is no emergency warranting preliminary relief, and Plaintiffs' Complaint pleads no claim with a likelihood of success. Plaintiffs' motion should be denied.

## BACKGROUND

### I.    HISTORY OF PRESIDENTIAL RECORDS

"History, custom, and usage indicate unequivocally that, prior to [1974], Presidents exercised complete dominion and control over their presidential papers" and, "without notable exception, treated" them as "personal property." *Nixon v. United States*, 978 F.2d 1269, 1277–78 (D.C. Cir. 1992).  George Washington "removed his papers to Mount Vernon" and "did not make arrangements for public access to them."  *Id.* at 1278.  "Presidents Jefferson, Madison[,] and Monroe passed their papers by testamentary gift."  *Id.*  The list goes on.  *See id.* at 1288–89, Appendix (recounting the history of each President's handling of their records).

During and after the Watergate scandal, Congress endeavored to assert unprecedented control over the President's papers.  *See* H.R. Rep. No. 95-1487 at 5 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5732, 5736; *see also Nixon v. Administrator of General Services*, 433 U.S. 425, 431 (1977) (*Nixon v. GSA*).  In 1974, shortly after his resignation, former President Nixon concluded an agreement with the General Services Administration (GSA) that would have provided for the eventual destruction of tape recordings made by the former President during his presidency.  *See Nixon v. GSA*, 433 U.S. at 433.  To abrogate the agreement, Congress enacted the Presidential Recordings and Materials Preservation Act of 1974 (PRMPA) to give custody of former President Nixon's records to the National Archives, which at that time was part of the GSA, and to prohibit the destruction of the tapes or any other presidential materials.  *See* H.R. Rep. No. 95-1487 at 5. Notably, the PRMPA did not regulate any other President's records, past or current, and did not impose recordkeeping obligations on the presidency.

In 1978, Congress enacted the Presidential Records Act, 44 U.S.C. §§ 2201–09.  The PRA applies to materials that are

created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

44 U.S.C. § 2201(2). The PRA sought to change the legal ownership of the official records of the President from private to public and established a new statutory structure under which Presidents, and subsequently NARA, must manage the records of their administrations. Under the PRA, the President is obligated to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records . . . ." 44 U.S.C. § 2203(a). The PRA thus imposes two distinct and significant obligations on a sitting President with respect to records of his administration—a requirement to *generate* records as needed to document the "activities, deliberations, decisions, and policies" of his administration and a requirement to *preserve* such records. *See id.* The PRA also constrains the President from disposing of records that "no longer have administrative, historical, informational, or evidentiary value" unless the President first obtains the written views of the Archivist regarding such proposed disposal and only after the Archivist has obtained the views of specific congressional committees in certain circumstances. *Id.* § 2203(c), (e).

The PRA expressly excludes from the definition of presidential records any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act (FOIA)])." *Id.* § 2201(2)(B).[1] It also excludes "personal records," which are materials "of a purely private or

---

[1] With respect to EOP, the Supreme Court has recognized that "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within the APA's and FOIA's definition of "agency." *See Kissinger v.*

nonpublic character which do not relate to or have an effect upon the carrying out of the . . . duties of the President." *Id.* § 2201(2)(B), (3).  Personal records include, for example, "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business."  *Id.* § 2201(3)(A).  The PRA directs the President, "to the extent practicable," to "categorize[]" materials as presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b).

When a President leaves office, the Archivist "assume[s] responsibility for the custody, control, and preservation of, and access to" the presidential records of the departing administration. *Id.* § 2203(g)(1).  The Archivist generally must make records covered by the PRA available to the public under FOIA starting five years after the President leaves office.  *Id.* § 2204(b)(2), (c)(1). However, the outgoing President may specify that access to records in six defined categories be restricted for up to twelve years after leaving office.  *Id.* § 2204(a).

## II.    THE OLC OPINION AND CURRENT PRA POLICIES

On April 1, 2026, the Department of Justice's Office of Legal Counsel issued an opinion in response to a request from White House Counsel David Warrington to evaluate the constitutionality of the PRA.  OLC concluded that the PRA is unconstitutional "for two independent but interlocking reasons: It exceeds Congress's enumerated and implied powers, and it aggrandizes the Legislative Branch at the expense of the constitutional independence and

---

*Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (citation omitted).  For example, the White House Office and the National Security Council are not subject to FOIA and not covered by the Federal Records Act (FRA).  *See*, *e.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019).  An EOP component's records are governed either by the PRA or by the FRA, depending on whether that component's sole function is to advise and assist the President.

autonomy of the Executive." *Constitutionality of the Presidential Records Act*, 50 Op. O.L.C. __ (slip op.) at 1 (April 1, 2026)[2] (OLC Op.). OLC also found that the statute did not contain any severable portion that could be constitutionally applied because the "constitutional defects lie at the statute's core: Congress's attempt to regulate presidential records without a valid legislative purpose, and the burdens on the Presidency that such regulation effects." *Id.* at 51. OLC advised that the "President need not further comply with its dictates," although it nowhere commanded that he or anyone else must refuse to do so. *See id.* 52.

Although the White House no longer accepts the PRA's constitutionality, it continues to preserve records that would have been covered by the PRA. A recent memorandum issued by White House Counsel David Warrington states that, notwithstanding the PRA's unconstitutionality, "EOP staff should preserve any material related to the performance of their duties." Ex. A to Declaration of James R. Powers, Memorandum from David Warrington, Assistant to the President and Counsel to the President, *Re: Records Retention Policy After Office of Legal Counsel Finding that the Presidential Records Act is Unconstitutional* at 2 (April 2, 2026) (2026 Policy). This "duty to preserve" applies regardless of the "medium of the material"—"printed, electronic, or hand-written materials are considered records and should be saved if they are related to the performance of EOP staff duties." *Id.* With respect to electronic records, the memo reminds EOP staff that they "cannot permanently delete emails or materials saved to an EOP laptop or the EOP network" and that "EOP staff should conduct all work-related communications via your official EOP email account." *Id.* EOP staff are further instructed to "avoid using personal devices for government business whenever possible." *Id.* at 3. Where a non-official medium like "text messaging" is used,

---

[2] *Available at* https://www.justice.gov/olc/media/1434131/dl.

the memo instructs staff to preserve materials "when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." *Id.* at 2.

NARA also continues to preserve all presidential records in its custody, including records of President Trump's first term in office. Ex. B to Powers Decl., Declaration of Kate Dillon McClure, Director of the Archival Operations Division in the Office of Presidential Libraries, National Archives and Records Administration ¶¶ 4, 5 (McClure Decl.). And NARA continues to process FOIA requests seeking presidential records. *Id.* ¶ 4.

## III.   THIS LAWSUIT, PLAINTIFFS, AND THEIR ASSERTED INJURIES

Five days after the OLC opinion issued, Plaintiffs filed this lawsuit. Compl., ECF No. 1. Plaintiffs pursue seven claims against the Defendants that fall into two buckets. Counts IV, V, and VI plead APA claims against DOJ and NARA. With respect to DOJ, Plaintiffs allege that the OLC opinion is a final agency action contrary to law. *Id.* ¶¶ 168–73. And Plaintiffs allege that NARA has decided to no longer comply with the PRA and is unlawfully withholding or delaying the release of presidential records. *Id.* ¶¶ 158–67.

Plaintiffs also include various non-statutory claims regarding NARA and the EOP Defendants' alleged failure to comply with the PRA. Counts I and II pursue causes of action in equity for declaratory and injunctive relief regarding Defendants' alleged failure to comply with the PRA. *Id.* ¶¶ 139–54. On the same basis, Count III pursues a non-statutory claim for judicial review of asserted ultra vires action by the Defendants. *Id.* ¶¶ 155–57. And Count VII seeks mandamus against the individual Defendants "to comply with their affirmative, mandatory duties under the PRA." *Id.* ¶¶ 174–79.

These claims are made by two Plaintiffs. First, the American Historical Association is a nonprofit organization and "membership association of historians" that has a mission of

6

"enhanc[ing] the work of historians." *Id.* ¶ 9. AHA alleges that it "its members regularly request and make use of presidential and vice-presidential records." *Id.* ¶¶ 9, 109. AHA contends that it is injured by the asserted failure to comply with the PRA because it "will lose access to information that would create the historical record of presidential activities and that would help to educate the public about that history." *Id.* ¶ 110. AHA also contends that its members would be harmed as an "incomplete historical record" could impair their work in various ways. *Id.* ¶¶ 109, 110.

Plaintiff American Oversight is a nonprofit corporation that, among other activities, submits FOIA requests to inform its work "educat[ing] the public about the activities and operations of the federal government." *Id.* ¶ 10. American Oversight "regularly requests" records subject to the PRA and alleges having done so many times since 2017. *Id.* ¶¶ 112, 113. American Oversight states that it "currently has at least five pending open FOIA requests seeking presidential records from President Trump's first term." *Id.* ¶¶ 10, 115, 116–30. Plaintiffs assert harm as to any disruption to the processing of these requests. Mot. at 41. Plaintiffs also allege that the asserted "Post-OLC PRA policy" "will harm American Oversight by impeding its access to presidential records and impeding its ability to share those records with the public." *Id.* ¶¶ 131, 133. Plaintiffs also assert standing on the basis that certain records at issue in a pending FOIA lawsuit are at risk of deletion as a result of the OLC opinion. *Id.* ¶ 135.

