**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States and in his personal capacity, *et al.*, <br><br> *Defendants*. | Case No. 26-cv-1169 |

**REPLY IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION AND STAY</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.     Plaintiffs Are Likely to Succeed on the Merits of Their Claims ....................................... 2

     A.     Plaintiffs Have Standing ...................................................................................... 2

          1.     The Imminent Loss or Destruction of Records Injures Plaintiffs .............. 2

          2.     The 2026 Policy and NARA Declaration Underscores Plaintiffs' Injuries 5

     B.     The PRA Does Not Preclude Plaintiffs' Claims ................................................. 10

     C.     Plaintiffs May Seek Relief on All Asserted Grounds .......................................... 13

     D.     The PRA Is Constitutional ................................................................................... 16

          1.     *Nixon v. GSA* Is Controlling............................................................ 16

          2.     The PRA Is Constitutional on First Principles......................................... 17

     E.     Plaintiffs Are Likely to Succeed on their Claims against the President, Vice President, and EOP Components ............................................................................. 20

     F.     Plaintiffs Are Likely to Succeed on their APA Claim Against DOJ .................... 21

     G.     Plaintiffs Are Likely to Succeed on their APA Claim Against NARA ................ 23

II.     Plaintiffs Face Irreparable Harm Absent an Injunction .................................................. 24

III.     The Balance of Equities and Public Interest Merit a Preliminary Injunction ................... 24

IV.     Plaintiffs' Requested Injunction Is Appropriate ................................................................ 25

CONCLUSION.................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*,
498 U.S. 517 (1991) ................................................................................................ 14

*Am. First Legal Found. v. Becerra*,
No. 24-cv-1092, 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..................................... 5

*Am. Hist. Ass'n v. Peterson*,
876 F. Supp. 1300 (D.D.C. 1995) ....................................................................... *passim*

*Armstrong v. Bush*,
924 F.2d 282 (D.C. Cir. 1991) ...................................................... 3, 4, 10, 11, 13, 21

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ................................................................................................ 13

*Armstrong v. Exec. Off. of the President*,
1 F.3d 1274 (D.C. Cir. 1993) .............................................................. 10, 11, 12, 13

*Ashwander v. Tennessee Valley Auth.*,
297 U.S. 288, 315 (1936) ........................................................................................ 18

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................ 21, 22, 23

*Bost v. Ill. State Bd. of Elections*,
146 S. Ct. 513 (2026) ................................................................................................. 2

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) .................................................................................................. 8

*CREW v. Cheney*,
593 F. Supp. 2d 194 (D.D.C. 2009) .................................................................... *passim*

*CREW v. DOJ*,
922 F.3d 480 (D.C. Cir. 2019) ................................................................................ 23

*CREW v. EOP*,
587 F. Supp. 2d 48 (D.D.C. 2008) ........................................................................... 4

iii

*CREW v. Trump*,
   924 F.3d 602 (D.C. Cir. 2019) ............................................................................... 15

*Dalton v. Specter*,
   511 U.S. 462 (1994) ............................................................................................... 14

*Fed. Express Corp. v. U.S. Dep't of Comm.*,
   39 F.4th 756 (D.C. Cir. 2022) ............................................................................... 15

*Glob. Health Council v. Trump*,
   153 F.4th 1 (D.C. Cir. 2025) ................................................................................. 14

*Gonzales v. Raich*,
   545 U.S. 1 (2005) ................................................................................................... 18

*Jud. Watch, Inc. v. NARA*,
   845 F. Supp. 2d 288 (D.D.C. 2012) ...................................................................... 13

*Kleppe v. New Mexico*,
   426 U.S. 529 (1976) ............................................................................................... 18

*Lujan v. Wildlife*,
   504 U.S. 555 (1992) ................................................................................................. 3

*Mathis v. U.S. Parole Comm'n*,
   794 F. Supp. 3d 8 (D.D.C. 2024) .......................................................................... 20

*Newdow v. Bush*,
   355 F. Supp. 2d 265 (D.D.C. 2005) ...................................................................... 25

*Nixon v. GSA*,
   433 U.S. 425 (1977) .......................................................................................... 16, 17

*NRC v. Texas*,
   605 U.S. 665 (2025) ............................................................................................... 15

*Pub. Citizen v. Burke*,
   655 F. Supp. 318 (D.D.C. 1987) ............................................................................ 22

*Pub. Citizen v. Carlin*,
   2 F. Supp. 2d 1 (D.D.C. 1997) ................................................................................ 4

*Rise Economy v. Vought*,
   No. 5:25-cv-10481, 2026 WL 710238 (N.D. Cal. Mar. 13, 2026) ........................ 23

iv

*Swan v. Clinton,*
   100 F.3d 973 (D.C. Cir. 1996) ................................................................ 25

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020) ............................................................................... 17

*Trump v. United States,*
   603 U.S. 593 (2024) ............................................................................... 19

*United States v. Stanchich,*
   550 F.2d 1294  (2d Cir. 1977) ................................................................. 1

*Venetian Casino Resort, L.L.C. v. EEOC,*
   530 F.3d 925 (D.C. Cir. 2008) ............................................................... 23

**Statutes**

44 U.S.C.
   § 2201 ....................................................................................... 7, 8, 12
   § 2203 ................................................................................. 10, 11, 15, 21
   § 2205 .............................................................................................. 19
   § 2209(a) ...................................................................................... 6, 7, 15, 21

**Constitutional Provisions**

U.S. Constitution
   Art. I
      § 1 ............................................................................................. 17
      § 8, cl. 18 .................................................................................. 18
   Art. II ................................................................................... 14, 16, 24
   Art. III .......................................................................................... 3, 4
   Art. IV, § 3, cl. 2 ..................................................................... 2, 17, 18

**INTRODUCTION**

Defendants' suggestion that there is nothing to see here—that they are continuing to collect and preserve Presidential records as the PRA requires—beggars belief. The White House Counsel asked OLC to issue an opinion on the PRA's constitutionality, on the premise that the PRA disables the Presidency from properly functioning. OLC gave the White House the answer it wanted, concluding that the PRA is unconstitutional because it "impair[s] the sound functioning of the Presidency." *See* Constitutionality of the Presidential Records Act, 50 Op. O.L.C. __, slip op. at 25 (Apr. 1, 2026) ("OLC Op."). And after OLC issued its opinion, the White House released a new policy that significantly changes its preservation practices. This was not merely an academic exercise. If ever there were a case where "[j]udges are not required to exhibit a naiveté from which ordinary citizens are free," *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.), it is this one.

