APPEAL,MANDAMUS,TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:26−cv−01169−JDB</u>
### *Internal Use Only*

AMERICAN HISTORICAL ASSOCIATION et al v. TRUMP et al

Assigned to: Judge John D. Bates

Related Case: 1:26−cv−01402−JDB

Cause: 28:1331 Fed. Question

Date Filed: 04/06/2026

Jury Demand: None

Nature of Suit: 899 Administrative Procedure Act/Review or Appeal of Agency Decision

Jurisdiction: U.S. Government Defendant

**<u>Plaintiff</u>**

**AMERICAN HISTORICAL ASSOCIATION**

represented by **Jessica Jensen**
AMERICAN OVERSIGHT
1030 15th Street NW, B−255
Washington, DC 20005
202−869−5246
Email: <u>jessica.jensen@americanoversight.org</u>
*ATTORNEY TO BE NOTICED*

**John Robinson**
JACOBSON LAWYERS GROUP
5100 Wisconsin Ave., Suite 310
Washington, DC 20016
732−939−2537
Email: <u>john@jacobsonlawyersgroup.com</u>
*ATTORNEY TO BE NOTICED*

**Lynn D. Eisenberg**
JACOBSON LAWYERS GROUP
5100 Wisconsin Avenue, NW
Suite 301
Washington, DC 20016
301−823−1148
Email: <u>lynn@jacobsonlawyersgroup.com</u>
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
JACOBSON LAWYERS GROUP PLLC
5100 Wisconsin Avenue NW
Suite 301
Washington, DC 20016
406−407−6051
Email: <u>stephen@jacobsonlawyersgroup.com</u>
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
JACOBSON LAWYERS GROUP PLLC

5100 Wisconsin Ave. NW
Suite 301
Washington, DC 20016
301–823–1148
Email: dan@jacobsonlawyersgroup.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMERICAN OVERSIGHT**                   represented by   **Jessica Jensen**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Robinson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Loree Stark**
AMERICAN OVERSIGHT
1030 15th Street NW
Suite B255
Washington, DC 20005
914–393–4614
Email: loree.stark@americanoversight.org
*ATTORNEY TO BE NOTICED*

**Lynn D. Eisenberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen K. Wirth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel F. Jacobson**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD TRUMP**                         represented by   **James R. Powers**
*in his official capacity as President of the*            U.S. DEPARTMENT OF JUSTICE
*United States and in his personal*                      Federal Programs Branch, Civil Division
*capacity*                                               1100 L Street NW
Room 11218
Washington, DC 20005
(202) 353–0543
Fax: (202) 616–8470
Email: james.r.powers@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
DOJ–Civ
Civil
950 Pennsylvania Ave NW
Ste 3618
Washington, DC 20530
202–514–6993
Email: john.bailey@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Winston Shi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202–880–0387
Email: winston.g.shi@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**JAMES DAVID VANCE**
*in his official capacity as Vice President*
*of the United States*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**WHITE HOUSE OFFICE**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**SUSAN WILES**
*in her official capacity as White House*

represented by **James R. Powers**
(See above for address)

| | | |
|---|---|---|
| *Chief of Staff* | | *LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Bailey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Winston Shi**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **PHILIP C. DROEGE**<br>*in his official capacity as Director of the*<br>*Office of Records Management* | represented by | **James R. Powers**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Bailey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Winston Shi**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **NATIONAL SECURITY COUNCIL** | represented by | **James R. Powers**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Bailey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Winston Shi**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **CATHERINE KELLER**<br>*in her official capacity as Executive*<br>*Secretary of the National Security*<br>*Council* | represented by | **James R. Powers**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **John Bailey**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Winston Shi**<br>(See above for address) |

4

*ATTORNEY TO BE NOTICED*

**Defendant**

**HOMELAND SECURITY COUNCIL**          represented by   **James R. Powers**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **John Bailey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Winston Shi**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN MILLER**                     represented by   **James R. Powers**
*in his official capacity as Homeland*                 (See above for address)
*Security Advisor*                                     *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **John Bailey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Winston Shi**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**COUNCIL ON ECONOMIC**                represented by   **James R. Powers**
**ADVISERS**                                           (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **John Bailey**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Winston Shi**
                                                        (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**PIERRE YARED**                       represented by   **James R. Powers**
*in his official capacity as Acting*                   (See above for address)
*Chairman of the White House Council of*               *LEAD ATTORNEY*
*Economic Advisers*                                    *ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**EXECUTIVE RESIDENCE**             represented by    **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**ROBERT B. DOWNING**              represented by    **James R. Powers**
*in his official capacity as White House*                 (See above for address)
*Chief Usher*                                                  *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PRESIDENT'S INTELLIGENCE**       represented by    **James R. Powers**
**ADVISORY BOARD**                                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEVIN NUNES**
*in his official capacity as Chairman of*
*the Presidents Intelligence Advisory*
*Board*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF ADMINISTRATION**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSHUA FISHER**
*in his official capacity as Director of the*
*Office of Administration*

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF THE VICE PRESIDENT**

represented by **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JACOB RESES**
*in his official capacity as Chief of Staff to the Vice President*

represented by  **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DOGE SERVICE**

represented by  **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**
*in her official capacity as Acting Administrator of the United States DOGE Service*

represented by  **James R. Powers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES DEPARTMENT OF JUSTICE**

represented by  **James R. Powers**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**John Bailey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Winston Shi**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**PAMELA BONDI**                               represented by   **James R. Powers**
*in her official capacity as Attorney*                         (See above for address)
*General of the United States*                                 *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John Bailey**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Winston Shi**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**NATIONAL ARCHIVES AND**                      represented by   **James R. Powers**
**RECORDS ADMINISTRATION**                                     (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John Bailey**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Winston Shi**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Defendant**

**ED FORST**                                   represented by   **James R. Powers**
*in his official capacity as Acting Archivist*                 (See above for address)
*of the United States*                                         *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John Bailey**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Winston Shi**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

**Movant**

JOHN H. PAGE                    represented by    **JOHN H. PAGE**
                                                 1077 30th Street NW
                                                 Apartment 411
                                                 Washington, DC 20007
                                                 202−352−6952
                                                 PRO SE

**Movant**

DAVID KRUCOFF                   represented by    **DAVID KRUCOFF**
                                                 2870 Upton Street NW
                                                 Washington, DC 20008
                                                 (202)437−7443
                                                 PRO SE

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2026 | 1 | COMPLAINT against PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, President's Intelligence Advisory Board, JACOB RESES, THE WHITE HOUSE OFFICE, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, SUSAN WILES, Pierre Yared ( Filing fee $ 405 receipt number ADCDC−12344563) filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Donald Trump, # 3 Summons to James David Vance, # 4 Summons to The White House Office, # 5 Summons to Susan Wiles, # 6 Summons to Philip C. Droege, # 7 Summons to National Security Council, # 8 Summons to Catherine Keller, # 9 Summons to Homeland Security Council, # 10 Summons to Stephen Miller, # 11 Summons to Council on Economic Advisers, # 12 Summons to Pierre Yared, # 13 Summons to Executive Residence, # 14 Summons to Robert B. Downing, # 15 Summons to President's Intelligence Advisory Board, # 16 Summons to Devin Nunes, # 17 Summons to Office of Administration, # 18 Summons to Joshua Fisher, # 19 Summons to Office of the Vice President, # 20 Summons to Jacob Reses, # 21 Summons to United States DOGE Service, # 22 Summons to Pamela Bondi, # 23 Summons to NARA, # 24 Summons to Ed Forst, # 25 Summons to Amy Gleason, # 26 Summons to Department of Justice, # 27 Summons to U.S. Attorney's Office, # 28 Summons to Attorney General)(Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT (Jacobson, Daniel) (Entered: 04/06/2026) |
| 04/06/2026 | 3 | CIVIL COVER SHEET *(corrected)* by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION re 1 Complaint,,,,,,, filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION. Related document: 1 Complaint,,,,,,, filed by AMERICAN OVERSIGHT, AMERICAN HISTORICAL ASSOCIATION.(Jacobson, Daniel) (Entered: 04/06/2026) |

| 04/06/2026 | 4 | NOTICE OF RELATED CASE by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. Case related to Case No. 25–cv–409. (Jacobson, Daniel) (Entered: 04/06/2026) |
|---|---|---|
| 04/06/2026 | 5 | NOTICE of Appearance by Lynn D. Eisenberg on behalf of All Plaintiffs (Eisenberg, Lynn) (Entered: 04/06/2026) |
| 04/07/2026 | | Case Assigned to Judge Beryl A. Howell. (znmw) (Entered: 04/07/2026) |
| 04/07/2026 | 6 | SUMMONS (27) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 04/07/2026) |
| 04/07/2026 | 7 | NOTICE of Appearance by John Robinson on behalf of All Plaintiffs (Robinson, John) (Entered: 04/07/2026) |
| 04/07/2026 | 8 | NOTICE of Appearance by Loree Stark on behalf of AMERICAN OVERSIGHT (Stark, Loree) (Entered: 04/07/2026) |
| 04/08/2026 | 9 | STANDING ORDER. Signed by Judge Beryl A. Howell on April 8, 2026. (lcbah2) (Entered: 04/08/2026) |
| 04/10/2026 | 10 | RESPONSE re 4 Notice of Related Case, by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Attachments: # 1 Exhibit A)(Powers, James) Modified event on 4/13/2026 (mg). (Entered: 04/10/2026) |
| 04/10/2026 | 11 | NOTICE of Appearance by Winston Shi on behalf of All Defendants (Shi, Winston) (Entered: 04/10/2026) |
| 04/13/2026 | 12 | NOTICE of Appearance by John Bailey on behalf of All Defendants (Bailey, John) (Entered: 04/13/2026) |
| 04/14/2026 | 13 | MOTION for Preliminary Injunction , MOTION to Stay *under 5 USC 705* by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Daniel F. Jacobson, # 3 Declaration Ex. A (email chain with counsel), # 4 Declaration Ex. B Gov't Br. in Nixon, # 5 Declaration Ex. C (Axios article), # 6 Declaration Ex. D (OLC testimony), # 7 Declaration of Sarah Weicksel, # 8 Declaration of Elizabeth Marx, # 9 Declaration of Matthew Connelly, # 10 Declaration of Timothy J. Naftali, # 11 Declaration of Kathryn Cramer Brownell, # 12 Declaration of Natalia Mehlman Petrzela, # 13 Text of Proposed Order)(Jacobson, Daniel) (Entered: 04/14/2026) |
| 04/14/2026 | | MINUTE ORDER (paperless), upon consideration of plaintiffs' 13 Motion for Preliminary Injunction and Stay ("Pls.' Mot."), DIRECTING parties to confer and file, by April 15, 2026, at 2:00 PM, a proposed schedule for briefing plaintiffs' Motion. Signed by Judge Beryl A. Howell on April 14, 2026. (lcbah2) (Entered: 04/14/2026) |
| 04/14/2026 | | MINUTE ORDER (paperless), upon consideration of defendants' 10 Objection to Plaintiffs' Notice of Related Case, filed at 5:00 PM on April 10, 2026, DIRECTING |

| | | |
|---|---|---|
| | | plaintiffs to file any response by April 15, 2026, at 2:00 PM. Signed by Judge Beryl A. Howell on April 14, 2026. (lcbah2) (Entered: 04/14/2026) |
| 04/14/2026 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/8/2026. Answer due for ALL FEDERAL DEFENDANTS by 6/7/2026. (Attachments: # 1 Exhibit Proof of service)(Robinson, John) (Entered: 04/14/2026) |
| 04/15/2026 | | Set/Reset Deadlines: Parties Proposed Briefing Schedule due no later than 2:00PM on 4/15/2026 Plaintiff Response due no later than 2:00PM on 4/15/2026 (mac) (Entered: 04/15/2026) |
| 04/15/2026 | 15 | RESPONSE re 10 MOTION to Reassign Case *Objection to Plaintiffs' Notice of Related Case* filed by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Jacobson, Daniel) (Entered: 04/15/2026) |
| 04/15/2026 | 16 | PROPOSED BRIEFING SCHEDULE *Joint Status Report* by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Jacobson, Daniel) (Entered: 04/15/2026) |
| 04/15/2026 | 17 | MEMORANDUM AND ORDER SUSTAINING defendants' 10 Objection to Plaintiffs' Notice of Related Case. See Order for further details. This case is hereby TRANSFERRED to the Calendar and Case Management Committee for random assignment. Signed by Judge Beryl A. Howell on April 15, 2026. (lcbah2) (Entered: 04/15/2026) |
| 04/15/2026 | | Case randomly reassigned to Judge John D. Bates pursuant to the 17 Order dated 4/15/2026. Judge Beryl A. Howell is no longer assigned to the case. (ztnr) (Entered: 04/15/2026) |
| 04/16/2026 | | MINUTE ORDER: Upon consideration of 16 the parties' joint status report and proposed briefing schedules, and the entire record herein, it is hereby ORDERED that defendants shall file their response to 13 plaintiffs' motion for a preliminary injunction by not later than April 21, 2026, and plaintiffs shall file their reply by not later than April 28, 2026. It is further ORDERED that a hearing on plaintiffs' motion is set for May 5, 2026, at 2:00 PM in Courtroom 30A (in person) before Judge John D. Bates. SO ORDERED. Signed by Judge John D. Bates on 4/16/2026. (lcjdb1) (Entered: 04/16/2026) |
| 04/16/2026 | 18 | **REQUEST FOR LEAVE TO FILE REVIEW.** The attached document requires leave to file: Amicus Brief – David Krucoff & John Page. Reason(s): Filer is not a party to the case. (zjm) (Entered: 04/20/2026) |
| 04/21/2026 | | MINUTE ORDER re **Request for Leave to File Review:** Upon consideration of 18 the request for leave to file amicus brief, and the entire record herein, it is hereby ORDERED that leave to file is DENIED without prejudice. Non–parties who seek to submit an amicus brief in the matter must file a motion for leave to file that complies with the requirements of D.D.C. Local Civil Rule 7(o)(2). Due to the expedited nature of this matter, such motions must be filed not later than April 28, 2026, with any oppositions to be filed not later than April 30, 2026. SO ORDERED. Signed by Judge John D. Bates on 4/21/2026. (lcjdb2). (Entered: 04/21/2026) |
| 04/21/2026 | 19 | Memorandum in opposition to re 13 MOTION for Preliminary Injunction MOTION to Stay *under 5 USC 705* filed by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE |

| | | |
|---|---|---|
| | | RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED. (Attachments: # 1 Declaration of James R. Powers, # 2 Exhibit A, # 3 Exhibit B, # 4 Text of Proposed Order)(Powers, James) (Entered: 04/21/2026) |
| 04/21/2026 | 20 | MOTION for Leave to File Amicus Brief by JOHN H. PAGE, DAVID KRUCOFF. (zjm) (Entered: 04/22/2026) |
| 04/28/2026 | | SCHEDULING ORDER: Upon consideration of the filing of the related case Freedom of the Press Foundation v. Trump, 26–1402, and the entire record herein, the schedule entered on April 16, 2026, is hereby VACATED. It is hereby ORDERED that the plaintiffs' reply is now due not later than April 30, 2026, and a consolidated hearing on the motions for preliminary injunction in both cases is set for May 13, 2026, at 10:00AM in Courtroom 30A (in person) before Judge John D. Bates. SO ORDERED. Signed by Judge John D. Bates on April 28, 2026. (lcjdb2). (Entered: 04/28/2026) |
| 04/29/2026 | 21 | NOTICE of Appearance by Jessica Jensen on behalf of All Plaintiffs (Jensen, Jessica) (Entered: 04/29/2026) |
| 04/30/2026 | 22 | REPLY to opposition to motion re 13 Motion for Preliminary Injunction,,, Motion to Stay,, filed by AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT. (Attachments: # 1 Declaration of Daniel Jacobson, # 2 Exhibit E (McGahn Memo))(Jacobson, Daniel) (Entered: 04/30/2026) |
| 05/08/2026 | | MINUTE ORDER: The Court will hold a hearing on 13 motion for Preliminary Injunction on May 13, 2026, at 10:00AM in Courtroom 30. A public line will be available at: 833–990–9400; meeting ID: 367524674. Signed by Judge John D. Bates on 5/8/2026. (lcjdb2). (Entered: 05/08/2026) |
| 05/08/2026 | | MINUTE ORDER: Upon consideration of 20 the motion for leave to file amicus brief, and the entire record herein, it is hereby ORDERED that the motion is DENIED. The motion does not comply with the requirements of D.D.C. Local Civil Rule 7(o)(2), such as the requirement that the motion state the position of each party as to the filing of such a brief, state the nature of the amicis interest in the matter, and be accompanied by a proposed order. SO ORDERED. Signed by Judge John D. Bates on 5/8/2026. (lcjdb2). (Entered: 05/08/2026) |
| 05/13/2026 | | Minute Entry for Preliminary Injunction proceeding held on 5/13/2026 before Judge John D. Bates: Parties presented oral argument. Matter taken under advisement. Order forthcoming. (Court Reporter Stacy Johns.) (zed) (Entered: 05/13/2026) |
| 05/20/2026 | 23 | ORDER granting in part and denying in part 13 motion for preliminary injunction and stay. See text of order and accompanying memorandum opinion for details. Signed by Judge John D. Bates on 5/20/2026. (lcjdb3) (Entered: 05/20/2026) |
| 05/20/2026 | 24 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 5/20/2026. (lcjdb3) (Entered: 05/20/2026) |
| 05/26/2026 | | |

| | | |
|---|---|---|
| | | MINUTE ORDER: The parties are hereby ORDERED to meet and confer and to file a joint status report by not later than June 4, 2026, proposing a schedule to govern further proceedings. If the parties cannot agree on a schedule, they may file separate proposals. SO ORDERED by Judge John D. Bates on 5/26/2026. Modified on 5/28/2026 (znbn). (Entered: 05/26/2026) |
| 05/28/2026 | 25 | NOTICE *of Compliance* by PAMELA BONDI, COUNCIL ON ECONOMIC ADVISERS, ROBERT B. DOWNING, PHILIP C. DROEGE, EXECUTIVE RESIDENCE, JOSHUA FISHER, ED FORST, AMY GLEASON, HOMELAND SECURITY COUNCIL, CATHERINE KELLER, STEPHEN MILLER, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, NATIONAL SECURITY COUNCIL, DEVIN NUNES, OFFICE OF ADMINISTRATION, OFFICE OF THE VICE PRESIDENT, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, JACOB RESES, DONALD TRUMP, UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES DOGE SERVICE, JAMES DAVID VANCE, WHITE HOUSE OFFICE, SUSAN WILES, PIERRE YARED re 23 Order on Motion for Preliminary Injunction, Order on Motion to Stay (Attachments: # 1 Exhibit WHCO Compliance Email)(Shi, Winston) (Entered: 05/28/2026) |
| 06/02/2026 | 26 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 24 Memorandum & Opinion, 23 Order on Motion for Preliminary Injunction, Order on Motion to Stay by STEPHEN MILLER, JACOB RESES, PHILIP C. DROEGE, NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, DEVIN NUNES, UNITED STATES DOGE SERVICE, OFFICE OF ADMINISTRATION, AMY GLEASON, PIERRE YARED, PRESIDENT'S INTELLIGENCE ADVISORY BOARD, SUSAN WILES, ED FORST, PAMELA BONDI, DONALD TRUMP, CATHERINE KELLER, COUNCIL ON ECONOMIC ADVISERS, EXECUTIVE RESIDENCE, ROBERT B. DOWNING, OFFICE OF THE VICE PRESIDENT, NATIONAL SECURITY COUNCIL, JAMES DAVID VANCE, UNITED STATES DEPARTMENT OF JUSTICE, HOMELAND SECURITY COUNCIL, JOSHUA FISHER, WHITE HOUSE OFFICE. Fee Status: No Fee Paid. (Powers, James) (Entered: 06/02/2026) |
| 06/02/2026 | 27 | NOTICE of Appearance by Stephen K. Wirth on behalf of AMERICAN HISTORICAL ASSOCIATION, AMERICAN OVERSIGHT (Wirth, Stephen) (Entered: 06/02/2026) |

14

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN HISTORICAL ASSOCIATION,
*et al.*,

Plaintiffs,

v.

Case No. 1:26-cv-01169-JDB

DONALD TRUMP, in his official capacity as
President of the United States, *et al.*,

Defendants.

**DEFENDANTS' NOTICE OF APPEAL**

Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order, ECF No. 23, and Memorandum Opinion, ECF No. 24, issued on May 20, 2026, and from all orders antecedent to such order and opinion and thus incorporated therein.

Dated: June 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director

JOHN BAILEY
Counsel to the Assistant Attorney General

*/s/ James Powers*
JAMES R. POWERS (TX Bar No. 24092989)
Chief Litigation Counsel
WINSTON G. SHI (NY Bar No. 5747068)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-0543
Email: James.R.Powers@usdoj.gov

*Counsel for the United States*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION et al., <br>      Plaintiffs, <br><br>        v. <br><br> DONALD TRUMP et al., <br>      Defendants. | Civil Action No. 26-1169 (JDB) |

## ORDER

Upon consideration of [13] plaintiffs' motion for a preliminary injunction and stay, [19] the government's opposition, [22] plaintiffs' reply, the hearing on May 13, 2026, and the entire record herein, and for the reasons identified in the memorandum opinion issued on this date; it is hereby **ORDERED** that:

1. Plaintiffs' motion for a preliminary injunction and stay is **GRANTED IN PART** and **DENIED IN PART**;

2. Defendants except the President, the Vice President, NARA, the Archivist, DOJ, and the Attorney General (hereinafter, Enjoined Defendants)[1] are preliminarily **ENJOINED**, effective 9:00am on May 26, 2026, to:

---

[1] The Enjoined Defendants subject to this order are: the White House Office, Chief of Staff to the President Susie Wiles, Director of the Office of Records Management Philip Droege, the National Security Council, Executive Secretary of the National Security Council Catherine Keller, the Homeland Security Council, Homeland Security Advisor Stephen Miller, the Council on Economic Advisers, Chair of the Council of Economic Advisers Pierre Yared, the Executive Residence, White House Chief Usher Robert Downing, Chair of the Intelligence Advisory Board Devin Nunes, the Office of Administration, Director of the Office of Administration Joshua Fisher, the Office of the Vice President, Chief of Staff to the Vice President Jacob Reses, the U.S. DOGE Service, and Acting Administrator of the U.S. DOGE Service Amy Gleason.

1

    a.  Comply in full with the provisions of the Presidential Records Act, 44 U.S.C. §§ 2201-09;

    b.  Preserve and not destroy or delete presidential and vice presidential records as defined under the Presidential Records Act, 44 U.S.C. §§ 2201(2) and 2207, except insofar as records disposal is permitted in accordance with the procedures set out under 44 U.S.C. § 2203(c)-(e);

    c.  Ensure that covered employees, as defined in section 2209(c) of the Act, not create or send any presidential or vice presidential record using non-official electronic message accounts—including Signal, WhatsApp, and other text or instant messaging applications or platforms—unless they copy an official electronic messaging account when creating or transmitting the record or forward a complete copy of the record to an official account within 20 days of creating or transmitting the record, see 44 U.S.C. § 2209;

    d.  Establish or reestablish records retention policies to preserve and maintain presidential records in full compliance with the Presidential Records Act, see 44 U.S.C. § 2203(a);

3. Defendants shall transmit a copy of this order to covered employees, as defined in section 2209(c) of the Act, by not later than 9:00am on May 26, 2026;

4. Defendants shall file a notice with the Court by not later than May 28, 2026, describing the steps they have taken to comply with this order.

**SO ORDERED**.

_____
/s/
JOHN D. BATES
United States District Judge

Date: <u>May 20, 2026</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AMERICAN HISTORICAL ASSOCIATION et al.,<br>    Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP et al.,<br>    Defendants. | Civil Action No. 26-1169 (JDB) |
| FREEDOM OF THE PRESS FOUNDATION et al.,<br>    Plaintiffs,<br><br>    v.<br><br>DONALD TRUMP et al.,<br>    Defendants. | Civil Action No. 26-1402 (JDB) |

**MEMORANDUM OPINION**

"Who controls the past controls the future; who controls the present controls the past."[1]

Perhaps with that lesson in mind, Congress enacted laws to ensure that government records are created, preserved, and made available to the public. Among those is the Presidential Records Act (Records Act), which mandates the preservation of materials related to the official responsibilities of the President. In so doing, the Act democratizes the history of an indispensable institution. Access to those records allows future Presidents to pick up where their predecessors left off, Congress to identify inefficiency and misfeasance, and the public to learn from the mistakes of the

---

[1] George Orwell, <u>1984</u> 37 (Penguin Classics 2000) (1949) (citation modified).

1

past.  Now, however, almost 50 years after its passage, the Executive Branch asserts that the Records Act is unconstitutional.

Two sets of plaintiffs have brought suit to challenge that assertion, seeking at this stage a preliminary injunction.  At the threshold, the government responds that plaintiffs lack standing because they have not been injured and that they lack a cause of action because review is precluded by the statutory scheme.  But plaintiffs have established a substantial risk that the government is no longer fully complying with the Records Act, at least with respect to three categories of records: electronic records created on personal rather than official devices, records created by the President or Vice President themselves, and records the President discards.  That risk amounts to informational injury for these plaintiffs because they have regularly sought access to presidential records under the Freedom of Information Act and plan to continue doing so.  And plaintiffs likely have a cause of action under the Constitution and to enjoin violations of federal law because the government—which has concluded that the Records Act is unconstitutional—is necessarily acting under its Article II powers rather than any statutory authority in promulgating new records guidance.

On the merits, the Records Act is likely constitutional.  It was validly enacted by Congress under the Property Clause because Congress may prospectively designate presidential records as federal property and then regulate that property.  And it is also a valid exercise of the Necessary and Proper Clause as it promotes the accountability and efficiency of Executive Branch operations. Moreover, it does not impermissibly intrude on any presidential prerogative, especially because Presidents—including President Trump in his first term—have complied without complaint for almost 50 years and the new guidance for the Executive Office of the President voluntarily imposes similar burdens to those the government now decries as unbearable.  Because the President must

2

"Take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, he must carry out the duties imposed by the Records Act.

The Records Act follows in a tradition, dating back to the Founding, of laws promoting integrity in public service. It is not the first, and it will not be the last. To adopt the government's position that the Act is unconstitutional would disable Congress and future Presidents from reflecting on experience, in defiance of the very words engraved on the National Archives Building in Washington: "What is past is prologue." See William Shakespeare, The Tempest act 2, sc. 1. And while the presidency is a singularly important institution, that gravity does not free it from modest constraint. Quite the opposite. Each branch of government derives its authority from the trust placed in it by the People, and Congress has validly determined that this Act helps to maintain that trust by shining some light on the activities of the President and his aides.

## Background

### I.    Statutory Background

In the aftermath of Watergate, Congress battled former-President Nixon to prevent the destruction of tapes related to the investigation. Congress passed the Presidential Recordings and Materials Preservation Act (Preservation Act), Pub. L. No. 93-526, 88 Stat. 1695 (1974), which required that Nixon turn over those tapes to the National Archives and directed the Administrator of General Services to prepare those materials for public access. Nixon unsuccessfully challenged the Preservation Act as unconstitutional. See Nixon v. Adm'r of Gen. Servs., 433 U.S. 425 (1977). The following year, Congress enacted a broader statute to govern future presidencies. Presidential Records Act, Pub. L. No. 95-591, 92 Stat. 2523 (1978). By passing the Presidential Records Act, "Congress sought to establish the public ownership of presidential records and ensure the

3

preservation of presidential records for public access after the termination of a President's term in office." Armstrong v. Bush (Armstrong I), 924 F.2d 282, 290 (D.C. Cir. 1991).

The Records Act governs the maintenance and preservation of information created or received by the President and Vice President or their staffs related to their official duties. 44 U.S.C. §§ 2201-09. It establishes that presidential records are the property of the United States, not of the officeholder. Id. § 2202. The Act covers all "documentary materials"—which includes electronic records—created or received by the President or Vice President, their immediate staffs, and advisors within their offices, that are created as part of the carrying out of their constitutional, statutory, or other responsibilities. Id. §§ 2201(1)-(2), 2207. But the Act does not extend to material that is "purely private" or irrelevant to the President's official duties, such as journals and campaign information. Id. § 2201(3). And in 2014, Congress amended the Act to prohibit executive department personnel from using non-official electronic messaging accounts unless they take steps to ensure the conversation is preserved. Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, § 10, 128 Stat. 2003, 2014-15.