## IV.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND STAY

One week after filing the Complaint, Plaintiffs moved for a preliminary injunction. Plaintiffs ask the Court to issue a sweeping injunction. To begin, the injunction would require all Defendants to preserve all records subject to the PRA, "except where the Presidential Records Act permits disposal of such records under 44 U.S.C. 2203(c)." Proposed Order at 1, ECF No. 13-13. It would further enjoin all Defendants and their employees from "using a non-official electronic

message account unless the President, Vice President, or covered employee" take action to preserve the records consistent with 44 U.S.C. § 2209. *Id.* at 1–2. This requirement applies to "all Presidential and Vice Presidential records created or sent via email, text message, and messages on messaging applications such as Signal and WhatsApp." *Id.* at 2. Further afield of the PRA's text, Plaintiffs also ask the Court to enjoin all Defendants and their employees "to notify the Court if they know or become aware that the President is disregarding the" foregoing requirements. *Id.* Finally, Plaintiffs seek a preliminary injunction and stay under the APA of the OLC opinion and NARA's purported policy "that it has no legal obligations under the PRA." *Id.* at 3.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such a request involves the exercise of a far-reaching power that "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (citation omitted). The moving party must demonstrate all of the following factors by "*a clear showing*": (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the moving party; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). The same factors govern Plaintiffs' request for a stay under Section 705 of the APA. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

## ARGUMENT

Plaintiffs' motion for preliminary relief should be denied. Plaintiffs have not shown that they will suffer irreparable injury, a likelihood of success on the merits, or that the remaining preliminary injunction factors favor their request. Plaintiffs' motion should also be denied as to its request for injunctive relief regarding the President and Vice President.

## I.   PLAINTIFFS DO NOT SHOW IRREPARABLE HARM

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  The moving party must demonstrate an injury "both certain and great" and "of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citation omitted).  The injury must also "be beyond remediation," meaning that the possibility of corrective relief "at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (citation omitted); *see also Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512–13 (D.D.C. 2018).  Plaintiffs have not made this showing.

Plaintiffs are unlikely to suffer irreparable harm pending final judgment in this litigation. They have rushed to federal court based on nothing more than speculation and their view that they are entitled to extract stipulations from more than two dozen defendants inside and outside the EOP by threatening emergency litigation.  But there is no basis for emergency relief.  Indeed, the record is devoid of any action by Defendants in violation of the PRA.

Start with NARA.  The PRA allocates two duties to NARA that are referenced in the Complaint: preservation of presidential records in its custody and processing of record requests from the public.  Emergency relief is unnecessary on both counts.  NARA has already committed to preserving records in its custody.  *See* McClure Decl. ¶ 4.[3]  Similarly, NARA continues to process requests for presidential records.[4]  *Id.*  And even if it were not, FOIA provides Plaintiffs

---

[3] Consistent with this declaration, Defendants' counsel informed Plaintiffs' counsel, before they filed their Motion, that NARA would preserve presidential records in its custody.

[4] The PI Motion does not ask the Court to order NARA to fulfill Plaintiffs' pending requests for records under the PRA. *Cf.* Proposed Order at 3 (stating only that the Court should enjoin NARA from asserting that "it has no legal obligations under the PRA"); Mot. at 45 (same).  Even if the Motion could be read to cover pending record requests, emergency relief would be inappropriate. NARA continues to process requests for presidential records, McClure Decl. ¶ 4, and Plaintiffs have not articulated any need for expedited treatment of any request.

with the appropriate remedy. That statute authorizes a records requester to file a "complaint . . . to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). But given NARA's declaration, there is no "certain and great" need for the Court's intervention. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.

Nor have Plaintiffs shown irreparable harm as to the EOP Defendants. Plaintiffs cannot possibly satisfy the "imminence" requirement within irreparable harm. *Id.* Plaintiffs will not have access to records from President Trump's second term for *years*. Under the PRA, a requester cannot obtain a President's records through FOIA until at least five years after the President's term ends. 44 U.S.C. § 2204(b)(2). Thus, records from President Trump's second term would remain protected from public disclosure for almost eight years from now until January 2034 at the earliest. That fact by itself precludes a finding of imminent, irreparable harm.

Moreover, Plaintiffs cannot show that in 2034 they will be denied access to records given the 2026 Policy's preservation measures. Under the PRA, the President must ensure that the "records" of the "activities, deliberations, decisions, and policies that reflect the performance of the President's . . . duties are . . . preserved and maintained." *Id.* § 2203(a). The 2026 Policy— which was issued "to ensure that [staff] are appropriately saving presidential records"—is consistent with the PRA's preservation requirements. 2026 Policy at 1. In a marker of that consistency, the 2026 Policy makes clear that "[c]omponents are free to retain the records retention policies developed under the PRA." *Id.*

The 2026 Policy instructs all EOP staff to "preserve any material related to the performance of their duties"—"[e]ven in the absence of the PRA"—including because records "may be subject to other legal preservation requirements." *Id.* at 2. It also informs staff that, "[a]s a matter of

10

prudence, the electronic records of EOP employees will be preserved." *Id.* And consistent with the PRA's definition of "documentary material," *see* 44 U.S.C. § 2201(1), the 2026 Policy provides that "[t]he medium of the material does not matter—printed, electronic, or hand-written materials are considered records and should be saved if they are related to the performance of EOP staff duties." 2026 Policy at 3. Staff are further encouraged "to routinely file any paper records with the Office of Records Management." *Id.* at 2. Moreover, the Policy explains that "EOP staff do not have any ownership of records created or obtained in the performance of their duties," and provides that "staff may not take any records" "[w]hen leaving EOP employment." *Id.* at 2. Nor can staff "permanently delete emails or materials saved to an EOP laptop or the EOP network." *Id.* And though the President "remain[s] exclusively responsible for custody, control, and access to . . . Presidential records" created during his term in office, 44 U.S.C. § 2203(f), NARA has expressly committed to preserving all records in its custody. McClure Decl. ¶ 4.

The 2026 Policy is also consistent with 44 U.S.C. § 2209(a), concerning "non-official electronic message account[s]." That PRA provision restricts the creation or transmission of presidential records "using a non-official electronic message account unless" the covered employee "copies an official electronic messaging account" or "forwards a complete copy of the . . . record to an official electronic messaging account" within 20 days. *Id.* § 2209(a)(1), (2). Like the PRA, the 2026 Policy strictly limits the creation or transmission of presidential records using non-official devices or accounts. It instructs EOP staff to "conduct all work-related communications via [their] official EOP email account." 2026 Policy at 2. And staff must "avoid using personal devices for government business whenever possible." *Id.* at 3. The 2026 Policy also requires the preservation of text messages that "contain unique information not available elsewhere" or that "are the sole record of official decision-making [or] government action." *Id.* at

2.   These approaches too are consistent with the PRA requirement to preserve materials that document the performance of the President's constitutional, statutory, or other official duties, *see* 44 U.S.C. § 2201(2), while excluding "personal records," *id.* § 2201(2)(B).

In sum, the 2026 Policy establishes a records preservation program that is consistent with the requirements of the PRA and NARA is preserving presidential records in its custody.  Plaintiffs' claim to irreparable harm hinges on the possibility of indiscriminate document destruction, Mot. at 38–39, but the record is entirely to the contrary.  In light of these facts, there is simply no basis for emergency relief from this Court to redress any imminent, irreparable harm during the pendency of this case.

## II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiffs Lack Standing to Obtain the Sweeping Preliminary Relief They Seek.

As the party invoking federal jurisdiction, Plaintiffs bear the burden of establishing the three elements of constitutional standing to sue: injury in fact, traceability, and redressability. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Additionally, because "standing is not dispensed in gross," "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (citation omitted).

"To establish injury in fact, a plaintiff must show that he or she [has] suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Specifically, the injury must affect the plaintiff in "a personal and individual way" and must be "real" not "abstract." *Id*. at 339–40.  A corollary to this requirement of concrete and individualized injury is that plaintiffs may not assert generalized grievances: "A

12

citizen may not sue based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 754 (1984)). "Article III does not contemplate a system where 330 million citizens can come to federal court whenever they believe that the government is acting contrary to the Constitution or other federal law." *Id.* at 382.

Plaintiffs have not pleaded any Article III injury for the same reasons that they have not shown irreparable harm. No Plaintiff has suffered any "concrete and particularized" and "actual or imminent" injury. NARA has not taken any action to change the status quo that would harm any interest of Plaintiffs. *See* McClure Decl. ¶ 4. The same goes for DOJ—the OLC opinion is merely legal advice that does not itself concretely impact Plaintiffs' interests. *See infra*. Nor have Plaintiffs demonstrated any action by the EOP Defendants injuring them. The 2026 Policy is consistent with the PRA's preservation requirements and, thus, Plaintiffs have no basis to allege an Article III injury based on that Policy.