Indeed, the notion that Defendants are still complying with the PRA falls apart upon scrutiny. The White House Counsel memorandum delineating the "2026 Policy" on its face treats the PRA as a dead letter and sets forth a purely *voluntary* records preservation regime. Staff no longer have any legal obligations to preserve Presidential records; instead, the policy advises staff of steps they "should" take, at their discretion. Worse still, the policy affirmatively advises staff *not* to preserve entire categories of text messages that clearly qualify as Presidential records. Beyond that, the 2026 Policy is limited to staff; Defendants do not represent that the President and Vice President are preserving records. As for NARA, it does not deny it has adopted a policy that the PRA no longer binds it, and its carefully worded declaration promises to preserve only records already in its custody. NARA has made clear in separate litigation that it is not preserving Presidential records it did not receive, such as those recovered from Mar-a-Lago.

This Court has jurisdiction and authority to stop Defendants' open lawbreaking. Defendants are wrong to invoke the *Armstrong* line of cases, which held that the PRA impliedly precludes certain claims regarding management of Presidential records. That has no bearing here, where Defendants have declared and are treating the entire PRA as void and inoperative. And even under the *Armstrong* framework, this Court may review Defendants' policy to classify *no* records as Presidential records under the PRA. The Court certainly can review Defendants' decision to exempt whole categories of text messages from preservation. Plaintiffs also have standing because the failure to preserve records—a failure which is happening *now*—is irreparable and harms them as historians and an oversight organization in particularized ways.

On the merits, Defendants cannot salvage OLC's untenable conclusion that the PRA is unconstitutional. Defendants make no meaningful challenge to Congress's clear authority to regulate Presidential records under the Property Clause. To borrow Defendants' analogy, Congress may not be able to direct the President to deploy an aircraft carrier, but it could certainly prevent the President from taking a carrier as his personal yacht after leaving office. And for purposes of the Necessary and Proper Clause, Defendants do not deny that the PRA serves to aid future Presidents, as well as federal courts and Congress, in fulfilling their constitutional duties. Because Plaintiffs are certain to succeed on the merits and face irreparable harm from the permanent loss of records, a preliminary injunction is warranted.

## ARGUMENT

**I.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims**

**A.      Plaintiffs Have Standing**

*1.   The Imminent Loss or Destruction of Records Injures Plaintiffs*

Plaintiffs have standing. The core question in evaluating standing is whether plaintiffs have a "personal stake" in the litigation. *Bost v. Ill. State Bd. of Elections*, 146 S. Ct. 513, 519

(2026). "They, must, in other words, be able to answer the basic question: 'What's it to you?'" *Id.* (quotation omitted). Here, it means everything to AHA's members, who include some of the nation's preeminent presidential historians, if Presidential records are not preserved for the historical record. The same is true for American Oversight, whose core mission is to obtain, scrutinize, and disseminate government records to promote accountability.

Plaintiffs have submitted unrebutted declarations that they regularly request and make use of Presidential records pursuant to the PRA, and that they intend to seek Presidential records of the current administration under the PRA. Pls. Br. 40–41. American Oversight has FOIA requests for Presidential records *currently* pending, including for emails sent during President Trump's first administration. Marx Decl. ¶¶ 4–6, 9–14. Far from a "generalized grievance" where the plaintiff "claim[s] only harm to his and every citizen's interest in proper application of the Constitution and laws," *Lujan v. Wildlife*, 504 U.S. 555, 573–74 (1992); *see* Opp. 12–13, Plaintiffs and their members are among a small group of entities and individuals who regularly request, view, and make use of Presidential records in carrying out their professions. Indeed, the D.C. Circuit has held that "one of the reasons that Congress mandated the creation and preservation of . . . presidential records was to ensure that private researchers and historians would have access to the documentary history of the federal government." *Armstrong v. Bush ("Amstrong I")*, 924 F.2d 282, 287 (D.C. Cir. 1991).

Courts have repeatedly found that historians and public interest groups like American Oversight have standing to challenge failures to preserve government records, including under the PRA. In *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009), the court held that a professor who alleged that he "ma[de] extensive use" of presidential and vice presidential records had Article III standing to challenge the Vice President's PRA policy, because if "records of the Vice

President are not preserved, then no speculation is needed to determine what will happen when [the professor] seeks to use them in his future research—they will be unavailable." *Id.* at 226–27. Similarly, in *CREW v. EOP*, 587 F. Supp. 2d 48 (D.D.C. 2008), the court held that plaintiffs, who had filed and would file FOIA requests, had standing to challenge a White House email retention policy because if the records were not maintained, the plaintiffs would "not be able to obtain [the] federal records through their pending and future requests and therefore suffer real injury." *Id.*; *see also Pub. Citizen v. Carlin*, 2 F. Supp. 2d 1 (D.D.C. 1997) (similar), *rev'd on other grounds*, 184 F.3d 900 (D.C. Cir. 1999).

Other courts that have considered PRA-related challenges made clear that the plaintiffs had alleged cognizable injuries, albeit without explicitly addressing Article III standing. In *Armstrong I*, the D.C. Circuit held that the historian-plaintiffs fell within the PRA's zone-of-interests and could challenge policies that would cause records to be "lost forever to history." *Armstrong I*, 924 F.2d at 288. In *American Historical Association v. Peterson*, 876 F. Supp. 1300, 1309 (D.D.C. 1995), the district court held that AHA's challenge to an agreement between President George H.W. Bush and NARA that contravened the PRA was not moot, because AHA remained "susceptible to injury" if the former President took custody of records pursuant to the agreement, rendering the records unavailable. *Id.* at 1309.

Defendants contend that Plaintiffs cannot show imminent injury, for purposes of both standing and irreparable harm, because "Plaintiffs will not have access to records from President Trump's second terms for years" under the PRA, until at least "January 2034." Opp. 10. But it is the *present* loss or destruction of Presidential records that is the imminent and ongoing harm to Plaintiffs. Plaintiffs "[do] not need to wait until . . . records are actually destroyed in order for [their] claimed injuries to become concrete and imminent." *Cheney*, 593 F. Supp. 2d at 227.