During a President's term, he is "exclusively responsible for custody, control, and access to such Presidential records." Id. § 2203(f). In that capacity, he must "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of [his] constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained." Id. § 2203(a). That requirement, however, is not absolute. The President may dispose of presidential records that lack "administrative, historical, informational, or evidentiary value," provided he first obtains the written views of the Archivist. Id. § 2203(c). If the Archivist "considers" that the records to be disposed of "may be of special interest to the Congress" or that consultation with Congress is "in

4

the public interest," then he "shall" notify Congress and the President must then wait at least 60 days before proceeding with disposal. Id. § 2203(d), (e). Once that clock has run, the President retains the authority to destroy the material. Armstrong I, 924 F.2d at 286.

Prior to his departure from office, the President must specify whether any of his records contain certain categories of information that justify restricting their disclosure. Those categories include national defense and foreign policy material, information related to appointments to federal office, trade secrets, confidential communications requesting or submitting advice, and personnel files that contain private information. 44 U.S.C. § 2204(a). If information falls into one of those categories, the President may prevent that information from being made public for up to twelve years. Id. Otherwise, presidential records are typically made available to the public under the Freedom of Information Act (FOIA) after no more than five years. See id. § 2204(b)-(c). During the intervening time, the Archivist assumes control over presidential records and may dispose of records that have "insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation." Id. § 2203(g)(1), (4). The Archivist may only disclose restricted records pursuant to a subpoena, to an incumbent President in furtherance of their official duties, to a congressional committee, or to the former President himself. Id. § 2205.

When the Archivist determines that it is time to make presidential records available, he must provide public notice of that determination to the former and current Presidents. Id. § 2208(a)(1). The Archivist must make those records available 60 days after transmitting the notices, unless either President extends the period by up to 30 additional days. Id. § 2208(a)(3). If the former President objects based on a claim of privilege, the Archivist must consult with the current President and determine whether the incumbent will uphold the asserted claim. Id. § 2208(c)(1). If the incumbent upholds the privilege claim, the Archivist must not make the

5

records in question available.  Id. § 2208(c)(2).  But if the incumbent does not uphold the privilege claim, the Archivist must make the records available ninety days after he received the privilege claim.  Id.  During that period, the former President may bring an action in the U.S. District Court for the District of Columbia asserting that the disclosure of the records in question violates a privilege.  Id. § 2204(e).

## II.   Factual and Procedural History

At the White House Counsel's request, the Department of Justice's (DOJ) Office of Legal Counsel (OLC) recently opined that the Records Act is unconstitutional because it exceeds Congress's powers and violates the separation of powers.  See Constitutionality of the Presidential Records Act, 50 Op. O.L.C. (Apr. 1, 2026) (slip op. at 1) (OLC Op.).  OLC examined four types of congressional power—oversight, document preservation, spending or appropriations, and assisting in the execution of the laws—and rejected each as a basis for the Act's constitutionality.  See id. at 17-41.  In OLC's view, the Supreme Court's decision in Nixon v. Administrator is distinguishable because the Records Act's predecessor statute was narrower and addressed the extraordinary circumstances of the Watergate scandal.  Id. at 41-45.  As a fallback argument, OLC contends that Nixon v. Administrator was wrongly decided because it focused on Congress's regulation of statutorily-created agencies, which cannot support regulating the President's papers, and understated the intrusion and burden on the presidency.  Id. at 45-49.  Finally, OLC declared that the Act is inseverable because the invalid purpose of regulating presidential records pervades the statute and arguably unobjectionable provisions standing alone would not function as Congress intended.  Id. at 49-51.

The next day, White House Counsel David Warrington issued a memo to staff in the Executive Office of the President (EOP) "to provide guidance on how the EOP will preserve

6

records in light of OLC's determination."  Warrington Mem. 1, Civ. A. No. 26-1169, Dkt. 19-2 (2026 Records Guidance).  The 2026 Records Guidance states that "[e]ven in the absence of the [Act], EOP staff should preserve any material related to the performance of their duties," explaining that the "medium of the material does not matter . . . ." Id. at 2.  The memo continues: "EOP staff may not take any records" when "leaving EOP employment," the "electronic records of EOP employees will be preserved," "EOP staff should conduct all work-related communications via [their] official EOP email account[s]," and "EOP staff should ensure that both electronic and paper records are preserved." Id. at 2-3.  The memo also instructs that "[s]taff cannot permanently delete emails or materials saved to an EOP laptop or the EOP network." Id. at 2.  As for text messages, the Guidance instructs that they "should only be preserved when they are the sole record of official decision-making, government action, or contain unique information not available elsewhere." Id.  The memo does not discuss disposal of records as provided under 44 U.S.C. § 2203(c)-(e).

Four days later, the American Historical Association (AHA) and American Oversight (together, Historian-Oversight plaintiffs) sued a raft of federal defendants for violating the Records Act and constitutional guarantees of the separation of powers.  The Historian-Oversight plaintiffs seek nonstatutory review of the 2026 Records Guidance, assert Administrative Procedure Act (APA) claims against the National Archives and Records Administration (NARA) and DOJ, and request mandamus relief.  See Historian-Oversight Pls.' Compl. 36-44, Civ. A. No. 26-1169, Dkt. 1.[2]

---

[2] The Historian-Oversight plaintiffs sued 25 defendants: President Donald Trump, Vice President JD Vance, the White House Office, Chief of Staff to the President Susie Wiles, Director of the Office of Records Management Philip Droege, the National Security Council, Executive Secretary of the National Security Council Catherine Keller, the Homeland Security Council, Homeland Security Advisor Stephen Miller, the Council on Economic Advisers, Chair of the Council of Economic Advisers Pierre Yared, the Executive Residence, White House Chief Usher Robert

7

As relief, the Historian-Oversight plaintiffs seek declarations that the Act is constitutional, the OLC opinion is contrary to law, defendants remain bound by the Act, and NARA decisions not to comply with the Act are unlawful. Id. at 45. They also seek an injunction to prevent federal officials from relying on the OLC opinion and to require them to comply with their duties under the Act and disclose to the Court any instances of the President violating the Act. Id. Further, they seek to compel NARA under the APA to make presidential records publicly available as required by the Act and to set aside any NARA decisions not to comply with the Act. Id. Finally, in the alternative, they seek mandamus relief. Id.

Eight days after bringing suit, the Historian-Oversight plaintiffs moved for a preliminary injunction and stay. See Historian-Oversight Mem. in Supp. of Prelim. Inj., Civ. A. No. 26-1169, Dkt. 13-1 (Historian-Oversight PI Mem.). The case was randomly reassigned the next day to the undersigned after another judge in this district rejected the Historian-Oversight plaintiffs' attempt to link the action to another pending case. See Am. Hist. Ass'n v. Trump, --- F. Supp. 3d ---, 2026 WL 1024772 (D.D.C. Apr. 15, 2026). Before this Court, defendants have opposed the Historian-Oversight plaintiffs' motion, Gov't's Opp'n to Historian-Oversight Pls., Civ. A. No. 26-1169, Dkt. 19, and plaintiffs have replied, Historian-Oversight Pls.' Reply, Civ. A. No. 26-1169, Dkt. 22.

Near the end of briefing in the Historian-Oversight case, Freedom of the Press Foundation (FPF) and Citizens for Responsibility and Ethics in Washington (CREW) (together, Press-CREW plaintiffs) also brought suit, seeking a preliminary injunction. See Press-CREW Pls.' Compl., Civ. A. No. 26-1402, Dkt. 1; Press-CREW Pls.' Mem. in Supp. of Prelim. Inj., Civ. A. No. 26-1402,

---

Downing, Chair of the Intelligence Advisory Board Devin Nunes, the Office of Administration, Director of the Office of Administration Joshua Fisher, the Office of the Vice President, Chief of Staff to the Vice President Jacob Reses, the U.S. DOGE Service, Acting Administrator of the U.S. DOGE Service Amy Gleason, the DOJ, now former Attorney General Pam Bondi, the National Archives and Records Administration, and Acting Archivist of the United States Edward Forst. Historian-Oversight Pls.' Compl. 1-3.

8

Dkt. 7-1 (Press-CREW PI Mem.).[3]  These plaintiffs, too, alleged violations of the Act and the separation of powers and sought nonstatutory review of the 2026 Records Guidance.  They also brought an APA claim, a FOIA claim, and a request for mandamus relief under 28 U.S.C. §§ 1361, 1651.  The government responded, Gov't's Opp'n to Press-CREW Pls., Civ. A. No. 26-1402, Dkt. 11, and plaintiffs replied, Press-CREW Pls.' Reply, Civ. A. No. 26-1402, Dkt. 12.  The Court held a consolidated hearing in both cases on May 13, 2026, and the preliminary injunction motions are now ripe for resolution.

## Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008).  To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  The balance of equities and public interest factors merge when the government is a party.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  The same factors govern a request for a stay under the APA.  Nw. Immigrant Rts. Project v. USCIS, 496 F. Supp. 3d 31, 45 (D.D.C. 2020).

## Analysis

At the threshold, plaintiffs may lack standing or a cause of action with respect to NARA, the Archivist, DOJ, and the Attorney General because they have identified neither present injury traceable to those defendants nor final agency action.  However, they likely have standing to bring their claims against the other defendants because they have established a substantial risk of non-

---

[3] The Press-CREW plaintiffs sued eight defendants: President Trump, Vice President Vance, Susie Wiles, and Edward Forst in their official capacities, and EOP, the Office of the Vice President, the White House Office, and NARA.  See Press-CREW Pls.' Compl. 1-2.

9

compliance with the Records Act caused by those defendants that would be redressable by the Court. They also likely have causes of action under the Constitution and to enjoin violations of federal law because defendants necessarily are not acting under a statute—the Records Act—that they deem unconstitutional.

On the underlying merits, Congress likely has the authority to regulate presidential records under the Property Clause, which is not limited to real property, and under the Necessary and Proper Clause, which empowers Congress to structure the internal functions of the Executive Branch. And the Act does not impose a constitutionally impermissible burden on the President. The likelihood of irreparable harm to plaintiffs and the balance of the equities also tip in favor of a preliminary injunction. Finally, as to the scope of relief, even if the Court cannot preliminarily enjoin the President or Vice President, it can grant substantial relief through injunctions as to other defendants, and will do so.

## I.    Standing

To establish Article III standing, a plaintiff must show "injury in fact that is concrete, particularized, and actual or imminent," "that the injury was likely caused by the defendant," and "that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "[F]uture injuries" satisfy standing where the threat of harm is "certainly impending, or there is a substantial risk that the harm will occur." Dep't of Com. v. New York, 588 U.S. 752, 767 (2019) (quoting Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (SBA List)); see also N.Y. Republican State Comm. v. SEC, 927 F.3d 499, 504 (D.C. Cir. 2019) (explaining that SBA List "clarified" the imminence test from Clapper v. Amnesty International USA, 568 U.S. 398 (2013)). Standing is "not dispensed in gross," so plaintiffs "must demonstrate standing for each claim that they press and for each form of relief that they seek." TransUnion,

10

594 U.S. at 431.  And plaintiffs bear the burden of demonstrating standing.  Id. at 430-31.  But to secure injunctive relief, "only one plaintiff need have standing."  Hall v. D.C. Bd. of Elections, 141 F.4th 200, 209 (D.C. Cir. 2025).

Organizations like these plaintiffs "can assert standing in one of two ways," either "on its own behalf, as an organization, or on behalf of its members, as associational standing."  Elec. Privacy Info. Ctr. v. Dep't of Com., 928 F.3d 95, 100 (D.C. Cir. 2019) (citation omitted).  Where a plaintiff asserts informational injury, as here, the first path requires the plaintiff to show that "(1) it has been deprived of information that a statute requires the government to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  Campaign for Accountability v. DOJ, 155 F.4th 724, 733 (D.C. Cir. 2025) (quotation omitted); see also FEC v. Akins, 524 U.S. 11, 21 (1998).[4]  The second path—called "associational standing"—requires the entity to show that (1) at least one of its members would have standing in their own right, (2) the interests the organization seeks to protect are germane to its purposes, and (3) neither the claim asserted nor relief requested requires the participation of individual members in the lawsuit.  Pub. Emps. for Env't Resp. v. Zeldin, --- F.4th ---, 2026 WL 1191153, at *1 (D.C. Cir. May 1, 2026) (quoting Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977)).[5]

---

[4] Outside of the informational injury context, "organizational standing" requires (1) that defendants' conduct "perceptibly impaired the organization's ability to provide services" and (2) that the organization "used its resources to counteract that harm."  Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919 (D.C. Cir. 2015) (citation modified); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).  The D.C. Circuit has recently reiterated that these are two different lines of cases subject to distinct analyses.  See Indep. Market Monitor for PJM v. FERC, 162 F.4th 1167, 1174 n.3 (D.C. Cir. 2025) (deeming informational injury argument forfeit); id. at 1175, 1177 (Edwards, J., concurring in the judgment) (agreeing but arguing that the majority nevertheless conflated organizational and informational standing).

[5] The third prong of associational standing is a prudential, not constitutional, requirement.  United Food & Com. Workers Union Loc. 751 v. Brown Grp., 517 U.S. 544, 555 (1996).

A.  *Injury in Fact*

Plaintiffs allege injury from ongoing failures to preserve or decisions to improperly dispose of records that they intend later to seek under FOIA, as provided for by the Act. See 44 U.S.C. § 2204(c) (providing for access to presidential records under FOIA); Campaign for Accountability, 155 F.4th at 733 (explaining that denial of records under FOIA constitutes informational injury sufficient to confer standing). Each plaintiff has submitted declarations that they or their members regularly use and intend to continue using presidential records, including from this presidential administration once those records become available.

In the Historian-Oversight case, AHA appears primarily to allege associational standing, providing four declarations of member historians who have used, are using, and intend to continue using presential records. See Decl. of Matthew Connelly ¶¶ 1-4, Civ. A. No. 26-1169, Dkt. 13-9 (stating that Connelly is a historian and member of AHA who has authored three books that rely on presidential records, who currently uses presidential records in new research, and who intends to continue using future records—including from this administration—as they become available under FOIA); Decl. of Timothy J. Naftali, Civ. A. No. 26-1169, Dkt. 13-10 (similar); Decl. of Kathryn Cramer Brownell, Civ. A. No. 26-1169, Dkt. 13-11 (similar); Decl. of Natalia Mehlman Petrzela, Civ. A. No. 26-1169, Dkt. 13-12 (similar); cf. Decl. of Sarah Weicksel ¶ 8, Civ. A. No. 26-1169, Dkt. 13-7 (stating that AHA itself "regularly request[s] and make[s] use of presidential records"). Setting aside for now the government's assertion that the 2026 Records Guidance complies with the Act, which the Court addresses below, AHA's declarations are enough to establish informational injury. For its part, American Oversight has provided a declaration that it routinely uses FOIA requests to obtain presidential records from NARA, including from the first Trump administration, and plans to submit additional FOIA requests for records pertaining to the

12

first Trump administration. Decl. of Elizabeth Marx, Civ. A. No. 26-1169, Dkt. 13-8. Although the American Oversight declaration does not expressly address the current or future administrations, it stands to reason that it will continue to request records of later administrations. In any event, only one plaintiff need establish standing. Hall, 141 F.4th at 209.