As for the possibility that records *could* be unavailable in the future if one of the Plaintiffs seeks records of this administration, that does not suffice to show the "'actual or imminent' injury that [the Supreme Court's] cases require." *Lujan*, 504 U.S. at 564. As explained, Defendants are in fact preserving presidential records, and what may or may not occur eight or more years into the future is purely speculative. *Cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–11, 414 (2013) (holding future injury must be "imminent" or "certainly impending" and rejecting standing premised on a "speculative chain of possibilities").

### B.    Plaintiffs' APA Claims Fail

The APA provides for judicial review of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. An

agency action is "final" for purposes of the APA only if it both (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Plaintiffs' APA claims against NARA and DOJ fail for lack of final agency action.

### 1.    The OLC opinion is not final agency action.

To begin, the OLC opinion is not final agency action because it does not on its own determine any "rights or obligations" or produce any "legal consequences." *Id.* at 177–78. OLC opinions are pre-decisional and deliberative documents, produced at the request of the President or an agency, containing candid legal advice to aid in a governmental decisionmaking process. *See* 28 C.F.R. § 0.25(a), (c) (delegating responsibility to OLC to "render[] informal opinions and legal advice to the various agencies" and "to the heads of the various organizational units of the Department [of Justice]"). OLC's opinions, being predecisional advice, are followed by agencies as a matter of custom and practice but are not themselves agency policy. Indeed, reflecting their deliberative nature, many OLC opinions are never publicly disclosed. And treating an OLC opinion as final agency action in this context—where it interprets a statute regulating the presidency—is particularly inapt where the President directs agencies, including DOJ, not the other way around. OLC's views cannot bind the President.

The conclusion that OLC opinions are not final agency action is directly supported by D.C. Circuit case law addressing a closely related question under FOIA. FOIA requires agencies to make public "the 'working law' of the agency," meaning the universe of agency documents that "have the force and effect of law." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–53 (1975). On several occasions, parties have sued under FOIA to compel the wholesale disclosure of OLC opinions on the theory that they constitute "working law." The D.C. Circuit has repeatedly rejected

14

those efforts, emphasizing that "[a]n OLC opinion . . . qualifies as the 'working law' of an agency only if the agency has 'adopted' the opinion as its own," *i.e.*, by invoking it as the basis for the agency's action. *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. (CREW) v. DOJ*, 922 F.3d 480, 486 (D.C. Cir. 2019).

For substantially the reasons that the D.C. Circuit has held that OLC opinions do not have the "force and effect of law" under FOIA's "working law" analysis, an OLC opinion standing alone is not final agency action. OLC renders legal advice and has no power to determine the "rights or obligations" of, or impose "legal consequences" on, Plaintiffs or any other private parties.

Plaintiffs respond that the OLC opinion imposes legal consequences because OLC's "determination" that the PRA is unconstitutional means that the President, Vice President, and PRA-covered staff are "under no legal compulsion to preserve Presidential records." Mot. at 36. To be clear, the PRA lacks force because of Articles I and II of the Constitution, not OLC's recognition of that fact. And Plaintiffs ignore the fact that, "[e]ven though all OLC opinions are considered authoritative within the Executive Branch, the requesting agency does not necessarily adopt every opinion as its own." *Campaign for Accountability v. DOJ*, 155 F.4th 724, 738–39 (D.C. Cir. 2025). OLC opinions "generally tell agencies what they can or cannot do, not what they must do." *Id.* So it is here—OLC advised the White House Counsel that because "the President *may* decline to enforce statutes he views as unconstitutional," the President "need not further comply with [the PRA's] dictates." OLC Op. at 52 (emphasis added). That says nothing about whether the President or anyone else in the Executive Branch may comply with the PRA as a discretionary matter. Plaintiffs cite an Executive Order stating that the "President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties." E.O. 14215 § 7, 90 Fed. Reg. 10447 (Feb. 18, 2025). But again, there is nothing

15

contradictory between OLC advising the Executive Branch that the PRA is unconstitutional and NARA nonetheless complying with its requirements as a matter of discretion. As for the 2026 Policy, OLC's opinion does not bind the President and, accordingly, there is no basis to say that OLC's opinion is reviewable by virtue of any impact on the 2026 Policy.

Plaintiffs cite two non-precedential authorities for the reviewability of OLC opinions, both of which involved subsequent agency actions providing a basis for judicial review. *Public Citizen v. Burke*, 655 F. Supp. 318 (D.D.C. 1987), for example, addressed an OLC opinion that provided advice regarding the validity of certain NARA regulations. 655 F. Supp. at 319–20. The Court found this opinion reviewable where the Archivist had testified to Congress that "the OLC memorandum binds him." *Id.* Thus, it was *NARA's* decision—not the OLC opinion—that created standing and that became the target of the relief provided. *See id.* at 320. Plaintiffs' out-of-circuit citation of *New Hampshire Lottery Comm'n v. Barr*, 386 F. Supp. 3d 132, 145 (D.N.H. 2019), is similarly inapposite. Consistent with the D.C. Circuit precedent above, that case involved a memo from "the Deputy Attorney General instruct[ing] DOJ attorneys to 'adhere to OLC's interpretation.'" *New Hampshire Lottery Comm'n v. Rosen*, 986 F.3d 38, 47, 62 (1st Cir. 2021) (citation omitted). Thus, the OLC opinion at issue in that case had been adopted by the agency in a manner that affected the rights of the plaintiffs.[5]

### 2.    NARA has taken no final agency action

Plaintiffs similarly fail to plausibly allege final agency action by NARA. Plaintiffs simply allege, without any supporting facts, that NARA has "decided that it is no longer legally bound to comply" with the PRA. Compl. ¶¶ 160, 164. But neither the Complaint nor the record at this stage

---

[5] Moreover, the First Circuit reversed the APA relief entered in that case because declaratory relief was adequate. *New Hampshire Lottery Comm'n*, 986 F.3d at 47, 62.

contains any "factual matter" to support the assertion that NARA has taken any agency action of the type that Plaintiffs allege, let alone final agency action. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Plaintiffs cite nothing to show that NARA has issued any rule, publication, or order following the OLC opinion that this Court could review. *See* 5 U.S.C. § 551(13) (listing the types of agency action). Nor does Plaintiffs' "nebulous assertion of the existence of a 'policy,'" supported by "no facts," plausibly establish that the policy actually exists. *Rodriguez v. U.S. Dep't of the Air Force*, 387 F. Supp. 3d 130, 135 (D.D.C. 2019) (citation omitted).

Even if Plaintiffs had identified action by NARA inconsistent with the PRA, all of their claims against NARA would fail because they cannot plausibly allege a final action by NARA that has harmed their interests. NARA has attested that it is preserving all presidential records in its custody and continuing to process FOIA requests for such records. Plaintiffs therefore can show no change in NARA's conduct that is affecting their legal rights. NARA's declaration confirms that nothing has changed. *See* McClure Decl. For similar reasons that they cannot show final agency action by NARA, Plaintiffs cannot show they have "suffer[ed]" any "wrong" as required to state a claim under the APA. *See* 5 U.S.C. § 702.

### C.     Plaintiffs' Non-Statutory Claims Fail

Threshold issues also doom Plaintiffs' attempt to challenge Defendants' compliance with the PRA under Count I (equitable claim under the separation of powers), Count II (equitable claim to enjoin asserted PRA violations), Count III (ultra vires action), and Count VII (mandamus). The PRA precludes judicial review of claims like Plaintiffs', and Counts III and VII fail to meet the high bars for ultra vires and mandamus claims. And in any event, all of the non-statutory claims lack merit because Defendants' current practices pursuant to the 2026 Policy are compliant with the preservation requirements of the PRA.

17

**1.     The PRA precludes judicial review of compliance with the Act.**

The Court lacks jurisdiction to consider Counts I–III and VII because they are precluded by the PRA.  With only a narrow exception not applicable here, longstanding D.C. Circuit precedent forbids judicial review of claims to enforce the PRA.

   *a.*     Armstrong I *forecloses judicial review of Plaintiffs' PRA claims.*

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) (*Armstrong I*), recognized that the "PRA is one of the rare statutes that does impliedly preclude judicial review." *Id.* at 290.  Plaintiffs' equitable causes of action challenge Defendants' purported noncompliance with the PRA's requirements. *See* Mot. at 17 (asserting without citation that "Defendants are openly disregarding the PRA" in violation of the separation-of-powers); *id.* at 32–35 (similar for equitable claim); Compl. ¶¶ 139–57, 174–79.  So too with Plaintiffs' APA claim against NARA.  *See* Mot. at 37 (Count IV "challeng[es] NARA's failure to comply with the PRA"); Compl. ¶¶ 158–61.  Because such challenges are precluded, the Court lacks subject matter jurisdiction over these claims.