"[T]he loss or destruction of federal records . . . is a harm that cannot be cured once the records are lost or destroyed." *Am. First Legal Found. v. Becerra*, No. 24-cv-1092, 2024 WL 3741402, at *14–16 (D.D.C. Aug. 9, 2024). Here, it is *certain* that Presidential records lost or destroyed now will be unavailable in the future. If Defendants' standing arguments were correct, Defendants could announce tomorrow that they intend to destroy all Presidential records of the current Administration, and no one would have standing to challenge that action "until January 2034," Opp., 10, at which point there would be no redressability.

2.  *The 2026 Policy and NARA Declaration Underscore Plaintiffs' Injuries*

Defendants contend that Plaintiffs do not face imminent harm because the "2026 Policy"—reflected in a memorandum from White House Counsel David Warrington ("Warrington Memo," ECF 19-2)—is purportedly "consistent with the PRA's preservation requirements," Opp. 13, and because NARA submitted a declaration stating that it is "continuing to preserve all Presidential records in its custody," McClure Decl. ¶ 4. Rather than demonstrate compliance that would eliminate Plaintiffs' injuries, these documents *themselves* make clear that Defendants have replaced the PRA's mandatory requirements with a voluntary scheme that, at best, will cause entire categories of Presidential to not be preserved.

The Warrington Memo has several glaring issues. First, the memo's guidance is limited to "staff," and does not apply to the President or Vice President or their records. Defendants have provided no indication or evidence that the President, the Vice President, or the people who process their records have been directed to preserve any of the President's or Vice President's records following OLC's determination, let alone that such records will actually be preserved.

Second, even as to staff, the Warrington Memo's entire guidance is hortatory: it provides staff with *discretion* over whether to voluntarily preserve records, rather than *mandating* they collect and preserve all Presidential records as a matter of their legal obligations under the PRA.

5

Throughout, the 2026 Policy recommends steps staff "should" take "[e]ven in the absence of the PRA." Warrington Memo at 2. Staff "should preserve" materials related to their official duties, "should conduct" work communications on their official email accounts, "should avoid" using personal devices for work "whenever possible," and so on. The Warrington Memo uses the term "should" ten times, with the only "mandatory" requirement being that staff attend trainings. *Id.* at 3. Under the 2026 Policy, staff are no longer under any legal compulsion to preserve records, and the PRA's penalties for non-compliance do not apply. *See* 44 U.S.C. § 2209(b).

The 2026 Policy's use of discretionary language is no accident; it stands in stark contrast to prior White House policies on the PRA, including for the first Trump Administration. In 2017, then-White House Counsel Donald McGahn sent a memorandum to EOP entities to advise them of their legal "obligations" under the PRA. *See* Jacobson Suppl. Decl. Ex. E (McGahn Memo), at 1. The McGahn Memo "required" staff to "conduct all work-related communications on [their] official EOP email account," and stated that staff "**must** preserve" any messages sent or received on a personal account by copying or forwarding to an official account. *Id.* at 3. *Cf.* Warrington Memo at 3 (suggesting that staff "should" avoid using personal devices "whenever possible," without any duty to copy or forward to an official account). And the McGahn Memo told staff that they "may be subject to administrative or even criminal penalties" if they intentionally failed to comply with the PRA. McGahn Memo at 2. In contrast, the Warrington Memo makes clear that complying with the PRA is not required: it *permits* EOP components "to retain the records retention policies developed under the PRA." Warrington Memo at 1.

Thus, even if the 2026 Policy's guidelines as to steps staff "should" take were consistent with the PRA (and they are not), and even if the guidelines applied to the President and Vice President (and they do not), such a voluntary preservation scheme would not obviate Plaintiffs'

harms. Just like in *AHA v. Peterson*, when the government stated that it would voluntarily act in accordance with the PRA even though it had entered an agreement providing otherwise, Plaintiffs face injury where Defendants have freed the President, Vice President, and staff from any legal obligation to preserve records, taking any preservation that occurs "out of the explicit confines of the PRA" and "plac[ing] it into the hands" of individuals to act on their own volition. 876 F. Supp. at 1309. And nothing would stop them from revoking or altering the Warrington Memo at any time, allowing them to immediately fail to preserve or to destroy records.

In fact, the Warrington Memo exacerbates—rather than eliminates—Plaintiffs' injuries because it affirmatively advises staff *not* to preserve text messages that are Presidential records. The guidance states that "[t]ext messages *should only be preserved* when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." Warrington Memo at 2 (emphasis added). What's more, even when a text message is the sole record of decisionmaking or contains unique information at the time the message is sent, the Warrington Memo does not require it be preserved, but instead "encourage[s]" staff to "memorialize[]" the information in "an email or memorandum" after-the-fact, meaning staff can create a sanitized record with an eye toward it being made public one day. *Id.* at 2–3.

This guidance is inconsistent with the PRA and leaves no doubt that Plaintiffs face imminent harm from the non-preservation of text messages, whether through Signal, WhatsApp, iMessage, or SMS. The PRA mandates that for any text message that meets the definition of a Presidential record under 44 U.S.C. § 2201(2), the President, Vice President, or covered employee must copy an official account or forward the messages to an official account within 20 days. 44 U.S.C. § 2209(a). And the definition of Presidential records that must be preserved is far broader than "the sole record of official decision-making [or] government action."

7

Presidential records encompass "any documentary material" that was created or received in "the course of conducting activities which relate to . . . [official] duties." 44 U.S.C. § 2201(2). The PRA contains no exception for records that have information also documented elsewhere; only clearly marked duplicate "copies" of records are excluded. *Id.*

In seeking to defend their new policy on text messages, Defendants advocate against a "hyperliteral" reading of the PRA. Opp. 29. Rather than rely on the statutory definition of "Presidential records," Defendants invent their own "definition" that "excludes" certain conversations, and they suggest that the 2026 Policy properly excludes text messages that "fall outside *that* definition." Opp. 28 (emphasis added). But "[o]nly the written word is the law," *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 653 (2020), and Congress amended this law in 2014 to require capture of all text messages meeting the statutory definition. Congress did so to "preserv[e] all information" qualifying as Presidential records, no matter the "technology used" to generate the record. 160 Cong. Rec. 8, H206 (Jan. 14, 2014). Defendants' suggestion that text messages should receive special, atextual treatment contravenes Congress's express intent.