In the Press-CREW case, FPF declares that it has 15 pending FOIA requests to NARA for presidential records from President Trump's first term and that it intends to submit additional FOIA requests for presidential records from the first Trump administration, the Biden administration, the second Trump administration, and other administrations as they become available. Decl. of Lauren Harper ¶¶ 7, 9, Civ. A. No. 26-1402, Dkt. 7-4. And CREW declares that it has multiple FOIA requests for presidential records outstanding, including one for records from the first Trump administration, and that it likewise intends to continue submitting FOIA requests for presidential records from more recent and future administrations. Decl. of Kavyan Farchadi ¶¶ 6, 9, Civ. A. No. 26-1402, Dkt. 7-2. That is also enough to show informational injury.

The government disputes injury in fact, arguing that no defendant has taken action to harm plaintiffs because the 2026 Records Guidance "is consistent with the [Act's] preservation requirements." Gov't's Opp'n to Historian-Oversight Pls. 13. But "[t]he Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume arguendo the merits of his or her legal claim." Tanner-Brown v. Haaland, 105 F.4th 437, 445 (D.C. Cir. 2024) (quotation omitted). And in the plaintiffs' telling, the 2026 Records Guidance conflicts with the Act at least in how it addresses (1) text or other instant message preservation, (2) presidentially- and vice presidentially-created records, and (3) disposal of records. The government is therefore mistaken as to injury in fact except with respect to NARA and DOJ.

13

The 2026 Records Guidance establishes a procedure for the creation and preservation of presidential records by EOP staff.  See, e.g., 2026 Records Guidance 3 ("EOP staff should ensure that both electronic and paper records are preserved.").  Moreover, the Act gives the President considerable discretion on how to create, preserve, and maintain records.  See 44 U.S.C. § 2203(a) (requiring the President to "take all such steps as may be necessary" to ensure "adequate document[ation]" and that presidential records are "preserved and maintained").  And the D.C. Circuit has admonished courts not to engage in "micromanaging" of "the day-to-day operations of the President."  Citizens for Resp. and Ethics in Wash. v. Trump, 924 F.3d 602, 609 (D.C. Cir. 2019).

However, the 2026 Records Guidance's approach to text or other instant messaging, which is apparently becoming "akin to speaking every day," likely does not comply with the Records Act's preservation requirements.  See 2026 Records Guidance 2-3.[6]  That is so because the Guidance calls for preserving "only" those text messages that are "the sole record of official decision-making, government action, or contain unique information not available elsewhere."  Id. at 2.  And the Guidance "encourage[s]" staff to "memorialize[]" any "unique information" contained within a text message "in a more accessible format, such as an email or memorandum."  Id. at 2-3.

But in that event, almost no texts would ever be preserved because insofar as they include unique information they would be memorialized in an email or memorandum and so be marked for deletion thereafter as a non-unique record.  Indeed, the Press-CREW plaintiffs argue that the

---

[6] The parties dispute whether the 2026 Records Guidance covers instant messaging applications such as Signal or other electronic messaging platforms besides text messaging.  Contrast Oral Arg. Tr. 125:2-9 (plaintiffs' view that Signal is not covered under the Guidance) with Oral Arg. Tr. 90:10-92:24 (government's view that Signal and similar applications would be covered under the Guidance).  But even if those alternative applications and platforms are covered, the gap remains between the requirements under the Records Act and the 2026 Record Guidance.  Insofar as alternative applications and platforms are not covered, that gap is even greater.

14

Court should infer a default policy of deletion.  Press-CREW PI Mem. 14.  And the text of section 2209 of the Act nowhere provides for discretionary deletion or piecemeal preservation.  To the contrary, it <u>requires</u> that <u>all</u> text messages from non-official messaging accounts be copied to official accounts or forwarded to official accounts within 20 days of the record's creation or transmission.  <u>See</u> 44 U.S.C. § 2209(a) (prohibiting the creation or sending of a presidential record using a non-official electronic message account unless the message is copied or forwarded to an official account).[7]

The government argues that "informal conversations" and text messages "that contain no unique information" fall outside the Act's ambit because it is "implausible that Congress intended" to cover such communications, Gov't's Opp'n to Press-CREW Pls. 26-28, and because section 2209 must be read in the context of the discretion granted to the President in section 2203(a), Oral Arg. Tr. 88:2-20.  However, provided that material meets the statutory definition of a presidential record under section 2201(2), the plain text of section 2209 admits of no such exception.  And the "cardinal canon" of statutory interpretation is that Congress "says in a statute what it means and means in a statute what it says there."  <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992) (citations omitted).  The government's view that section 2209 imposes a "senseless and

---

[7] Plaintiffs also take issue with the 2026 Records Guidance instruction that text messages "reflecting personal conversations, workplace gossip, ministerial tasks or other workplace minutiae (e.g., 'call me,' 'what room for the meeting,' 'there is a typo in the first line of the memo') do not need to be preserved."  2026 Records Guidance 3; <u>see also</u> Press-CREW PI Mem. 13-14 & n.4.  Personal conversations and workplace gossip would typically be personal rather than presidential records.  <u>See</u> 44 U.S.C. § 2201(3).  But a "ministerial" act generally means one "that involves obedience to instructions or laws instead of discretion," <u>Ministerial</u>, <u>Black's Law Dictionary</u> (12th ed. 2024), and many records of non-discretionary tasks would be of historical or other value.  That said, under the canon of <u>noscitur a sociis</u>, associated words bear on one another's meaning, A. Scalia & B. Garner, <u>Reading Law</u> § 31, and this use of "ministerial" was preceded by "gossip" and followed by "minutiae."  And indeed there is likely some category of text messages that would not contain meaningful information.  To the extent that the term "ministerial tasks" under the Guidance signifies duties more substantive than minutiae, text messages reflecting such tasks would be presidential records under section 2201(2) that must be preserved under section 2209.

15

indiscriminate retention mandate" does not give this Court, OLC, or the White House license to override Congress's determination.  Gov't's Opp'n to Press-CREW Pls. 27.

Thus, under the 2026 Records Guidance, some presidential records could be communicated through non-official messaging accounts and not copied or forwarded to official accounts because the information was documented elsewhere, which would not comply with section 2209 of the Act.  Granted, the government has submitted a declaration from the Director of White House Information Technology stating that text messages sent from work phones are archived in a database and that the pre-OLC opinion records retention policy is being "maintained . . . with respect to EOP electronic records."  Decl. of Robert J. Eisenhauer ¶¶ 6-9, Civ. A. No. 26-1402, Dkt. 11-1.  Even so, this declaration does not speak to any text messages sent on personal phones. By saying that staff "should avoid using personal devices for government business whenever possible," the Guidance necessarily contemplates some use of personal devices for government business.  2026 Records Guidance 3 (emphasis added).  And unlike under the Records Act, no provision is made to preserve such communications under the Guidance.

Moreover, the 2026 Records Guidance does not set out how the government intends to handle either the preservation of presidential records created by the President or Vice President themselves or the disposal of presidential records.[8]

The 2026 Records Guidance is only addressed to EOP staff and is silent as to records created by the President or Vice President.  But the definition of presidential records in the Act expressly includes records "created . . . by the President," so failure to properly preserve those

---

[8] Although plaintiffs appear less concerned at this preliminary injunction stage about the President's compliance with the Records Act's disposal provisions in section 2203(c)-(e), they remain highly concerned about possible deletion or destruction of (and thereby failure to preserve) records today.  Oral Arg. Tr. 54:3-56:23; 130:6-24.  Of course, in the absence of the Records Act, the President need not comply with the disposal notice provisions and so could order the destruction or deletion of presidential records at any point.

records would be a violation of the Act causing injury to plaintiffs.  44 U.S.C. § 2201(2); see also id. § 2207 ("Vice-Presidential records shall be subject to the provisions of this chapter in the same way as Presidential records.").  As the government conceded at oral argument, presidential records created by the President on a personal device would typically have historical value but are not covered by the Guidance and would not automatically be preserved on EOP systems.  Oral Arg. Tr. 73:10-74:20.  True, there is a potential remedial issue noted below about the Court's power to enjoin the President or Vice President, but many records created by the President or Vice President are also transmitted to their aides, thereby triggering those aides' duties under the Act.  And in any event, a redressability problem does not lessen the injury from failure to properly preserve records created by the President or Vice President.

The 2026 Records Guidance also does not address disposal except to instruct EOP staff not to delete emails or documents from EOP laptops or the EOP network.  See 2026 Records Guidance 2.  But the Act only permits disposal insofar as records "no longer have administrative, historical, informational, or evidentiary value."  44 U.S.C. § 2203(c).  Even then, the President "may dispose" of such records only after he "obtains the views, in writing, of the Archivist concerning the proposed disposal" and "the Archivist states that [he] does not intend to take any action under subsection (e)" of section 2203.  Id.  In turn, subsection (e) requires the Archivist to "request the advice" of Congress where he considers that "these particular records may be of special interest to the Congress" or "consultation with the Congress regarding the disposal of these particular records is in the public interest."  Id. § 2203(e).  And in that event, the President must wait 60 calendar days before disposing of the records.  Id. § 2203(d).  There is no indication that the 2026 Records Guidance envisages such consultation before any destruction of records at the President's instruction.  Indeed, at oral argument the government confirmed that the Guidance does not speak

17

to disposal and was unable to represent that the President would notify the Archivist before disposing of presidential records.  Oral Arg. Tr. 85:24-87:24.  That matters because the notification mechanism provides Congress with its "traditional means of voicing objection," including if necessary "by passing legislation to block the destruction of certain records."  Armstrong I, 924 F.2d at 290 (quotation omitted).

In sum, plaintiffs have likely established a substantial risk of injury because the 2026 Records Guidance on text messages conflicts with section 2209 of the Records Act and because it is uncertain whether the government intends either to preserve records created by the President or Vice President themselves or to comply with section 2203(c) in disposing of records.[9]

However, plaintiffs have likely not established injury in fact with respect to NARA or DOJ. Regarding NARA, the Director of the Archival Operations Division in the Office of the Presidential Libraries at NARA has submitted a declaration stating that "NARA is continuing to preserve" presidential records in its custody, including from President Trump's first term. McClure Decl. ¶¶ 4-5, Civ. A. No. 26-1169, Dkt. 19-3.  Granted, the NARA declaration does not address records disposal, and "[t]he Archivist is authorized to dispose" of presidential records that he "has appraised and determined to have insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation."  44 U.S.C. § 2203(g)(4).  However, the first sense of the word "preserve" is to "keep safe from injury, harm, or destruction."  Preserve, Merriam-Webster's  Dictionary,  https://www.merriam-webster.com/dictionary/preserve  (last visited May 12, 2026).  Moreover, NARA has been processing FOIA requests for presidential

---

[9] The government halfheartedly points out that plaintiffs would not have access to records created today for at least eight years because presidential records may not generally be requested under FOIA until five years after the President's term ends.  Gov't's Opp'n to Historian-Oversight Pls. 10 (citing 44 U.S.C. § 2204(b)(2)).  But the substantial risk is of harm occurring now because the records must be created, preserved, and not disposed of today in order to be available several years later.

records since the OLC opinion and "plans to continue" doing so.  McClure Decl. ¶ 4.  Without more, it does not appear that NARA is deviating from its duties under the Records Act at this time.

In reply, the Historian-Oversight plaintiffs point out that NARA's declaration "does not deny that the OLC opinion is controlling on NARA, that NARA has adopted the opinion, or that NARA now treats its duties under the [Act] as discretionary rather than mandatory."  Historian-Oversight PI Mem. 9.  This demands too much.  For one, the D.C. Circuit has explained that "[e]ven though all OLC opinions are considered authoritative within the Executive Branch, the requesting agency does not necessarily adopt every opinion."  Campaign for Accountability, 155 F.4th at 738.  And even assuming that NARA adopted the OLC opinion, that does not require any change in NARA's policy regarding preservation of and access to presidential records from past administrations, and the declaration does not indicate any change from its formerly compliant policy.

The Historian-Oversight plaintiffs also point out in reply that the NARA declaration does not speak to presidential records not in its custody from President Trump's first term.  Historian-Oversight PI Mem. 9.  And the Records Act provides that NARA "shall assume responsibility for the custody, control, and preservation of, and access to" presidential records after a President's term in office and imposes an "affirmative duty to make such records available to the public as rapidly and completely as possible."  44 U.S.C. § 2203(g)(1).  So, the Historian-Oversight plaintiffs assert injury from NARA's failure to preserve those records.  But this theory of harm may be forfeit at this preliminary injunction stage because it was not raised until the reply brief. See Twin Rivers Paper Co. v. SEC, 934 F.3d 607, 615 (D.C. Cir. 2019).  And even if properly preserved, it does not appear that NARA itself has enforcement authority to seek out presidential records unlawfully removed.  Under the Federal Records Act, the Archivist is limited to requesting

19

that the Attorney General take action or notifying Congress where the head of an agency failed to take action against unlawful removal.  44 U.S.C. § 3106.  There is no corresponding provision under the Presidential Records Act.  Moreover, to the extent that NARA has any collection duty, plaintiffs do not explain why NARA's inaction is suddenly harming them when these records have been known to be outside its custody for several years.  Thus, plaintiffs have likely not shown injury with respect to NARA.

A fortiori, it is not DOJ itself—which does not have any duties under the Act—that has injured plaintiffs.  Instead, EOP has done so by issuing the 2026 Records Guidance and no longer fully complying with the Records Act.  That may be why plaintiffs at oral argument made no mention of DOJ or the Attorney General as defendants.  Accordingly, plaintiffs likely lack standing to sue NARA and DOJ and no preliminary relief will be entered as to them.