In *Armstrong I*, the D.C. Circuit held that the PRA "precludes judicial review of the President's recordkeeping practices and decisions."  924 F.2d at 291.  *Armstrong I* involved allegations that President Reagan, Vice President Bush, and components of EOP "intend[ed] to delete material from the White House computer systems in violation of the FRA and the PRA." *Id.* at 286.  The plaintiffs sought to preserve access to these computer records, which contained emails and other communications of administration officials over the course of several years. *Id.* at 286–87.  They also sought a "declaration that many of the documents stored in the [computer] system at the close of the Administration are federal and presidential records" and an "injunction prohibiting the destruction of these documents and directing the President and [an EOP component] to classify and preserve the documents as required by the FRA and PRA." *Id.* at 287.

18

In rejecting the plaintiffs' claims, the court explained that, although the PRA "contain[ed] no provision expressly precluding judicial review," "the PRA is one of the rare statutes that does impliedly preclude judicial review." *Id.* at 290. For good reason: "permitting judicial review of the President's compliance with the PRA would upset the intricate statutory scheme" that was at least intended "to keep in equipoise important competing political and constitutional concerns." *Id.*

On the one hand, "Congress sought to establish the public ownership of presidential records and ensure the preservation of presidential records for public access after the termination of a President's term in office." *Id.* On the other hand, Congress attempted to address the "separation of powers concerns that were implicated by legislation regulating the conduct of the President's daily operations," and "therefore sought assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors." *Id.* Congress tried to reconcile these competing concerns by "requiring the President to maintain records documenting the policies, activities, and decisions of his administration, [while] leaving the implementation of such a requirement in the President's hands." *Id.* Indeed, under the PRA, the Archivist has no authority to override a President's decision to dispose of records, and Congress could only do so through valid legislation prohibiting disposal of particular documents. *Id.*

The court explained that "it is difficult to conclude that Congress intended to allow courts, at the behest of private citizens, to rule on the adequacy of the President's records management practices or overrule his records creation, management, and disposal decisions." *Id.* The court declined to "second-guess" Congress's choice "[not] to give outsiders the right to interfere with White House recordkeeping practices"—and instead "rel[y] on the fact that subsequent Presidents would honor their statutory obligations to keep a complete record of their administrations." *Id.* at

19

290–91.  The court thus dismissed the plaintiffs' claims seeking injunctive and declaratory relief under the PRA.  *See id.* at 287, 291.

Plaintiffs cannot plausibly distinguish their claims here from those addressed in *Armstrong I*.  The point of this suit is to secure sweeping "judicial review of [Defendants'] general compliance with the PRA."  *Id.* at 282.  Plaintiffs seek to "ensure the President and his administration abide by the recordkeeping obligations" under the PRA, Compl. ¶ 5, and speculate that staff will "retain only a limited subset of records . . . that the PRA requires to be retained," *id.* ¶ 153.  Plaintiffs thus ask this Court to rule that the President must implement the PRA, including by "establish[ing] or reestablish[ing] record retention policies for capturing and preserving all documentary material that the [PRA] requires to be captured and preserved by Defendants."  Proposed Order at 2.  Like the plaintiffs in *Armstrong I*, plaintiffs here ask this Court to review the "President's records management practices" and to "overrule his records creation, management, and disposal decisions."  924 F.2d at 290.

Plaintiffs cannot circumvent the court's holding in *Armstrong I* by alleging that the PRA imposes "non-discretionary duties" on Defendants, Compl. ¶ 177, or that Defendants' recordkeeping practices "are a clear departure from a statutory mandate," *id.* ¶ 156 (citation omitted).  Those assertions, and Plaintiffs' inclusion of mandamus and ultra vires claims, in no way distinguishes this case from *Armstrong I*, where the plaintiffs alleged that the President violated a duty—which they would no doubt have characterized as "non-discretionary" and "statutorily mandated"—to preserve documents in a computer system, some of which were alleged to be presidential records.  924 F.2d at 286–87.  And the D.C. Circuit has applied *Armstrong I* in rejecting an attempt at using mandamus to privately enforce the PRA.  *CREW v. Trump*, 924 F.3d 602, 609 (D.C. Cir. 2019) ("Determining whether White House personnel are in fact complying

20

with the directive to conduct all work-related communication on official email would require just the kind of micromanaging proscribed by *Armstrong I*."). The result in *Armstrong I* would have been no different if the plaintiffs had invoked the court's mandamus power or recast their APA claims as ultra vires. That tactic is equally unavailing here.

       b.      *The* Armstrong II *exception does not apply.*

Nothing in the Court of Appeals' subsequent decision in *Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) (per curiam) (*Armstrong II*), suggests that Plaintiffs' PRA claims are reviewable. "[T]he narrow and specific *Armstrong II* exception" does not apply here. *CREW v. Trump*, 438 F. Supp. 3d 54, 64 (D.D.C. 2020). *Armstrong II* reaffirmed *Armstrong I*'s holding that "decisions that involve materials that are truly presidential records are immune from judicial review," *Armstrong II*, 1 F.3d at 1293, while distinguishing the court's limited role in reviewing whether certain records are properly characterized as presidential records subject to the PRA or as agency records subject to the FRA and FOIA.

Following remand in *Armstrong I*, the plaintiffs amended their complaint and dropped their claim under the PRA. *See Armstrong v. EOP*, 810 F. Supp. 335, 337 n.1 (D.D.C. 1993). Instead, the plaintiffs invoked the FRA and FOIA to urge that a component of the EOP had "improperly instruct[ed] . . . staff to treat as presidential records materials that are, in fact, agency records subject to the FRA." *Armstrong II*, 1 F.3d at 1290. The court held that "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record. *Id.* Faced with a "potential definitional overlap between agency records under the FOIA and presidential records under the PRA," the Court concluded that it could properly review the EOP guidelines in that case "for the limited purpose of ensuring that they do not

encompass within their operational definition of presidential records materials properly subject to the FOIA." *Id*. at 1290, 1292.

Thus, while *Armstrong II* reaffirmed *Armstrong I*'s holding that "decisions that involve materials that are truly presidential records are immune from judicial review," it created a limited exception for certain claims seeking "to ensure that *materials that are not subject to the PRA are not treated as presidential records*." *Id*. at 1293–94 (emphasis added). But "*Armstrong II* nowhere casts in doubt [that] when enacting the PRA, 'Congress . . . sought assiduously to minimize outside interference with the day-to-day operations of the President.'" *CREW*, 924 F.3d at 609 (quoting *Armstrong I*, 924 F.2d at 290). And most courts in this district have understood the limited scope of *Armstrong II*'s holding. *See, e.g., Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 297 (D.D.C. 2012) ("*Armstrong II* was addressing a concern that too many records were being classified as Presidential, not too few."); *see CREW v. EOP*, 587 F. Supp. 2d 48, 55 (D.D.C. 2008) (*Armstrong II* "allow[s] limited review to assure that guidelines defining Presidential records do not improperly sweep in nonpresidential records.").

This case does not implicate the question addressed in *Armstrong II*. Plaintiffs here do not assert FRA or FOIA claims to "ensure that materials that are not subject to the PRA are not treated as presidential records." *Armstrong II*, 1 F.3d at 1294. Rather, the "gravamen of" Plaintiffs' claims is that Defendants are "avoid[ing] the recordkeeping contemplated by Congress," *CREW*, 438 F. Supp. 3d at 63–64, through implementation of the "Post-OLC PRA Policy," Compl. ¶ 94. "But plaintiffs' mere invocation of the word 'policy' is not enough to relieve the parties of the jurisdictional bar recognized in *Armstrong I* or to bring these claims within the ambit of the narrow and specific *Armstrong II* exception." *Id.* Plaintiffs' claims to enforce the PRA are precluded.

22

    c.  *Plaintiffs may not restyle their statutory claim as constitutional.*

In an attempt to avoid the fatal impact of *Armstrong I* on their PRA-compliance claims, Plaintiffs attempt to recast their objections to Defendants' recordkeeping policies as a freestanding constitutional claim. But that move is "foreclosed . . . by *Dalton v. Specter*." *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025), *reh'g en banc denied*, No. 25-5097, 2025 WL 2709437 (D.C. Cir. Aug. 28, 2025). *Dalton* makes clear that allegations that an official has acted in opposition to a statute are statutory claims—not "'constitutional' claims" that can be asserted through a direct cause of action. *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

As the Supreme Court has explained, not "every action by the President or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. Rather, the Court has carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution may be implicated, for example, if executive officers rely on it as an independent source of authority to act, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims" that can be asserted through a direct cause of action. *Id.* at 473.

Here, Plaintiffs' asserted constitutional claims are really "statutory one[s]," *id.* at 474, as the crux of this dispute is whether the 2026 Policy coheres with the statutory preservation requirements of the PRA. In any event, because Plaintiffs have not shown that Defendants are "disregarding the PRA's requirements," Compl. ¶ 141, their purported constitutional claim rooted in the separation-of-powers fails. *See infra* pp. 27–29.