The Warrington Memo itself reveals the deficiencies in its policy on text messages and the reality that Presidential records will be imminently and permanently lost as a result. The memo provides the following example of an exchange that does not need to be preserved.



Warrington Memo at 3. The PRA indisputably requires preserving this exchange, which relates to the carrying out of official duties. But the Warrington Memo states that it should not be preserved because one of the texters would later send an email "memorializ[ing]" the President's approval. *Id.* As a result of this guidance, only the President's approval would be recorded; there would be no record that Steve and the sender met with the President when he provided approval, of when the President approved the plan, or what the texters said in real time coming out of that meeting. Historians like AHA's members will be denied primary documents actually used in the course of staff duties, and instead will have to rely on sanitized records created for the purpose of curating the historical record and avoiding preservation of original written communications. This is exactly what the PRA aims to avoid.[1] *See* Pls. Br. 42.

As for NARA, its bare-bones declaration does not defeat Plaintiffs' standing to assert claims against NARA. *See* Opp. 13. The declaration does not deny that the OLC opinion is controlling on NARA, that NARA has adopted the opinion, or that NARA now treats its duties under the PRA as discretionary rather than mandatory. *See* McClure Decl. Defendants in fact confirm in their brief NARA is now preserving records only "as a matter of discretion." *See* Opp. 16–17. The declaration, moreover, conspicuously limits itself to documents "in [NARA's] custody," as opposed to all Presidential records of a prior administration. McClure Decl. ¶ 4. That limitation is telling, because in separate litigation, NARA has said that it "does not possess any materials seized by the FBI from Mar-a-Lago on August 8, 2022" and "has no knowledge of their disposition." *See* McClure Decl. ¶ 6, *Legal Eagle v. NARA*, No. 8:26-cv-920 (D. Md. April 22, 2026), Dkt. 20-1. NARA thus has *not* committed to preserve this set of documents of great

---

[1] The Warrington Memo contravenes the PRA in other ways as well. For instance, it limits preservation of paper records to materials "necessary to the performance of . . . duties," Warrington Memo at 2, rather than all those "created or received . . . in the course of" those duties, while providing no guidance on what makes a document "necessary."

public importance, even though the PRA places a clear duty on NARA to assume custody of and preserve those records. 44 U.S.C. § 2203(g)(1). Nor has NARA committed to comply with its other obligations under the PRA, including its obligation to proactively disclose Presidential records "as rapidly and completely as possible," 44 U.S.C. § 2203(g)(1).

### B.    The PRA Does Not Preclude Plaintiffs' Claims

Defendants make the paradoxical argument that the PRA—which they have declared "invalid in its entirety" (OLC Op. 50)—impliedly precludes Plaintiffs' claims. The implied preclusion analysis from the *Armstrong* line of cases simply has no bearing here, where Defendants have determined that all of the PRA's provisions are a dead letter.

In *Armstrong I* and *Armstrong II*, the D.C. Circuit held that the PRA impliedly precludes claims challenging certain decisions about "the creation, management and disposal" of Presidential records, because the PRA itself vests the President with discretion in "the implementation of" those decisions. *Armstrong v. Exec. Off. of the President* ("*Armstrong II*"), 1 F.3d 1274, 1293–94 (D.C. Cir. 1993) (citing *Armstrong I*, 924 F.2d at 290). Specifically, 44 U.S.C. § 2203(a) provides that "the President shall take all such steps as may be necessary" to implement the PRA's "requirements of [44 U.S.C. § 2203]" regarding creation, management, and disposal. The D.C. Circuit held that, through § 2203(a), "Congress balanced [] competing goals by requiring the President to maintain records documenting the policies, activities, and decisions of his administration, but leaving the implementation of such a requirement in the President's hands." *Armstrong I*, 924 F.2d at 290. Permitting judicial review of the President's "day-to-day" implementation decisions would upset that balance. *See id.*

*Armstrong*'s implied preclusion analysis categorically does not apply here, where Defendants have declared that "the PRA falls entirely," including § 2203(a). *See* OLC Op. 51.

10

The authority and discretion that § 2203(a) vests in the President to implement the PRA cannot preclude Plaintiffs' claims where, in Defendants' view, § 2203(a) is inoperative, and the President need not "take all such steps as may be necessary" to comply with the PRA. Implied preclusion focuses entirely on "congressional intent," *Armstrong I*, 924 F.2d at 290, and Congress obviously did not intend for § 2203(a) or any other PRA provision to preclude judicial review if these provisions are no longer in force.

Indeed, "it 'borders on the absurd' to believe that Congress statutorily defined [Presidential] records and required the [President] to implement steps to preserve them," but intended to "den[y] any judicial review" where the President declares he need not comply with the PRA at all. *Cheney*, 593 F. Supp. 2d at 216 (quoting *AHA*, 876 F. Supp. at 1315). It is remarkable for Defendants to claim that permitting judicial review "would upset the intricate statutory scheme," or undermine "Congress's choice[s]," *contra* Opp. 19, where Defendants have purported to invalidate Congress's *entire* statutory scheme.

In any event, judicial review would be appropriate even if the Court applied the framework of *Armstrong I* and *Armstrong II*. Taken together, *Armstrong I* and *Armstrong II* bar judicial review of the President's "day-to-day operations" regarding the "creation, management, and disposal" of records under the PRA, but not "classification" policies or guidance regarding what "materials will be treated as presidential records in the first place." *Armstrong II*, 1 F.3d at 1294. For example, the *Armstrong* cases do not "foreclose judicial review of a decision to denominate certain materials 'personal records,'" rather than Presidential records, that will be "subject to [the President's] control following his term in office." *AHA*, 876 F. Supp. at 1314. Nor, as *Cheney* explained, would review be precluded if the Vice President "created guidelines for preserving records wherein he defined Vice-Presidential records as consisting of only 'hand-

written documents concerning the ceremonial duties of the Vice President,'" which would "clearly controvert the language of the PRA." *Cheney*, 593 F. Supp. 2d at 215.