### B. Other Standing Elements

Beyond injury in fact, plaintiffs also likely satisfy the other elements of Article III standing. The government does not dispute that operating under the 2026 Records Guidance rather than the Records Act has caused any alleged injury or that enjoining defendants would redress that injury. Nor could it.  Plainly, the alleged injury is traceable to the changes to document preservation from the 2026 Records Guidance.  And although courts generally may not "enjoin the President in the performance of his official duties"—which issue is discussed below both as to the President and Vice President—redressability only requires that the Court be able to provide "at least some of the relief" that plaintiffs seek.  Severino v. Biden, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (first quoting Franklin v. Massachusetts, 505 U.S. 788, 802 (1992) (plurality opinion); then quoting Collins v. Yellen, 594 U.S. 220, 243 (2021)).  But see Citizens for Resp. & Ethics in Wash. v. Trump, 438 F. Supp. 3d 54, 69 n.14 (D.D.C. 2020) (granting motion to dismiss mandamus suit seeking records

under the Act in the alternative for lack of redressability because courts lack the authority to enjoin the President).

AHA has also likely carried its burden on the remaining elements of associational standing. AHA has established germaneness because its mission is "to enhance the work of historians," including through "the preservation of historical documents" such as presidential records. Weicksel Decl. ¶ 4. And because this suit "raises a pure question of law" and does not "require the consideration of the individual circumstances of any aggrieved member of the organization," the third prong is also satisfied. Healthy Gulf v. Dep't of Interior, 152 F.4th 180, 191 (D.C. Cir. 2025); see also United Food & Com. Workers Union Loc. 751 v. Brown Grp., 517 U.S. 544, 554 (1996) (explaining that suits for declaratory or injunctive relief but not damages generally satisfy associational standing's third prong).

## II.    Cause of Action/Reviewability

Both sets of plaintiffs assert four nonstatutory causes of action as well as causes of action under the APA, FOIA, and 28 U.S.C. § 1361.

In terms of nonstatutory causes of action, each set of plaintiffs brings an equitable cause of action to challenge executive action in excess of constitutional authority. Historian-Oversight Pls.' Compl. 36-40 (Count I); Press-CREW Pls.' Compl. 37-38 (Count IV); see also Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952). Both also advance an equitable cause of action to enjoin federal officials from violating federal law. Historian-Oversight Pls.' Compl. 40-41 (Count II); Press-CREW Pls.' Compl. 33-35 (Count I); see also Armstrong v. Exceptional Child Ctr., 575 U.S. 320, 327-31 (2015). Next, each bring an ultra vires claim to challenge action taken in excess of statutory authority. Historian-Oversight Pls.' Compl. 41 (Count III); Press-CREW Pls.' Compl. 36-37 (Count III); see also Nuclear Regul. Comm'n v. Texas, 605 U.S. 665, 680-83 (2025). And

21

both plaintiff groups bring an action in the nature of mandamus against individual defendants. Historian-Oversight Pls.' Compl. 44 (Count VII); Press-CREW Pls.' Compl. 35-36 (Count II); see also Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 380-81, 390-91 (2004).

As to statutory causes of action, all plaintiffs bring APA claims—the Historian-Oversight plaintiffs against NARA and DOJ and the Press-CREW plaintiffs only against NARA. Historian-Oversight Pls.' Compl. 41-44 (Counts IV-VI); Press-CREW Pls.' Compl. 38-39 (Count V), see also 5 U.S.C. § 706. And the Press-CREW plaintiffs also bring a FOIA claim against NARA. Press-CREW Pls.' Compl. 39-40 (Count VI); see also Jud. Watch, Inc. v. DHS, 895 F.3d 770 (D.C. Cir. 2018).

Most importantly here, plaintiffs likely have an equitable constitutional cause of action under Youngstown (Historian-Oversight Count I and Press-CREW Count IV).[10] The government resists this conclusion, arguing that the dispute is statutory in nature, turning on whether the "2026 [Records Guidance] coheres with the statutory preservation requirements of the [Act]." Gov't's Opp'n to Historian-Oversight Pls. 22-23. Not so. The government has necessarily "disclaimed any statutory authority" for the 2026 Records Guidance, Dalton v. Specter, 511 U.S. 462, 473 (1994) (citing Youngstown, 343 U.S. at 585), because it has adopted OLC's position that the Records Act is unconstitutional, see 2026 Records Guidance 1 (explaining that White House Counsel requested the OLC opinion because "Congress never had the Article I power to regulate the President's records in the manner contemplated by the [Act]"). Indeed, at oral argument, the

---

[10] As explained above, plaintiffs likely lack standing to sue NARA, the Archivist, DOJ, and the Attorney General, but they also would lack a cause of action for related reasons. Regarding their APA claims, plaintiffs have not identified "final agency action" to enable review. See Bennett v. Spear, 520 U.S. 154, 177-78 (1997). With respect to DOJ, although the OLC opinion is authoritative, it does not require agencies to take or refrain from taking any actions, so it is not an action "from which legal consequences will flow." Id. at 178 (citation modified). As to NARA, plaintiffs have not identified any action that the agency has taken following the OLC opinion to change its policies. For the same reason, the Press-CREW plaintiffs have failed to identify a new "policy or practice" to enable review under FOIA. Jud. Watch., 895 F.3d at 778.

22

government confirmed twice that the Guidance was issued under the President's inherent Article II authority and not under any statutory authority. Oral Arg. Tr. 79:24-80:13, 116:23-16. Hence, although the extent of de facto compliance with the Records Act is relevant to injury, the core question presented is constitutional: whether the executive has exceeded its inherent constitutional authority by adopting a policy incompatible with the express will of Congress.

In other words, and as in Youngstown, this case "involve[s] the conceded absence of any statutory authority, not a claim that the President acted in excess of such authority." Dalton, 511 U.S. at 473. And "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Youngstown, 343 U.S. at 637 (Jackson, J., concurring). "Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution." Id. at 638. As icing on the cake, the government itself argues that the President has "conclusive and preclusive" power over presidential records, squarely placing this case within the Youngstown framework. Gov't's Opp'n to Historian-Oversight Pls. 36 (quoting Trump v. United States, 603 U.S. 593, 609 (2024)).

Finally, Global Health Council v. Trump, 153 F.4th 1 (D.C. Cir. 2025), is not to the contrary. There, the government did "not contest[] the constitutionality of the relevant statutes" and "disclaim[ed] any constitutional defense" on appeal, although it had briefly advanced such an argument below. Id. at 14-15 & n.9. As just explained, here, in contrast, OLC has opined that the Act is unconstitutional and the government has adopted that "authoritative" opinion in the 2026 Records Guidance. See Campaign for Accountability, 155 F.4th at 738; Exec. Order 14215 § 7, 90 Fed. Reg. 10447, 10448 (Feb. 25, 2025) (Attorney General opinions are "controlling").

23

For similar reasons, plaintiffs likely also have an equitable cause of action under Armstrong v. Exceptional Child Center. There, the Supreme Court observed that the "power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327 (quotation omitted). As a result, where a statute implicitly precludes review, plaintiffs cannot circumvent that preclusion by relying on equity. Id. at 328. Plaintiffs lacked an equitable cause of action to enforce section 30(A) of the Medicaid Act in that case because Congress provided the "sole remedy" of withholding Medicaid funds and the provision was "judicially unadministrable" due to its "broad[] and [non-]specific" requirement to balance "efficiency, economy, and quality of care" against preventing "unnecessary utilization." Id.

Here, in contrast, Armstrong I and Armstrong v. EOP, 1 F.3d 1274, 1294 (D.C. Cir. 1993) (Armstrong II), establish that certain kinds of review involving the Records Act are implicitly precluded by the statutory scheme while others are not. On the one hand, in Armstrong I the D.C. Circuit observed that the Records Act evinces an "intricate statutory scheme Congress carefully drafted to keep in equipoise important competing political and constitutional concerns." 924 F.3d at 290. Accordingly, "judicial review of the President's management of admittedly presidential records is impliedly precluded by the [Records Act]." Armstrong II, 1 F.3d at 1292 (emphasis added) (citing Armstrong I, 924 F.2d at 289); see also id. at 1290 (explaining that the Records Act "delineates those records over which the President may exercise 'virtually complete control' during his term of office and the courts may not restrict that control by reviewing the President's recordkeeping practices and decisions." (quoting Armstrong I, 924 F.2d at 290-91)). On the other hand, in Armstrong II the D.C. Circuit clarified that "[t]he Armstrong I opinion does not stand for the unequivocal proposition that all decisions made pursuant to the [Records Act] are immune from judicial review." Id. at 1293 (emphasis added). Instead, "courts are accorded the power to

24

review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." Id. at 1290. Otherwise, the Records Act could be used as a "carte blanche to shield materials from the reach of the FOIA." Id. at 1292.

This case is more like Armstrong II than Armstrong I. Because the government's position is that the Records Act is unconstitutional, the decisions that it has made—namely issuing the 2026 Records Guidance—were not "pursuant to the [Records Act]." Armstrong II, 1 F.3d at 1293. And, in the government's view, Congress could not transform President Trump's private property into property of the United States, so these records are not "admittedly" the property of the United States either. Contrast Gov't's Opp'n to Press-CREW Pls. 36-37, with Armstrong II, 1 F.3d at 1292. As a result, this Court may review EOP's new "classification" of all presidential records as property of the President rather than as federal property. Armstrong II, 1 F.3d at 1294; see also 44 U.S.C. § 2202 (defining presidential records as federal property). The logic of Armstrong I simply does not apply when the government is not acting under the Records Act and does not believe that the Records Act has legal force. Contra Gov't's Opp'n to Press-CREW Pls. 14-21; Gov't's Opp'n to Historian-Oversight Pls. 18-22.

Accordingly, plaintiffs likely have equitable causes of action under both Youngstown and Exceptional Child Center.[11]

----

[11] Because plaintiffs have Youngstown and Exceptional Child Center causes of action, the Court need not reach their alternative theories of reviewability. The Court notes that, to the extent that defendants are violating "clear and mandatory" or "ministerial" duties, plaintiffs may have an ultra vires cause of action to challenge the 2026 Records Guidance as in excess of statutory authority or a similar cause of action for mandamus relief. See Glob. Health, 153 F.4th at 20 (ultra vires standard); Citizens for Resp. and Ethics in Wash., 924 F.3d at 606 (mandamus standard). However, those causes of action require that no alternative review be available, and here review is available under both Youngstown and Exceptional Child Center. And the Press-CREW plaintiffs also do not even press their mandamus claim at this preliminary stage. See Pls.' Mot. for Preliminary Inj. 1, Civ. A. No. 26-1402, Dkt. 7 (seeking relief only as to EOP defendants, not the President, Vice President, or Archivist). At oral argument, Historian-Oversight plaintiffs agreed that the Court need not reach the ultra vires or mandamus causes of action. Oral Arg. Tr. 121:19-122:5.

25

### III.    Underlying Merits

The government asserts that the 2026 Records Guidance and its actions pursuant to that guidance are lawful because the President has inherent authority to manage Executive Branch records. But this is not a case where the President exercises executive power upon a blank slate— Congress has already legislated on the matter by enacting the Presidential Records Act. As analyzed above in the discussion of standing, the 2026 Records Guidance likely does not comply with the Presidential Records Act. And the Act does not provide a basis for the President to disregard its statutory requirements.

The Constitution obligates the President to "Take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. Hence, the President's inherent authority to manage records is only sufficient to justify the 2026 Records Guidance if Congress lacked the power to pass the Act or the President nevertheless has a constitutional basis to disregard it.[12] Neither is likely true.

When Congress has expressly legislated contrary to the President's actions, his authority is "at its lowest ebb." Youngstown, 343 U.S. at 637 (Jackson, J., concurring). Here, Congress has not left the regulation of presidential records "an open field" but has "covered it" with "statutory policies inconsistent with" the 2026 Records Guidance. Id. at 639. The government cannot claim it operates in a zone of concurrent authority with the legislature where its current approach, derived from the OLC opinion, was not "necessitated or invited by failure of Congress to legislate upon the occasions, grounds and methods" for regulating presidential records. Id. The interbranch conflict in this case is direct and explicit.

---

[12] At oral argument, the government asserted that the President's inherent executive power to manage executive records automatically forecloses a separation of powers challenge. Oral Arg. Tr. 118:5-13. But Youngstown is clear that the mere presence of executive power over a subject is not dispositive. Instead, as explained below, the President's assertion of executive power must be evaluated against any legitimate exercise of legislative authority to the contrary. Youngstown, 343 U.S. at 638 (Jackson, J., concurring).

When the President acts in a manner contrary to a clear congressional mandate, "he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." Id. at 637. In such cases, courts may only uphold the executive action "by disabling the Congress from acting upon the subject"—in practical terms, by finding the law unconstitutional. Id. at 637-38. This may occur where the court concludes that Congress lacks the power to enact the law altogether, or determines that the legislation impermissibly interferes with a presidential power that is so "conclusive and preclusive" that it defies concurrent regulation. Id. at 638.

The government argues both here. As an initial matter, it contends that Congress lacks any enumerated power to regulate presidential records. Beyond that, the government believes that the Records Act impermissibly infringes on the President's Article II authority. On both counts, it is likely mistaken.

### A. Enumerated Powers

Our federal government is "one of enumerated powers." M'Culloch v. Maryland, 17 U.S. 316, 405 (1819). Every law enacted by Congress must be traceable to "one or more of those powers." United States v. Comstock, 560 U.S. 126, 133 (2010) (citation modified). The Presidential Records Act is based on at least two: Congress's authority to regulate federal property under the Property Clause and its power to structure the operations of the federal government and promote the integrity of the Executive Branch under the Necessary and Proper Clause. Notably, the OLC opinion on which the 2026 Records Guidance is founded mentions neither.

### 1. Property Clause

The Property Clause grants Congress the authority to "dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The government suggests that the Framers could not have meant to

27

include presidential records as government property because those records were treated as the President's private property until the Presidential Records Act.  The central question, therefore, is the meaning of the term "other Property."

The Court starts, as it must, with the text.  See N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 22-23 (2022).  The Property Clause provides that Congress may regulate "Territory or other Property" of the United States.  The word "Territory," as the Supreme Court explained in United States v. Gratiot, 39 U.S. 526, 537 (1840), means "land."  Land is "merely descriptive of one kind of property," and Congress "has the same power over it as over any other property belonging to the United States . . . ."  Id.  Put another way, Congress has the same regulatory authority over the government's real property as it has over its personal property.  Id.  The terms "Territory" and "Property" thus cover the waterfront of possible circumstances where Congress might need to legislate over the holdings of the United States.  Accordingly, "[t]he power of Congress to dispose of any kind of property belonging to the United States is vested in Congress without limitation."  Alabama v. Texas, 347 U.S. 272, 273 (1954) (emphasis added) (internal quotation omitted).