23

### 2.   Plaintiffs' mandamus and ultra vires claims fail.

Counts III and VII of the Complaint also fail.  Plaintiffs cannot satisfy the "strictly confined" elements necessary to establish mandamus jurisdiction.  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc).  "The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."  *CREW*, 924 F.3d at 606 (citation modified).  To prevail, Plaintiffs must demonstrate (1) "a clear and indisputable right to relief"; (2) "that the government official has a 'clear duty to act'"; and (3) "that 'no adequate alternative remedy exists.'"  *Id.* (citation omitted).  "[E]ven if the plaintiff overcomes all these hurdles, whether mandamus relief should issue is discretionary."  *In re Cheney*, 406 F.3d at 729.

Plaintiffs cannot meet their burden of showing that their right to issuance of the writ is clear and indisputable.  Not only does the PRA lack any private right of action, *see Judicial Watch*, 845 F. Supp. 2d at 299 n.5, but, as discussed, the D.C. Circuit has concluded that it affirmatively precludes judicial review of claims to privately enforce the PRA.  If nothing else, the uncertainty regarding the availability of mandamus relief to enforce the PRA "suggest[s] that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing."  *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 471 (6th Cir. 2023), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025).  Insofar as Plaintiffs may argue there are "'open questions' regarding the precise scope and effect of the facially PRA-compliant" preservation measures in the 2026 Policy, such questions "are the antithesis of the 'clear and indisputable' right needed for mandamus relief," assuming it is available at all under *Armstrong I*.  *CREW*, 924 F.3d at 608.

Separately, Plaintiffs' mandamus claim fails because they cannot establish that Defendants are violating a clear duty to act.  The duty to be performed must be "ministerial and the obligation to act peremptory, and clearly defined."  *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758,

24

760 (D.C. Cir. 1980).  A ministerial duty "is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty."  *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).  The PRA directs the President to take steps "as may be necessary," through "implementation of records management controls and other necessary actions[,]" to assure "adequate" documentation of Presidential activities.  44 U.S.C. § 2203(a).  This discretion-laden directive is far from ministerial or clearly defined.  "This duty necessarily involves the application of judgment and the formation of policy."  *CREW*, 438 F. Supp. 3d at 68.  Indeed, the D.C. Circuit has already concluded that the PRA "accords the President virtually complete control over his records during his term in office."  *Armstrong I*, 924 F.2d at 290.

Any argument that PRA section 2209 could justify mandamus against the individual Defendants would fail as well.  The 2026 Policy requires EOP staff to preserve presidential records created or transmitted on non-official electronic accounts.[6]  And when the alleged duty "depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion."  *Consol. Edison Co. of N.Y. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (citation omitted).

Even if Plaintiffs could identify any ministerial obligation that the PRA imposes on Defendants, they fail to allege a violation of any such duties owed *to them*.  *See* 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty *owed to the plaintiff*.") (emphasis added).  Any duties created by the PRA are owed not to Plaintiffs, but to the public at large.  *See* 44 U.S.C. § 2203)(g)(1) (obligating the Archivist to "make . . . records

---

[6] And insofar as Plaintiffs believe that Congress in PRA section 2209 intended to require preservation of text messages containing no unique information, it is far from clear that is what the PRA requires, as discussed below.

available to the public"). Plaintiffs fail to show mandamus is available against the individual Defendants under PRA section 2209.

Plaintiffs cannot obtain relief by relabeling their mandamus claim as a challenge to ultra vires action. The Supreme Court recently clarified the narrow scope of a non-statutory ultra vires claim, describing it as the judicial equivalent of a "Hail Mary pass—and in court as in football, the attempt rarely succeeds." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681–82 (2025) (*NRC*) (citation omitted). The Court explained that ultra vires claims are "strictly limited" to the "painstakingly delineated procedural boundaries of" the Court's decision in *Leedom v. Kyne*, 358 U.S. 184 (1958). *Id.* The *Kyne* exception applies only where an "agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute." *NRC*, 605 U.S. at 681 (citation omitted).

Neither of these two exceptional circumstances applies here. Instead, as in *NRC*, Plaintiffs merely attempt to "dress up a typical statutory-authority argument as an ultra vires claim." *Id.* at 682. As for the EOP Defendants, ultra vires review is not available under *Armstrong I*. *See id.* at 681 (ultra vires review is not an "easy end-run around the limitations" on judicial review present in other statutes). Even if it were, Plaintiffs cannot show that the 2026 Policy is "blatantly lawless" or a "clear departure by the [defendants] from" the preservation obligations under the PRA. *Fed. Express Corp. v. U.S. Dep't of Comm.,* 39 F.4th 756, 764 (D.C. Cir. 2022) (citation omitted); *see infra* pp. 27–29. Plaintiffs may dispute that the 2026 Policy coheres with the PRA's preservation requirements, but "garden-variety errors of law or fact are not enough." *Fed. Express Corp.,* 39 F.4th at 764. Nothing in the PRA "specific[ally] prohibit[s]" the issuance of the 2026 Policy or the actions it directs. *See NRC*, 605 U.S. at 681 (citation omitted). Just as Plaintiffs have not shown that the EOP Defendants are acting in violation of a clear duty owed to them for purposes

26

of mandamus jurisdiction, Plaintiffs have not come close to showing ultra vires conduct. Whatever dissatisfaction Plaintiffs may have with the 2026 Policy, ultra vires review is not a mechanism to adjudge the particulars of how the Executive is "ensur[ing] that [EOP staff] are appropriately saving presidential records." 2026 Policy at 1.

As for the ultra vires challenge directed at NARA and DOJ, that claim also fails several times over. Initially, Plaintiffs must pursue those challenges through the APA. That is the "statutory review scheme [that] provides aggrieved persons with a meaningful and adequate opportunity for judicial review" of unlawful agency actions. *NRC*, 605 U.S. at 681 (citation omitted). Plaintiffs cannot repackage their APA claims as an ultra vires challenge to evade the strictures of the APA. Those claims fail for reasons explained above, *see supra* pp. 14–17, and Plaintiffs cannot save them with artful pleading. Regardless, the Office of Legal Counsel does not act ultra vires when it renders legal advice, nor does NARA when it preserves all presidential records in its custody.

### 3.    The 2026 Policy is consistent with the PRA's preservation requirements.

Although Plaintiffs cannot obtain judicial review of the Defendants' compliance with the PRA, any such challenge would lack merit because the 2026 Policy plainly meets the preservation standards of the PRA. It directs EOP staff to "preserve any material related to the performance of their duties," regardless of the "medium of the material." 2026 Policy at 2. As for electronic records, the memo states that staff "cannot permanently delete emails or materials saved to an EOP laptop or the EOP network" and that "EOP staff should conduct all work-related communications via your official EOP email account." *Id.* EOP staff are further instructed to "avoid using personal devices for government business whenever possible." *Id.* at 3. Where a non-official medium like "text messaging" is used, the memo instructs staff to preserve materials "when they are the sole

record of official decision-making, government action, or contain unique information not available elsewhere." *Id.* at 2.

In enacting the PRA, Congress did not mandate that the President and his advisors retain every communication generated within the White House orbit; it required preservation of materials that document the performance of the President's constitutional, statutory, or other official duties. *See* 44 U.S.C. § 2201(2). Properly considered, the definition of "Presidential records" excludes informal conversations that neither record nor memorialize governmental decisionmaking, policy deliberation, or the exercise of presidential authority. Text messages that contain no unique information fall outside that definition. A message that says "'call me', 'what room for the meeting', [or] 'there is a typo in the first line of the memo'" does not document the discharge of presidential duties in any meaningful sense. 2026 Policy at 3. It does not reflect a decision, preserve a rationale, or capture information that might otherwise be lost to the historical record. The PRA does not require indiscriminate preservation of such records.

The PRA's structure reinforces that functional limit. The Act distinguishes "Presidential records" from "personal records," the latter encompassing materials "of a purely private or nonpublic character" that do not have an effect on or relate to the official duties of the President. 44 U.S.C. § 2201(2), (3). Routine logistical messages containing no unique information sit comfortably outside the definition of "Presidential records" for similar reasons: they do not relate to the substance of the President's official duties, but to the incidental acts of those who assist the President in his performance of those duties. Reading the PRA to sweep in such messages would collapse the statutory distinction and convert a targeted preservation regime into a senseless and indiscriminate retention mandate.

It is simply implausible that Congress intended to create such a regime. A rule requiring preservation of every non-substantive text message, regardless of whether it duplicates information captured elsewhere or bears any relation to official decisionmaking, would dilute the archival record with noise and (as the 2026 Policy explains) impose "an enormous technological burden" on the Executive. 2026 Policy at 2. The Court should not lightly assume that Congress—when seeking "assiduously to minimize outside interference with the day-to-day operations of the President and his closest advisors," *Armstrong I*, 924 F.2d at 290—intended to require the retention of vast quantities of trivial, duplicative communications that add nothing to the historical record. Indeed, padding the archival record with troves of such documents would impede "the expressed statutory goal of preserving records for historical purposes." *Id.* at 288.