This case involves a similar but even more extreme circumstance: Defendants have declared that *no materials* are Presidential records subject to the PRA's preservation and access requirements. Under Defendants' new policy, not a single document, email, text message, or other record will be classified as a Presidential record subject to the PRA's dictates. Rather, Defendants have classified every record created or received by the President, Vice President, or PRA-covered employees related to their official duties as the President's "personal property," *see* Opp. 2, which the President has free rein to keep or destroy. This Court may review and reject that determination, and require Defendants to classify records meeting the definition of Presidential records under 44 U.S.C. § 2201(2) as records subject to the PRA's requirements.

Defendants' new policy on text and direct messages is also subject to judicial review if the Court applies the *Armstrong* framework. The 2026 Policy contains "guidelines" on which messages should and should not be preserved, with the 2026 Policy advising staff that "[t]ext messages should only be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." Warrington Memo at 2. The Court may review whether that classification guidance is consistent with the PRA's requirements for Presidential records that must be preserved.

Defendants ask this Court to cabin *Armstrong II* to provide for judicial review *only* where plaintiffs bring claims under the FRA or FOIA and allege records are improperly being treated as Presidential records. Opp. 22. The court in *Cheney* correctly rejected this cramped reading, in a case challenging guidelines for Vice Presidential records that were allegedly underinclusive. The court found that while that case "present[ed] the reverse situation" from the one in *Armstrong II*,

12

the "review undertaken by a court in each circumstance is nevertheless identical; a court must review the guidelines the executive uses to define records under the PRA." *Id.* at 215. Precluding judicial review of a policy that classifies records in a manner contrary to the statute would be "illogical in light of Congress' decision to include a clear definition of records falling under the PRA." *Id.*; *see also AHA*, 876 F. Supp. at 1315 ("[T]he Court declines to hold, as the Defendants would have it, that *Armstrong I* and *Armstrong II* preclude judicial review of a document that effectively purports to supersede the clear mandates of . . . the PRA.").

*Cheney* was correct. *Armstrong II* made clear the limited nature of the holding in *Armstrong I*: "We held that those decisions that involve materials that are *truly* Presidential records"—*i.e.*, decisions regarding "the creation, management and disposal" of indisputably Presidential records—"are immune from judicial review." *Armstrong II*, 1 F.3d at 1293–94 (emphasis added). *Armstrong I* does not preclude review of policies that classify entire categories of materials as not falling under the PRA. *Id.* Defendants point to a single decision that took a narrower view of *Armstrong II*, *see Jud. Watch, Inc. v. NARA,* 845 F. Supp. 2d 288 (D.D.C. 2012), but that case is distinguishable because it involved the President's treatment of particular records, not a policy that classified whole categories of records using criteria inconsistent with the PRA's definitions. And of course, *Judicial Watch* did not involve a situation like here, where the government has declared that the entire PRA is void and inoperative.

### C.    Plaintiffs May Seek Relief on All Asserted Grounds

Although Defendants dispute the availability of relief on some of Plaintiffs' counts, they do not dispute that Plaintiffs may invoke, as they have in Count II, this Court's inherent equitable authority to enjoin Defendants from violating the PRA. *See* Pls. Br. 32–33; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Defendants have waived any argument to

13

the contrary. *See Air Courier Conf. of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 523 n.3 (1991) ("Whether a cause of action exists is not a question of jurisdiction.").

Defendants' arguments that Plaintiffs may not pursue their other claims fail as well. Defendants point to *Global Health Council v. Trump*, 153 F.4th 1, 13 (D.C. Cir. 2025), to dispute whether Plaintiffs may assert a separation-of-powers claim. Opp. 23. But they ignore the D.C. Circuit's explicit carve-out for circumstances where there is a "conceded *absence* of *any* statutory authority" for the government's actions, and the "only basis of authority asserted" for the government's disregard of a statute is constitutional. *Id.* at 15 (quoting *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). Defendants do not address this carve-out or deny that it applies here, even though Plaintiffs relied upon it in their opening brief. *See* Pls. Br. 17. In fact, Defendants recognize that "[t]he Constitution may be implicated . . . if executive officers rely on it as an independent source of authority to act." Opp. 23. Defendants here rely only on the Constitution, including the "autonomy of the President guaranteed by Article II," OLC Op. 51, for determining that they are not legally bound by the PRA, and in turn for treating Presidential records as the President's personal property and making the preservation of the records optional.

Defendants are wrong that "the crux of this dispute is whether the 2026 Policy coheres with the statutory preservation requirements of the PRA." Opp. 23. The crux of the dispute is that Defendants have invoked the Constitution to deem the PRA "invalid in its entirety," OLC Op. 50, and based on that determination, they have left the collection and preservation of Presidential records to the whims of the President and Vice President, and to whether staff choose to voluntarily follow non-binding guidance. There is a "conceded absence of any statutory authority" for those decisions, and Plaintiffs may challenge this assertion of Article II power to disregard the PRA's legal mandates. *Dalton*, 511 U.S. at 473.

14

Mandamus is also available if Plaintiffs are unable to obtain relief on their other claims. Defendants note that § 2203(a) allows the President to determine what steps "may be necessary" to comply with the PRA, but the requirement that the President take steps necessary to comply is non-discretionary. 44 U.S.C. § 2203(a) ("the President *shall* take all such steps"). Plaintiffs seek to enforce that mandatory duty, which Defendants have disclaimed altogether. That distinguishes this case from *CREW v. Trump*, 924 F.3d 602, 607 (D.C. Cir. 2019), where mandamus was unavailable because the White House's policy properly required PRA compliance, and the question was just whether the policy was being followed. *See id.* at 606–07.

Other portions of the PRA also impose mandatory duties. Under 44 U.S.C. § 2209(a), if a covered individual sends a message meeting the definition of a Presidential record using a non-official account, they must copy an official account or forward the message to an official account within 20 days. Defendants cannot transform this mandatory duty into a discretionary one by inventing some ambiguity in the statute. *See* Opp. 25 & n.6.