This understanding comports with common Founding-era definitions of property.  Prominent dictionaries from that time define "property" to mean the position occupied by the "highest" rightsholder in "Lands or Tenements, Goods, or Chattels."  Giles Jacob, A New Law Dictionary (The Savoy, Henry Lintot, 6th ed. 1750), cited by Rothgery v. Gillespie County, 554 U.S. 191, 221 (2008) (Thomas, J., dissenting); see also Richard Burn & Jonathan Burn, A New Law Dictionary (1792) (same), cited by NFIB v. Sebelius, 567 U.S. 519, 649 n.1 (2012) (Scalia, J., dissenting).  The import of those definitions is that the ratifying public would have understood

28

"property" to encompass both real and personal property.  If the Framers meant to depart from that original public meaning, they would have done so explicitly.

This definition of "property" also comports with our understanding of the Fifth Amendment's guarantee against deprivations of "property" without due process of law.  See PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 82 n.6 (1980) ("Property rights in a physical thing have been described as the rights to possess, use and dispose of it." (citation modified)); Sperry Corp. v. United States, 853 F.2d 904, 907 (Fed. Cir. 1988) ("The fifth amendment by its terms applies to all private property, not only real property . . . ." (citation modified)); see generally Akhil Reed Amar, Intratextualism, 112 Harv. L. Rev. 747, 788-95 (1999) (explaining that words used in constitutional provisions often carry concordant meaning with the same words used elsewhere).

What the text of the Property Clause establishes, decades of precedent confirm.  The Supreme Court has construed the Property Clause to include any property in which the United States holds a legitimate interest.  In Ashwander v. TVA, the Court deemed electrical energy generated from facilities on federal land to be "property belonging to the United States" within the meaning of the Clause.  297 U.S. 288, 333 (1936).  And in Kleppe v. New Mexico, the Court reasoned that the Property Clause enabled Congress to regulate wild animals on federal land, in so doing rejecting an interpretation of the Clause that would have cabined Congress's power to merely make rules incidental to the protection and sale of federal land.  426 U.S. 529, 535-42 (1976); see also Wis. Cent. R.R. v. Price County, 133 U.S. 496, 504 (1890) (reasoning that states could not levy taxes on federal "buildings and other property essential to the discharge of the ordinary business of the national government" because the Property Clause preempted those regulations).  Such applications of the Property Clause belie the claim that Congress's authority is

29

limited to real estate.[13]   And no party, nor the Court, has found any example of a law held unconstitutional on the basis that it regulates government possessions beyond the scope of the Property Clause.

This commonsense definition of property accords with historical understandings of the Clause as well.  In his Commentaries on the Constitution, Joseph Story wrote that the Property Clause "is not confined to the territory of the United States; but extends to 'other property belonging to the United States.'"  3 Joseph Story, Commentaries on the Constitution § 1319; see also District of Columbia v. Heller, 554 U.S. 570, 597 (2008) (citing Story as an authority for interpretive guidance).  Lest there be any confusion, Story explained that Congress's authority under the Clause "may be applied to the due regulation of all other personal and real property rightfully belonging to the United States."  Id.  Far from indicating that the provision was the subject of any interpretive debate, Story concluded that "it has been constantly understood" as such, "and acted upon."  Id.

The government's main rejoinder is that "no one at the founding era" would have expected that presidential records would be made property of the United States.  Gov't's Opp'n to Historian-Oversight Pls. 39.  But that position impermissibly elevates the Framers' supposed hidden intentions over the public meaning of the words that they drafted, and that the people ratified.  See

---

[13] The Supreme Court has departed from its mainline interpretation of the Property Clause in one infamous case: Dred Scott v. Sandford, 60 U.S. 393 (1856).  There, Justice Taney reasoned that the Property Clause did not allow the government to regulate the Missouri territory to abolish slavery in that jurisdiction because it only applied to "territory which at that time belonged to, or was claimed by, the United States, and was within their boundaries as settled by the treaty with Great Britain."  Id. at 432 (emphasis added); see also id. at 436 (arguing in dicta that "other Property" similarly referred to property transferred to the new national government at ratification).  Of course, Dred Scott's holding on slavery was overturned by the passage of the Thirteenth Amendment.  The Court has declined to follow Dred Scott's limitation on the Property Clause ever since, such as in Kleppe.  Dred Scott's limitation on the Property Clause is best understood as the Taney Court's aberrant departure from an otherwise uninterrupted line of cases that apply the Clause to all federal property, written to justify the Court's since-repudiated holding on slavery.  Moreover, even Dred Scott did not depart from the Supreme Court's consistent understanding: "other property necessarily, by every known rule of interpretation, must mean property of a different description from territory or land."  60 U.S. at 439-40.

30

Reid v. Covert, 354 U.S. 1, 8 n.7 (1957) ("This Court has constantly reiterated that the language of the Constitution where clear and unambiguous must be given its plain evident meaning."); Lake County v. Rollins, 130 U.S. 662, 670 (1889) ("This intent is to be found in the instrument itself; and, when the text of a constitutional provision is not ambiguous, the courts, in giving construction thereto, are not at liberty to search for its meaning beyond the instrument.").

The Framers drafted the Constitution to be read and debated by the American public, and so used terms that they would understand. See Akhil Reed Amar, The Words That Made Us: America's Constitutional Conversation (2021); see also 3 Joseph Story, Commentaries on the Constitution § 451 ("[E]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it."). And so, when interpreting the Constitution, judges must give effect to the "natural and common import of words" unless the language and structure of the provision in question makes doing so unreasonable. Sturges v. Crowninshield, 17 U.S. 122, 202-03 (1819). "It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation." Id. at 202. And, as previously discussed, the ordinary meaning of "property" sweeps in both real and personal property.

The government notes that the Property Clause is located in Article IV, as opposed to Article I. But that does not change the meaning of its terms. The framers wrote Article I to establish Congress and enumerate its powers to legislate over subject-matter areas of national importance. Article IV serves a different purpose: it governs the relationship among the states and between the states and the federal government, unifying the new republic through a common set of guarantees and ensuring the national character of the federal government. Gillian E. Metzger,

31

Congress, Article IV, and Interstate Relations, 120 Harv. L. Rev. 1468, 1507-08 (2007) ("The Court has frequently emphasized the union-forging purpose of Article IV, describing it as animated by the purpose of making the states 'integral parts of a single nation' and as constituting 'an essential part of the Framers' conception of national identity and Union.'") (first citing Baker v. Gen. Motors Corp., 522 U.S. 222, 232 (1998); then citing California v. Superior Ct., 482 U.S. 400, 405 (1987)). For example, it vests Congress with the authority to pass enabling legislation for the Full Faith and Credit Clause. U.S. Const. art IV, § 1 ("Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof."). It also provides that the United States shall guarantee every state a republican form of government and protect them from invasions. Id. § 4. The Property Clause is similar. It establishes that the property held by the United States is uniquely federal and may be governed by Congress, not subject to conflicting laws passed by the state in which that property is located. In other words, national property for a national government.

The government also argues that the Property Clause does not encompass governmental papers because the phrase "other property" appears alongside the word "territory," thereby limiting its applicability.[14] See Gov't's Opp'n to Historian-Oversight Pls. 30 (citing Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 115 (2001) ("A residual clause should itself be controlled and defined by reference to the category just before it." (citation modified)). Specifically, it contends that a broad reading of "other property" runs afoul of the ejusdem generis canon, which provides that residual terms following a list should be limited by the nature of the items that precede them. There

---

[14] The government appeared to abandon this theory during oral argument. Oral Arg. Tr. 109:2-7. But because it was addressed in the government's briefs, the Court considers it here. The government also does not provide a definition of "other property" that it believes comports with its reading of the Clause.

32

are a few issues with this analysis.  As an initial matter, as discussed above, that notion has already been rejected by the Supreme Court, which has applied the Clause more broadly than just to real property.  See Gratiot, 39 U.S. at 537; Ashwander, 297 U.S. at 331.

It also fails as an interpretive matter.  The ejusdem generis canon provides that "where general words follow an enumeration of two or more things, they apply only to persons or things of the same general kind or class specifically mentioned."  A. Scalia & B. Garner, Reading Law § 32.  But the Property Clause does not contain a list of "two or more things"—it only references territory before other property.  The requirement that a list contain multiple items is important because it provides the context that the final clause is meant to be cabined by the meaning of the previous provisions.  For example, consider a will that grants a decedent's "farm, field, lake, barn, house, and other property."  In that context, the residual clause could naturally be limited to real property.  But if the will merely bequeathed a decedent's "land and other property," then the same inference would not hold because the preceding clause does not establish a "readily identifiable genus" for the remaining term.  Id. n.32 (citing United Towns Elec. Co. v. Att'y Gen. for Newfoundland, [1939] 1 All. E.R. 423, 428 (P.C.) ("The mention of a single species does not constitute a genus." (citation modified)).

And there was good reason for the Framers to specify that Congress could legislate over both territory and personal property.  The Articles of Confederation did not expressly vest Congress with the authority to regulate the federal territories, and only used property to mean personal property.  Articles of Confederation art. IV (providing that certain "restrictions shall not extend so far as to prevent the removal of property imported into any state, to any other State, of which the Owner is an inhabitant; provided also that no imposition, duties or restriction shall be laid by any state, on the property of the united states, or either of them.").  So, if the Framers had

33

not expressly provided for Congress's power to regulate "territory," it would be far from obvious that federal territory would be governed by the same authorities as other federal property. And, of course, only vesting Congress with the power to regulate "territory" would leave unspoken the extent to which Congress could regulate other forms of federal property. To avoid confusion, expressly addressing both territory and other property was prudent. The most straightforward reading of the Clause, then, is that it means what it says.

The government's remaining argument is that even if the Property Clause allows Congress to regulate the government's personal property, it does not allow Congress to transform a president's records into government property. Presidential records began as the president's private property, the argument goes, and the Property Clause does not provide a basis for taking them. Accordingly, the Property Clause cannot justify section 2202 of the Records Act, which provides that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records." Here, too, the government is mistaken.

Congress may legislate to define and clarify its latent property interest in the work product of members of the United States government. To understand why, recall that "[b]ecause the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source" such as state or federal law. Ralls Corp. v. CFIUS, 758 F.3d 296, 315 (D.C. Cir. 2014) (citation modified). Those background principles create "mutually reinforcing understandings that" if "sufficiently well grounded" give rise to property interests. Nixon v. United States, 978 F.2d 1269, 1275 (D.C. Cir. 1992). Thus, the first question is whether the government has a property interest in presidential records.

34

It does.  The government generally holds a property interest in the materials created by government officials.  See Solomons v. United States, 137 U.S. 342 (1890).  In particular, it is well settled that records created by government employees are government property.[15]  United States v. Dean, 989 F.2d 1205, 1207-09 (D.C. Cir. 1993); United States v. First Trust Co. of St. Paul, 251 F.2d 686, 688 (8th Cir. 1958) ("Records of a government officer executed in the discharge of his official duties are public documents and ownership is in the United States" (citation modified)); Grosjean v. Bommarito, 302 F. App'x 430, 435 (6th Cir. 2008) ("[T]he actions of [the State of Michigan's] employees in their official capacities are made under color of state law and its property . . . is public property." (citation omitted)).

The government concedes that the materials typically used to make presidential records— such as "[p]aper and computers at the White House"—"are the property of the United States." Gov't's Opp'n to Historian-Oversight Pls. at 39.  And, more broadly, the government routinely restricts how officials can use the outputs they create while on government time, using government materials.[16]  For example, government employees cannot copyright materials created pursuant to their official duties.  Pub. Affs. Assocs., Inc. v. Rickover, 369 U.S. 111, 113 (1962).  The government's property interest in official records is deeply rooted and, even when not absolute,

---

[15] The Government agreed at oral argument that Executive Branch records outside the Executive Office of the President are property of the United States.  Oral Arg. Tr. 109:2-7.

[16] The government argues that Congress cannot direct how the President uses certain types of government property, such as by deploying an aircraft carrier to a particular region.  That is true, but because such a law would run afoul of constitutional constraints on Congress's authority that are external to the Property Clause, such as by infringing on the President's Commander-in-Chief authority.  For the same reason, Congress could not regulate federal property in a manner that discriminates on the basis of race without running afoul of the Fifth Amendment.  See Bolling v. Sharpe, 347 U.S. 497, 498-99 (1954).  But the existence of external constraints is not relevant for the question whether a law falls within Congress's enumerated powers, especially when the power in question is plenary. See Alabama, 347 U.S. at 273; see also Gerald Gunther, Congressional Power to Curtail Federal Court Jurisdiction, 36 Stanford L. Rev. 895, 916 (1984) (explaining that Congress has considerable authority to shape the jurisdiction of federal courts but is nonetheless limited by external constraints imposed by other constitutional provisions).  The impact of the alleged external constraint in this case—the separation of powers—is discussed further below.

35

exists alongside whatever entitlements that other parties might have in that property.  See Folsom v. Marsh, 9 F. Cas. 342, 347 (C.C.D. Mass. 1841) (Story, J.).

The Property Clause allows Congress to clarify and assert the federal government's property interests in cases where it possesses a legitimate entitlement.  For example, Congress could "assume jurisdiction over highways within" national parks, but it might also decline to do so and leave regulation to the states.  See Kleppe, 426 U.S. at 544.  Similarly, in the absence of federal law, states may regulate wildlife on federal land.  Id.  But if Congress chooses to do so, it may assert its latent property interest in those wild animals by exerting ownership over or regulating them, thereby displacing contrary state law and practice.  Id.

What of the long history of the President treating presidential records as his own?  The government's latent entitlement to the work product of government officers allows Congress to prospectively clarify and define the government's property rights over presidential records.  True, Congress did not act to take ownership of presidential records for much of our history.  But Congress cannot surrender the legislative powers that the Constitution vests in it.  See Marshall Field & Co. v. Clark, 143 U.S. 649, 692 (1892) ("[C]ongress cannot delegate legislative power to the president.").  After Watergate, Congress made the decision to regulate this category of its property.  The Records Act thus established that, going forward, the federal government would retain full ownership rights in presidential records.  44 U.S.C. § 2202.[17]  Hence, for almost 50 years, that has been the unchallenged rule.  Congress is entitled to make that choice.

The government invokes the Supreme Court's recent decision in Tyler v. Hennepin County, 598 U.S. 631 (2023), to argue that Congress cannot redefine property rights by statute in

---

[17] It is important that the Records Act operates prospectively because it alters future Presidents' entitlements to their records before any property rights vest in them.  See Nixon v. United States, 978 F.2d at 1284 (holding that former-President Nixon had a vested property right in his papers, and so was owed just compensation, but that the Records Act presents a separate question because it is prospective).