No principle of law or equity supports a hyperliteral construction of the PRA that would require retention of text messages containing no unique information. *See Dubin v. United States*, 599 U.S. 110, 120 (2023) ("A statute's meaning does not always turn solely on the broadest imaginable definitions of its component words. Instead, linguistic and statutory context also matter.") (citation modified). As the 2026 Policy explains, "[u]nder the PRA, no presidential administration required EOP staff to transcribe phone calls, meetings, or informal discussions," despite language in the PRA that might be interpreted to require such an "immensely time consuming and costly" result. 2026 Policy at 2; *see* 44 U.S.C. § 2203(a) (requiring the President to "assure that the . . . deliberations . . . that reflect the performance of" his official duties "are adequately documented and that such records are preserved"). Rather, the PRA must be functionally interpreted "in a common-sense way that accords with the [statute's] purposes." *Georgia v. DOJ*, 148 F.4th 724, 735 (D.C. Cir. 2025) ("refrain[ing] from giving 'intra-agency' in

29

Exemption 5 [of FOIA] an unduly rigid reading" and adopting "textually possible" construction that "is much more in accord with the purpose of the provision") (citation omitted).

The Court should thus reject any argument that the 2026 Policy fails to comply with the PRA's preservation requirements, even if the Court deemed those requirements constitutional and found that judicial review is somehow available.

### D.    The PRA is Unconstitutional

For the reasons set forth above, Plaintiffs lack any basis to obtain the sweeping preliminary relief they seek regarding the Defendants' compliance with the PRA, so this Court need not address the PRA's constitutionality.    Nonetheless, insofar as the Court ultimately considers any direct challenge to OLC's opinion, it is apparent that the PRA is unconstitutional.

The Presidential Records Act, like all statutes, "must be based on one or more of [Congress's] powers enumerated in the Constitution," *United States v. Morrison*, 529 U.S. 598, 607 (2000), or "such implied powers as are necessary and proper to carry into effect the enumerated powers," *Carter v. Carter Coal Co.*, 298 U.S. 238, 291 (1936).  Additionally, special considerations apply where a statute implicates the separation of powers principle that one branch may "not impair another in the performance of its constitutional duties." *Clinton v. Jones*, 520 U.S. 681, 701 (1997) (citation omitted).  Attempts by Congress to directly regulate the recordkeeping of the President and his staff necessarily implicate the "Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications." *Cf. Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 372, 385 (2004) (evaluating judicial discovery orders issued to the Vice President and other senior Executive officials).

Even if Congress had constitutional authority to regulate presidential recordkeeping, the PRA's "disruption" to the "constitutionally assigned functions" of the Executive Branch would

violate the separation of powers unless "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443. In considering such separation of powers questions, the Court "has often 'put significant weight upon historical practice.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (citation omitted). The Court has explained that "a lack of historical precedent is generally a telling indication of a severe constitutional problem with the asserted power." *Trump v. Anderson*, 601 U.S. 100, 113–14 (2024) (citation modified).

### 1.    The PRA has little historical precedent and imposes significant burdens on the presidency

The PRA establishes a sweeping presidential recordkeeping scheme that regulates the presidency and its records for all time and in all contexts, with a presumption of public disclosure. It does so despite having essentially no historical foundation in the practices of all Presidents for the nearly 200 years preceding its enactment. Indeed, as the D.C. Circuit has explained, "history, custom, and usage indicate unequivocally that, prior to [1974], Presidents exercised complete dominion and control over their presidential papers." *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992). Prior to the PRA, "Presidents were never subject to any specific, express legal duty to create or maintain their papers." *See id.* at 1276 (citation omitted).

Additionally, as OLC explained, this ahistorical regime imposes significant burdens on the presidency, both as to its autonomy and independence and as to the confidentiality of presidential communications. The PRA may chill the President's advisers from offering candid or unpopular advice, because there is uncertainty as to whether a future President will invoke the privilege on that specific topic. OLC Op. at 47–48. The risk of selective invocation of privilege is not hypothetical. In *Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021), for example, President Biden declined to invoke executive privilege as to certain presidential records of then-former President

Trump in response to a congressional access request under the PRA. *Id.* at 16, 22. President Biden reasoned that an assertion of privilege over records relating to the events of January 6, 2021, was "not in the best interests of the United States" and declined to uphold then-former President Trump's assertions of privilege, a determination that the courts refused to disturb. *Id.* at 46–48. Under the PRA, changes in presidential administration may thus jeopardize the confidentiality of presidential advice. OLC also explained that the PRA poses a risk of inadvertent disclosure of sensitive or privileged information. OLC Op. at 48.

The capacious sweep of the PRA, OLC reasoned, also may "burden White House personnel to a degree that prevents them from effectively advising and assisting the President in the performance of his constitutional duties." *Id.* Such burdens necessarily impede the President's access to information and advice that he might otherwise receive. *Id.* at 48–49.

Plaintiffs' primary rejoinder to the foregoing analysis is that numerous Presidents have served under the PRA and those Presidents have not made public statements criticizing the impact of the PRA or attributed any adverse events to the statute. Mot. at 12, 41. But executive acquiescence does not function as a sort of adverse possession, permitting Congress to claim authority that it otherwise would not have. *See INS v. Chadha*, 462 U.S. 919, 942 n.13 (1983) ("Furthermore, it is not uncommon for Presidents to approve legislation containing parts which are objectionable on constitutional grounds."); *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 202 (1994) ("[T]here is no constitutional analogue to the principles of waiver and estoppel."). And Plaintiffs' argument that the presidency has functioned without incident during the PRA's tenure fails to account for whether each President may have received better and more fearless advice in the absence of the PRA's thoroughgoing disclosure regime.

32

### 2.      The PRA cannot be justified by any express or implied congressional power

Given the significant burden that the PRA imposes on the presidency, it must be "justified by an overriding need to promote objectives within the constitutional authority of Congress." *Nixon v. GSA*, 433 U.S. at 443.  No enumerated or implied congressional authority justifies the PRA's sweeping regulation of the presidency.

#### a.      *Power of inquiry*

OLC began its analysis with the most apparently relevant congressional authority to the PRA disclosure regime—the power of inquiry.  OLC Op. at 17.  After all, there is a long history, dating back to the Founding, of Congress requesting records from the Executive Branch, followed by dispute resolution among the political branches through the "give-and-take of the political process." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (citation omitted).  Congress's power of inquiry has significant limits, however, both as a general matter and specifically where presidential records are involved.  Although the power of inquiry is "broad," congressional requests for information must "serve a valid legislative purpose" and "concern a subject on which legislation could be had." *Id.* at 862–63 (citation modified).  "[T]here is no congressional power to expose for the sake of exposure." *Id.* at 863 (quoting *Watkins v. United States*, 354 U.S. 178, 200 (1957)).  Additionally, as to "congressional subpoenas for the President's information," such subpoenas raise "significant separations of powers issues." *Id.* at 866–67.  "Without limits on its subpoena powers, Congress could exert an imperious controul over the Executive Branch" and seek to "compel compliance" with its requests "in court" rather than "negotiating over information requests" with the Executive. *Id.* at 866–67 (citation modified).

In light of those concerns, "courts must perform a careful analysis" of the constitutionality of congressional demands for presidential information "that takes adequate account of the

33

separation of powers principles at stake." *Id.* at 869. That analysis should include (among other considerations) whether Congress's asserted interest "warrants the significant step of involving the President" or could instead be pursued through "other sources," whether the subpoena is "no broader than reasonably necessary to support Congress's legislative objective," and whether the subpoena imposes undue "burdens" on the President. *Id.* at 869–71.

The PRA's blanket approach cannot withstand this kind of careful analysis. It imposes preservation obligations on an undifferentiated basis, regardless of the context or the legislative need. OLC Op. at 23. Indeed, unlike the PRMPA, it is not tied to the need for any particular records at all, rendering it impossible to say that the PRA is "no broader than reasonably necessary" to accomplish Congress's legislative objective. *Mazars*, 591 U.S. at 870. And the PRA imposes significant burdens on the presidency, as explained above. *See supra.*

Plaintiff disputes the relevance of *Mazars* and its discussion of the power of inquiry, contending that *Mazars* involved subpoenas, rather than a duly enacted statute. Mot. at 22–23. But the issue here is not the procedure by which Congress seeks to exercise its power—it is whether the power exists in the first place. Were Plaintiffs' argument correct, Congress could pass any plainly unconstitutional law it wanted, *e.g.* claiming a general police power throughout the nation, so long as it satisfied the Constitution's procedural requirements of bicameralism and presentment. That is not what the Constitution contemplates. And as the Supreme Court has explained, Congress does not have a freestanding power to "expose for the sake of exposure." *Mazars*, 591 U.S. at 863 (citation omitted). The separation of powers problem of broad congressional regulation of presidential recordkeeping and disclosure under the PRA undoubtedly raises the same category of concerns as specific subpoenas for presidential information—indeed, it raises those concerns even more acutely.