Finally, Plaintiffs' ultra vires claims are actionable. This case does not involve "a typical statutory-authority argument." Opp. 26 (quoting *NRC v. Texas*, 605 U.S. 665, 682 (2025)). Plaintiffs allege that Defendants are engaging in a "clear departure" from the statutory scheme by disclaiming it altogether. *Fed. Express Corp. v. U.S. Dep't of Comm.*, 39 F.4th 756, 764 (D.C. Cir. 2022). And the PRA *does* "specifically prohibit" the conduct that Plaintiffs challenge: deeming Presidential records to be the President's property, making the preservation of Presidential records optional, and affirmatively advising staff not to preserve entire categories of Presidential records. *Contra* Opp. 26 (quoting *NRC*, 605 U.S. at 681).

### D.      The PRA Is Constitutional

#### 1. Nixon v. GSA *Is Controlling*

*Nixon v. GSA*, 433 U.S. 425 (1977), is dispositive of the PRA's constitutionality. Defendants argue it is not because the Preservation Act "did not regulate the recordkeeping of *any* current President but, rather, only the custody and disposition of presidential records of one particular *former* President." Opp. 40. But Nixon's separation-of-powers arguments were all based on alleged harms to the Office of the President under Article II, and the future functioning of incumbent presidents, and not any harms specific to Nixon. The Court's controlling analysis in the "Separation of Powers" and "Presidential Privilege" sections of the opinion thus focused entirely on Congress's structural power to require *any* President to preserve official records and transfer those records within the Executive Branch for future disclosure. 433 U.S. at 453.

Indeed, the Court framed its entire "inquiry" as "focuse[d] on the extent to which [the Act] prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Id.* at 443. If the Court's holding related only to Nixon's particular circumstances, it would have made no sense to analyze the "potential for disruption" to the Executive Branch or whether the law would chill the "candid presentation of views by . . . contemporary advisers" of "an incumbent," because Nixon was no longer in office by this time. *Id.* at 448. The Court instead analyzed and upheld the propriety of legislation regulating Presidential materials generally. It rejected Nixon's argument "that the Act's regulation of the disposition of Presidential materials within the Executive Branch constitutes . . . a violation of the principle of separation of powers." *Id.* at 441. The "adequate justifications" the Court found for the Act—ensuring a public historical record and that "an incumbent President" has access to the materials of "a prior President"— apply equally to every President. *Id.* at 452–53. And the Court's holding that the law did not

16

jeopardize the "autonomy" of the Executive Branch was squarely about future Presidents. *Id.* at 444–45. Defendants thus could not be more wrong that "the Court's statements . . . bearing on the PRA's regulation incumbent recordkeeping is dicta." Opp. 40.

And it is demonstrably false that "[t]he Court's analysis in *Nixon v. GSA* is, at bottom, demonstrably tied to the particular context of Watergate." Opp. 41. Across the Separation of Powers and Presidential Privilege sections of the decision, only *one* of the 21 paragraphs said a word about Watergate or Nixon, and that paragraph described "other . . . substantial interests," beyond the "adequate justifications" for the law *not* specific to Nixon. 433 U.S. at 452–53.

### 2. The PRA Is Constitutional on First Principles

**a.** The PRA is also constitutional on first principles. Defendants insist that the balancing test of *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020), governs the analysis, but they cite no case ever applying this test to evaluate the constitutionality of enacted *legislation*, as opposed to a unilateral congressional subpoena. Defendants fail to grasp why the distinction matters, arguing absurdly that Plaintiffs' position would mean "Congress could pass any plainly unconstitutional law . . . so long as it satisfied . . . bicameralism and presentment." Opp. 34. The distinction is critical because Congress may rely on its vast "legislative powers" to enact laws, U.S. const., art. I, § 1, including for the many enumerated purposes in Article I and, as relevant here, under Article IV, Section 3, Clause 2. By contrast, the oversight power at issue in *Mazars* is implied and only "auxiliary to the legislative function," which is why it is limited. 591 U.S. at 862 (quotations omitted). The test for whether Congress has power to enact a law is whether it falls under Congress's "legislative powers," not a four-part balancing test for subpoenas.

Here, Congress plainly has authority to regulate official government records under its legislative powers, including under the Property Clause. Defendants' arguments against this clear

17

source of authority, ignored in the OLC opinion, are makeweight. They claim that Congress could not pass a law in 1978 deeming future, not-yet-existing official records of a not-yet-elected President to be government property (starting in 1981), because Congress had not declared records of previous Presidents to be government property. Opp. 39. But Congress's prior inaction does not limit the scope of its constitutional powers. Just as it may newly define a longstanding activity as affecting interstate commerce and begin regulating it as such, *e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005), under the Property Clause, Congress may prospectively define and clarify government ownership over property created by government officials in performing their duties. *Kleppe v. New Mexico*, 426 U.S. 529, 536–40 (1976).

Defendants also suggest that the "other property" that Congress may regulate under the Property Clause must be similar to the "Territory" referenced just prior in the Clause, but the Supreme Court has expressly rejected this notion. The Court has held that the Property Clause authorizes "regulation of all other personal . . . property belonging to the United States," including even property such as electric energy. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 315, 331 (1936). Defendants' remaining Property Clause arguments—hypothesizing laws that would "compel the President to deploy an aircraft carrier" or forbid the President from "memorializing a pardon" using paper and computers, *see* Opp. 39—are non-sequiturs. The PRA does not dictate how the President uses any record in the course of his duties; it just requires him to preserve records and transfer custody of them after his term in office.

Congress independently has authority to enact the PRA under the Necessary and Proper Clause. Defendants ignore the second provision of the Clause, which authorizes Congress to enact laws necessary and proper to the carrying out of "all other Powers vested by this Constitution in the Government of the United States." U.S. Const. art. I, § 8, cl. 18. That

18

provision, by definition, gives Congress authority to regulate the operations of all three branches of "the Government." Defendants point to the statement in *Trump v. United States*, 603 U.S. 593 (2024), that "Congress cannot act on . . . subjects within [the President's] conclusive and preclusive constitutional authority." *Id.* at 609. Yet they identify no provision of the Constitution giving the President conclusive and preclusive authority over handling Presidential records.