36

the face of historical practice. That is a stark misreading of the case. In Tyler, the Court held that a state "may not extinguish a property interest that it recognizes everywhere else to avoid paying just compensation when it is the one doing the taking." Id. at 645. Simply put, this is an anticircumvention principle. States may not use their legislative power to strip individuals of vested rights and thereby take their property without just compensation. But that holding implicitly recognizes that governments do have the background authority to modify property rights through statutes outside the context of expropriation, particularly when the new law draws upon "traditional property law principles" and judicial "precedent[.]" Id. at 638; see also Andrus v. Allard, 444 U.S. 51, 64-67 (1979). Here, there is no concern that Congress has end-run the Takings Clause because the Records Act operates prospectively, so property rights never vest in an incumbent President at all. And, as previously discussed, the Act draws upon historical practice and precedent that recognizes the government's interest in the work product of government officers.[18]

In sum, the original public meaning of the text of the Constitution, canons of interpretation, Supreme Court precedent, general principles of property law, and almost 50 years of practice confirm that Congress has the enumerated power to regulate presidential records under the Property Clause.

---

[18] In the alternative, if the President did have an irreducible property interest in his papers, the conversion of those records into public property could be justified by the Takings Clause, which allows for the government to take private property for public use. The public use requirement is satisfied as "long as a taking has a conceivable public character; the means by which it will be attained is for Congress to determine." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 988 (1984) (citation modified). In Nixon v. Administrator, as discussed below, the Supreme Court explained that government ownership of presidential records has a "public character" insofar as it promotes accountability among Executive Branch personnel, gives incumbent Presidents the benefit of their predecessors' knowledge, and allows the public to learn about the history of the Executive Branch. 433 U.S. at 452-53. So, if the President had an irreducible property right in his records, then he would be owed just compensation, but Congress would nonetheless have authority to enact a law like the Records Act, just as it enacted the Preservation Act.

37

2. Necessary and Proper Clause

Congress is vested with the power to "make all Laws which shall be necessary and proper" to facilitate other legitimate legislative objectives. U.S. Const. art. I, § 8, cl. 18. Those objectives include not only Congress's "foregoing" enumerated powers but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Id. That latter provision provides Congress with the authority to enact "legislation affecting the internal operations of the national government." O'Bryan v. Bureau of Prisons, 349 F.3d 399, 401 (7th Cir. 2003). In particular, Congress may legislate to facilitate the operations of the coordinate branches, "promote efficiency and integrity in the discharge of official duties," and prevent malfeasance among public servants. Ex parte Curtis, 106 U.S. 371, 373 (1882) (upholding restriction on political activity by Executive Branch employees); see also Nixon v. Administrator, 433 U.S. at 499 (Powell, J., concurring) (Congress has the "inherent power" to "preserve the departments and institutions of the general government from impairment or destruction" (citation modified)).

The Presidential Records Act falls squarely within Congress's authority to structure the internal operations of the national government. The Act is substantially related to several important operational objectives. Its predecessor statute served to "punish bribery and conflicts of interests," and "publicize corruption, maladministration, [and] inefficiency." Id. So does the Records Act. More broadly, the preservation of presidential records facilitates "efficiency . . . in the discharge of official duties," Ex parte Curtis, 106 U.S. at 373, by ensuring that future Presidents and Executive Branch personnel are not "dependent on the happenstance or the whim of a prior President when [they] seek[] access to records of past decisions that define or channel current decisions," Nixon v. Administrator, 433 U.S. at 452.

The government's arguments to the contrary are unavailing. The government initially argues that the Necessary and Proper Clause only enables Congress to legislate pursuant to specific enumerated powers. Gov't's Opp'n to Historian-Oversight Pls. 35. That ignores the second half of the Necessary and Proper Clause. The case the government cites for its narrow reading of the Necessary and Proper Clause only analyzes whether a law is constitutional under the "foregoing powers" provision. Id. (citing United States v. Comstock, 560 U.S. 126, 134 (2010)). And of course, laws passed pursuant to the foregoing powers provision must be "rationally related" to an Article I, Section 8 enumerated power. Comstock, 560 U.S. at 134. But in any event, here plaintiffs rely on the second part of the Necessary and Proper Clause. That provision provides independent legal authority to enact "legislation affecting the internal operations of the national government," O'Bryan, 349 F.3d at 401, including the regulation of the "officers and employees of the United States," Ex parte Curtis, 106 U.S. at 372. Put another way, such laws are necessary and proper to enable the other branches to execute their constitutional responsibilities.

This latter provision is seldom litigated but deeply rooted. See M'Culloch, 17 U.S. at 325 (situating Congress's power to create a national bank in the Necessary and Proper Clause, inter alia, to "assist the operations of the government"). Congress has used its authority over structuring internal governmental functions to pass laws related to executing judicial orders and setting terms for borrowing credit. See Bank of the United States v. Halstead, 23 U.S. (10 Wheat.) 51, 53-54 (1825) (upholding the power to legislate to "carry into complete effect the judgments of the Courts"); Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 22-23 (1825) (upholding delegation of the power to prescribe rules of judicial procedure); United States v. Fisher, 6 U.S. (2 Cranch) 358, 396 (1805) (Marshall, C.J.) (upholding a policy giving the United States a preference over other creditors). In Ex parte Curtis, the Court upheld a law prohibiting members of the Executive Branch

39

from requesting or providing money for political purposes as necessary and proper to promote accountability to the general public and improve Executive Branch operations by instilling discipline and removing incentives to retain unproductive employees.  106 U.S. at 374-75.  Far from being an outlier, the law in Ex parte Curtis was animated by the "same principle" as laws that regulated executive officer conduct tracing back to 1789.  Id. at 372.  And Congress continues to pass legislation to structure the federal government, promote efficiency, and deter bad actors.  For instance, the Hatch Act, 5 U.S.C. §§ 7321-7326, prohibits political advocacy by government officials, and the Paperwork Reduction Act, 44 U.S.C. §§ 3501-3521, sets out a process for Executive Branch review of agency actions and establishes the Office of Information and Regulatory Affairs.  The Presidential Records Act is in keeping with that tradition.

The government's remaining argument is that even if the Necessary and Proper Clause allows Congress to pass laws related to government operations, "this power does not authorize Congress to interfere with the President's execution of his Article II powers."  Gov't's Opp'n to Historian-Oversight Pls. 45.  That argument presupposes that the government prevails on its separation of powers claim that the Records Act impermissibly infringes on core executive powers.  That is not the case, as the Court will now explain.

Accordingly, the Necessary and Proper Clause likely provides an independent basis for the Presidential Records Act.  The Act appropriately regulates internal government operations to promote integrity among Executive Branch members and enable future presidents to carry out their constitutional functions.[19]

---

[19] The government has suggested that if Congress has the enumerated power to pass a law regulating presidential records, it could also pass a law regulating Supreme Court records.  Perhaps.  But that issue is not before the Court today.  The Court only notes that such a law would be subject to a distinct separation of powers inquiry, because that analysis requires consideration of the specific interests and burdens implicated by the particular challenged provision.  See Trump v. Mazars USA, LLP, 591 U.S. 848, 869 (2020) (explaining that courts must analyze

40

B. *Separation of Powers*

The government next argues that even if Congress has the authority to enact the Presidential Records Act, the law impermissibly encroaches on the President's executive power for two reasons. First, in the government's view, the Act chills the President's advisors from offering candid advice for fear that records of their positions will later be disclosed. Second, the government contends that the law burdens White House personnel with tedious record-keeping duties that impede them from carrying out various responsibilities to aid the President in executing other laws. Neither argument is persuasive.

Again, recall the operative principles. "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . . ." Youngstown, 343 U.S. at 637 (Jackson, J., concurring). For the President to prevail in such a circumstance, his claim to power must be "so conclusive and preclusive" that it displaces congressional authority to pass contrary legislation in that arena. Id. at 637-38. That means that here the President must show that control over presidential records "is within his domain and beyond control by Congress." Id. at 640.

To assess whether Congress has intruded into the President's exclusive domain, "courts must perform a careful analysis" of the separation of powers principles at stake, considering the unique positions of the President and Congress, and their traditional ways of conducting government. Trump v. Mazars USA, LLP, 591 U.S. 848, 869 (2020) (citing Youngstown, 343 U.S. at 610 (Frankfurter, J., concurring)). For example, in Nixon v. Administrator the Court

---

separation of powers questions based on the specific contours of the challenged law and how it entangles the branches of government). In the judicial context, courts would have to consider implications of a disclosure provision based on the life tenure of federal judges, the multimember nature of the Supreme Court, and the potential impact of disclosure on due process. And, of course, the fact that Congress might pass other, unrelated legislation to regulate government records in the future does not bear on its power to pass the law at issue here.

41

considered the extent to which the Preservation Act "prevent[ed] the Executive Branch from accomplishing its constitutionally assigned functions," and reasoned that if the law posed such an imposition, the Court would also have to evaluate whether "that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." 433 U.S. at 443.

The Court more recently evaluated a President's claim that congressional action intruded on executive power in Mazars. 591 U.S. at 869. In that case, the Court considered the permissibility of congressional subpoenas for the sitting President's personal financial records. It evaluated the asserted legislative justification for obtaining the records, the evidence that the subpoenas served that purpose, and the degree to which those subpoenas burdened the President. Id. at 869-71. The Court also considered whether the subpoenas were narrowly drafted, because broadly drafted demands for evidence might evince Congress's intent to aggrandize itself at the expense of the President rather than serve some legitimate legislative purpose. Id. at 870.

The parties disagree about how Nixon v. Administrator and Trump v. Mazars bear on this case. Plaintiffs contend that Nixon controls the separation of powers analysis here, and that the Supreme Court's blessing of the Preservation Act straightforwardly applies to the Records Act. The government argues that the Supreme Court's skepticism toward legislative subpoenas targeted at the President's personal records in Mazars stands for a broader hostility toward congressional action aimed at exposing presidential materials. Both cases are relevant insofar as they outline the legal standards relevant for interbranch disputes and, broadly speaking, which interests and burdens are cognizable and how they should be weighed. But neither case controls because the Records Act presents a distinct statutory scheme that implicates interests and distributes burdens differently than either its predecessor statute or a targeted legislative subpoena.

42

Nixon is highly informative where issues relevant to the Preservation Act reappear in the Records Act context.  For example, the statutes similarly enable judicial review and preserve the President's ability to challenge public disclosure of records by invoking executive privilege.  But the statutes also differ in important respects.  The Records Act, unlike the Preservation Act, operates prospectively and is not a direct remedial measure aimed at preventing the imminent destruction of a specific President's records following recognized malfeasance involving those records.  Those differences implicate how courts must balance the separation of powers interests at issue.  After all, the Nixon Court did not hold that a records disclosure statute could never violate the separation of powers, only that the statutory scheme in the Preservation Act did not.

Mazars is even less on point. There, the Supreme Court only concluded that the legislative subpoenas in question implicated the separation of powers, without determining how each factor panned out.  And Mazars involved Congress's implied investigative powers; it focused on the lack of authority to issue legislative subpoenas without any discernable legislative purpose.  That discussion is not relevant here because Congress has independent, enumerated authority to enact the Records Act under the Property Clause and the Necessary and Proper Clause, without relying on any implied authority.  That said, Mazars remains relevant for determining which separation of powers factors are implicated by congressional demands for executive information.

Following the Supreme Court's lead from both Nixon and Mazars, this Court will consider Congress's purpose in enacting the Records Act, whether the intrusion imposed by the Act is reasonably tailored to its legislative goal, and the extent to which it prevents the President from fulfilling his constitutionally assigned duties.

The Records Act serves several legitimate legislative purposes.  As the Supreme Court has noted, Congress's ability to regulate federal property is "without limitation."  Gratiot, 39 U.S. at

43

537. Under that authority, Congress acts at the apex of its power and may preserve presidential records for any purpose not otherwise prohibited by the Constitution. Thus, the Act is "adequately justified" by the need to "establish regular procedures to deal with the perceived need to preserve the materials for legitimate historical and governmental purposes." Nixon v. Administrator, 433 U.S. at 452 (citation modified).

Beyond that, the Presidential Records Act also serves the legitimate goal of promoting efficiency and accountability in the Executive Branch. See Ex parte Curtis, 106 U.S. at 373. Congress reasonably believed that, after Watergate, additional safeguards were necessary to ensure that Executive Branch personnel behaved with discipline and integrity. Finally, the Records Act protects effective transitions of power and our republican form of government by ensuring incumbent Presidents may pick up where their predecessors left off. "Congress could legitimately conclude that" the prior system—where incumbent presidents and the public were dependent on the good will and charity of their predecessors—was "unstable and ripe for change." Nixon v. Administrator, 433 U.S. at 452 n.15.

More broadly, nothing suggests that Congress is using the Records Act to aggrandize itself at the expense of the President. The Act does not grant Congress new powers, like a line-item veto, see INS v. Chadha, 462 U.S. 919 (1983), or prevent the President from exercising control over an executive agency, see Seila Law, LLC v. CFPB, 591 U.S. 197 (2020). Congress does not gain any structural advantage over the President by dint of the requirements imposed by the Act. Nor is this a case like Mazars where Congress can arguably use the records at issue to expose the President's sensitive personal materials to his public embarrassment. Simply put, there is no reason to doubt that Congress enacted the Records Act for legitimate legislative purposes.

The Records Act is also narrowly drafted. There is no substitute for collecting presidential records that would achieve the aforementioned purposes of the Act. See Nixon v. Administrator, 433 U.S. at 452 n.15 (observing that Congress "could legitimately conclude" that the voluntary practices that preceded the Preservation Act were "unstable"). Indeed, the Records Act focuses on material that is essential to carrying out the statutory scheme. Like the Preservation Act, the Records Act appropriately carves out personal records from collection. Id. at 454. The Records Act also grants the President authority to dispose of records that lack "administrative, historical, informational, or evidentiary value" upon obtaining the views of the Archivist (an Executive Branch officer). 44 U.S.C. § 2203(c). And the President has unreviewable discretion to make those determinations. Armstrong I, 924 F.2d at 290. Hence, the careful construction of the statute demonstrates that the law only reaches materials that are genuinely necessary to achieve valid legislative purposes.

And the strain that the Records Act imposes on the President's ability to receive advice is minor. The government's mere invocation of "chilling" is not enough to render a law unconstitutional. While the President is in office, he is "exclusively responsible for the custody, control, and access" to records. 44 U.S.C. § 2203(f). The Supreme Court has recognized that "it is clearly less intrusive to place custody and screening of the materials within the Executive Branch itself than to have Congress or some outside agency" take responsibility of the records. Nixon v. Administrator, 433 U.S. at 444. In this respect, the Records Act is highly similar to the Preservation Act, which the Supreme Court concluded was not "unduly disruptive" of Executive Branch activities. Id. at 445.