Plaintiff also contends that the PRA may be justified on the ancillary basis that Congress may require the preservation of materials so that they may be tapped in the future for legislative inquiries. Mot. at 30. That cannot bear the weight of the PRA. Indeed, the concerns that animated the Court's decision in *Mazars*, including "burdens" on the President and the need for a robust showing of legislative need, are even more acutely presented by a sweeping preservation requirement than a targeted legislative inquiry. *Mazars* does not permit the judicial enforcement of a de facto permanent and blanket preservation notice from Congress to the President.

### b.    *Necessary and Proper Clause*

There is no express textual commitment in the Constitution for congressional regulation of presidential recordkeeping. Accordingly, the OLC opinion also analyzed whether the PRA is justifiable under the Necessary and Proper Clause. A statute may be constitutional under this clause where it is "a means that is rationally related to the implementation of a constitutionality enumerated power" and where the statute is not otherwise prohibited by the Constitution. *United States v. Comstock*, 560 U.S. 126, 134 (2010); *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819).

OLC first considered whether the PRA is a necessary and proper regulation of agencies and offices that Congress created. Mot. at 30–31. But it found this possible justification wanting because the President and Vice President's offices are established by the *Constitution*, not Congress. Consistent with that distinction, the Records Act of 1789, passed by the first Congress, governed the retention and transmission of "books, records, and papers" of the Treasury and War Departments, omitting any regulation of the President's papers. Act of July 27, 1789, ch. 14, § 7, 1 Stat. 68, 69. Later amendments of the statute in the succeeding decades continued to maintain this distinction between records of Executive Departments created by Congress and records of the

35

President himself.  4 Rev. Stat. § 161 (2d ed. 1878); *see also, e.g.*, 5 U.S.C. § 22 (1958); *id.* § 301 (1970).

In response, Plaintiffs assert that the Necessary and Proper Clause provides a blanket authority for Congress to regulate "all" constitutional powers vested in the United States, whether they be in Article I, II, or III.  *See* Mot. at 26, 29.  That striking claim to congressional supremacy makes hash of the carefully calibrated separation of powers system devised by the Framers and cannot be squared with Supreme Court precedent.  Congress may, to be sure, enact legislation to assist in the execution of the powers vested in "any Department or Officer" of the government.  U.S. Const. art I., § 8, cl. 18.  But this power does not authorize Congress to interfere with the President's execution of his Article II powers.  *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 135 (1976) (per curiam).  Indeed, the Court recently explained that "Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority."  *Trump v. United States*, 603 U.S. 593, 609 (2024).  Plaintiffs' reading of the Necessary and Proper Clause is irreconcilable with this clear statement from the Court that various matters within the President's Article II domain are beyond the reach of congressional regulation.

Plaintiffs further protest that, at a minimum, Congress possesses authority to regulate recordkeeping of EOP entities that it has established by statute.  Mot. at 29.  But Congress's decision to formalize in law the structure of certain EOP entities cannot change their fundamental character as adjuncts and advisers to the President.  OLC Op. at 32.  Even by the terms of the cited statutes, EOP entities not subject to the FRA do not themselves execute the laws of the United States, such as by issuing regulations applicable to the public or directing military action.  *See, e.g.*, 50 U.S.C. § 3021(b) (providing that the National Security Council has no "operational authority" and that it exists to "advise" and "make recommendations to the President").  The role

of these EOP components is to advise and assist the President in carrying out *his* duties.  That is consistent with the fact that the President's organization of and consultation with staff derives from his inherent Article II authorities, not congressional largesse.  *See Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes.").  Congress cannot create for itself an otherwise nonexistent power to regulate the presidency simply by purporting to organize the President's advisers on his behalf.  That turns the separation of powers on its head.

The opinion also considered whether the PRA may be necessary and proper as derived from Congress's power to appropriate funds for use by EOP and the White House, including as those funds are used in creating presidential records.  OLC Op. at 32–33.  The Appropriations Clause, however, is a *limitation* on federal power, requiring that no federal funds may be expended unless they have been appropriated by Congress, not a substantive grant of authority for Congress to regulate the presidency.  *See CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 438 (2024) (explaining that, although the clause "presupposes Congress' powers over the purse," its "phrasing and location in the Constitution make clear that it is not itself the source of those powers").  And any conditions on the use of federal funding that Congress may impose under the Spending Clause have no relevance here, where Congress's power under the Spending Clause to effect conduct is "in the nature of a contract" whereby recipients of federal funding may "voluntarily and knowingly" conform their conduct to the terms by which Congress has expended funds.  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216, 219 (2022) (citation omitted).  There is no basis in the Constitution to analogize this kind of contract-based Spending Clause jurisprudence to conditions on the use of federal funds by the President.  Indeed, congressional

37

appropriations to the Judiciary and the Executive are not contracts between the branches of the Federal Government; they are authorizations to those branches to draw money from the Treasury for funding their operations. And in all events, Congress did not invoke its spending powers in passing the PRA by, e.g., conditioning Executive Branch appropriations on compliance. OLC Op. at 36.

Finally, the PRA may not be justified as necessary and proper to assist the other branches in carrying out their duties. Plaintiffs contend that the PRA assists each branch, including future Presidents, by ensuring the preservation of records that may be used in the future to, *e.g.*, inform executive action or legislation. Mot. at 26–27. This argument cannot justify the PRA for a number of reasons. First, even where legislation may bear a relation to a proper legislative goal (*e.g.*, assisting in the execution of the laws), it still may not regulate another branch to impair that branch's functioning. OLC Op. at 33. The PRA does exactly that. Second, this justification for the PRA assumes a need for Congress to save the presidency from itself, a perverse rationale that runs aground on the nearly two centuries of history preceding the PRA's enactment and the presumption of regularity that attends executive action. *Id.* at 40–41. The record here indicates that the President has undertaken appropriate measures to ensure the preservation of records from his administration, notwithstanding the PRA's unconstitutionality. *See* 2026 Policy. Lastly, this rationale at most would justify the aspects of the PRA permitting the President to access records needed for his duties. 44 U.S.C. § 2205(2)(B). That narrow provision does not justify the sweeping obligations on the President to generate records of his administration, the vesting of title in such records to the United States, or the public disclosure regime established by the statute. Nor, from the perspective of severability, would it be consistent with congressional intent for this

provision to stand alone in the absence of the constitutionally objectionable portions of the statute. *See infra*.

### c.    *Property Clause*

Plaintiffs also invoke the Property Clause, which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. To start, Plaintiffs' argument begs the question by assuming that Congress had the power in the first place to make presidential records the property of the United States. Plaintiff's reading of the Property Clause cannot be squared with the near-200 years of history preceding the PRA that presidential records were *not* property of the United States. OLC Op. at 5–10. It is hard to see how the original public meaning of the Property Clause could encompass a kind of property that no one at the founding era would have identified as a "Property belonging to the United States." And Plaintiffs' capacious interpretation of the Property Clause flouts the *ejusdem generis* canon of interpretation. The clause's reference to "other Property" is a "residual clause" that "should itself be controlled and defined by reference to the . . . categor[y] . . . just before it." *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001).

Moreover, even if the Property Clause had any relevance here, Congress's exercise of that power must still be consistent with the separation of powers. Navy ships are property of the United States, but Congress could not use its Property Clause power to compel the President to deploy an aircraft carrier. Paper and computers at the White House are property of the United States, but Congress could not forbid the President from using such media to memorialize a pardon. There is no indication that the clause was intended to create another power for Congress's use in regulating the President's exercise of Article II authorities.

### 3.    *Nixon v. GSA*'s evaluation of the PRMPA does not control here.

Plaintiffs principally contend that the Supreme Court's analysis of the PRA's predecessor statute forecloses Defendants' conclusion that the PRA is unconstitutional.  Their argument fails for multiple reasons.

To begin, *Nixon v. GSA* plainly does not control as to the PRA's regulation of each incumbent administration's recordkeeping obligations.  OLC Op. at 42.  The PRMPA did not regulate the recordkeeping of *any* current President but, rather, only the custody and disposition of presidential records of one particular *former* President.  *Id.*  Regulation of the ongoing functioning of a presidential administration raises an even more direct separation of powers confrontation than the retrospective regulation of a completed corpus of presidential materials.  The *Nixon v. GSA* Court expressly recognized as much in considering the purposes of the presidential communications privilege.  *See* 433 U.S. at 448 (explaining that "to the extent that the [presidential communications] privilege serves as a shield for executive officials against burdensome requests for information which might interfere with the proper performance of their duties, a former President is in less need of it than an incumbent") (citations omitted).  Given this context, any statements by the *Nixon v. GSA* Court arguably bearing on the PRA's regulation of incumbent recordkeeping is dicta that this Court should not treat as persuasive for the reasons discussed above. As OLC has explained, the burdens imposed on each incumbent administration by the PRA are unjustifiable in comparison to the lack of enumerated authority for Congress's arrogation of presidential authority.