Like OLC, Defendants imply that Congress may only enact legislation that facilitates, rather than constrains, another branch's exercise of power. *See* Opp. 38. But like OLC, they cite no judicial precedent for such an assertion. And even under their own view, Defendants have no meaningful response to the ways in which the PRA *does* aid all three branches in exercising their constitutional responsibilities. Defendants do not dispute that the PRA facilitates the work of courts and the Congress, by preserving and providing those branches access to records that they may need for adjudicating cases or enacting new laws. *See* Pls. Br. 27. As for future Presidents who need access to the records of prior administrations, such as for national security purposes, Defendants assert that "this rationale at most would justify the aspects of the PRA permitting the President to access records needed for his duties." Opp. 38 (citing 44 U.S.C. § 2205(2)(B)). But the only way to ensure a future President will be able to access records is to require that the current President preserve those records and not take them with him when he leaves office.

Finally, the PRA's preservation requirements may be independently sustained under Congress' implied powers, including to require preservation of records to enable potential future oversight. Pls. Br. 30. Defendants argue that merely preserving records produces unbearable "burdens on the President," Opp. 35, but they do not explain what those burdens are or why no prior President found those burdens unbearable.

19

**b.** The PRA also does not impose any cognizable intrusion on the President's autonomy or ability to carry out his constitutional responsibilities. Defendants repeat all of OLC's speculative concerns over how the PRA "may chill" communications, "may burden White House personnel," and "poses a risk of inadvertent disclosure," without citing a single example where this has ever occurred in the PRA's 45-year history, including in the first Trump administration and the opening 15 months of this administration. *See* Opp. 32. Indeed, Defendants have wisely abandoned the sole concrete example that OLC put forward as a burden—that the White House Counsel's Office has to spend time advising staff on complying with the law.

E.       **Plaintiffs Are Likely to Succeed on their Claims against the President, Vice President, and EOP Components**

Because the PRA is constitutional, Plaintiffs are likely to succeed on their claims against all Defendants. With respect to the President, Vice President, and EOP components, as explained in the standing section *supra*, these Defendants are disregarding the PRA in multiple fundamental ways, including by: (1) not advising the President, the Vice President, or their subordinates to preserve the President's and Vice President's records at all; (2) telling staff that the PRA's requirements are discretionary for them (at best), and not legal mandates; (3) affirmatively advising staff not to preserve text messages that are Presidential records; and (4) deeming all Presidential records to be the President's personal property.

Plaintiffs are thus likely to succeed in their claim seeking that the Court exercise its inherent equitable authority to enjoin these violations of the PRA. *See* Compl. Count II; *Mathis v. U.S. Parole Comm'n*, 794 F. Supp. 3d 8, 22–23 (D.D.C. 2024). Plaintiffs are also likely to succeed on their claim seeking to enjoin Defendants' separation-of-powers violations, because Defendants lack the constitutional authority they claim to disregard this law. Compl. Count I.

And if relief is not available on those claims, Plaintiffs are likely to prevail on their claim that Defendants, including the President, Vice President, and EOP components are acting *ultra vires*. *See* Compl. Count III. The PRA imposes numerous "clear and specific" requirements on Defendants. *See* Pls. Br. 34 (citing 44 U.S.C. §§ 2203(a), 2203(b), 2203(g), 2209(a)). Defendants' actions in disregard of these legal mandates are not "garden-variety errors of law." Opp. 26. Defendants are entirely without legal authority to nullify the PRA, and Defendants cannot justify that *ultra vires* action by purporting to voluntarily follow some aspects of the PRA as a matter of discretion. Indeed, Defendants' decision to treat various PRA requirements as discretionary, rather than as legal duties, is itself *ultra vires*.

For the same reasons, if no other adequate remedy exists, Plaintiffs are entitled to mandamus relief. The court in *Cheney* correctly held that the PRA's definitional and preservation provisions are clear, specific, and non-discretionary, giving rise to a claim for mandamus. 593 F. Supp. 2d at 220. Nor can Defendants avoid mandamus on the ground that "[a]ny duties created by the PRA are owed not to Plaintiffs, but to the public at large." Opp. 25. Defendants cite no authority for that position, which ignores the D.C. Circuit's recognition that Congress passed the PRA, in part, specifically to "ensure that private researchers and historians would have access to the documentary history of the federal government." *Armstrong I*, 924 F.2d at 287.

### F.   Plaintiffs Are Likely to Succeed on their APA Claim Against DOJ

Plaintiffs are also likely to succeed on their APA claim against DOJ. Defendants' sole response on this claim (at 14–16), that the OLC opinion is not final agency action, fails. The OLC opinion meets both prongs of the Supreme Court's test for final agency action. First, it "mark[s] the consummation of the agency's decisionmaking process" *Bennett v. Spear*, 520 U.S. 154, 178 (1997); *see* Pls. Br. 36. The opinion represents DOJ's definitive legal position on the constitutionality of the PRA, issued in a formal, signed opinion. Second, the opinion is one by

21

which "rights or obligations have been determined" or from which "legal consequences will flow." The OLC opinion on its face determines Defendants' "obligations," declaring that "the President need not further comply with [the PRA's] dictates." OLC Op. 52. And "legal consequences" did "flow" directly from the opinion: the Warrington Memo accepts as a given OLC's "conclu[sion] that the PRA is unconstitutional" and "provide[s] guidance . . . in light of OLC's determination." Warrington Memo at 1. And Defendants do not dispute that OLC's determination is legally binding on NARA under Executive Order 14215. *See* Opp. 15.

Defendants argue that the second *Bennett* prong is not because the President and "anyone else in the Executive Branch" may still choose to follow the PRA "as a discretionary matter." Opp. 15–16. That proves Plaintiffs' point. As a *legal* matter, being bound by statutory mandates is entirely different from having discretion over what to preserve. Defendants also fail to meaningfully distinguish the cases that have set aside OLC opinions where they are found to be contrary to law, including in *Public Citizen v. Burke*, 655 F. Supp. 318 (D.D.C. 1987). Defendants suggest that *Burke* involved a challenge to a "NARA decision" rather than an "OLC Opinion," and that it was the NARA decision that "became the target of the relief provided." Opp. 16. But the plaintiffs in *Burke* "brought th[e] action seeking to nullify any impact of [a] *DOJ/OLC memorandum* on the orderly release of the Nixon papers" and "contend[ed] that *the memorandum* [was] contrary to the [Preservation] Act." *Id.* at 320 (emphasis added). The court then analyzed at length the legality of the OLC memorandum itself, concluding that it was "not compelled by the Constitution" and "thwarted the legislative intent of the [Preservation] Act." *Id.* at 322. The court "declared that the [OLC] memorandum . . . [was] contrary to law" and ordered NARA not to comply with it. *Id.* Thus, contrary to Defendants' suggestion, the OLC opinion was in fact the "target of the relief provided" by the district court. Opp. 16.