The government argues that the true danger is the chilling that flows from the Records Act's public disclosure provisions. Oral Arg. Tr. 103:4-7. But the Supreme Court has held that

45

an "absolute barrier to all outside disclosure is not practically or constitutionally necessary." Nixon v. Administrator, 433 U.S. at 450. The Court reasoned that the Preservation Act provided a "limited" period of confidentiality, which was "subject to erosion over time," and that period was nonetheless sufficient to enable the "candid communication of views by Presidential advisers." Id. at 451. So too here.

The Records Act is carefully crafted to minimize the likelihood of a present imposition on candor. Records are sequestered for five years after the President leaves office, and the President may extend that period to 12 years in certain circumstances. The sequestration provision ensures that any records of an advisor giving the President unpopular advice will not become public until long after the salience of the issue has faded. And, crucially, the Act preserves the outgoing President's ability to assert presidential privilege in federal court against disclosure. 44 U.S.C. § 2204(e). The availability of judicial review ensures that the President will always receive the constitutionally required amount of protection from the disclosure of sensitive information. Under the ambit of such protections, it is difficult to imagine that advisors would shrink from offering the President their honest opinions on matters of national importance.

Finally, the government has not demonstrated that the Records Act creates an intolerable administrative burden. To prevail on this claim, the government must show that the law is "unduly disruptive" of Executive Branch activities. Nixon v. Administrator, 433 U.S. at 445. And the Supreme Court has emphasized that the standard for demonstrating such a burden is high because "there is abundant statutory precedent for the regulation and mandatory disclosure of documents in the possession of the Executive Branch." Id. (citing, inter alia, FOIA and the Privacy Act). Here, the government has not provided any evidence about the resources it expends to comply with the Records Act, merely asserting that the law "necessarily impede[s]" the President from

46

support he might otherwise receive.  Gov't's Opp'n to Historian-Oversight Pls. 32.  Such a bald assertion cannot suffice.  And even if the government provided such evidence, it is unclear that the expenditure of resources for statutory compliance is cognizable as a "burden" in the separation of powers analysis.[20]  The Constitution commands the President to "Take Care that the Laws be faithfully executed"—the Records Act is one such law.  Otherwise, the President could claim a separation of powers burden whenever he had to execute a substantial statutory mandate that he opposed.

History and Executive Branch practice likewise suggest that the Records Act does not substantially impede Executive Branch administration.  During the passage of the Records Act, OLC testified before Congress that the law posed "no substantial separation of powers problems . . . ."  Presidential Records Act of 1978: Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations, 95th Cong. 87, 89 (1978).  And for nearly 50 years, every President—including President Trump in his first term—has complied with the Records Act, negotiating records disclosure within its framework.  None has challenged its facial constitutionality as too burdensome on the presidency.  Even today, the government purports to abide for the most part with the Records Act, which belies the claim that the burden of compliance is intolerable.  Such acquiescence is not dispositive, but it is illuminating.  See Mazars, 591 U.S. at 869 (citing Youngstown, 343 U.S. at 610 (Frankfurter, J., concurring)).  It suggests that the post-Watergate settlement reflected in the Records Act adequately protects the President's interests without imposing unacceptable burdens.

---

[20] At oral argument, the Government could not identify any cases to suggest that the administrative burden of executing an otherwise valid statute could constitute a separation of powers violation.  Oral Arg. Tr. 104:3-14.

47

In sum, the relevant separation of powers principles all indicate that the Presidential Records Act is likely constitutional. The Act serves a legitimate legislative purpose, is carefully crafted to those ends, and does not impose a substantial burden on Executive Branch activities. Accordingly, it likely does not impermissibly encroach upon the President's authority.

Because Congress has the enumerated power to regulate presidential records, and because the Presidential Records Act does not unduly tread on core executive power, the law is likely constitutional. The President is not free to disregard valid laws. His actions doing so, therefore, are in excess of his constitutional authority and in violation of federal law, so plaintiffs are likely to succeed on the merits of their claims.

## IV.   Other <u>Winter</u> Factors

Recall that a plaintiff seeking a preliminary injunction must show not only a likelihood of success on the merits but also "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. Plaintiffs have carried their burden on these factors as well.

Unpreserved or improperly destroyed documents are "lost forever to history," and therefore injury from failure to preserve presidential records or the unlawful destruction of those records would be irreparable. <u>Am. Oversight v. Hegseth</u>, 788 F. Supp. 3d 14, 29 (D.D.C. 2025) (quoting <u>Armstrong I</u>, 924 F.2d at 288); <u>see also</u> <u>Am. First Legal Found. v. Becerra</u>, Civ. A. No. 24-1092, 2024 WL 3741402, at *14 (D.D.C. Aug. 9, 2024) (same); Historian-Oversight PI Mem. 38-39 (collecting cases); Press-CREW PI Mem. 32-33 (same). For example, text messages that are deleted from personal devices under the 2026 Records Guidance because staffers memorialized the substance of the discussion in a memorandum or email likely cannot be recovered. Moreover,

48

individual staffers may not be able to accurately identify which conversations or details are worth preserving, risking the loss of documentary materials that may in fact have considerable value to historians or other interested parties entitled to access those materials under FOIA in the future.

The government disputes that plaintiffs are irreparably harmed by the 2026 Records Guidance primarily by arguing that the Guidance conforms to the Act. See Gov't's Opp'n to Historian-Oversight Pls. 9-12. However, the Court has already determined in its standing analysis that plaintiffs have carried their burden as to the imminence of their injury by showing a substantial risk that defendants are currently or soon will be failing to adequately preserve records as required by the Records Act. And "Damocles's sword does not have to actually fall on [plaintiffs] before the court will issue an injunction." League of Women Voters of U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016). As noted above, in this preliminary injunction posture plaintiffs are focused on ensuring record preservation rather than the President's compliance with the disposal notice requirements of section 2203(c)-(e), but plaintiffs raise valid concerns about EOP staff deletion of records insofar as that represents a failure to preserve records. See Oral Arg. Tr. 54:3-56:23; 130:6-24. Such deletion would be irreparable because plaintiffs who ultimately prevail on the merits would not be able to subsequently recover those records. The government makes no argument that records deleted today would be recoverable at a later date.

In sum, plaintiffs have carried their burden as to irreparable harm at this preliminary injunction stage. They have shown a substantial risk of current or imminent non-preservation or deletion of electronic messages created or sent on non-official accounts, of non-preservation or deletion of presidential records created by or sent to the President or Vice President themselves, and, secondarily, of records disposal without following the requirements of section 2203(c)-(e).

49

As to the public interest and balance of equities, recall that these merge when the government is a party. Nken, 556 U.S. at 435. And as the D.C. Circuit has explained, there is "generally no public interest in the perpetuation of unlawful agency action." League of Women Voters, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operations." Id. (citation modified). That is no less true here with respect to unlawful actions by EOP and the individual federal officer defendants.

Moreover, as also just explained, the government suffers only minimal (if any) harm from complying with the Records Act. It has complied with the Act without complaint for almost 50 years, including during the first Trump administration and the first year of the current one. Even now, it is willing to voluntarily impose on itself similar—it would say equivalent—requirements, and hence burdens, under the 2026 Records Guidance. Finally, the public at large has a great interest in learning "what their [President] is up to." NARA v. Favish, 541 U.S. 157, 171 (2004) (citation modified). Indeed, that is precisely the purpose of the Records Act.

Insofar as the government has emphasized the harm from disclosure requirements after the President's term in office, Oral Arg. Tr. 97:4-103:16, such disclosure would not take place for another eight or more years. In other words, the harm that the government most fears would not materialize for close to another decade. Granted, the government's theory of burden is about chilling candid advice today, but again it has not complained before in nearly half a century, and any harm from later disclosure would be mitigated if the government ultimately prevails on the merits in this case. Moreover, as discussed in the context of the separation of powers burden imposed by the Records Act, the statute contains ample safeguards to ensure presidential control over records while the President is in office and grants judicial review of any constitutional

50

challenges he might bring to specific disclosure decisions.  These guardrails blunt any assertion of harm by the President.  As a result, the balance of equities tips quite strongly in plaintiffs' favor— the irreparable harm on plaintiffs' side of the ledger alongside the public's interest in the Executive Branch following the law outweighs the government's asserted interests in its inherent executive prerogatives.

Fortunately, the country has not had another Watergate scandal since President Nixon, which suggests that the sunshine disinfectant of the Records Act is working as intended.  And in any event, it is not for this Court, OLC, or the White House to second guess Congress's lawful determination—made pursuant to at least two different enumerated powers—that citizens ought eventually to have access to these records of presidential activities carried out in their name. Therefore, the other Winter factors also weigh in favor of a preliminary injunction.

## V.    Scope of Relief

Because plaintiffs have shown an entitlement to a preliminary injunction, the final task for the Court is to determine the appropriate scope of relief.  See Historian-Oversight Pls.' Compl. 45; Press-CREW Compl. 40-41.  As discussed above, the Court will deny relief as to the NARA, Archivist, DOJ, and Attorney General defendants for likely lack of standing or a cause of action.

The government also disputes whether the Court has the authority to enjoin the President or Vice President.  Gov't's Opp'n to Historian-Oversight Pls. 44-45.  "A court generally may not 'enjoin the President in the performance of his official duties.'"  Severino v. Biden, 71 F.4th 1038, 1042 (D.C. Cir. 2023) (quoting Franklin v. Massachusetts, 505 U.S. 788, 802 (1992) (plurality opinion)).  Granted, "Franklin left open a narrow potential exception for injunctions that require the President to perform a purely ministerial duty over which he has no discretion."  Id. (quotation

51

omitted).  But the D.C. Circuit has "never attempted to exercise power to order the President to perform a ministerial duty."  Swan v. Clinton, 100 F.3d 973, 978 (D.C. Cir. 1996).

The Historian-Oversight plaintiffs point out the narrow exception under Franklin, but promptly pivot, offering that the Court "may enjoin the President's subordinates."  Historian-Oversight Pls.' Reply 25 (citing Swan, 100 F.3d at 978).  Following that invitation, the Court will not enjoin the President.  And the Court also finds unadministrable and overly intrusive the Historian-Oversight plaintiffs' request to enjoin individual defendants besides the President "to disclose to the Court any known instances in which the President destroys, converts for personal use, or otherwise fails to maintain Presidential records as required by the [Act]."  Historian-Oversight Pls.' Compl. 45.  However, as explained above, records created by the President and transmitted or transferred to EOP staff would still trigger those staff members' duties under the Act.

Whether the court has the authority to enjoin the Vice President appears to be a question of first impression, although the Historian-Oversight plaintiffs do identify one case in this district in which a judge entered a preliminary injunction against the Vice President in a Records Act case before later denying relief on the merits.  See Citizens for Resp. & Ethics in Wash. v. Cheney, 577 F. Supp. 2d 328, 330-31 (D.D.C. 2008) (entering preliminary injunction); Citizens for Resp. & Ethics in Wash. v. Cheney, 593 F. Supp. 2d 194, 233 (D.D.C. 2009) (vacating preliminary injunction).

The government argues that the same separation of powers concerns apply to the Vice President as the President because both are constitutionally- rather than statutorily-created positions.  Gov't's Opp'n to Historian-Oversight Pls. 45.  And at oral argument the government relied on Cheney v. U.S. Dist. Ct. in support.  See Oral Arg. Tr. 94:2-96:11.  There, the Supreme

Court vacated the D.C. Circuit's refusal to issue a writ of mandamus to block discovery orders directed at the Vice President and his staff.  542 U.S. at 391-92.  In doing so, it reiterated the President's "unique position in the constitutional scheme" and held that similar "separation-of-powers considerations should inform" courts in evaluating a mandamus petition involving the Vice President.  Id. at 381-82 (quotation omitted).  In this Court's view, it need not at this time wade into the thicket of whether it has the authority to enjoin the Vice President because it can enjoin the Vice President's subordinates and thereby provide most of the preliminary relief that plaintiffs seek.  See Swan, 100 F.3d at 978-79.

Therefore, the Court will enjoin the remaining federal defendants besides the President and Vice President to comply with the Records Act and not rely on the OLC opinion and the 2026 Records Guidance.[21]

## **CONCLUSION**

For the foregoing reasons, the Court grants both sets of plaintiffs' motions for a preliminary injunction except as to the President and Vice President, NARA, the Archivist, DOJ, and the Attorney General.  The Court denies the Historian-Oversight plaintiffs' motion for a stay.  Separate orders will issue in each case to accompany this opinion.[22]

---

[21] The Court finds it premature to enjoin President Trump in his personal capacity from violating the Records Act after he leaves office.  Although plaintiffs have established imminent injury with respect to current violations of the Act by defendants, it is far less clear what President Trump will do with respect to his obligations under the Act when leaving office in almost three years.

[22] The Court will also not stay its orders pending appeal.  In deciding whether to grant a stay, courts consider (1) whether the applicant has made a strong showing of likelihood of success on the merits, (2) whether the applicant will be irreparably injured absent a stay, (3) whether a stay will substantially injure the other parties, and (4) the public interest.  Nken, 556 U.S. at 434.  The first two factors are the most important.  Id.  Of course, the burden for any stay request is now on the government as the applicant.  The government cannot demonstrate a strong showing of likelihood of success on the merits because plaintiffs have already established their likelihood of success on the merits.  That failure is an "arguably fatal flaw."  Citizens for Resp. & Ethics in Wash. v. FEC, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (citation omitted).  And plaintiffs have shown substantial injury from ongoing or imminent noncompliance with the Records Act.  Granted, infringement on Executive Branch functioning may be irreparable if the government ultimately prevails on appeal.  See, e.g., Dellinger v. Bessent, No. 25-5052, 2025 WL 887518, at *3 (D.C. Cir. Mar. 10, 2025).  But the actual (or even likely) injury to the government is not great, for the reasons the Court has explained.  And the

53

_____
/s/
JOHN D. BATES
United States District Judge

Date: May 20, 2026

---

public interest also tips against a stay for the reasons just explained.  Therefore, on balance the stay factors weigh against granting this "extraordinary relief."  Citizens for Resp. & Ethics in Wash., 904 F.3d at 1017.  The Court will also not issue an administrative stay of its orders because the orders already provide that the government has six days before compliance is required.

54