*Nixon v. GSA* also has nothing to say about the portion of the PRA that treats presidential records as property of the United States.  To the contrary, the Court saw "no reason to engage in

the debate whether [Nixon] has legal title to the materials" because, *inter alia*, the statute "assure[d] [Nixon] of just compensation if his economic interests are invaded." *Id.* at 445 n.8.

Even as to the aspects of the PRA that have a more direct analogue in the PRMPA, *Nixon v. GSA* is distinguishable in key respects. The PRMPA, like the PRA, required the Executive Branch's retention of presidential records and required a mechanism for public release of such records in certain circumstances. *Id.* at 434–35. *Nixon v. GSA* held that the PRMPA was permissible under the separation of powers. *Id.* at 441–46. But the context in which the PRMPA was enacted, written into the text of the statute itself, is critical. The PRMPA was passed in the wake of the Watergate scandal and its purpose was expressly tied to the preservation of records related to that scandal. As the *Nixon v. GSA* Court recognized, the statute's "primary purpose [was] to provide for the American people a historical record of the Watergate events." *Id.* at 436 n.4. The statute, consistent with its stark deviation from nearly two hundred years of historical practice regarding presidential records, "ar[ose] in a context unique in the history of the Presidency." *Id.* at 439. And the text of the statute is replete with indicia of its Watergate-focused intent. At section 104(a)(1), the statute instructs NARA to promulgate public access regulations that account for "the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate.'" 433 U.S. at 435. The Act also gave special prioritization to records requests "by the Office of Watergate Special Prosecution Force." *Id.* at 434 (citing Pub. L. No. 93-526, § 102(b), 88 Stat. 1695, 1696 (1974)).

The Court's analysis in *Nixon v. GSA* is, at bottom, demonstrably tied to the particular context of Watergate. That Nixon and the GSA Administrator had entered into an agreement allowing for the destruction of materials needed by the Watergate Special Prosecutor, *see* 433 U.S. at 431–32, demonstrably bore on the Court's analysis, as the Court suggested that Congress's

41

power to regulate such documents was "augmented" by the PRMPA's "important interests," *id.* at 445–46. Given that context, Congress came closer in the PRMPA to coloring inside the lines of its proper authority under Article I. *See Mazars*, 591 U.S. at 870 ("insist[ing]" that a congressional subpoena be "no broader than reasonably necessary to support Congress's legislative objective"); *cf. United States v. Nixon*, 418 U.S. 683, 709 (1974) (permitting grand jury subpoena to the President where "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts"). Although the *Nixon v. GSA* Court saw no separation of powers problem in the PRMPA, its reasoning should not be extended to the broader PRA context, particularly where the Court did not analyze the congressional powers justifying the PRMPA.

Finally, *Nixon v. GSA* sits in significant tension with *Mazars* and other recent separation of powers decisions by the Supreme Court. OLC Op. at 45–46. That tension further warrants a limited reading of *Nixon v. GSA* that does not extend it beyond the four corners of the opinion. *Cf. id.* at 44 (noting that President Nixon did not present "any challenge to Congress's Article I power to enact the PRMPA"). Nonetheless, to the extent the Court determines that *Nixon v. GSA* is controlling as to any aspect of the PRA, the United States preserves for appeal its argument that *Nixon v. GSA* was wrongly decided for the reasons laid out above and in OLC's opinion. *Id.* at 45–49.

### 4. No part of the PRA can be constitutionally applied.

Lastly, there are no non-severable provisions of the PRA that may be applied in the absence of the constitutionally infirm portions. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018). That is because, for the reasons discussed above, the lack of congressional authority to establish this scheme necessarily pervades all aspects of the PRA's recordkeeping and disclosure regime. Even as to stray provisions of the statute that do not apparently implicate the document

42

creation, preservation, and disclosure aspects of the statute—and which might therefore be constitutionally acceptable—these provisions are not severable because the statute would not "function in a *manner* consistent with the intent of Congress" in their absence. *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Although there is nothing apparently problematic in the statute's authorization for the Archivist to "maintain and preserve Presidential records on behalf of the President" during his term in office, 44 U.S.C. § 2203(f), that provision cannot advance the intent of Congress where divorced from the Archivist's disclosure role following the term's conclusion. OLC Op. at 50–51; *see also Murphy*, 584 U.S. at 481–86 (finding "no provision" of statute severable where the Court held Congress would not have wanted remaining provisions to stand in the absence of the unconstitutional aspects of the statute).

Moreover, Plaintiffs allege standing only on the basis of the PRA's recordkeeping and public release provisions, which sit at the heart of the constitutional infirmities identified above. Plaintiffs lack standing to challenge OLC's severability analysis as to stray provisions of the PRA having no relationship to their interests. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (holding the Court had "no business answering" "important questions" as to severability where "no plaintiff" burdened by potentially severable provisions was before the Court).

## III.   THE REMAINING FACTORS DISFAVOR PRELIMINARY RELIEF

Nor do the balance of harms and the public interest favor any injunction, much less the sweeping obey-the-law injunction Plaintiffs propose. The remaining equitable factors, which merge when the government is the nonmoving party, *see Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh decisively in the government's favor.

At bottom, Plaintiffs contend that they are entitled to unprecedented relief against the President, Vice President, and dozens of other employes inside and outside the EOP because

43

"[a]bsent relief, the President and his advisors will choose which records to keep and which to destroy, creating a curated archive that portrays the administration precisely as the President desires." Mot. at 42. The problem for Plaintiffs is that this assertion is factually unfounded, even according to Plaintiffs' own evidence. *Cf.* Mot. Ex. C at 4, ECF No. 13-5 (public reporting that "[t]he White House has not been destroying documents," "instructed . . . employees to preserve their records," and "[e]mployees' emails and electronic documents are not being deleted"). The 2026 Policy and McClure Declaration show that there is no harm to Plaintiffs in the absence of relief now.

Moreover, the remedy that Plaintiffs seek would harm the Executive Branch and the public interest, undermining the separation of powers even more than the PRA alone through their request for injunctive relief against the President and Vice President. *See infra*. And Plaintiffs ignore that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong I*, 924 F.2d at 290.

## IV.   PLAINTIFFS' REQUESTED INJUNCTION SHOULD BE DENIED AS TO THE PRESIDENT AND VICE PRESIDENT.

"With regard to the President, courts do not have jurisdiction to enjoin him . . . , and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866), and *Franklin v. Massachusetts*, 505 U.S. 788, 827-28 (1992) (Scalia, J., concurring in part and concurring in the judgment)). Indeed, "[t]here is longstanding legal authority that the judiciary lacks the power to issue an injunction or declaratory judgment against the co-equal branches of the government—the President and the Congress." *Newdow v. Bush*, 355 F. Supp. 2d 265, 280 (D.D.C. 2005). The Executive "is a coequal branch of government, and for the President to 'be ordered to perform particular executive . . . acts at the behest of the Judiciary,' at best creates an unseemly appearance

44

of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Swan*, 100 F.3d at 978 (citation omitted).

"To be sure, the Supreme Court has assumed without deciding that some *ultra vires* claims may lie against presidential action." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (citing *Dalton*, 511 U.S. at 474). But "such review is not available when the statute in question commits the decision to the discretion of the President." *Id.* (quoting *Dalton*, 511 U.S. 474); *cf. Swan*, 100 F.3d at 978 (reserving the question of whether a court could "order the President to perform a ministerial duty," and pointing out that the D.C. Circuit has "never attempted" to do that for "painfully obvious" separation of powers reasons).

Although Plaintiffs (wrongly) seek an injunction against all Defendants without limitation, they also appear to recognize their inability to obtain injunctive relief against the President in asking the Court to enter unusual reporting relief with respect to the President. Plaintiffs would have this Court create a patent end-run around its lack of jurisdiction over the President by forcing EOP employees to essentially serve as court-appointed monitors of presidential compliance with the PRA. *See* Proposed Order at 2. That proposed order would still unconstitutionally subordinate the President's conduct to the judiciary. And Plaintiffs do not have standing to obtain that remedy because they cannot establish redressability with respect to a reporting-only requirement.

The Court also lacks jurisdiction to enjoin the Vice President. The same separation of powers concerns applicable to the President also apply to the Vice President where his office is created by the Constitution, not by statute.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction and Stay, ECF No. 13, should be denied.

45

Dated: April 21, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ James Powers*
JOHN BAILEY
Counsel to the Assistant Attorney General
(Ohio Bar No. 104260)
JAMES R. POWERS (TX Bar No. 24092989)
WINSTON SHI (NY Bar No. 5747068)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 353-0543
E-mail: James.R.Powers@usdoj.gov

*Counsel for the United States*