22

Defendants cite no case holding that an OLC opinion was not final agency action under the APA. Defendants instead rely on a separate line of cases holding that OLC opinions are the "working law" of an agency for purposes of FOIA's "reading room" provision only if the agency has "adopted" the opinion as its own. Opp. 15 (quoting *CREW v. DOJ*, 922 F.3d 480, 486 (D.C. Cir. 2019)). But whether an agency action is "final" for purposes of APA involves the distinct two-prong test under *Bennett*, not the "adoption" standard for FOIA's reading room provision.

### G.   Plaintiffs Are Likely to Succeed on their APA Claim Against NARA

Plaintiffs are also likely to succeed on their APA claim against NARA. Because the OLC opinion is "controlling" on NARA, *see* E.O. 14215 § 7, NARA's policy today is that it has no legal obligations under the PRA. Defendants do not deny this and effectively admit as much, stating "NARA [is] complying with its requirements as a matter of discretion." *See* Opp. 16–17.

Defendants suggest that NARA has not taken final action because Plaintiffs have not cited a "rule, publication, or order following the OLC opinion." Opp. 17. But those are not the only reviewable agency "actions"; the D.C. Circuit has held that such action can include an agency "adopt[ing] a policy" that affects the legal obligations of its employees. *Venetian Casino Resort, L.L.C. v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008); *see, e.g.*, *Rise Economy v. Vought*, No. 5:25-cv-10481, 2026 WL 710238, at *12 (N.D. Cal. Mar. 13, 2026).

Nor can Defendants rely on NARA's statement that it "is continuing to preserve all Presidential records in its custody." Dkt. 19-3 ¶ 4. Even if NARA were doing that "as a matter of discretion," Opp. 16, that does not change the unlawful nature of NARA's policy or the need for relief. *AHA* rejected the same argument from NARA, holding that as long as the Bush-Wilson agreement remained in place, former President Bush retained legal control over records, which violated the PRA. 876 F. Supp. at 1309. Moreover, as noted above, NARA is *not*, in fact,

23

complying with the PRA (even "as a matter of discretion"), because it is not taking custody of all Presidential records from President Trump's first term. *See supra* Section I.A.

## II.    Plaintiffs Face Irreparable Harm Absent an Injunction

Defendants do not dispute that the destruction or failure to preserve records is irreparable. *See* Pls. Br. 38–39. Defendants nonetheless contend that Plaintiffs do not face irreparable harm for the same reasons that they contend Plaintiffs lack standing. Opp. 9–12. For the reasons already explained, these arguments fail. *Supra* Section I.A.

And, stepping back, Defendants' suggestion that they continue to collect and preserve all Presidential records as the PRA requires, despite requesting and receiving an OLC Opinion that the PRA is unconstitutional, is simply not credible. Indeed, OLC's conclusion that the PRA is invalid rested on the notion that the law disables the Presidency from properly functioning. Even now, at the same time they claim to be following the PRA, Defendants argue that the PRA must be unconstitutional "[g]iven the significant burden that the PRA imposes on the presidency." Opp. 33. They contend that the PRA has prevented Presidents, including the current President from "receiv[ing] better and more fearless advice." *Id.* at 32. Defendants cannot credibly assert that they are continuing to abide by the statutory scheme that they believe imperils Article II.

## III.    The Balance of Equities and Public Interest Merit a Preliminary Injunction

With respect to the balance of equities and the public interest, Defendants' arguments are just a recitation of their claim that their current policies comply with the PRA and that the President has discretion in the handling of records during his presidency. Opp. 43–44. As explained above, the guidance outlined in the Warrington Memo falls far short of compliance with the PRA. And if it did comply, as Defendants claim, then an injunction requiring compliance would add no additional burden. On the other hand, the public at large, as well as

24

other branches of government and future occupants of the Presidency face significant harm if documents are not preserved during the pendency of this case. Pls. Br. 41–44.

## IV.    Plaintiffs' Requested Injunction Is Appropriate

Defendants argue that the Court should not issue an injunction against the President. Opp. 44–45. The President's immunity from injunctive relief, however, "is not without its exceptions," and "[t]he Supreme Court in *Franklin* left open the question, for example, whether the judiciary could enjoin the President in his ministerial functions." *Newdow v. Bush*, 355 F. Supp. 2d 265, 281 (D.D.C. 2005) (Bates, J.). In any event, this Court need not resolve the propriety of entering injunctive or mandamus relief against the President at this juncture because it is well established that the Court may enjoin the President's subordinates. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Here, the Court should at a minimum enjoin the President's subordinates to "notify the Court if they know or become aware that the President is disregarding the requirements of the Presidential Records Act." Proposed Order at 2. Entering such relief against staff would not "subordinate the President's conduct to the judiciary." Opp. 45. The President has no constitutional right to break the law in secret.

Finally, Defendants cite no authority for their assertion that "[t]he same separation of powers concerns . . . also apply to the Vice President." Opp. 45. The Vice President is not the "elected head of a coequal branch of government." *Swan*, 100 F.3d at 978. And there is precedent in this Court that relief directed at the Vice President is available, in the PRA context specifically. *Cheney*, 593 F. Supp. 2d at 219–21.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

April 30, 2026

Respectfully submitted,

*/s/ Daniel F. Jacobson*
Daniel F. Jacobson (D.C. Bar 1016621)
Lynn D. Eisenberg (D.C. Bar 1017511)
John Robinson (D.C. Bar 1044072)
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Ave NW, Suite 301
Washington DC, 20016
(301) 823-1148
dan@jacobsonlawyersgroup.com


*/s/ Loree Stark*
Loree Stark
D.C. Bar No. 90021926
American Oversight
1030 15th Street NW, B255
Washington, D.C. 20005
(202) 869-5246
loree.stark@americanoversight.org

*Counsel for Plaintiffs*

26